# United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:10–cv–05135
### *Internal Use Only*

Ezell et al., v. City of Chicago
Assigned to: Honorable Virginia M. Kendall
 Case in other court:  10–03525
Cause: 42:1983 Civil Rights Act

Date Filed: 08/16/2010
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/13/2010 | 25 | 2 | MOTION by Plaintiffs Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. for temporary restraining order (Attachments: # 1 Request for Judicial Notice, # 2 Declaration of Andre Queen, # 3 Declaration of Richard Pearson, # 4 Declaration of Julianne Versnel, # 5 Declaration of Jerry Tilbor, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Declaration of Alan Gura, # 10 Memorandum in Support, # 11 Notice of Filing)(Gura, Alan) (Entered: 09/13/2010) |
| 09/13/2010 | 26 | 57 | AMENDED motion for temporary restraining order,, 25 *Corrected Memorandum in Support* (Gura, Alan) (Entered: 09/13/2010) |
| 09/14/2010 | 27 | 72 | MOTION by Defendant City Of Chicago to vacate *briefing schedule and preliminary injunction hearing set for October 1* (Attachments: # 1 Exhibit A–D)(Hirsch, Rebecca) (Entered: 09/14/2010) |
| 09/15/2010 | 31 | 169 | MEMORANDUM by Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. in Opposition to motion to vacate 27 *briefing schedule and hearing* (Gura, Alan) (Entered: 09/15/2010) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | MOTION FOR |
| v. | ) | TEMPORARY RESTRAINING ORDER |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

### PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and through undersigned counsel, and move for the entry of a Temporary Restraining Order:

1.      Enjoining Defendant, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Chicago Municipal Code § 8-20-280, barring operation of gun ranges open to the public;

2.      Enjoining Defendant, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Chicago Municipal Code §§ 8-20-020, 8-20-030, 8-20-080, 8-20-100, 8-20-110, 8-20-140, and 8-24-010, *or any other law*, as against the ordinary operation and use of gun ranges open to the public and the loan or rental of functional firearms within gun ranges open to the public.

Dated: September 13, 2010       Respectfully submitted,

Alan Gura (admitted pro hac vice)       David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC       Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405       4300 Commerce Court, Suite 300-3
Alexandria, VA 22314       Lisle, IL 60532
703.835.9085/Fax 703.997.7665       630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/ _____       By: /s/ David G. Sigale/ _____
     Alan Gura                     David G. Sigale
                                     Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Motion for Temporary Restraining Order, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | REQUEST FOR JUDICIAL NOTICE |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and pursuant to Federal Rule of Evidence 201 request judicial

notice of the following:

1.      The City of Chicago, the third largest city in the United States, covers an area of

        60,000 hectares (231.661 square miles).

        Source:      http://www.cityofchicago.org/city/en/about.html

                     http://www.cityofchicago.org/city/en/about/facts.html

2.      As of the 2000 census, Chicago was home to 2,896,016 people.

        Source:      http://factfinder.census.gov/servlet/SAFFFacts?_event=&geo_id=1
6000US1714000&_geoContext=01000US|04000US17|16000US1714000&_street=&_county=C
hicago%2C+IL&_cityTown=Chicago%2C+IL&_state=&_zip=&_lang=en&_sse=on&ActiveGeo
Div=&_useEV=&pctxt=fph&pgsl=160&_submenuId=factsheet_1&ds_name=ACS_2008_3YR_
SAFF&_ci_nbr=null&qr_name=null&reg=null%3Anull&_keyword=&_industry=

Dated: September 13, 2010

Respectfully submitted,

Alan Gura (admitted pro hac vice)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

David G. Sigale (Atty. ID# 6238103)
Law Firm of David G. Sigale, P.C.
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/
    Alan Gura

By: /s/ David G. Sigale/
    David G. Sigale
    Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Request for Judicial Notice, and this certificate of service, on:

> Andrew W. Worseck
> City of Chicago Department of Law
> 30 N. LaSalle Street, Suite 900
> Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RHONDA EZELL, et al.,           )       Case No. 10-C-5135
                                )
                  Plaintiffs,   )       DECLARATION OF
                                )       ANDRE QUEEN
        v.                      )
                                )
CITY OF CHICAGO,                )
                                )
                  Defendant.    )
                                )
                                )

## DECLARATION OF ANDRE QUEEN

I, Andre Queen, am competent to state, and declare the following based on my personal knowledge:

1.  I am the Executive Director of Fidelity Investigative Training Academy. Fidelity is a state-licensed investigative and security academy located in Chicago, license number 102-000232.

2.  We employ state-certified firearms instructors, and offer the Chicago Firearms Permit (CFP) class to members of the public so that they may register and safely operate firearms.

3.  Our ability to provide range training is limited because the suburban ranges are locking out Chicago-based instructors, so that they can keep the CFP training market for themselves. For example, we have been excluded from Illinois Gun Works and Midwest Guns. We have an agreement with G.A.T. to use their range for our class, but G.A.T. is now running their own program, and I am concerned

that we may lose access to their range at some point. Recently, G.A.T. informed me that it would charge us $250 per week to have use of their range for 2 hours per week for training our CFP students. G.A.T. is also located in Dundee, Illinois, a significant drive from Chicago. We also use Maxon's Gun Range in Des Plains, but that range is not open on Mondays and has only ten lanes. Maxon's is usually a forty-five minute drive from Chicago, without traffic.

4. The lack of adequate range facilities costs us customers, both because there is simply not enough range time to take on the students that we can serve, and because the cost and time associated with using the ranges that are available discourages customers.

5. Fidelity is interested in sharing the mobile range that the Plaintiffs in this case are bringing to Chicago, and is also interested in bringing in its own mobile range, at least until it can construct its own permanent range in Chicago. I have previously met with representatives of a mobile range manufacturer, Laser Shot, at the Midwest Police and Security Expo in Rosemont, Illinois, which is sponsored by the Illinois Association of Chiefs of Police. I was impressed with Laser Shot and their mobile range product.

6. I have also visited the Meggitt website and have researched their mobile ranges. I believe that their ranges are well-constructed and ideal for our use.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 12th day of September, 2010

Andre Queen

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Declaration, and this certificate of service, on:

William Macy Aguiar
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RHONDA EZELL, et al., ) | Case No. 10-C-5135 |
| ) | |
| Plaintiffs, ) | DECLARATION OF |
| ) | RICHARD PEARSON |
| v. ) | |
| ) | |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**DECLARATION OF RICHARD PEARSON**

I, Richard Pearson, am competent to state, and declare the following based on my personal knowledge:

1. I am the Executive Director of the Illinois State Rifle Association ("ISRA").

2. ISRA is a non-profit membership organization incorporated under the laws of Illinois with its principal place of business in Chatsworth, Illinois. ISRA has over 17,000 members and supporters in Illinois. The purposes of ISRA include securing the Constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation.

3. ISRA members and supporters in Chicago are among the individuals who need immediate range training to maintain their ability to keep firearms for self-defense under Chicago's new firearms ordinance. ISRA has approximately 1,144 members in Chicago. Most of our members are gun owners.

4.      Not every gun is suitable for every person. It is quite obviously better for potential gun owners, and in the interest of public safety, that prospective gun buyers experience a variety of guns, or at least, those guns they are considering, *before* actually making their purchases. And many people are introduced to shooting and gun ownership by visiting a range prior to deciding to purchase a gun.

5.      ISRA has long operated a gun range near Kankakee, Illinois, for the benefit of its members, and to promote marksmanship and the shooting sports. Among ISRA's members and officers are various firearms trainers certified by the State of Illinois who are qualified to provide the training mandated by the City of Chicago as a prerequisite to obtaining a Chicago Firearms Permit.

6.      There currently exist at least ten gun ranges in the city of Chicago, but none are open to the public. These include five ranges are operated by the Chicago Police Department; four gun ranges operated by the federal government (Postal Inspectors, Air Marshals, Customs and Border Protection, and the Federal Reserve Bank); and at least one gun range operated by a private security company for its own purposes. Previously I declared there were two security company ranges, but this was an oversight on my part, for which I apologize. The fact remains that there are ranges in Chicago, but none that the public can access.

7.      There exists a severe shortage of range-time within a hundred miles of the City of Chicago, owing to the incredible demand on training facilities created by (1) the need of existing gun registrants to obtain officially-recognized training to continue their firearms ownership, (2) the need for people to obtain officially-recognized training in time for them to comply with the grandfathering provisions for previously acquired guns, and (3) an intense interest in firearms ownership as a result of the *McDonald* case, and the city's acquiescence in recognizing legal

handgun ownership. Handguns, as the Supreme Court recognized, are overwhelmingly the arms of choice in our country for people wishing to have a means of self-defense, and handgun ownership has just become legally possible in Chicago for the first time in decades. Without the construction of additional range facilities open to the public, including range facilities in Chicago, people who would register their firearms will not be able to do so.

8.    To fulfill ISRA's organizational objectives, and serve our members and supporters, ISRA will supply state certified firearms trainers to operate the mobile gun range being brought to the City of Chicago by the Second Amendment Foundation.

9.    ISRA has a comprehensive general liability insurance policy which covers its fixed range and other activities of the ISRA. It will cover the mobile range as well. However, I will need to add the address of the mobile range as soon as the decision is made as to where it's going to be located, either at the Accurate Perforating or the Bell lot, and once we have the Court's permission. The policy is designed for shooting ranges and has $1,000,000/$2,000,000 general liability coverage with a $5,000,000 umbrella over that. Range insurance is readily available.

10.   But for the criminal enactments challenged in this complaint, SAF and ISRA would operate the mobile range within the City of Chicago on September 24, 2010.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 12th day of September, 2010

Richard Pearson

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Declaration, and this certificate of service, on:

William Macy Aguiar
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura_____
Alan Gura

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-C-5135 |
| | ) | |
| Plaintiffs, | ) | DECLARATION OF |
| | ) | JULIANNE VERSNEL |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF JULIANNE VERSNEL

I, Julianne Versnel, am competent to state, and declare the following based on my personal knowledge:

1.    I am the Director of Operations of the Second Amendment Foundation ("SAF"). I have worked with the foundation in numerous capacities for thirty-four years.

2.    SAF has approximately 1,700 members in Chicago. Most of our members own guns.

3.    My deposition in this case lasted over five hours. As part of this deposition, the city's attorney argued with me at great length about whether SAF's corporate purpose allows us to bring a gun range to Chicago and file this lawsuit. As part of this line of inquiry, I was repeatedly asked, in different ways, why SAF's general statement of purpose does not specifically mention, literally, that the organization may bring a range to Chicago and file this lawsuit, and why I interpret our mission statement as permitting this activity.

4.    The Second Amendment Foundation exists to promote Second Amendment rights. The mobile gun range project and this lawsuit were approved by SAF's Board of Directors and Executive Vice President. Filing strategic civil rights lawsuits against the City of Chicago over its gun laws is within the essential core purpose of SAF, as is ensuring that our members can exercise Second Amendment rights in Chicago by having access to required range training. We brought *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). Our membership is enthusiastic and supportive of our efforts in this case. No one, other than the city's attorney at my deposition, has ever suggested that it is not within SAF's mission to bring a gun range to Chicago and challenge the city's range ban.

5.    I located our first landlord, Accurate Perforating, by searching the internet for industrial space for lease in Chicago. My search led me to a real estate leasing broker, Beverly Hayes. I explained to Ms. Hayes exactly what SAF would do with the property -- operate a mobile gun range inside a trailer, and Ms. Hayes placed me in touch with Accurate Perforating's Larry Cohen. I explained to Mr. Cohen exactly what SAF would do with the property -- operate a mobile gun range inside a trailer. Mr. Cohen agreed to lease us the land. I was explaining the range to Mr. Cohen and told him the only noise was something similar to a nail gun. He said that that would be quieter than the noise emanating from his factory.

6.    Following the Court's denial of our first motion for temporary restraining order, I renegotiated SAF's lease with Accurate so that the start date would be moved up to August 31, from September 15.

7.    At my deposition, the city's attorney asked me numerous questions about whether a gun range in Chicago would violate zoning codes, building codes, parking regulations, environmental regulations, and the like, and whether it would place Accurate Perforating in

violation of the law. While I cannot give any legal opinions, I did understand the questioning as threatening our landlord, Accurate Perforating, with retaliation for leasing us the property on which to operate the range.

8.     Mr. Cohen told me on September 3 that he would be changing the location of the property that we had leased. On September 7, I was told that the lease would be terminated.

9.     I immediately began searching the internet for a replacement land. On September 8, Accurate formally terminated our lease effective October 31, Exhibit C.

10.     On September 9, I reached an agreement in principle with Leo Solarte of First Western Properties, to rent a portion of 6300-6400 South Bell.  This property is a vacant two-acre parking lot, with high powered lights, that used to store cars for a car dealership.  The property has an electric fence, and barbed wire at the top of the fence on the street side. The opposite side borders a railroad yard. Another portion of this property is currently occupied by a wrecking company. I am told that it is zoned M1-2, Limited Manufacturing District.

11.     On September 10, I received a formal lease offer from Mr. Solarte, which I accepted and returned September 11 with the required payment. Our lease for the Bell property starts September 15, and SAF has paid for the first two months' rent. A copy of that lease agreement is attached as Exhibit D.

12.     Accordingly, SAF now has two properties suitable for the mobile gun range, starting September 15. We will consider abandoning possession of the Accurate property, and operate exclusively at Bell, provided that Accurate refunds our money and that nothing occurs limiting our options to Accurate's land.

13.     SAF has now arranged with Blue Line to have the Blue Line mobile range begin operations in Chicago on September 24. Blue Line has indicated that it could operate on either

parcel of our land, or anywhere else in Chicago where a truck trailer can be parked. SAF has paid Blue Line the first $7,500 of the non-refundable fee to get the range to Chicago.

14.    As a practical matter, SAF does not wish to have the range sitting idle in Chicago while people are scheduled for its use. Lead time is needed to schedule the trainers, to contact our membership and alert them to the range's arrival and availability. Ten days is sufficient lead time to ensure that everyone and everything will be in place for the range's arrival.

15.    The only thing stopping the range's operation on September 24 is Chicago's range ban. If the Court issues an injunction, the range will commence training Chicagoans for their Chicago Firearms Permits on September 24.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 12th day of September, 2010

Julianne Versnel

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Declaration, and this certificate of service, on:

William Macy Aguiar
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | DECLARATION OF JERRY TILBOR |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF JERRY TILBOR**

I, Jerry Tilbor, am competent to state, and declare the following based on my personal knowledge:

1.   I am the President of Blue Line Corporation.

2.   Blue Line is engaged in the business of renting a mobile firearms range. The range is contained in a truck trailer, which I drive to Blue Line's clients. Upon arrival at the customer location, I operate the range, while the client is responsible for the use of the range, including the provision of any training.

3.   Blue Line's range was constructed by Meggitt Training Systems. The range appears from the outside as a plain, unmarked truck trailer, and on the inside it contains three shooting lanes and a range-master office. The range is equipped with a state of the art HEPA air filtration system, a bullet trap, is fully bullet-proof, and is insulated for sound, so that gunfire inside the range sounds no louder than a nail gun on the outside. The range interior is lined with foam.

4. Apart from the fact that the Blue Line range is mobile, it is no different than any gun range that exists inside a fixed structure.

5. No one has ever been injured by a bullet fired inside the Blue Line range.

6. Most of Blue Line's customers are law enforcement departments who need range facilities to maintain their officers' firearms qualifications. However, Blue Line also rents the range to the civilian market. There are no features or characteristics of the range that make it unsuitable for the public. For example, every fall, the Blue Line range is parked outside of a sporting goods store in Kittery, Maine, where members of the public use it for recreation, and to try out different kinds of guns and ammunition.

7. Blue Line's range can be parked and operated on any flat surface. There are no special parking requirements. If the range fits in a parking spot, it can be safely operated there. I frequently deliver the range to locations I have never previously examined in person. There is no particular spot within a parking lot or street that is better or worse than any other, so long as the parking space is level.

8. In many locations, the range's muffled noise does not rise above the general background noise. I have operated the range five feet from a house without incident.

9. I have examined satellite images of the Accurate Perforating property, and the property located at 6300-6400 South Bell. These appear to be ideal places to operate the range. The Accurate Perforating parking lot is next to a major highway and factories. The Bell lot is a large vacant lot next to a railroad.

10.  Blue Line has a contract with the Second Amendment Foundation (SAF) to operate the Blue Line range in Chicago, so that members of the general public may obtain the range training required by the City of Chicago to own guns. Blue Line fully endorses SAF's project. The Blue Line range is perfect for this application. Blue Line understands that the training will be provided by firearms instructors certified by the State of Illinois, who are familiar with the basic rules of firearms safety. Blue Line understands that the trainers may be provided by the Illinois State Rifle Association, which is working with SAF, but that in any event, all Chicago Firearms Permit trainers must be certified by the State of Illinois, and Blue Line is satisfied that such trainers can safely use its facility.

11.  The precise way in which the project is operated, for example, whether or how appointments are taken, whether fees are charged to use the range and in what amount, or whether firearms and ammunition are supplied, is of no concern to Blue Line. It is for SAF to determine how best to utilize the range for its purposes. Blue Line's role is only to operate the range and ensure that the basic rules of safety are followed.

12.  Blue Line is contractually obligated to provide its range to SAF at agreed-upon dates within a one-year period. If the Court permits it, Blue Line is currently scheduled to deliver the range to Chicago September 24, and operate it in Chicago for a week. As a practical matter the final decision to drive the range to Chicago must be made by September 22 as the range would be trucked from Massachusetts.

13.  After the first visit to Chicago, ending September 30, Blue Line will continue offering the range's availability to SAF throughout the service agreement year. Our contract does not allow us to deny SAF access to the range after the initial visit. I see no reason why the Blue Line range could not return to Chicago following its next appointment, consistent with our contract.

14.  If there is no legal impediment to doing so, Blue Line fully intends to operate the range for SAF in Chicago.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 12th day of September, 2010

Jerry Tilbor

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Declaration, and this certificate of service, on:

William Macy Aguiar
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

**MEMO**

TO:        SECOND AMENDMENT FOUNDATION
           12500 NE 10TH PLACE
           BELLEVUE, WASHINGTON 98005
           LESSEE
FROM:      ACCURATE PERFORATING CORPORATION
           LESSOR
DATE:      SEPTEMBER 8, 2010
RE:        TERMINATION OF INDUSTRIAL BUILDING LEASE

---

You are hereby notified that the Industrial Building Lease dated August 12, 2010, commencing August 31, 2010 on a month-to-month basis, is hereby terminated effective October 31, 2010.

Accurate Perforating Corporation

By: _____

Date Signed: _____ 9 - 8 - 10 _____

CERTIFICATE OF SERVICE

     The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Exhibit, and this certificate of service, on:

       Andrew W. Worseck
       City of Chicago Department of Law
       30 N. LaSalle Street, Suite 900
       Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


       /s/ Alan Gura_____
       Alan Gura

## LAND LEASE

THIS AGREEMENT is made and executed this 11 day of September, 2010, by and between GILLESPIE PROPERTIES, LLC of Downers Grove, Cook County, Illinois, hereinafter referred to as "LESSOR", and SECOND AMENDMENT FOUNDATION, of Bellevue, King County, Washington, hereinafter referred to as "LESSEE".

WHEREAS, Lessor is the owner of a certain piece or parcel of land: 6331 S. Bell situated in Chicago, Cook County, Illinois 60636. WHEREAS, Lessee desires to lease enough approximately two-thousand (2,000) square feet of the aforesaid parcel, hereinafter referred to as "PREMISES", from Lessor month-to-month in accordance with the terms and conditions hereinafter set forth;

WHEREAS, Lessor agrees to lease the Premises to Lessee in accordance with the terms and conditions hereinafter set forth.

NOW THEREFORE, the parties hereto intending to be legally bound hereby, in consideration of the above covenants and conditions and those hereinafter stated, mutually covenant and agree as follows:

1. Use: Lessor hereby leases to Lessee and Lessee rents from Lessor, for the purpose of providing a mobile shooting range.

2. Terms: The term of this Agreement is month-to-month having commenced on the 15 day of September.

3. Rent: Lessee shall pay Lessor the sum of One thousand five hundred ($1,500.00) Dollars per month in advance commencing on the eighth day of September, and monthly thereafter on the same day of each consecutive month during the original term hereof or any extension thereof. Lessee agrees to pay the rent to Lessor at GILLESPIE PROPERTIES, LLC , 2001 BUTTERFIELD RD., SUITE 520, DOWNERS GROVE, IL 60515, or at such other place as Lessor may from time to time request.

~~Security Deposit: A security deposit of $_____ shall be deposited with the Lessor. At the expiration of the lease, the security deposit will be returned to Lessee less any damages to the property.~~

4. Late Fee: If payment is not received by the 10th of each calendar month a 10% (ten percent) late charge will be assessed to the tenant and paid.

**5. Indemnification by Lessee: Lessee hereby covenants and agrees that he will indemnify, defend and hold harmless, the Lessor from any and all claims, demands, suits, causes of action, losses, damages, expenses and/or any and all litigation arising out of occurrences, in or at the Premises or as occasioned or suffered by the Lessee or any of his employees, agents, invitees, occupants, or other**

**persons in attendance in or at the Premises, including for any damages awarded for such claims, demands, causes of action, losses, damages and expenses or for costs or attorney's fees, due to the error, act or omission of the Lessee. Lessee shall provide Lessor with a Certificate of Insurance providing proof that Lessee has adequate insurance prior to any use of the premises.**

5. Laws, Regulations and Codes: Lessee shall at all times during the term of this Agreement comply with all local, state and federal laws, building, land use ordinances, fire and sanitation regulations and codes as they affect Lessee's enjoyment of the Premises.

6. Waste and Nuisance: Lessee hereby covenants and agrees not to commit waste on or at the Premises or allow it to be committed nor permit maintenance of a nuisance or any other noxious matter which may interfere with or affect the Premises.

7. Environmental:. Tenant shall not use or permit the use of any part of the Premises for any purpose prohibited by law. Tenant shall, at its sole expense, comply with and conform to all of the requirements of all governmental authorities having jurisdiction over the Building which relate in any way to the condition, use and occupancy of the Premises throughout the entire Term of this Lease. Without limitation of the foregoing, Tenant covenants and agrees not to bring into the Premises or to use, store, treat or dispose, or permit the use, storage, treatment or disposal, in the Premises of (i) any hazardous substance or regulated materials as defined under any present or future federal, state or local law, rule or regulation or (ii) any explosives or any flammable substances, including, but not limited to, gasoline, liquefied petroleum gas, turpentine, kerosene and naphtha (the substances and materials referred to in clauses (i) and (ii) hereof are collectively referred to herein as **"Hazardous Materials"**), except for such materials customarily used in office and trading operations (x) in such quantities which do not exceed any legal limits, and (y) used, stored, treated and disposed of in compliance with all applicable laws and regulations.

a. Environmental Disclosure. Tenant, from time to time, upon not less than ten (10) days' prior written request by Landlord, will provide Landlord with such information in Tenant's possession which Landlord may request regarding Tenant's operations in the Premises (including, without limitation, whether or not such operations involve the generation, transportation, storage, treatment or disposal of Hazardous Materials) and shall cooperate with Landlord in the event Landlord is required to prepare any disclosure document or instrument pursuant to the provisions of any federal, state or local laws, rules or regulations in connection with such Hazardous Materials

8. Surrender of Premises: Unless otherwise agreed between the parties or unless as otherwise provided for by the terms of this Agreement, Lessee hereby covenants and agrees to surrender the premises at the end of the term arranged for under this Agreement or any extension hereof, and to remove all Lessee's personal property occupying the Premises, so that it is restored to the same or similar condition it was in before Lessee first occupied it. Any and all property not removed from the Premises at the end of the

term of this Agreement or any extension hereof, will be considered to have reverted to the status of building improvements belonging to the Lessor or to have abandoned as to any and all rights or claims of Less, and will be at Lessor's sole right of disposal.

9. Holding Over: At the termination of the term of this lease, by lapse of time or otherwise, Lessee will yield up immediate possession of the Premises to Lessor, in good condition and repair, loss by fire and ordinary wear expected, and will return the keys therefore to Lessor at the place of payment of rent. If Lessee retains possession of the Premises or any part thereof after the termination of the term by lapse of time or otherwise, then Lessor may at its option within thirty days after termination of the term serve written notice upon Lessee that such holdings over constitutes either (a) a renewal of this lease for the one year, and from year to year thereafter, at double the rental (computed on an annual basis) specified in Section 1, or (b) creation of a month to month tenancy, upon the terms of this lease except at double the monthly rental specified in Section 1, or (c) creation of a tenancy at sufferance, at a rental rate of 200% of base rent dollars per day, for the time Lessee remains in possession. If no such written notice is served then a tenancy a tenancy at sufferance with rental as stated at (c) shall have been created. Lessee shall also pay to Lessor all damages sustained by Lessor resulting from retention of possession by Lessee. The provisions of this paragraph shall not constitute a waiver by Lessor of any right of re-entry as hereinafter set forth; nor shall receipt of any rent or any other act in apparent affirmance of tenancy operate as a waiver of the right to terminate this lease for a breach of any of the covenants herein.

9. Assignment and Subordination: Lessee during the term hereof, shall not have the right to sell, assign, sublease, mortgage or encumber any part or all of the Premises, without the prior written consent of the Lessor, which may be unreasonably withheld at the sole discretion of the Lessor.

10. Time of the Essence: Time is of the essence with respect to any time period for the performance of any conduct or act by either party set forth in this Agreement.

11. Binding Effect: This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns.

12. Cancellation: This lease can be cancelled by either party with thirty (30) days written notice.

13. Governing Law: This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

14. Integration: This Agreement contains and constitutes the final expression of the intent of the parties hereto and is the complete and exclusive statement of the terms and conditions agreed upon by the parties hereto. No modifications or amendment of this Agreement will be valid unless stated in writing and executed by the parties hereto, and

no parol or intrinsic evidence shall be admissible to explain or contradict the terms hereof.

15. <u>Counterparts:</u> This Agreement may be executed simultaneously in one or more copies or counterparts, each of which shall be deemed an original, but all of which together shall constitute and be one and the same Agreement.

16. <u>No Recording:</u> The parties covenant and agree that this Agreement shall not be recorded at the Office of the Recorder of Deeds of Cook County.

LESSEE:                                    LESSOR:


_____

Gillepie Properties, LLC


**Mail Correspondence:**

**If to tenant:**                          **If to landlord:**
Second Amendment Foundation               Gillespie Properties, LLC
12500 NE 10th Place                       2001 Butterfield Rd., Suite 520
Bellevue, WA 98005                        Downers Grove, IL 60515

**SECOND AMENDMENT FOUNDATION**
12500 N.E. 10TH PLACE   425-454-7012
BELLEVUE, WA 98005-2532

30096

19-2   1250   WA
52/180

DATE September 11, 2010

PAY
TO THE
ORDER OF   Gillespie Properties LLC   $ 3000 00

Three Thousand and 00/   DOLLARS

**Bank of America**
Bank via Bank of America
Washington

Alan M. Gottlieb

FOR Rent 9/15 - 11/5/2010
Sept Rent
Prepay 1 month

⑈030096⑈ ⑆125000002⑈: ⑆2290 219⑈⑈

CERTIFICATE OF SERVICE

 The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Exhibit, and this certificate of service, on:

   Andrew W. Worseck
   City of Chicago Department of Law
   30 N. LaSalle Street, Suite 900
   Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


   /s/ Alan Gura_____
   Alan Gura

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EZELL, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10-CV-5135 |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT'S NOTICE OF DEPOSITION OF ACCURATE PERFORATING CORP.

TO:  Alan Gura                          David G. Sigale
     Gura & Possessky, PLLC             Law Firm of David G. Sigale, P.C.
     101 N. Columbus Street             Corporate West I
     Suite 405                          4300 Commerce Court, Suite 300-3
     Alexandria, VA 22314               Lisle, IL 60532

**PLEASE TAKE NOTICE** that pursuant to pursuant to Fed. R. Civ. P. 30(b)(6) and 45, Defendant City of Chicago (the "City") requests that Accurate Perforating Corporation ("Accurate") designate an individual(s) for deposition at 10:00 a.m. on September 10, 2010 at the City's offices located at 30 N. LaSalle Street, Suite 1230, Chicago, IL 60602 before a notary public or any officer authorized to administer oaths.

The individual(s) designated by Accurate shall have knowledge to testify with respect to: (i) the negotiation and execution of the Industrial Building Lease between Accurate and Second Amendment Foundation dated August 12, 2010; and (ii) the zoning, licensing, and/or permitted purposes of the 3333 W. 36th Street, Chicago, IL 60632.

Date: August 30, 2010                   Respectfully submitted,

                                        MARA S. GEORGES,
                                        Corporation Counsel for the City of Chicago

                                        By: _____
                                        Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I, William Macy Aguiar, an attorney, hereby certify that on this, the 30th day of August, 2010,

I caused a copy of the forgoing **Notice of Deposition of Accurate Perforating Corp.** to be served

by facsimile and first-class United States mail, postage prepaid, on:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314
Fax No. 703-997-7665

David G. Sigale
Law Firm of David G. Sigale, P.C.
Corporate West 1
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
Fax No. 630-596-4445

William Macy Aguiar

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Exhibit, and this certificate of service, on:

> Andrew W. Worseck
> City of Chicago Department of Law
> 30 N. LaSalle Street, Suite 900
> Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


> /s/ Alan Gura_____
> Alan Gura

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | DECLARATION OF ALAN GURA |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## **DECLARATION OF ALAN GURA**

I, Alan Gura, am competent to state, and declare the following based on my personal knowledge:

1. I am counsel for the Plaintiffs in the above-captioned case.

2. On August 25, this Court denied Plaintiffs' motion for a temporary restraining order without prejudice. The Court found that Plaintiffs had not established irreparable harm for two reasons: first, the individual plaintiffs were able to move beyond the city's borders to get training, and in fact Plaintiff Ezell had done so; and the mobile range "can't get here yet . . . [it] looks like it's coming at the earliest mid-September." Tr., 8/25/10, at 75, l. 14-23. "But that is a denial without prejudice, meaning that it can be soon enough an irreparable injury." *Id.*, at 76, l. 1-2. "I also am saying to the plaintiffs, this is a denial without prejudice. This is one that you can bring again." *Id.*, at 76, l. 11-12.

3.      As detailed in the additional declarations submitted today, the mobile range will

be operating in Chicago within ten days if the Court allows it. The absence of

injunctive relief is the sole impediment to operating the range. The issuance of a

temporary restraining order now will enable the range to begin its journey to

Chicago, and enable the Plaintiffs to inform and schedule trainees and trainers so

that the range is not idle when it arrives.

4.      This morning, I spoke with counsel for the city, and provided oral notice of this

motion prior to filing it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 13th day of September, 2010

/s/ Alan Gura_____
Alan Gura

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Declaration, and this certificate of service, on:

William Macy Aguiar
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | EX PARTE MOTION FOR |
| | ) | TEMPORARY RESTRAINING ORDER |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and submit their Memorandum of Points and Authorities in

Support of their Ex Parte Motion for Temporary Restraining Order.

Dated: September 13, 2010        Respectfully submitted,

Alan Gura (admitted pro hac vice)        David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC        Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405        4300 Commerce Court, Suite 300-3
Alexandria, VA 22314        Lisle, IL 60532
703.835.9085/Fax 703.997.7665        630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/        By: /s/ David G. Sigale/
    Alan Gura                           David G. Sigale

                              Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

INTRODUCTION

On August 24, the Court denied without prejudice Plaintiffs' previous application for a temporary restraining order, on grounds that Plaintiffs had not yet established irreparable harm for two reasons: first, the individual plaintiffs were able to move beyond the city's borders to get training, and in fact Plaintiff Ezell had done so; and the mobile range "can't get here yet . . . [it] looks like it's coming at the earliest mid-September." Tr., 8/25/10, at 75, l. 14-23.

"But that is a denial without prejudice, meaning that it can be soon enough an irreparable injury." *Id.*, at 76, l. 1-2. "I also am saying to the plaintiffs, this is a denial without prejudice. This is one that you can bring again." *Id.*, at 76, l. 11-12.

Following the Court's guidance, Plaintiffs now move for a temporary restraining order.

As the Court has recently considered the issues before, this brief is not intended to recount the entire dispute among the parties, but rather, focuses primarily on addressing the Court's stated concerns and the Defendant's arguments. Considering recent events, Plaintiffs also clarify and stress certain aspects of the relief requested.

STATEMENT OF FACTS

*Background*: Defendant requires all gun owners to obtain range training in order to register their firearms, and periodically renew such registrations. The logic of this requirement is obvious: gun training saves lives. People who do not know how to use their guns are a danger to themselves and to others. On this common-sense point there is no dispute. Yet Defendants have also banned all gun ranges open to the public.

1

The gun range ban, apparently unique in the United States, covers the entire City of Chicago – the third largest city in the United States, encompassing an area over 230 square miles, and home to nearly three million people. *See* Request for Judicial Notice.

Defendant has imposed an October 12 deadline for people to obtain range training if they wish to register their currently owned firearms. Chi. Mun. Code § 8-20-140(d)(2). Registration certificates issued under the old law remain valid, but upon their expiration, range training is required for renewal, and thereafter every three years. Chi. Mun. Code § 8-20-110(d) (requiring CFP upon expiration of pre-*McDonald* registration). Defendant claims that existing certificates expiring before October 12 are nonetheless extended to that date – but makes no such claim regarding registrations expiring October 13 and thereafter.

*The Range Training Shortage*: Plaintiff Second Amendment Foundation, Inc. ("SAF") has approximately 1,700 members in Chicago. Versnel Decl., ¶ 2. Plaintiff Illinois State Rifle Association has 1,144 members in Chicago. Pearson Decl., ¶ 3. By definition, these individuals are interested in advancing the exercise of Second Amendment rights. Most of them own guns. Versnel Decl., ¶ 2; Pearson Decl., ¶ 3. Assuming a complete overlap in these organization's memberships, Plaintiffs have approximately 1,700 members whose ability to register guns expires October 12, and whose currently registered guns will become unregistrable absent range training by July 11 (one year from the ordinance's effective date) – a daily average of almost 5 people. Of course, not all members of the public impacted by the range ban are motivated to join Plaintiff organizations.

Current range facilities are inadequate to train all the people who require training. Plaintiff ISRA's Executive Director, Richard Pearson, is in a position to know. *See* Pearson

Decl., ¶ 7. This information is now verified by a third party whose deposition was noticed by Defendant:[1] Andre Queen, Executive Director of Fidelity Investigative Training Academy. Fidelity, a state-licensed investigative and security academy in Chicago, offers the CFP course to Chicago residents. Queen Decl., ¶¶ 1-2. But Fidelity's ability to provide range training is limited because the suburban ranges are locking out Chicago-based instructors, so that they can keep the CFP training market for themselves. Queen Decl., ¶ 3. What ranges are available to Fidelity are beginning to charge high fees and compete with Fidelity's business, offer limited facilities, and are a significant distance from the city. *Id.* The lack of adequate range facilities costs Fidelity customers, both because there is simply not enough range time to take on the students that it can serve, and because the cost and time associated with using the ranges that are available discourages customers. Queen Decl., ¶ 4.

Accordingly, Fidelity is interested in sharing the mobile range that the Plaintiffs in this case are bringing to Chicago, and is also interested in bringing in its own mobile range, at least until it can construct its own permanent range in Chicago. Queen Decl., ¶ 5.

*The Mobile Range*: A great portion of Ms. Versnel's deposition was consumed by counsel's arguments with Ms. Versnel that the SAF-Blue Line contract did not truly allow SAF to bring a range to Chicago and utilize it for training, and speculating that Blue Line would be too busy to visit Chicago. Fortunately, counsel did not dwell on this topic at the uneventful deposition of Jerry Tilbor, Blue Line's principal. In any case, there exists zero doubt in the parties' minds as to what they have contracted to do. "Blue Line has a contract with the Second

---

[1] In response to the Court's concern about the volume of accelerated discovery, Defendant advised the Court that discovery would be limited to the Plaintiffs. Tr., 8/23/10, p. 18, l. 19-24. When Defendant finally started discovery a week later, it noticed 5 third party depositions.

3

Amendment Foundation (SAF) to operate the Blue Line range in Chicago, so that members of the general public may obtain the range training required by the City of Chicago to own guns. Blue Line fully endorses SAF's project. The Blue Line range is perfect for this application." Tilbor Decl., ¶ 10. Nor can Blue Line refuse to provide the range to SAF throughout the contract year, Tilbor Decl., ¶ 12, nor does Blue Line see any reason why it would not make future visits to Chicago throughout the contract year. Tilbor Decl., ¶ 13.

If the Court grants relief, the range will operate in Chicago on September 24. Plaintiff has paid the first half of the non-refundable $15,000 fee, and Mr. Tilbor is prepared to begin heading toward Chicago in nine days. Versnel Decl., ¶¶ 13, 15; Tilbor Decl., ¶¶ 12, 14 . As the range has three positions, Plaintiffs can save the Second Amendment rights of twenty-four Chicagoans each eight-hour day, assuming only one trainee per lane per hour.

Blue Line's range was constructed by Meggitt Training Systems. The range appears from the outside as a plain, unmarked truck trailer, and on the inside it contains three shooting lanes and a range-master office. The range is equipped with a state of the art HEPA air filtration system, a bullet trap, is fully bullet-proof, and is insulated for sound, so that gunfire inside the range sounds no louder than a nail gun on the outside. The range interior is lined with foam. Tilbor Decl., ¶ 3. Apart from the fact that the Blue Line range is mobile, it is no different than any gun range that exists inside a fixed structure. Tilbor Decl., ¶ 4.

No one has ever been injured by a bullet fired inside the Blue Line range. Tilbor Decl., ¶ 5. Although most of Blue Line's customers are law enforcement departments who need range facilities to maintain their officers' firearms qualifications, Blue Line also rents the range to the civilian market. There are no features or characteristics of the range that make it unsuitable for

4

the public. For example, every fall, the Blue Line range is parked outside of a sporting goods store in Kittery, Maine, where members of the public use it for recreation, and to try out different kinds of guns and ammunition. Tilbor Decl., ¶ 6.

Blue Line's range can be parked and operated on any flat surface. There are no special parking requirements. If the range fits in a parking spot, it can be safely operated there. Tilbor Decl., ¶ 7. In many locations, the range's muffled noise does not rise above the general background noise. It has been operated five feet from a house without incident. Tilbor Decl., ¶ 8.

When the range arrives, there will be two places to park it. Owing to Defendant's discovery of Plaintiffs' first landlord, Plaintiffs lost their lease on the property where the range would be situated, effective November 1. Versnel Decl., ¶¶ 7-9.[2] However, Plaintiffs still have possession of this land through October 31. Versnel Decl., ¶ 9; Exh. C. The City claims, irrationally, that the lease's termination in November renders impossible the mobile range's operation earlier. In an abundance of caution, and also because the Plaintiffs would like to continue operating a mobile range in Chicago beyond October 31, SAF has leased additional property effective September 15. Versnel Decl., ¶¶ 10-12; Exh. D.

Blue Line does not need to inspect property before operating in it, but has examined satellite images of the Accurate Perforating property, and the property located at 6300-6400 South Bell, and concluded that these appear to be ideal places to operate the range. The Accurate Perforating parking lot is next to a major highway and factories. The Bell lot is a large vacant lot next to a railroad. Tilbor Decl., ¶¶ 7, 9. Chicago has a great deal of suitable, vacant land.

---

[2]Business owners can be expected to dislike the city's notices to discuss under oath "the zoning, licensing and/or permitted purposes" of their factories. Exh. E.

5

While Plaintiffs can – and have – taken the steps *currently* necessary and available to operate the range on September 24 (at significant cost), final arrangements require injunctive relief. The law challenged forbids the very existence of a range within city limits; thus, the range cannot enter the city absent injunctive relief. Moreover, without injunctive relief, Plaintiffs are limited in their ability to schedule their trainers, inform their members and the general public of the range's availability, schedule individuals for training, and add the range's location to ISRA's range insurance policy. Versnel Decl., ¶ 14; Pearson Decl., ¶ 9. Indeed, as a practical matter, these steps must be taken only when Plaintiffs know that the range can open its doors September 24, so that it can immediately begin serving people.

The bottom line is clear: Plaintiffs have concrete and imminent plans to bring a mobile training range to Chicago on September 24, for immediate operation, providing range training necessary for compliance with the city's looming gun registration deadlines. If a temporary restraining order is issued, trainers and trainees will be scheduled, and the range will commence operations immediately upon its arrival next week.

## SUMMARY OF ARGUMENT

Although Plaintiffs maintain that a complete and total gun range ban violates the core of the Second Amendment right, obviating the need to locate a standard of review, Plaintiffs would nonetheless prevail under the intermediate scrutiny standard referenced by the Court. Quite simply, there is no substantial government interest in banning gun ranges, let alone any such interest. To the contrary, the city concedes that range training is *required* for public safety.

The irreparable harm is plain: without adequate gun training, people get injured and killed. Without training, people cannot register their guns in Chicago and thus lose the ability to

6

defend themselves and their families from violent crime. And training itself is constitutionally-protected activity, both because use of a gun at a range is secured by the Second Amendment, and because, as found by the Fourth Circuit, gun training is protected First Amendment speech.

ARGUMENT

I.       PLAINTIFFS WILL PREVAIL ON THE MERITS OF THEIR CLAIMS.

There is no need to recount at length the reasoning why using guns at a range is constitutionally protected. "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." *District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2812 (2008). The provision of gun training for a state-issued permit is protected First Amendment speech. *Edwards* v. *City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999).

Plaintiffs reserve their arguments that a flat ban on protected activity requires no standard of review analysis, and that in any event, the appropriate standard would be strict scrutiny. But the end result is the same under intermediate scrutiny, which requires that the there be a "strong showing" that the regulation is "substantially related to an important governmental objective." *United States v. Skoien*, 2010 U.S. App. Lexis 14262 at *10 (7th Cir. July 13, 2010) (en banc) (citations omitted).

Quite simply, there is no important governmental objective in banning gun ranges. Defendant has offered only that banning ranges reduces people's desire to transport guns, but this makes no sense, as it has the effect of causing people to drive longer distances with their guns, and in any event, the law requires that guns be inoperable and locked away while driving. The

7

concern with "arms being discharged en masse and with great frequency," Tr., 8/23/10, p. 51, l. 25  - p.52, l.1, is simply circular reasoning. The city wants to ban gun ranges because it does not want them to operate. But since gun ranges are protected by the Constitution, general opposition to their existence is unavailing.  "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 128 S. Ct. at 2822. "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 177 L. Ed.2d 894, 924 (2010) (citation omitted).

But the amorphous fears of gun ranges are not merely irrelevant; they are rejected at law. The Illinois Court of Appeals, for example, held shooting at a range is not an ultrahazardous activity because, inter alia,

> the risk of harm to persons or property, even though great, can be virtually eliminated by the exercise of reasonable or even "utmost" care under the circumstances . . . the use of firearms is a matter of common usage and the harm posed comes from their misuse rather than from their inherent nature alone . . . the location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice [and] target practice is of some social utility to the community . . .

*Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995). The same court has upheld Illinois' range protection statute. *Miller v. Fulton County Zoning Bd. of Appeals*, 337 Ill. App. 3d 210, 785 N.E.2d 532 (Ill. App. 2003). A gun range becomes unusually dangerous if one runs into the line of fire, but that is also true of vehicular traffic.

II.    PLAINTIFFS AND THE PUBLIC SUFFER IRREPARABLE HARM.

The facts indicate that there is a range shortage that is discouraging people from

complying with the city's laws and exercising their rights. Defendant's claims that the harm in this case can be reduced to money damages, and thus is not subject to preliminary injunctive relief, is baseless. Irreparable harm is presumed in many "money damages" cases. *See, e.g,* *Computer Assocs. Int'l* v. *Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004) (trade secret misappropriation and copyright infringement). Irreparable harm is also presumed in First Amendment cases, " *National People's Action* v. *Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990), and there is no reason to suppose the same is not true of Second Amendment cases, although the question appears to be one of first impression.

The government could not claim money damages are adequate to compensate for the seizure of Bibles, though they are never mentioned in the text of the First Amendment. "Arms," however, are spelled out as protected in the Second Amendment. And money damages will not compensate for people who are dead and injured because they had no gun with which to defend themselves, or because someone was not proficient in the use of their gun.

Going to the suburbs is not option. The Constitution, with its Bill of Rights, is in full effect in the City of Chicago. *See McDonald*. Chicago cannot exclude itself from the United States, and violate the rights of its citizens, by telling them to vote with their feet. The idea that individuals should simply go to the suburbs to exercise their rights is nothing more than what the Supreme Court has rejected, yet again, in *McDonald*, the idea that constitutional rights may be abandoned because "conditions and problems differ from locality to locality." *McDonald*, 177 L. Ed. 2d at 924. The only condition that matters is one that applies uniformly in Chicago and its suburbs: the operative, functioning condition of the Constitution.

In the First Amendment context, "[i] is not sufficient to say that neighboring communities

permit the type of speech that the challenged ordinance bans . . . .the government may not simply point to neighboring communities that permit the speech as a defense to their ordinance that bans that type of speech from its jurisdiction." *Palmetto Props., Inc.* v. *County of DuPage*, 160 F. Supp. 2d 876, 883 (N.D. Il. 2001) (citing *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) ("[One] is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place") (quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939))

Gun training is speech, but the concept works for all constitutional rights. Chicago could not, for example, ban abortion clinics on the grounds that they are available in the suburbs. *Cf. Carey* v. *Population Svcs.*, 431 U.S. 678, 689 (1977) ("the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition") (footnotes omitted). Gun ranges are places of the Second Amendment and, to the extent that training is conducted there, the First. They are protected from complete bans.

III.    OTHER LAWS, INCLUDING ZONING, ARE IRRELEVANT.

Defendant's counsel have strenuously argued that even were the range ban struck down, gun ranges would nonetheless remain illegal under a slew of other laws, most emphatically the zoning code, which allegedly forbids all that it does not permit. Under this theory, the range ban is superfluous, as might be a large portion of the criminal code.

The argument fails on three critical levels. *First,* it ignores that Plaintiffs have anticipated this sort of tactic by requesting an injunction from the application of "any other law" achieving

the same unconstitutional effect. The city cannot dress up a range ban under the guise of some other restriction, else the Court would be powerless to order the city to do anything. The city would always just invent another legal mechanism to circumvent any ruling. But the city has enacted a range ban for a reason: it wanted to ban ranges, because obviously, it did not feel it had achieved that effect through existing laws.[3]

*Second*, a bigger problem with the zoning argument is that the Supreme Court forbids the use of zoning to extinguish constitutional rights. In the landmark case of *Renton* v. *Playtime Theaters, Inc.*, 475 U.S. 41 (1986), the Supreme Court upheld restrictive zoning of adult establishments, to the extent these businesses were regulated for their secondary effects. Yet recognizing that these businesses nonetheless engaged in protected expression, the Court held: "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Renton*, 475 U.S. at 53. Ever since, adult zoning ordinances are measured largely by whether they effectively prohibit adult establishments, or merely limit their location pursuant to constitutional standards. *See*, *e.g.* *BBI Enters.* v. *City of Chicago*, 874 F. Supp. 890, 895 (N.D. Ill. 1995).

Of course gun ranges are not pornographic establishments. Lawful gun owners who would  obtain a CFP must undergo multiple background checks, and all instructors are state-certified police trainers. The only secondary effects of a gun range, apart from noise that can be, as in the Blue Line range, mitigated, is the offense such establishments give to gun rights opponents. Even in the adult bookstore context, courts require regulators to come up with actual

---

[3]Had the city chosen to regulate gun ranges rather than ban them, this would have been a very different case, had it been filed at all. Plaintiffs do not suggest that the city is powerless to regulate ranges, but neither is the city required to do so, and regulation has yet to occur.

11

evidence justifying the regulation, not merely "the conjecture of their attorneys." *Palmetto*, 160 F. Supp. 2d at 882. Counsel's description of "arms being discharged en masse and with great frequency," Tr., 8/23/10, p. 51, l. 25  - p.52, l.1, does not even amount to a conjectural harm at a gun range, any more than "gasoline set ablaze en masse and with great frequency" could be used to describe internal combustion engines driven along a highway.

But there is a more profound problem with the city's zoning arguments: it describes an economic system in which there are no property rights. Under the city's argument, there would be no right to do anything with land, even unpack a tent, in the absence of governmental permission. And under this view, churches exist in Chicago not because they are protected by the First Amendment, but by the grace of the city council's permission. This is simply not the law. Without getting into an extended discussion of the concept of property, it is enough to note that the Supreme Court has ruled that when the government deprives a property owner of all expected uses of the property, a taking is effected under the Fifth Amendment. *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003 (1992).

A gun range is plainly consistent with the Accurate Perforating and Bell lands, which are industrial in character. If the city wants to zone for gun ranges, it is welcome to do so consistent with constitutional principles. But if the zoning law were read as a complete city-wide ban, then it, too, must be enjoined, just like the more explicit range ban challenged by Plaintiffs.

CONCLUSION

The irreparable harm is plain. Defendant lacks even an argument to sustain its unconstitutional law. Respectfully, Plaintiffs pray that the temporary restraining order be issued so that the range can operate as scheduled next week.

Dated: September 13, 2010                Respectfully submitted,

Alan Gura (admitted pro hac vice)        David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                   Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405        4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                     Lisle, IL 60532
703.835.9085/Fax 703.997.7665           630.452.4547/Fax 630.596.4445

By:  /s/ Alan Gura/                       By:     /s/ David G. Sigale/
     Alan Gura                                    David G. Sigale
                                                  Attorneys for Plaintiffs

13

<u>CERTIFICATE OF SERVICE</u>

   The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Memorandum of Points and Authorities in Support of the Motion for Temporary Restraining Order, and this certificate of service, on:

     Andrew W. Worseck
     City of Chicago Department of Law
     30 N. LaSalle Street, Suite 900
     Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


     /s/ Alan Gura
     Alan Gura

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | NOTICE OF MOTION |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

NOTICE OF MOTION

TO:   All Counsel of Record
      The Honorable Virginia M. Kendall

You are hereby notified that on the 13th day of September, 2010 at 9:00 A.M., or as soon

thereafter as counsel may be heard, we shall appear before the Honorable Virginia M. Kendall, or

any Judge sitting in her stead, in Courtroom 1403 of the Everett McKinley Dirksen Building, 219

South Dearborn Street, Chicago, IL 60604, and then and there present the Plaintiffs' Ex Parte

Motion for Temporary Restraining Order, a copy of which is filed simultaneously.

Dated: September 13, 2010              Respectfully submitted,

Alan Gura (admitted pro hac vice)       David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                  Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405       4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                    Lisle, IL 60532
703.835.9085/Fax 703.997.7665          630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/                      By: /s/ David G. Sigale/

    Alan Gura                               David G. Sigale

                                         Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Notice of Motion, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).

/s/ Alan Gura
Alan Gura

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | EX PARTE MOTION FOR |
| | ) | TEMPORARY RESTRAINING ORDER |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and submit their Memorandum of Points and Authorities in

Support of their Ex Parte Motion for Temporary Restraining Order.

Dated: September 13, 2010                    Respectfully submitted,

Alan Gura (admitted pro hac vice)            David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                       Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405            4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                         Lisle, IL 60532
703.835.9085/Fax 703.997.7665               630.452.4547/Fax 630.596.4445


By: /s/ Alan Gura/                           By: /s/ David G. Sigale/
    Alan Gura                                    David G. Sigale


                                             Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

INTRODUCTION

On August 24, the Court denied without prejudice Plaintiffs' previous application for a temporary restraining order, on grounds that Plaintiffs had not yet established irreparable harm for two reasons: first, the individual plaintiffs were able to move beyond the city's borders to get training, and in fact Plaintiff Ezell had done so; and the mobile range "can't get here yet . . . [it] looks like it's coming at the earliest mid-September." Tr., 8/25/10, at 75, l. 14-23.

"But that is a denial without prejudice, meaning that it can be soon enough an irreparable injury." *Id.*, at 76, l. 1-2. "I also am saying to the plaintiffs, this is a denial without prejudice. This is one that you can bring again." *Id.*, at 76, l. 11-12.

Following the Court's guidance, Plaintiffs now move for a temporary restraining order.

As the Court has recently considered the issues before, this brief is not intended to recount the entire dispute among the parties, but rather, focuses primarily on addressing the Court's stated concerns and the Defendant's arguments. Considering recent events, Plaintiffs also clarify and stress certain aspects of the relief requested.

STATEMENT OF FACTS

*Background*: Defendant requires all gun owners to obtain range training in order to register their firearms, and periodically renew such registrations. The logic of this requirement is obvious: gun training saves lives. People who do not know how to use their guns are a danger to themselves and to others. On this common-sense point there is no dispute. Yet Defendants have also banned all gun ranges open to the public.

1

The gun range ban, apparently unique in the United States, covers the entire City of Chicago – the third largest city in the United States, encompassing an area over 230 square miles, and home to nearly three million people. *See* Request for Judicial Notice.

Defendant has imposed an October 12 deadline for people to obtain range training if they wish to register their currently owned firearms. Chi. Mun. Code § 8-20-140(d)(2). Registration certificates issued under the old law remain valid, but upon their expiration, range training is required for renewal, and thereafter every three years. Chi. Mun. Code § 8-20-110(d) (requiring CFP upon expiration of pre-*McDonald* registration). Defendant claims that existing certificates expiring before October 12 are nonetheless extended to that date – but makes no such claim regarding registrations expiring October 13 and thereafter.

*The Range Training Shortage*: Plaintiff Second Amendment Foundation, Inc. ("SAF") has approximately 1,700 members in Chicago. Versnel Decl., ¶ 2. Plaintiff Illinois State Rifle Association has 1,144 members in Chicago. Pearson Decl., ¶ 3. By definition, these individuals are interested in advancing the exercise of Second Amendment rights. Most of them own guns. Versnel Decl., ¶ 2; Pearson Decl., ¶ 3. Assuming a complete overlap in these organization's memberships, Plaintiffs have approximately 1,700 members whose ability to register guns expires October 12, and whose currently registered guns will become unregistrable absent range training by July 11 (one year from the ordinance's effective date) – a daily average of almost 5 people. Of course, not all members of the public impacted by the range ban are motivated to join Plaintiff organizations.

Current range facilities are inadequate to train all the people who require training. Plaintiff ISRA's Executive Director, Richard Pearson, is in a position to know. *See* Pearson

Decl., ¶ 7. This information is now verified by a third party whose deposition was noticed by Defendant:[1] Andre Queen, Executive Director of Fidelity Investigative Training Academy. Fidelity, a state-licensed investigative and security academy in Chicago, offers the CFP course to Chicago residents. Queen Decl., ¶¶ 1-2. But Fidelity's ability to provide range training is limited because the suburban ranges are locking out Chicago-based instructors, so that they can keep the CFP training market for themselves. Queen Decl., ¶ 3. What ranges are available to Fidelity are beginning to charge high fees and compete with Fidelity's business, offer limited facilities, and are a significant distance from the city. *Id.* The lack of adequate range facilities costs Fidelity customers, both because there is simply not enough range time to take on the students that it can serve, and because the cost and time associated with using the ranges that are available discourages customers. Queen Decl., ¶ 4.

Accordingly, Fidelity is interested in sharing the mobile range that the Plaintiffs in this case are bringing to Chicago, and is also interested in bringing in its own mobile range, at least until it can construct its own permanent range in Chicago. Queen Decl., ¶ 5.

*The Mobile Range*: A great portion of Ms. Versnel's deposition was consumed by counsel's arguments with Ms. Versnel that the SAF-Blue Line contract did not truly allow SAF to bring a range to Chicago and utilize it for training, and speculating that Blue Line would be too busy to visit Chicago. Fortunately, counsel did not dwell on this topic at the uneventful deposition of Jerry Tilbor, Blue Line's principal. In any case, there exists zero doubt in the parties' minds as to what they have contracted to do. "Blue Line has a contract with the Second

---

[1]In response to the Court's concern about the volume of accelerated discovery, Defendant advised the Court that discovery would be limited to the Plaintiffs. Tr., 8/23/10, p. 18, l. 19-24. When Defendant finally started discovery a week later, it noticed 5 third party depositions.

3

Amendment Foundation (SAF) to operate the Blue Line range in Chicago, so that members of the general public may obtain the range training required by the City of Chicago to own guns. Blue Line fully endorses SAF's project. The Blue Line range is perfect for this application." Tilbor Decl., ¶ 10. Nor can Blue Line refuse to provide the range to SAF throughout the contract year, Tilbor Decl., ¶ 12, nor does Blue Line see any reason why it would not make future visits to Chicago throughout the contract year. Tilbor Decl., ¶ 13.

If the Court grants relief, the range will operate in Chicago on September 24. Plaintiff has paid the first half of the non-refundable $15,000 fee, and Mr. Tilbor is prepared to begin heading toward Chicago in nine days. Versnel Decl., ¶¶ 13, 15; Tilbor Decl., ¶¶ 12, 14. As the range has three positions, Plaintiffs can save the Second Amendment rights of twenty-four Chicagoans each eight-hour day, assuming only one trainee per lane per hour.

Blue Line's range was constructed by Meggitt Training Systems. The range appears from the outside as a plain, unmarked truck trailer, and on the inside it contains three shooting lanes and a range-master office. The range is equipped with a state of the art HEPA air filtration system, a bullet trap, is fully bullet-proof, and is insulated for sound, so that gunfire inside the range sounds no louder than a nail gun on the outside. The range interior is lined with foam. Tilbor Decl., ¶ 3. Apart from the fact that the Blue Line range is mobile, it is no different than any gun range that exists inside a fixed structure. Tilbor Decl., ¶ 4.

No one has ever been injured by a bullet fired inside the Blue Line range. Tilbor Decl., ¶ 5. Although most of Blue Line's customers are law enforcement departments who need range facilities to maintain their officers' firearms qualifications, Blue Line also rents the range to the civilian market. There are no features or characteristics of the range that make it unsuitable for

4

the public. For example, every fall, the Blue Line range is parked outside of a sporting goods store in Kittery, Maine, where members of the public use it for recreation, and to try out different kinds of guns and ammunition. Tilbor Decl., ¶ 6.

Blue Line's range can be parked and operated on any flat surface. There are no special parking requirements. If the range fits in a parking spot, it can be safely operated there. Tilbor Decl., ¶ 7. In many  locations, the range's muffled noise does not rise above the general background noise. It has been operated five feet from a house without incident. Tilbor Decl., ¶ 8.

When the range arrives, there will be two places to park it. Owing to Defendant's discovery of Plaintiffs' first landlord, Plaintiffs lost their lease on the property where the range would be situated, effective November 1. Versnel Decl., ¶¶ 7-9.[2] However, Plaintiffs still have possession of this land through October 31. Versnel Decl., ¶ 9; Exh. C. The City claims, irrationally, that the lease's termination in November renders impossible the mobile range's operation earlier. In an abundance of caution, and also because the Plaintiffs would like to continue operating a mobile range in Chicago beyond October 31, SAF has leased additional property effective September 15. Versnel Decl., ¶¶ 10-12; Exh. D.

Blue Line does not need to inspect property before operating in it, but has examined satellite images of the Accurate Perforating property, and the property located at 6300-6400 South Bell, and concluded that these appear to be ideal places to operate the range. The Accurate Perforating parking lot is next to a major highway and factories. The Bell lot is a large vacant lot next to a railroad. Tilbor Decl., ¶¶ 7, 9.  Chicago has a great deal of suitable, vacant land.

---

[2]Business owners can be expected to dislike the city's notices to discuss under oath "the zoning, licensing and/or permitted purposes" of their factories. Exh. E.

While Plaintiffs can – and have – taken the steps *currently* necessary and available to operate the range on September 24 (at significant cost), final arrangements require injunctive relief. The law challenged forbids the very existence of a range within city limits; thus, the range cannot enter the city absent injunctive relief. Moreover, without injunctive relief, Plaintiffs are limited in their ability to schedule their trainers, inform their members and the general public of the range's availability, schedule individuals for training, and add the range's location to ISRA's range insurance policy. Versnel Decl., ¶ 14; Pearson Decl., ¶ 9. Indeed, as a practical matter, these steps must be taken only when Plaintiffs know that the range can open its doors September 24, so that it can immediately begin serving people.

The bottom line is clear: Plaintiffs have concrete and imminent plans to bring a mobile training range to Chicago on September 24, for immediate operation, providing range training necessary for compliance with the city's looming gun registration deadlines. If a temporary restraining order is issued, trainers and trainees will be scheduled, and the range will commence operations immediately upon its arrival next week.

## SUMMARY OF ARGUMENT

Although Plaintiffs maintain that a complete and total gun range ban violates the core of the Second Amendment right, obviating the need to locate a standard of review, Plaintiffs would nonetheless prevail under the intermediate scrutiny standard referenced by the Court. Quite simply, there is no substantial government interest in banning gun ranges, let alone any such interest. To the contrary, the city concedes that range training is *required* for public safety.

The irreparable harm is plain: without adequate gun training, people get injured and killed. Without training, people cannot register their guns in Chicago and thus lose the ability to

6

defend themselves and their families from violent crime. And training itself is constitutionally-protected activity, both because use of a gun at a range is secured by the Second Amendment, and because, as found by the Fourth Circuit, gun training is protected First Amendment speech.

<u>ARGUMENT</u>

I.      PLAINTIFFS WILL PREVAIL ON THE MERITS OF THEIR CLAIMS.

There is no need to recount at length the reasoning why using guns at a range is constitutionally protected. "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." *District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2812 (2008). The provision of gun training for a state-issued permit is protected First Amendment speech. *Edwards* v. *City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999).

Plaintiffs reserve their arguments that a flat ban on protected activity requires no standard of review analysis, and that in any event, the appropriate standard would be strict scrutiny. But the end result is the same under intermediate scrutiny, which requires that there be a "strong showing" that the regulation is "substantially related to an important governmental objective." *United States v. Skoien*, 2010 U.S. App. Lexis 14262 at *10 (7th Cir. July 13, 2010) (en banc) (citations omitted).

Quite simply, there is no important governmental objective in banning gun ranges. Defendant has offered only that banning ranges reduces people's desire to transport guns, but this makes no sense, as it has the effect of causing people to drive longer distances with their guns, and in any event, the law requires that guns be inoperable and locked away while driving. The

concern with "arms being discharged en masse and with great frequency," Tr., 8/23/10, p. 51, l. 25  - p.52, l.1, is simply circular reasoning. The city wants to ban gun ranges because it does not want them to operate. But since gun ranges are protected by the Constitution, general opposition to their existence is unavailing.  "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 128 S. Ct. at 2822. "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 177 L. Ed.2d 894, 924 (2010) (citation omitted).

But the amorphous fears of gun ranges are not merely irrelevant; they are rejected at law. The Illinois Court of Appeals, for example, held shooting at a range is not an ultrahazardous activity because, inter alia,

> the risk of harm to persons or property, even though great, can be virtually eliminated by the exercise of reasonable or even "utmost" care under the circumstances . . . the use of firearms is a matter of common usage and the harm posed comes from their misuse rather than from their inherent nature alone . . . the location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice [and] target practice is of some social utility to the community . . .

*Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995). The same court has upheld Illinois' range protection statute. *Miller v. Fulton County Zoning Bd. of Appeals*, 337 Ill. App. 3d 210, 785 N.E.2d 532 (Ill. App. 2003). A gun range becomes unusually dangerous if one runs into the line of fire, but that is also true of vehicular traffic.

## II.    PLAINTIFFS AND THE PUBLIC SUFFER IRREPARABLE HARM.

The facts indicate that there is a range shortage that is discouraging people from

complying with the city's laws and exercising their rights. Defendant's claims that the harm in this case can be reduced to money damages, and thus is not subject to preliminary injunctive relief, is baseless. Irreparable harm is presumed in many "money damages" cases. *See, e.g*, *Computer Assocs. Int'l* v. *Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004) (trade secret misappropriation and copyright infringement). Irreparable harm is also presumed in First Amendment cases, *National People's Action* v. *Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990), and there is no reason to suppose the same is not true of Second Amendment cases, although the question appears to be one of first impression.

The government could not claim money damages are adequate to compensate for the seizure of Bibles, though they are never mentioned in the text of the First Amendment. "Arms," however, are spelled out as protected in the Second Amendment. And money damages will not compensate for people who are dead and injured because they had no gun with which to defend themselves, or because someone was not proficient in the use of their gun.

Going to the suburbs is not an option. The Constitution, with its Bill of Rights, is in full effect in the City of Chicago. *See McDonald*. Chicago cannot exclude itself from the United States, and violate the rights of its citizens, by telling them to vote with their feet. The idea that individuals should simply go to the suburbs to exercise their rights is nothing more than what the Supreme Court has rejected, yet again, in *McDonald*, the idea that constitutional rights may be abandoned because "conditions and problems differ from locality to locality." *McDonald*, 177 L. Ed. 2d at 924. The only condition that matters is one that applies uniformly in Chicago and its suburbs: the operative, functioning condition of the Constitution.

In the First Amendment context, "[i] is not sufficient to say that neighboring communities

9

permit the type of speech that the challenged ordinance bans . . . . the government may not simply point to neighboring communities that permit the speech as a defense to their ordinance that bans that type of speech from its jurisdiction." *Palmetto Props., Inc.* v. *County of DuPage*, 160 F. Supp. 2d 876, 883 (N.D. Il. 2001) (citing *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) ("[One] is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place") (quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939)).

Gun training is speech, but the concept works for all constitutional rights. Chicago could not, for example, ban abortion clinics on the grounds that they are available in the suburbs. *Cf. Carey* v. *Population Svcs.*, 431 U.S. 678, 689 (1977) ("the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition") (footnotes omitted). Gun ranges are places of the Second Amendment and, to the extent that training is conducted there, the First. They are protected from complete bans.

III.   OTHER LAWS, INCLUDING ZONING, ARE IRRELEVANT.

Defendant's counsel have strenuously argued that even were the range ban struck down, gun ranges would nonetheless remain illegal under a slew of other laws, most emphatically the zoning code, which allegedly forbids all that it does not permit. Under this theory, the range ban is superfluous, as might be a large portion of the criminal code.

The argument fails on three critical levels. *First,* it ignores that Plaintiffs have anticipated this sort of tactic by requesting an injunction from the application of "any other law" achieving

10

the same unconstitutional effect. The city cannot dress up a range ban under the guise of some other restriction, else the Court would be powerless to order the city to do anything. The city would always just invent another legal mechanism to circumvent any ruling. But the city has enacted a range ban for a reason: it wanted to ban ranges, because obviously, it did not feel it had achieved that effect through existing laws.[3]

*Second*, a bigger problem with the zoning argument is that the Supreme Court forbids the use of zoning to extinguish constitutional rights. In the landmark case of *Renton* v. *Playtime Theaters, Inc.*,  475 U.S. 41 (1986), the Supreme Court upheld restrictive zoning of adult establishments, to the extent these businesses were regulated for their secondary effects. Yet recognizing that these businesses nonetheless engaged in protected expression, the Court held: "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Renton*, 475 U.S. at 53. Ever since, adult zoning ordinances are measured largely by whether they effectively prohibit adult establishments, or merely limit their location pursuant to constitutional standards. *See, e.g. BBI Enters.* v. *City of Chicago*, 874 F. Supp. 890, 895 (N.D. Ill. 1995).

Of course gun ranges are not pornographic establishments. Lawful gun owners who would obtain a CFP must undergo multiple background checks, and all instructors are state-certified police trainers. The only secondary effects of a gun range, apart from noise that can be, as in the Blue Line range, mitigated, is the offense such establishments give to gun rights opponents. Even in the adult bookstore context, courts require regulators to come up with actual

---

[3]Had the city chosen to regulate gun ranges rather than ban them, this would have been a very different case, had it been filed at all. Plaintiffs do not suggest that the city is powerless to regulate ranges, but neither is the city required to do so, and regulation has yet to occur.

evidence justifying the regulation, not merely "the conjecture of their attorneys." *Palmetto*, 160

F. Supp. 2d at 882. Counsel's description of "arms being discharged en masse and with great

frequency," Tr., 8/23/10, p. 51, l. 25 - p.52, l.1, does not even amount to a conjectural harm at a

gun range, any more than "gasoline set ablaze en masse and with great frequency" could be used

to describe internal combustion engines driven along a highway.

But there is a more profound problem with the city's zoning arguments: it describes an

economic system in which there are no property rights. Under the city's argument, there would

be no right to do anything with land, even unpack a tent, in the absence of governmental

permission. And under this view, churches exist in Chicago not because they are protected by the

First Amendment, but by the grace of the city council's permission. This is simply not the law.

Without getting into an extended discussion of the concept of property, it is enough to note that

the Supreme Court has ruled that when the government deprives a property owner of all expected

uses of the property, a taking is effected under the Fifth Amendment. *Lucas* v. *South Carolina*

*Coastal Council*, 505 U.S. 1003 (1992).

A gun range is plainly consistent with the Accurate Perforating and Bell lands, which are

industrial in character. If the city wants to zone for gun ranges, it is welcome to do so consistent

with constitutional principles. But if the zoning law were read as a complete city-wide ban, then

it, too, must be enjoined, just like the more explicit range ban challenged by Plaintiffs.

CONCLUSION

The irreparable harm is plain. Defendant lacks even an argument to sustain its

unconstitutional law. Respectfully, Plaintiffs pray that the temporary restraining order be issued

so that the range can operate as scheduled next week.

Dated: September 13, 2010                     Respectfully submitted,

Alan Gura (admitted pro hac vice)            David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                        Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405             4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                          Lisle, IL 60532
703.835.9085/Fax 703.997.7665                 630.452.4547/Fax 630.596.4445

By:   /s/ Alan Gura/                     By:      /s/ David G. Sigale/
      Alan Gura                                   David G. Sigale
                                                  Attorneys for Plaintiffs

13

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Memorandum of Points and Authorities in Support of the Motion for Temporary Restraining Order, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **EZELL, ET AL.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 10-CV-5135** |
| ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** ) | |
| ) | |
| **Defendants.** ) | |

**DEFENDANT CITY OF CHICAGO'S MOTION TO VACATE BRIEFING**
**SCHEDULE AND PRELIMINARY INJUNCTION HEARING SET FOR OCTOBER 1**

The City of Chicago ("City" or "Defendant"), by and through its attorney, Mara S. Georges,

Corporation Counsel of the City of Chicago, hereby files this motion to vacate the current briefing

schedule and preliminary injunction hearing in this matter set for October 1, 2010, and in support

shows as follows.

1.        On July 6, 2010, four days following the enactment of the Responsible Gun Owners

Ordinance (the "Ordinance") by the City Council, a group of plaintiffs filed a lawsuit challenging

the constitutionality of numerous provisions of the Ordinance.  That case, *Benson, et al. v. City of*

*Chicago, et al*., 10-C-4184, is currently pending before Judge Guzman.

2.        Six weeks later, Plaintiffs filed this action on August 16, 2010, challenging the

constitutionality of the prohibition of shooting and/or training ranges within the City under the

Ordinance.  Contemporaneous with the filing of their complaint, Plaintiffs filed a motion for a

preliminary injunction and an accompanying memorandum of law in support thereof.

3.        Because the sole provision of the Ordinance challenged here – the prohibition on gun

ranges within the City – is also challenged in *Benson*, the issues in this case are subsumed by the

*Benson* case.  Accordingly, in order to serve the goals underlying Local Rule 40.4, which are to promote efficiency of litigation and to avoid duplicative and potentially conflicting rulings by judges within the same district, Defendant promptly moved, on August 20, 2010, to reassign this case as related to Judge Guzman ("Reassignment Motion").  Briefing will be complete on that motion by tomorrow, September 15, 2010, after which time Judge Guzman indicated that he would rule by mail.

4.     In direct response to Defendant's filing of their motion to reassign based on relatedness, Plaintiffs filed a motion for temporary restraining order ("TRO") late Sunday night, August 22, and noticed it up for Monday morning, August 23.  Indeed, aside from referencing Defendant's motion for relatedness, Plaintiffs' motion did not offer any explanation for how or why Plaintiffs' situation had changed since the filing of their motion for a preliminary injunction, such as to warrant the emergency relief requested in their TRO motion.

5.     On Monday, August 23, this Court heard argument on Plaintiffs' TRO motion.  On Tuesday, August 24, the Court ruled in open court that the TRO was being denied because Plaintiffs had not shown any irreparable harm.  The Court then set the following schedule on Plaintiffs' motion for a preliminary injunction: (a) three weeks to complete all discovery, with a discovery cut-off date of September 13; (b) the City to file its written response to Plaintiffs' motion by September 20; (c) Plaintiffs to file their reply brief by September 27; and (d) the preliminary injunction hearing to be held on October 1.

6.     Since August 24, the City has been actively and diligently pursuing discovery related to the numerous issues raised by Plaintiffs' request for injunctive relief.  The City has served written discovery and document requests and, in the last two weeks, has taken ten depositions, including:

2

(a) individual Plaintiffs Ezell, Hespen, and Brown; (b) Julianne Versnel, Director of Operations of Plaintiff Second Amendment Foundation ("SAF"); (c) Richard Pearson, Executive Director of Plaintiff Illinois State Rifle Association ("ISRA"); and (d) Chris Hart, Midwest Range Consultant for Plaintiff Action Target, Inc.  The City also deposed five third parties, including (a) Jerry Tilbor, President of Blue Line Corporation, the entity that contracted with SAF to provide the mobile range unit; (b) Larry Cohen, the President of Accurate Perforating Corporation, the entity that leased the property to SAF for storage of a trailer; (c) a representative from a suburban gun range that offers the one-hour training; and (d) a representative from an academy in the City that offers the four-hour classroom training.

7.     This discovery has not only been necessary to test Plaintiffs' assertions of the irreparable harm they will suffer if forced to obtain their one-hour of range training required by the Ordinance at suburban Chicagoland ranges, but also to discover essential information regarding Plaintiffs' proposed plans regarding the mobile range, including but not limited to how it will operate, when it will operate, whether firearms will be provided on-site, what environmental and safety precautions would be in place to ensure it complies with all local and federal regulations, and whether required business licenses and other zoning permits had been acquired.  Notwithstanding this discovery, critical unanswered questions remain, including the recent identification by SAF of a new possible location for the mobile range.

8.     On September 13, 2010, while two depositions were being conducted at the offices of the Corporation Counsel, Plaintiffs filed a second motion for TRO, claiming that immediate relief is necessary because the mobile range unit leased from Blue Line will be arriving in Chicago on September 24 and Plaintiff SAF desires to begin operating it on that date.  Plaintiffs state that they

have filed this second motion because, while the Court denied their initial TRO motion, it did so without prejudice because Plaintiffs had not yet established irreparable harm, since the mobile range was not arriving until mid-September.  *See* Plaintiffs' Motion For Temporary Restraining Order, p. 1.  But the mobile range still has not arrived; indeed, it is now arriving later than originally anticipated.  Thus, nothing has changed since Plaintiffs filed their original papers or since the Court denied Plaintiffs' first motion for TRO.

9.      Although Plaintiffs attempted to notice the motion for this morning, September 14, that notice was defective and the Court has set the hearing on Plaintiffs' second motion for a temporary restraining order for tomorrow afternoon, September 15, at 4:00 p.m.

10.      Based on recent developments uncovered through the discovery process, and also based on the pending TRO motion, this Court should vacate the current preliminary injunction schedule and reset it until after ruling on the TRO motion.

11.      Most significantly, Defendants have learned that the mobile range unit will only be available to SAF for operation in Chicago from September 24 until October 1, at which time it must be returned to Blue Line for use by another customer. *See* Deposition of Julianne Versnel, pp.84, 90 attached as Exhibit A.  Although SAF's contract with Blue Line grants SAF the right to request the use of the mobile range for a year-long period, the actual dates of use are dependent on the mobile range's availability. *Id.* at 88-91.  It is uncontroverted that there are no certain dates in the future that SAF will have the right to possession of the mobile range, after October 1. *Id.* at 88, 91, 93.

12.      Because the mobile range will only be able to operate, if at all, for no more than eight days between September 24 and October 1, there is no reason for a preliminary injunction hearing on October 1.  If the Court denies Plaintiffs' pending TRO motion, as it should, it will have found

4

for the second time that Plaintiffs will suffer no irreparable harm.  To hold yet another hearing on this issue two weeks later would be allowing Plaintiffs a *third* bite at the apple, after failing to meet their burden twice (and after having already filed three papers in support of their position).  As discussed more fully in Defendants' opposition to Plaintiffs' motion for TRO, which will be filed tomorrow, September 15, all of the individual Plaintiffs have testified that they are capable of getting, or have already received, the training at suburban ranges.  Thus, nothing will have changed to warrant holding the October 1 hearing.

13.     Likewise, should the Court grant Plaintiffs' motion for TRO, maintaining the current preliminary injunction schedule will be unnecessary.  The relief granted by a temporary restraining order lasts for a period of 14 days, and can be extended for another like period, which will amply cover all of the time that the mobile unit will be here.  *See* Fed. R. Civ. P. 65(b)(2).  Accordingly, further relief in the form of a preliminary injunction, at least on an expedited basis, would be unnecessary, as the mobile range will be gone after October 1.

14.     Because there is no reason to hold the preliminary injunction hearing on October 1, Defendant should not be required to file it response to the preliminary injunction motion by September 20.

15.     Moreover, Defendant will be prejudiced if it does not get relief from the September 20 filing deadline.  Defendant has been working nonstop to complete discovery within the prescribed period and to prepare for the preliminary injunction hearing.  In the last three business days, Defendant has had to conduct five depositions, respond to an emergency motion to quash a deposition (filed at 3:00 a.m.), review Plaintiffs' latest motion for TRO (which included five new declarations), prepare for the TRO hearing, and work on a written response to the TRO motion.

Therefore, even if the Court does not vacate the October 1 hearing date, Defendant should be permitted more time to adequately prepare and submit its brief.

16.     Finally, this Court should vacate the date set for the preliminary injunction hearing and postpone scheduling another date, if at all, until Judge Guzman rules on Defendants' Reassignment Motion.  As discussed above, that motion will be fully briefed by September 15, 2010, and Judge Guzman indicated that he would be ruling by mail thereafter.

17.     Given the pendency of the Reassignment Motion, the City asks this Court to vacate the preliminary injunction hearing date in this case as it did in similar circumstances in *Local 727, International Brotherhood of Teamsters v.  Metropolitan Pier and Exposition Authority, et al.*, No. 10 C 3484 ("*Teamsters*").

18.     *Teamsters* was a lawsuit filed by the labor union on June 7, 2010, which was originally assigned to this Court.  Previously, on June 2, 2010, a similar action had been filed by the Chicago Regional Council of Carpenters, which was assigned to Judge Guzman ("*Carpenters*").  Both labor unions raised the same legal challenges to the same Illinois statutes and named the same defendants.  One of the defendants in *Carpenters*, the lower numbered case, moved before Judge Guzman pursuant to Local Rule 40.4 to reassign *Teamsters* as related.  *See* Illinois Attorney General's Motion to Reassign Related Case Pursuant to Local Rule 40.4, attached as Exhibit B.

19.     One of the defendants in *Carpenters* and *Teamsters* responded to the Motion to Reassign by opposing it on the grounds that the cases were in a different procedural posture because this Court already had set a schedule for briefing and a hearing on the motion for a preliminary injunction filed by the plaintiff in the *Teamsters* case.

20.     In addition, like the Plaintiffs here, the Teamsters Union filed a TRO motion before

6

this Court after the motion to reassign had been filed before Judge Guzman.  On July 28, 2010, this Court heard and denied the TRO motion.  However, before entertaining the motion, this Court commented on its prior *sua sponte* order of July 19, 2010, canceling the preliminary injunction hearing that had been scheduled to go forward on July 22, 2010.  A copy of the minute order is attached as Exhibit C.

21.     This Court said the following about the pendency of the relatedness motion which sought to transfer the *Teamsters* case to Judge Guzman:

> THE COURT:   Okay.  Well, I was hoping that Judge Guzman would rule.  I called Judge Guzman to ask him about the relatedness issue.  There is no reason – I am an efficient judge but there is no reason to do two times the work for two of us, so that's why I had asked him about the relatedness motion.
>
> He said he wasn't ready to rule on it.  That's why I moved your preliminary injunction motion.  I can't imagine it's going to take too long for him to get to it, but that was my intent in the sua sponte order that moved the preliminary injunction.

Transcript of Proceedings at pp. 4,5  before the Honorable Virginia M. Kendall dated July 28, 2010, attached as Exhibit D.

22.     On August 6, 2010, Judge Guzman granted the motion to reassign *Teamsters* as related to *Carpenters*.  Because this Court rightfully deferred to Judge Guzman, a separate preliminary injunction hearing never occurred in this Court.  Defendants respectfully submit that the rationales underlying Local Rule 40.4 were served by postponing the preliminary injunction hearing that had been scheduled in *Teamsters* and that there is no principled reason to treat this case differently than *Teamsters.*

Wherefore, Defendant City of Chicago respectfully requests that the Court vacate the briefing

schedule and preliminary injunction hearing set for October 1.


Date: September 14, 2010                    Respectfully submitted,


                                            MARA S. GEORGES,
                                            Corporation Counsel for the City of Chicago

                                            By:      /s/ Rebecca Hirsch_____ _____
                                            Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I, Rebecca Hirsch, an attorney, hereby certify that on this, the 14th day of September, 2010,

I caused a copy of the forgoing **Defendant City of Chicago's Motion To Vacate Briefing Schedule**

**and Preliminary Injunction Hearing Set For October 1** via electronic notification on the

following counsel of record:

Alan Gura                               David G. Sigale
Gura & Possessky, PLLC                  Law Firm of David G. Sigale, P.C.
101 N. Columbus Street                  Corporate West I
Suite 405                               4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                    Lisle, IL 60532
Fax No. 703-997-7665                    Fax No. 630-596-4445


<u>Rebecca Hirsch</u>

# Exhibit A

Juliane Versnel                           September 2, 2010

1

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EZELL, et al,                        )
                    Plaintiffs,      )  No. 10-CV-5135
          vs.                        )  Judge
CITY OF CHICAGO,                     )  Virginia M.
                    Defendants.      )  Kendall

          The deposition of JULIANE VERSNEL,
called as a witness for examination, taken pursuant
to the Federal Rules of Civil Procedure of the
United States District Courts pertaining to the
taking of depositions, taken before LISA C. HAMALA,
a Notary Public within and for the County of Cook,
State of Illinois, and a Certified Shorthand
Reporter of said state, CSR No. 84-3335, at Suite
1230, 30 North LaSalle Street, Chicago, Illinois,
on the 2nd day of September, A.D. 2010, at 1:40
p.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

2

1     PRESENT:

2

3          GURA & POSSESSKY, P.L.L.C.,

4          (101 North Columbus Street,  Suite 405,

5          Arlington, Virginia 22314,

6          703-835-9085), by:

7          MR. ALAN GURA,

8          alan@gurapossessky.com,

9                    -and-

10         LAW FIRM OF DAVID G. SIGALE, P.C.,

11         (Corporate West 1,

12         4300 Commerce Court, Suite 300-3,

13         Lisle, Illinois 60532,

14         630-452-4547), by:

15         MR. DAVID G. SIGALE,

16         dsigale@sigalelaw.com,

17              appeared on behalf of the Plaintiffs;

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                      September 2, 2010

3

1      PRESENT: (Continued)

2

3              CORPORATION COUNSEL

4              CITY OF CHICAGO,

5              (30 North LaSalle Street, Suite 1230,

6              Chicago, Illinois 60602,

7              312-744-4216), by:

8              MR. ANDREW WORSECK,

9              aworseck@cityofchicago.org,

10                   appeared on behalf of the Defendants.

11

12     ALSO PRESENT:

13              MR. RICHARD PEARSON,

14                   Illinois State Rifle Association.

15

16

17

18

19

20

21

22

23     REPORTED BY:   LISA C. HAMALA, CSR.

24                    Illinois CSR No. 84-3335.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                              September 2, 2010

84

1          MR. GURA:   Objection.   Calls for speculation.

2     BY THE WITNESS:

3          A.    The truck can't come to Chicago until it

4     is legal for it to come to Chicago, so I don't know

5     what those dates will be.

6     BY MR. WORSECK:

7          Q.    Assume it was legal for the truck to be

8     in Chicago.   Assume you win your preliminary

9     injunction.   The judge's orders remain in force.

10              When will the truck be in Chicago?

11         A.    September 24 through October 1, I think.

12         Q.    One week?

13         A.    Yes.

14         Q.    It will be here for one week, and then

15    it will leave?

16         A.    Yes.

17         Q.    It will leave on October 2nd or

18    October 1st?

19         A.    Approximately.

20         Q.    How long will it be gone?

21         MR. GURA:   Objection.   Calls for speculation.

22    BY THE WITNESS:

23         A.    I don't know.

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

87

1    days.  At which point it would leave.  Mr. Tilbor,

2    Blue Line Corporation, would go to his next client.

3    BY MR. WORSECK:

4         Q.    You don't know when it would come back

5    to Chicago after it leaves?

6         A.    A second time?

7         MR. GURA:  Objection.  Calls for speculation.

8    BY THE WITNESS:

9         A.    It's impossible to determine that.

10   BY MR. WORSECK:

11        Q.    You don't even know if it would come

12   back after it leaves, correct?

13        MR. GURA:  Objection.  Calls for speculation.

14             You may answer that.

15   BY THE WITNESS:

16        A.    If we found it was extremely beneficial

17   in our fight to allow the citizens of Chicago to

18   exercise their second amendment right, we would

19   make arrangements for it to return.

20             The day would have to be determined

21   based on availability.

22   BY MR. WORSECK:

23        Q.    As you sit here now, SAF does not have

24   any specific contractual right to demand this truck



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

88

1   come back to Chicago at any specific period of

2   time, or ever?

3        A.    Sorry.   That's not the way it reads in

4   Terms of Use.

5        MR. GURA:   The contract speaks for itself.

6   BY MR. WORSECK:

7        Q.    What about the Terms of Use provision

8   creates a problem with my question?

9        A.    The agreement that we signed says "The

10  rights provided for in this agreement shall be for

11  the periodic use of the trailer for a period of one

12  year from the date of this agreement as necessary

13  for firearms training, qualifications or general

14  use by the client as scheduled in advance by

15  written agreement of the parties."

16            It says it is good for a year.   I assume

17  we can bring it back subject to its availability

18  until July 25, 2011.

19       Q.    And you don't know what that future

20  availability is?

21       A.    No.

22       Q.    And to bring it back in the future

23  pursuant to this Term of Use provision, you have to

24  schedule it in advance by a written agreement?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

90

1     Q.    Would that be applied to the $15,000
2     that would be due for the week the truck is in
3     town?
4     A.    I don't recall.
5     Q.    If the truck isn't here for say four
6     weeks, you don't have to pay $60,000 to Blue Line,
7     right?  You sort of pay as you go?
8     A.    No.  No.  The day I tell you to put the
9     truck on the road to come to Chicago is the day I
10    have to pay him $15,000, whether it is in Chicago
11    or not.
12    Q.    That $15,000 buys you one week of truck?
13    A.    Yes.
14    Q.    If that truck has to leave at the end of
15    that week, the meter stops ticking?  You don't owe
16    Jerry anything?
17    A.    I would have paid him $15,000.
18    Q.    You don't owe another $15,000 for the
19    following week because the truck is not here?
20    A.    We have a one-week contract at this
21    point, and he has somewhere else to go.
22    Q.    Where is your one-week contract?
23    A.    That may be a verbal understanding.
24    Q.    Is there any written agreement



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

91

1   scheduling in advance the truck's schedule in

2   Chicago that the SAF and Blue Line have executed?

3         A.    Oral communications.

4         Q.    Those oral communications have led to a

5   one-week contract?

6         A.    Yes.

7         Q.    Embodied in a one-week contract?

8         A.    Yes, an initial one week in Chicago.

9         Q.    You don't have any contract, be it oral

10  or written, for the truck to be here at any

11  particular point in time after that week?

12        A.    We have an option based on No. 3 to

13  request it.

14        Q.    You have no contract in place today for

15  the truck to come back after the one week that it

16  will be here, right?

17        MR. GURA:  Objection.  That misstates the

18  witness's testimony.  It is contrary to the record.

19              There are many people in Chicago that

20  understand options contracts.

21        MR. WORSECK:  She is the one bringing in these

22  subsidiary one-week contracts to the written

23  contract.

24              I'm trying to figure out what they are,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

93

1        MR. GURA:   That's fine.

2             Answer in a non-argumentative way.

3    BY THE WITNESS:

4        A.    My understanding is this.   This is a

5    service agreement.   He is agreeing to provide a

6    service.

7             This allows me to request those services

8    for one year.   If they are not available at the

9    specific time that I request, then we have the

10   opportunity to go forward and choose another date.

11   BY MR. WORSECK:

12       Q.    And any of those future dates are up in

13   the air at this point?

14       A.    Yes.

15       Q.    There's no specific date --

16       MR. WORSECK:   Asked and answered.

17   BY MR. WORSECK:

18       Q.    -- that exists today other than this

19   one-week period in September?

20       MR. GURA:   Objection.   Asked and answered.

21   You just asked the very same question.

22   BY MR. WORSECK:

23       Q.    -- where you have the contractual right

24   to demand the truck to be in Chicago.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

204

```
 1    STATE OF ILLINOIS )
 2                      )   SS:
 3    COUNTY OF C O O K )
 4              I, LISA C. HAMALA, a Notary Public
 5    within and for the County of Cook, State of
 6    Illinois, and a Certified Shorthand Reporter of
 7    said state, do hereby certify:
 8              That previous to the commencement of the
 9    examination of the witness, the witness was duly
10    sworn to testify the whole truth concerning the
11    matters herein;
12              That the foregoing deposition transcript
13    was reported stenographically by me, was thereafter
14    reduced to typewriting under my personal direction
15    and constitutes a true record of the testimony
16    given and the proceedings had;
17              That the said deposition was taken
18    before me at the time and place specified;
19              That I am not a relative or employee or
20    attorney or counsel, nor a relative or employee of
21    such attorney or counsel for any of the parties
22    hereto, nor interested directly or indirectly in
23    the outcome of this action.
24              IN WITNESS WHEREOF, I do hereunto set my
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

205

1    hand of Chicago, Illinois, this 7th day of

2    September, 2010.

3                        *Lisa Christine Hamala*

4              Notary Public, Cook County, Illinois.

5              My commission expires August 23, 2012.

6

7

8    C.S.R. Certificate No. 84-3335.

9

```
OFFICIAL SEAL
LISA CHRISTINE HAMALA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-23-2012
```

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 CV 3372 |
| | ) | |
| JAMES REILLY, as Trustee of the Metropolitan Pier and Exposition Authority; METROPOLITAN PIER AND EXPOSITION AUTHORITY, a body politic and municipal corporation, and LISA MADIGAN, as Attorney General for the State of Illinois | ) | |
| | ) | The Honorable |
| Defendants. | ) | RONALD A. GUZMAN, Judge Presiding. |

**ILLINOIS ATTORNEY GENERAL'S MOTION
TO REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4**

Two different labor unions have filed two separate complaints, naming the same defendants, and raising the same legal challenges to the same Illinois statutes. Because the cases filed by the Chicago Regional Council of Carpenters ("Carpenters") and Local 727, International Brotherhood of Teamsters ("Teamsters") arise from the same statute and involve overlapping issues of fact and law, they are related and should be reassigned pursuant to Local Rule 40.4.

**BACKGROUND**

Public Acts 96-898 and 96-899 became effective on May 28, 2010. Teamster's Compl. ¶ 1.[1] On June 2, 2010, the Carpenters sued to have P.A. 96-898 declared unconstitutional. Carpenters Compl. ¶ 2. On June 9, 2010, the Carpenters filed an amended complaint, alleging

---

[1] In accordance with LR 40.4(c), a copy of the Teamsters' complaint is attached to this motion.

that P.A. 86-899 also was unconstitutional.  Carpenters' Am. Compl. ¶ 2.  On June 7, 2010, the

Teamsters sued to have P.A. 96-898 and P.A. 96-899 declared unconstitutional.  Teamsters'

Compl. ¶ 1.

The Carpenters and the Teamsters sued the same Defendants:  James Reilly, the

administrator of the Metropolitan Pier and Exposition Authority ("Authority"), the Authority,

and the Illinois Attorney General, Lisa Madigan, in her official capacity.  *Compare* Carpenters'

Compl. *with* Teamsters' Compl.

Both the Carpenters and the Teamsters alleged that P.A. 898 and 899 were preempted by

the National Labor Relations Act.  Carpenters' Am. Compl. Counts I-II; Teamster's Compl.

Count III.  Both alleged that the Acts unconstitutionally impaired their contractual rights under

certain collective bargaining agreements.  Carpenters' Am. Compl. Counts III-IV; Teamsters'

Compl. Counts I-II.  Both alleged violations of the equal protection clause because the Acts

allegedly discriminated against union employees in favor of non-union employees.  Carpenters'

Am. Compl. Count V; Teamsters' Compl. Count IV.  Both alleged violations of the Illinois

Constitution's prohibition on "special legislation."  Carpenters' Am. Compl. Count VII;

Teamsters' Compl. Count V.  And both complaints alleged that the Acts were unenforceable

because they conflicted with the Illinois State Labor Relations Act.  Carpenters' Am. Compl.

Count VIII; Teamsters' Compl. Count VII.

The Illinois Attorney General now moves pursuant to Local Rule 40.4 to reassign the

Teamsters' case, which is the higher-numbered complaint.

## DISCUSSION

Local Rule 40.4 provides for the reassignment of related cases. Under section (a) of the rule, two cases are related if, *inter alia*, they "involve some of the same issues of fact or law," or "grow out of the same transaction or occurrence." Two related cases should be assigned to the judge presiding over the lower-numbered case if

  (1) both cases are pending in the this Court;

  (2) the handling of both cases by the same judge is likely to result in substantial saving of judicial time and effort;

  (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and

  (4) the cases are susceptible to disposition in a single proceeding.

LR 40.4 (b).

All of the conditions set forth in Local Rule 40.4 are met. The cases share common legal and factual issues because all of the claims in both complaints challenge the same Illinois statutes, and the plaintiffs' legal claims are duplicative.

The cases are both pending in the United States District Court for the Northern District of Illinois. They are susceptible to disposition in a single proceeding because it makes obvious sense to resolve the same legal claims in the same proceeding. Indeed, doing so will save substantial judicial resources because only one, rather than two, judges will be necessary to adjudicate the legal issues involved in this case. Lastly, this motion to reassign is being filed before the defendants have filed any responsive pleadings so no judicial effort has yet been expended on either case.

Local Rule 40.4 states that a motion to reassign based on relatedness "should not generally be filed until after the answer or motions in lieu of answer." However, because the Teamsters, the plaintiff in the higher numbered case, filed a motion for a preliminary injunction, and set that motion for a hearing on June 21, 2010, it is likely that a substantial amount of judicial resources will be expended on the Teamsters' case before defendants file an answer or otherwise plead. Thus, this early filing is consistent with the purpose underlying Rule 40.4, which is to foster judicial economy and avoid wasting judicial resources.

Respectfully Submitted,

**LISA MADIGAN**
Attorney General
State of Illinois

By: /s/Paul Berks
**PAUL BERKS**
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312)814-2575

# EXHIBIT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOCAL 727, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | Judge |
| METROPOLITAN PIER AND EXPOSITION AUTHORITY, JAMES REILLY, as Trustee of the Metropolitan Pier and Exposition Authority, and LISA MADIGAN, as Attorney General for the State of Illinois, | ) ) ) ) ) ) | Mag. Judge: |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff, LOCAL 727, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

("IBT") by and through its attorneys Marvin Gittler, Margaret Angelucci and Ryan Hagerty of

Asher, Gittler, & D'Alba, Ltd. complains of Defendants METROPOLITAN PIER AND

EXPOSITION AUTHORITY ("MPEA"), JAMES REILLY, as Trustee of the Metropolitan Pier

and Exposition Authority, and LISA MADIGAN, as Attorney General for the State of Illinois

(collectively "Defendants") as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory judgment and an injunction to declare certain

sections of Public Acts 898 and 899 (Senate Bills 28 and 3215), which amend the Metropolitan

Pier and Exposition Authority Act ("MPEA Act") and which were approved by the legislature

and enacted by the Governor of the State of Illinois on May 28, 2010, to be unconstitutional and

1

therefore null and void, under the Constitutions of the United States and the State of Illinios; and to enjoin Defendants from enforcing or acting under color of said sections of Senate Bills 28 and 3215. True and correct copies of Senate Bills 28 and 3215 are attached hereto as Exhibits A and B.

## JURISDICTION AND VENUE

2.   Count I and II arise under the Declaratory Judgment Act, 28 U.S.C. §2201, 42 U.S.C. §1983 and Article I, §10 of the Constitution of the United States.  Count III arises under the Declaratory Judgment Act, 28 U.S.C. §2201, 29 U.S.C. §158, *et seq* and the Supremacy Clause of the United States Constitution, Article VI, Clause 2.  Count IV arises under the Declaratory Judgment Act, 28 U.S.C. §2201, 42 U.S.C. §1983 and the Equal Protection Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States.  Counts V and VI arise under Article IV, §13 of the Illinois Constitution.  Count VII arises under the Illinois State Labor Relations Act, 5 ILCS 315/1, *et seq.*

3.   Jurisdiction of Counts I-II is conferred on this Court by 28 U.S.C. §§1331 and 1343.  This Court has supplemental jurisdiction of Count III pursuant to 28 U.S.C. §1367. Venue within this judicial district is proper under 28 U.S.C. § 1391(b).

## PARTIES

4.   Plaintiff Local 727 is an unincorporated labor organization which is the exclusive bargaining representative of employees employed by the MPEA and private contractors working in the trade show industry, including but not limited to Global Experience Specialists ("GES") and Freeman Decorating.

2

5. Plaintiff Local 727 is a labor organization as defined by the National Labor Relations Act ("NLRA"), 29 U.S.C. 152(5).

6. Defendant MPEA is a municipal corporation and has its principal office in the City of Chicago. (70 ILCS 210/3 (2010)

7. Defendant JAMES REILLY is the Trustee of the Defendant MPEA as designated by the legislature and is sued in his official capacity as Trustee. As Trustee, Defendant Reilly has the responsibility to "to ensure the proper administration of the authority." (70 ILCS 210/14.5 (2010), including the implementation and enforcement of the MPEA Act, as amended.

8. Defendant LISA MADIGAN is the Attorney General of the State of Illinois. As Attorney General, Defendant Madigan has the responsibility to enforce the laws passed by the General Assembly of the State of Illinois. (Illinois Constitution 1970 Article V, Section 15), including the implementation and enforcement of the MPEA Act, as amended.

## ALLEGATIONS COMMON TO ALL COUNTS

9. The MPEA is a political subdivision of the State of Illinois subject to the plenary authority of the Illinois General Assembly.

10. The MPEA owns and operates McCormick Place and Navy Pier, both of which are located in the City of Chicago.

11. The MPEA Act, as amended, defines "union employees" as follows:

"union employees" means workers represented by a labor organization, as defined in the National Labor Relations Act, providing skilled labor services to exhibitors, a show manager, or a show contractor on Authority premises.

70 ILCS 210/5.4(b).

3

12.     The MPEA employs workers under a collective bargaining agreement ("MPEA Agreement") entered into and currently in effect with Local 727, IBT.  A true and correct copy of the MPEA agreement which has an expiration date of December 31, 2011  is attached as Exhibit C.

13.     MPEA also rents space at its facilities to trade show managers who organize and sponsor tradeshows.

14.     Tradeshow managers have agreements with general contractors who are responsible for among other things constructing and dismantling the booths, transporting equipment and materials.

15.     General Contractors performing work at MPEA facilities employ private sector workers under collective bargaining agreements ("Tradeshow Agreement") entered into and currently in effect with Local 727, IBT.  A true and correct copy of the Tradeshow Agreement has an expiration date of December 31, 2013 and is attached as Exhibit D.

16.     Members of Local 727, who work under the MPEA and Tradeshow Agreements(Exhibits C and D) are workers represented by a labor organization, providing skilled labor services to exhibitors, a show manager, or a show contractor on Authority premises . These members are classified as "union employees" under the the MPEA Act, as amended.

17.     Members of Local 727, who work under the MPEA Agreement are public employees as defined under the Illinois State Labor Relations Act ("ISLRA").  5 ILCS 315/3(n).

18.     The ISLRA provides that employees as defined therein have the right to form, join or assist unions and to engage in other concerted activities for the purpose of collective

4

bargaining on such matters as wages, hours and terms and conditions of employment. 5 ILCS 315/6

19.     Members of Local 727 who work under the Tradeshow Agreement are employees within the meaning of the NLRA, 29 U.S.C. 152(3)

20.     The NLRA provides that employees as defined therein have the right to form, join or assist unions and to engage in other concerted activities for the purpose of collective bargaining on such matters as wages, hours and terms and conditions of employment. 29 U.S.C. §§ 157 and 158(a).

21.     The MPEA Act, as amended, specifically regulates, restricts and impairs the ability of union employees to negotiate with their employers with respect to wages, hours and working conditions for work performed on the premises of the MPEA as follows:

**70 ILCS 210/5.4(c):**

(1)     Consistent with safety and the skills and training necessary to perform the task, as determined by the Authority, an exhibitor and exhibitor employees are permitted in a booth of any size with the use of the exhibitor's ladders and hand tools to:

     (i)     set-up and dismantle exhibits displayed on Authority premises;

     (ii)    assemble and disassemble materials, machinery, or equipment on Authority premises; and

     (iii)   install all signs, graphics, props, balloons, other decorative items, and the exhibitor's own drapery, including the skirting of exhibitor tables, on the Authority's premises.

(2)     An exhibitor and exhibitor employees are permitted in a booth of any size to deliver, set-up, plug in, interconnect, and operate an exhibitor's electrical equipment, computers, audio-visual devices, and other equipment.

(3)     An exhibitor and exhibitor employees are permitted in a booth of any

5

size to skid, position, and re-skid all exhibitor material, machinery, and equipment on Authority premises.

(5) The Authority shall designate areas, in its discretion, where exhibitors may unload and load exhibitor materials from privately owned vehicles at Authority premises with the use of non-motorized hand trucks and dollies.

(6) On Monday through Friday for any consecutive 8-hour period during the hours of 6:00 a.m. and 10:00 p.m., union employees on authority premises shall be paid straight-time hourly wages plus fringe benefits. Union employees shall be paid straight-time and a half hourly wages plus fringe benefits for labor services provided after any consecutive 8-hour period; provided, however, that between the hours of midnight and 6:00 a.m. union employees shall be paid double straight-time wages plus fringe benefits for labor services.

(12) The Authority has the power to determine, after consultation with the advisory council, the work jurisdiction and scope of work of union employees on Authority premises during the move-in, move-out, and run of a show, provided that any affected labor organization may contest the authority's determination through a binding decision of an independent, third-party arbitrator. When making the determination, the Authority or arbitrator, as the case may be, shall consider the training and skills required to perform the task, past practices on Authority premises, safety, and the need for efficiency and exhibitor satisfaction. These factors shall be considered in their totality and not in isolation. Nothing in this item permits the Authority to eliminate any labor organization representing union employees that provide labor services on the move-in, move-out, and run of the show as of the effective date of this amendatory act of the 96th General Assembly.

(13) During the run of a show, all stewards of union employees shall be working stewards. Subject to the discretion of the authority, no more than one working steward per labor organization representing union employees providing labor services on authority premises shall be used per building and per show.

(14) An exhibitor or show manager may request by name specific union employees to provide labor services on authority premises consistent with all state and federal laws. Union employees requested by an exhibitor shall take priority over union employees requested by a show manager.

(16) Crew sizes for any task or operation shall not exceed 2 persons unless, after consultation with the Advisory Council, the Authority determines otherwise based on the task, skills, and training required to perform the task and on safety.

(19)     A show manager or contractor shall charge an exhibitor only for labor services provided by union employees on Authority premises on a minimum half-hour basis.

70 ILCS 210/5.4(c).

22.     The MPEA Act does not similarly restrict the ability of non-union employees to negotiate with their employer with respect to wages, hours and working conditions for work performed on the MPEA premises.

23.     The amendments to the MPEA Act set and regulate labor policy on MPEA premises, and, therefore, interfere with national labor policy as established by the NLRA

24.     The amendments to the MPEA Act are unlimited in duration, and, therefore, interfere with rights granted in the ISLRA and NLRA allowing employers and unions to negotiate collective bargaining agreements regarding wages, hours and terms and conditions of employment. 29 U.S.C. 157 and 5 ILCS 315/6.

25.     The amendments to the MPEA Act are not narrowly tailored for one particular show or particular job or a specific project and mandate conditions of employment that are normally reserved for free and open negotiation between employers and labor organizations under the ISLRA and NLRA. 29 U.S.C. 157 and 5 ILCS 315/6.

26     Determination of private sector work jurisdiction and related disputes between labor organizations representing employees of the same employer or working in the same facility is reserved to the National Labor Relations Board pursuant to the jurisdictional dispute provisions of the NLRA. 29 U.S.C. §§158(b)(4) and 160(b)

7

27.    The jurisdictional dispute provisions of the MPEA Act, as amended, interfere with the federal labor policy by directing such disputes to the MPEA and a third party arbitrator. 70 ILCS 210/5.4(c)(12).

28.    The amendments to the MPEA Act specifically targets union employees for discriminatory treatment and arbitrarily fails to regulate the ability of similarly situated non-union employees to negotiate with respect to wages, hours or conditions of employment.

## COUNT I
## CONTRACT IMPAIRMENT
## (TRADE SHOW AGREEMENT)

Plaintiff incorporates by reference paragraphs 1 through 28 above as if fully set out in this Count I.

29.    There is currently a collective bargaining agreement between Local 727 and private contractors ( Exhibit D known as the "Trade Show Agreement")

30.    The Trade Show Agreement has a term of January 1, 2009 through December 31, 2013, and currently remains in full force and effect.

31.    The Trade Show Agreement Agreement contains provisions concerning the terms of wages, hours, and working conditions of union employees which are substantially different and which are more favorable to union employees than the terms of the wages, hours, and working conditions of the MPEA Act, as amended.

32.    Pursuant to Section 26.1 of the Trade Show Agreement, the parties agreed that the Company would "recognize the historical jurisdiction of the Teamsters work." (Exhibit D, §26.1).

8

33. Section 26.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(1)-(3), (5) and (12), by allowing exhibitors and contractors to perform work historically within the exclusive jurisdiction of Local 727.

34. Pursuant to Section 2.1 (b) of the Trade Show Agreement, the parties agreed that the Company would employ all Referral Employees on the terms and conditions stated within the contract. (Exhibit D, §2.1(j))

35. Pursuant to Section 2.1(j) of the Trade Show Agreement, the parties agreed that Local 727 would make every reasonable effort to meet the <u>Contractors</u> request (by name) for Dock, Traffic and Leadmen Personnel. The parties agreed that the Company would rotate those requests. (Exhibit D, §2.1(j)(emphasis added)

36. Section 2.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(14), as it now allow exhibitors to request union personnel by name, that such requests will take precedence over requests by Contractors, and it does not require any employee rotation.

37. Pursuant to Section 5.3(g) of the Trade Show Agreement, the parties agreed that the Union Steward shall be a working steward with 6 bargaining unit members or less per floor. (Exhibit D, §5.3(g))

38. Section 5.3(g) of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(13), as it limits the number of stewards to one per building and per show.

39. Pursuant to Section 14.1 of the Trade Show Agreement, the parties agreed to compensate employees for a guaranteed number of hours. (Exhibit D, §14.1)

9

40.    Section 14.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(19), as it limits charges only for labor services provided by union employees.

41.    Pursuant to Section 14.3(a) of the Trade Show Agreement, the parties agreed to compensate employees at time and one-half for work performed before 8:00 a.m. and after 4:30 p.m. (Exhibit D, §14.3(a))

42.    Section 14.3(a) of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(6), as it prohibits certain overtime payments.

43.    Pursuant to a Trade Show Agreement Letter of Understanding, effective January 1, 2012, work historically performed by three man crews could be performed by two man crews (unless the Company chose otherwise) (Exhibit D, Letter of Understanding)

44.    The Letter of Understanding of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(16), as it immediately limits the crew size to 2.

45.    Pursuant to Section 10.1 of the Trade Show Agreement, the parties agreed that there would be no reduction or elimination of standards, privileges and benefits throughout the period of the agreement. (Exhibit D, §10.1)

46.    Section 10.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4© , by all the aforementioned restrictions referenced in ¶¶ 23 and 34-46 above.

10

47.    By reason of the foregoing, the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10, because it substantially impairs an existing contracts between the Plaintiff and private contractors

48.    By reason of the foregoing, the MPEA Act, as amended , violates the Contracts Clause of the United States Constitution, Article I, Section 10 because it violates contractual rights which induced Local 727 on behalf of its members,  to enter into the collective bargaining agreements with the private contractors, which were voted on and ratified by Local 727 members..

49.    Defendants are acting under color of state law to violate the rights of the Plaintiff as guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983, this Court may grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.    Declaring that the MPEA Act, as amended, violates the  Contracts Clause of the United States Constitution, Article I, Section 10, Clause 1 because it substantially impairs an existing contract between Local 727 and the  private contractors and for that reason is unconstitutional and void.

B.    Declaring that Defendants have acted under color of state law in infringing on the rights of Local 727 and its membership and are entitled to relief under 42 U.S.C. 1983.

C.    Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

D.    Enter a judgment for money damages for lost wages and fringe benefit

11

contributions for each and every member of the collective bargaining unit who lost employment, wages and/or fringe benefits by reason of the unconstitutional amendments to the MPEA Act.

E.    Grant Local 727 leave to file their petition for costs and attorneys fees pursuant to 42 U.S.C. 1988.

## COUNT II
## CONTRACT IMPAIRMENT
## (MPEA AGREEMENT)

Plaintiff incorporates by reference paragraphs 1 through 49 above as if fully set out in this Count II.

50.    There is currently a collective bargaining agreement between Local 727 and MPEA (Exhibit C) identified as "MPEA Agreement".

51.    The MPEA Agreement was entered into by Local 727's predecessor, Local 714, IBT and as successor, Local 727 and its members are entitled to the benefits of the MPEA Agreement I. (Exhibit C, Article 17)

52.    The MPEA Agreement has a term of January 1, 2007 through December 31, 2011, and currently remains in full force and effect.

53.    The MPEA Agreement contains provisions concerning the wages, hours, and working conditions of union employees which are substantially different and which are more favorable to union employees than the terms of the wages, hours, and working conditions of the MPEA Act, as amended.

54.    Pursuant to Section 11.1 of the MPEA Agreement, the parties agreed to compensate employees for a guaranteed number of hours on Saturdays. (Exhibit C, §11.1)

12

55.     Section 11.1 of the MPEA Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(19), as it limits charges only for labor services provided by union employees.

56.     Pursuant to Section 15.1 of the MPEA Agreement I, the parties agreed that the MPEA would not assign bargaining unit work outside of the bargaining unit. (Exhibit C, §15.1)

57.     Section 15.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(1)-(3), (5) by allowing exhibitors and contractors to perform bargaining unit work.

58.     By reason of the foregoing, the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10, because it substantially impairs an existing contracts between Local 727 and the Defendant MPEA.

59.     By reason of the foregoing, the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10 because it violates contractual rights which induced Local 727 on behalf of its members to enter into the collective bargaining agreement with the Defendant MPEA.

60.     Defendants are acting under color of state law to violate the rights of Local 727 as guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983, this Court may grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.      Declaring that the MPEA Act, as amended, violates the violates the Contracts Clause of the United States Constitution, Article I, Section 10, because it substantially impairs

13

an existing contract between Local 727 and the MPEA and for that reason is unconstitutional and void.

B.      Declaring that Defendants have acted under color of state law in infringing on the rights of Local 727 and its membership and are entitled to relief under 42 U.S.C. 1983.

C.      Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

D.      Enter a judgment for money damages for lost employment, wages and fringe benefits and/or contributions for each and every member of the collective bargaining unit who lost employment, wages and fringe benefit contributions by reason of the unconstitutional amendments to the MPEA Act.

E.      Grant Plaintiff leave to file their petition for costs and attorneys fees pursuant to 42 U.S.C. 1988.

## COUNT III
## PREEMPTION

Plaintiff incorporates by reference paragraphs 1 through 60 above, as if fully set out in this Count III.

61.     Congress has regulated the field of labor relations by passing the National Labor Relations Act, 29 U.S.C. 151, *et seq* ("NLRA") and by that legislation Congress has enacted an integrated and comprehensive scheme of regulation of labor relations in the private sector.

62.     By the enactment of the NLRA, states are preempted from enacting legislation which would regulate or otherwise interfere with the ability of private sector employees to

14

negotiate with their private employer with respect to the terms of wages, hours and working conditions.

63.    The MPEA Act, as amended, unlawfully regulates the ability of Local 727 to negotiate with employers with respect to the union employee's wages, hours and working conditions.

64.    The MPEA Act, as amended, violates the Supremacy Clause of the United States Constitution, Article VI, Clause 2, and for that reason is unconstitutional and void.

65.    Defendants are acting under color of state law in their violation of the rights of Local 727 as guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983 this Court may grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.    Declaring that the MPEA Act, as amended, is preempted by the NLRA,

B. Declaring that the MPEA Act, as amended, violates the violates the Supremacy Clause of the United States Constitution, Article VI, Clause 2, and for that reason is unconstitutional and void.

C.    Declaring that Defendants have acted under color of state law in infringing on the rights of Plaintiff and its members and Plaintiff is entitled to relief under 42 U.S.C. 1983.

D.    Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

E.    Enter a judgment for money damages lost employment, wages and fringe benefits and/or contributions for each and every member of the collective bargaining unit who lost

15

employment, wages and fringe benefits and/or contributions by reason of the unconstitutional

amendments to the MPEA Act.

    F.     Grant Plaintiff leave to file their petition for costs and attorneys fees pursuant to

42 U.S.C. 1988.

## COUNT IV
## EQUAL PROTECTION – ARBITRARY CLASSIFICATION

    Plaintiff incorporates by reference paragraphs 1 through 65 above as if fully set out in this

Count IV.

    66.     The MPEA Act, as amended, defines "union employees" and provides those

employees with fewer and less favorable rights than non-union employees.

    67.     Union employees are prohibited from bargaining for wages, hours, and terms and

conditions of employment more favorable than those set forth in the MPEA Act, as amended.

    68.     Similarly situated non-union employees are not similarly prohibited from

bargaining for wages, hours, and terms and conditions of employment more favorable than those

set forth in the MPEA Act, as amended.

    69.     The MPEA Act, as amended, violates the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution because the amendments create a

legislative classification of "union employees" that is unreasonable and arbitrary.

    70.     Defendants are acting under color of state law to violate the rights of Local 727 as

guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983 this Court may

grant relief.

    WHEREFORE, Plaintiff prays that this Court enter an Order:

16

A.    Declaring that the MPEA Act, as amended, creates an unreasonable and arbitrary classification of "union employees".

B.    Declaring that the MPEA Act, as amended, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the amendments create a legislative classification of "union employees" which is unreasonable and arbitrary and for that reason the above specified amendments to the MPEA Act are unconstitutional and void.

C.    Declaring that Defendants have acted under color of state law in infringing on the rights of Plaintiff and its membership and are entitled to relief under 42 U.S.C. 1983.

D.    Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

E.    Enter a judgment for money damages, lost employment, wages and fringe benefits and/or contributions for each and every member of the collective bargaining unit who lost employment, wages and fringe benefit contributions by reason of the unconstitutional amendments to the MPEA Act.

F.    Grant Local 727 leave to file their petition for costs and attorneys fees pursuant to 42 U.S.C. 1988.

**COUNT V**
**ILLINOIS CONSTITUTION**
**SPECIAL LEGISLATION ("UNION EMPLOYEES")**

Plaintiff incorporates by reference paragraphs 1 through 70 above, as if fully set out in this Count V.

71.    The Illinois Constitution of 1970, Article IV, Section 13 bans special legislation and states the following:

17

The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination.

72.     The Illinois Constitution of 1970, Article IV, Section 13 prohibits legislation which discriminates in favor of a select class of persons and against a similarly situated disfavored class of persons.

73.     The MPEA Act, as amended, treats "union employees" more restrictively and less favorably than it does non-union employees who are performing similar work.

74.     The MPEA Act, as amended, discriminates in favor of non-union employees without a sound and reasonable basis and is prohibited as special legislation under Article IV, Section 13 of the Illinois Constitution of 1970.

75.     Defendants are acting under color of state law to violate the rights of Local 727 as guaranteed by the Illinois Constitution of 1970 and pursuant to Article IV, Section 13, this Court is authorized to grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.     Declaring that the MPEA Act, as amended, creates an arbitrary and irrational classification of "union employees" which classification discriminates in favor of union employees and discriminates against similarly situated non-union employees without a sound and reasonable basis.

B.     Declaring that the MPEA Act, as amended, violates the Article IV, Section 13 of the Illinois Constitution of 1970 because the amendments create a legislative classification of unreasonably favors non-union employees and discriminates against similarly situated union employees.

18

C.    Enter a permanent injunction prohibiting Defendants from enforcing the above

specified amendments to the MPEA Act.

D.    Enter a judgment for money damages, lost employment, wages and fringe benefits

and/or contributions for each and every member of the collective bargaining unit who lost

employment, wages and fringe benefit contributions by reason of the unconstitutional

amendments to the MPEA Act.

**COUNT VI**
**ILLINOIS CONSTITUTION**
**SPECIAL LEGISLATION (JAMES REILLY)**

Plaintiff incorporates by reference paragraphs 1 through 75 above, as if fully set out in

this Count VI.

76.    The MPEA Act, as amended, specifically appoints Defendant James Reilly to the

position of Trustee of the MPEA . 70 ILCS 210/4.5:

> As provided in Senate Bill 28 of the 96[th] General Assembly, the Trustee of the
> Authority is James Reilly . . . .

77.    The MPEA Act, as amended, discriminates in favor of Defendant Reilly without a

sound and reasonable basis and is prohibited as special legislation under Article IV, Section 13 of

the Illinois Constitution of 1970.

78.    The appointment of a Trustee for the MPEA could have been achieved without

the specific legislative appointment of Defendant Reilly and is prohibited as special legislation

under Article IV, Section 13 of the Illinois Constitution of 1970.

79.    Defendants are either enforcing the above specified amendments to the MPEA

Act or are threatening to enforce those amendments. They are acting under color of state law to

19

violate the rights of Local 727 as guaranteed by the Illinois Constitution of 1970 and pursuant to

Article IV, Section 13, this Court is authorized to grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.      Declaring that the MPEA Act, as amended, discriminates in favor of Defendant

Reilly without a sound and reasonable basis.

B.      Declaring that the MPEA Act, as amended, violates the Article IV, Section 13 of

the Illinois Constitution of 1970 because the amendment discriminates in favor of Defendant

Reilly without a sound and reasonable basis.

C.      Enter a permanent injunction prohibiting Defendants from enforcing the above

specified amendment to the MPEA Act.

## COUNT VII
## ILLINOIS STATE LABOR RELATIONS ACT

Plaintiff incorporates by reference paragraphs 1 through 79 above, as if fully set out in

this Count VII.

80.      There is currently a collective bargaining agreement between Local 727 and

MPEA (attached as Exhibit C identified as "MPEA Agreement")

81.      The MPEA Agreement has a term of January 1, 2007 through December 31, 2011,

and currently remains in full force and effect.

82.      The ISLRA provides that:

in case of any conflict between the provisions of this Act and any other law . . . ,
relating to wages, hours and conditions of employment and employment relations,
the provisions of this Act or any collective bargaining agreement negotiated
thereunder shall prevail and control. 5 ILCS 315/15.

83.     The MPEA Act contains provisions concerning the terms of wages, hours, and working conditions of union employees which are substantially different than the rights provided in the MPEA Agreement.

84.     By reason of the foregoing, the MPEA Act, as amended, is in direct conflict with the MPEA Agreement.

85.     Due to the conflict the MPEA Agreement and the terms contained therein shall prevail and control.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.     Declaring that the MPEA Act, as amended, is in conflict with the MPEA Agreement.

B.     Declaring that the MPEA Agreement shall prevail and control.

C.     Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendment to the MPEA Act.

D.     Enter a judgment for money damages, lost wages and fringe benefit contributions for each and every member of the collective bargaining unit who lost wages and fringe benefit contributions by reason of the amendments to the MPEA Act.

Respectfully submitted,

/s/ Margaret Angelucci
Marvin Gittler
Margaret Angelucci
Ryan Hagerty
Asher, Gittler & D'Alba
200 W. Jackson, Suite 1900
Chicago, Illinois 60606

# Exhibit C

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 4.0.3
### Eastern Division

Local 727, International Brotherhood of
Teamsters

                                                    Plaintiff,

v.                                                                    Case No.: 1:10−cv−03484
                                                                     Honorable Virginia M.
                                                                     Kendall

Metropolitan Pier and Exposition Authority, et
al.

                                                    Defendant.
_____

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, July 19, 2010:

     MINUTE entry before Honorable Virginia M. Kendall:Preliminary injunction
hearing date of 7/22/2010 is stricken pending ruling by Judge Guzman on the motion for
relatedness. Status hearing is set for 8/25/2010 at 09:00 AM.Mailed notice(jms, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

# Exhibit D

1

1

2

3

4                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
5                         EASTERN DIVISION

6

7

LOCAL 727, INTERNATIONAL              Case No. 1:10-cv-03484
8  BROTHERHOOD OF TEAMSTERS,

9    Plaintiff,                       Chicago, Illinois
                                      July 28, 2010
10       v.                           Motion for Temporary
                                      Restraining Order
11

METROPOLITAN PIER AND
12 EXPOSITION AUTHORITY, et al.,

13   Defendants.
   -------------------------------

14

15      TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER
           BEFORE THE HONORABLE VIRGINIA M. KENDALL
16               UNITED STATES DISTRICT JUDGE

17

18 APPEARANCES:

19

20 For the Plaintiff:     Asher, Gittler, Greenfield,
                          Cohen & D'Alba
21                        By:  Marvin Gittler,
                               Margaret A. Angelucci, and
22                             Ryan A. Hagerty
                          200 W. Jackson Blvd., Ste. 1900
23                        Chicago, IL 60606
                          (312) 263-1500
24

25

1

2

3    <u>APPEARANCES (Cont'd)</u>:

4

5    For the Defendants:        Franczek Radelet PC
     MPEA and                   By:  Michael A. Warner, Jr., and
6    James Reilly                    Sally J. Scott
                                300 S. Wacker Dr., Ste.  3400
7                               Chicago, IL 60606
                                (312) 986-0300
8

9    For the Defendant:         Illinois Attorney General's Office
10   Lisa Madigan               By:  Paul Berks, and
                                     Thomas A. Ioppolo
11                              100 W. Randolph St., 13th Fl.
                                Chicago, IL 60601
12                              (773) 343-3778

13

14

     <u>COURT REPORTER</u>:            FEDERAL OFFICIAL COURT REPORTER
15                              April M. Metzler, RPR, CRR, FCRR
                                219 South Dearborn St., Rm. 2318-A
16                              Chicago, IL 60604
                                (312) 408-5154
17                              April_Metzler@ilnd.uscourts.gov

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by notereading.

| 09:25:26 | 1 | (Commenced at 9:25 a.m.) |
| 09:25:26 | 2 | THE CLERK:  10C3484, Local 727, International |
| 09:25:32 | 3 | Brotherhood of Teamsters versus Metropolitan Pier and |
| 09:25:41 | 4 | Exposition Authority. |
| 09:25:41 | 5 | MR. GITTLER:  Good morning, your Honor.  Marvin -- |
| 09:25:41 | 6 | THE COURT:  Hold on just one second. |
| 09:25:41 | 7 | (Discussion had off the record.) |
| 09:25:47 | 8 | THE COURT:  Gentlemen, just move aside for just a |
| 09:25:48 | 9 | second and let's see if we can recall, because you're going to |
| 09:25:51 | 10 | take longer -- we want to recall a case that's just a status. |
| 09:31:33 | 11 | (Recess taken.) |
| 09:31:33 | 12 | THE COURT:  All right.  Let's try again for the TRO. |
| 09:31:37 | 13 | THE CLERK:  10C3484, Local 727, International |
| 09:31:43 | 14 | Brotherhood of Teamsters versus Metropolitan Pier and |
| 09:31:45 | 15 | Exposition Authority. |
| 09:31:45 | 16 | MR. GITTLER:  Good morning, your Honor.  Marvin |
| 09:31:46 | 17 | Gittler, Local 727, plaintiff. |
| 09:31:49 | 18 | THE COURT:  Okay.  Good morning. |
| 09:31:51 | 19 | MS. ANGELUCCI:  Good morning, your Honor.  Margaret |
| 09:31:53 | 20 | Angelucci. |
| 09:31:53 | 21 | THE COURT:  I missed your last name. |
| 09:31:54 | 22 | MS. ANGELUCCI:  Angelucci, A-n-g-e-l-u-c-c-i. |
| 09:31:58 | 23 | THE COURT:  All right.  Good morning, Ms. Angelucci. |
| 09:32:00 | 24 | MR. HAGERTY:  Good morning, your Honor.  Ryan Hagerty |
| 09:32:02 | 25 | on behalf of the plaintiff. |

| | | |
|---|---|---|
| 09:32:02 | 1 | THE COURT:   Okay.   Good morning, Mr. Hagerty. |
| 09:32:04 | 2 | MR. WARNER:   Good morning, your Honor.   Michael |
| 09:32:07 | 3 | Warner on behalf of Metropolitan Pier and Exposition Authority |
| 09:32:09 | 4 | and James Reilly. |
| 09:32:10 | 5 | THE COURT:   Good morning. |
| 09:32:11 | 6 | MS. SCOTT:   Good morning.   Sally Scott on behalf of |
| 09:32:14 | 7 | Metropolitan Pier and Exposition Authority and James Reilly. |
| 09:32:16 | 8 | THE COURT:   Okay.   Good morning. |
| 09:32:18 | 9 | MR. BERKS:   Paul Berks on behalf of Lisa Madigan, the |
| 09:32:22 | 10 | Attorney General. |
| 09:32:22 | 11 | THE COURT:   Good morning.   Berks with a plural, |
| 09:32:23 | 12 | right? |
| 09:32:24 | 13 | MR. BERKS:   B-e-r-k-s. |
| 09:32:25 | 14 | THE COURT:   Okay. |
| 09:32:28 | 15 | MR. IOPPOLO:   And Thomas Ioppolo also on behalf of |
| 09:32:31 | 16 | the Attorney General, Lisa Madigan. |
| 09:32:33 | 17 | THE COURT:   Good morning, folks. |
| 09:32:34 | 18 | MR. IOPPOLO:   Good morning, your Honor. |
| 09:32:34 | 19 | THE COURT:   Okay.   Well, I was hoping that Judge |
| 09:32:38 | 20 | Guzman would rule.   I called Judge Guzman to ask him about the |
| 09:32:40 | 21 | relatedness issue.   There is no reason -- I am an efficient |
| 09:32:45 | 22 | judge but there is no reason to do two times the work for two |
| 09:32:47 | 23 | of us, so that's why I had asked him about the relatedness |
| 09:32:51 | 24 | motion. |
| 09:32:51 | 25 | He said that he wasn't ready to rule on it.   That's |

| | |
|---|---|
| 09:32:55 | 1 |
| 09:32:58 | 2 |
| 09:33:03 | 3 |
| 09:33:09 | 4 |

1  why I moved your preliminary injunction motion.  I can't
2  imagine it's going to take too long for him to get to it, but
3  that was my intent in the sua sponte order that moved the
4  preliminary injunction.
5       But now, of course, we have the TRO where
6  defendants -- or, rather, plaintiffs -- excuse me -- are
7  alleging that factors have changed since the original filing,
8  because certain individuals have asserted that they will be
9  impacted in invoking this change in the statute, which they
10  believe will cause them harm.
11       So I will deal with the TRO now, and we'll still wait
12  for the preliminary injunction issue, depending on whether
13  Judge Guzman takes it or not, which I think you're going to
14  hear shortly.  I can't imagine it's going to take you too
15  long, but today we'll do the TRO.
16       So let me hear, first, from the plaintiffs as to why
17  you believe that you -- and I have received the motion and the
18  response and all the exhibits.  So I think I'm all set for
19  you.
20       MR. GITTLER:  Your Honor, if you'll allow, we -- or I
21  received the response to the TRO motion late yesterday.  I was
22  out of town until about 8:00 o'clock last night.  I went over
23  it, but my partners -- I may want to ask them to add to any
24  points that I may miss.
25       THE COURT:  Your colleagues?

09:34:32  1      MR. GITTLER:  My colleagues.

09:34:33  2      THE COURT:  Oh, that's fine, your partners, that's

09:34:35  3  fine.

09:34:35  4      MR. GITTLER:  My brains actually.

09:34:37  5      (Laughter.)

09:34:39  6      MR. GITTLER:  Basically --

09:34:39  7      THE COURT:  Oh, I read it on the treadmill this

09:34:42  8  morning at 6:00, so ...

09:34:44  9      (Laughter.)

09:34:45  10     THE COURT:  So I don't know.  I didn't talk to my

09:34:47  11 partners or colleagues over here yet either.  So let's just

09:34:51  12 move forward and hear what your position is.

09:34:53  13     MR. GITTLER:  Thank you, your Honor.

09:34:55  14     Your Honor, the -- our presence today in a sense was

09:35:01  15 anticipated.  I will say, as you indicate, that I was

09:35:05  16 surprised that we haven't resolved the reassignment issue at

09:35:13  17 this point, and --

09:35:14  18     THE COURT:  You know, it's not a big issue.

09:35:17  19 Different judges do things differently.  I move things along

09:35:21  20 quickly.  I gave you the schedule quickly.  But even in my

09:35:25  21 desire to be efficient, it is shooting myself in the foot if

09:35:28  22 he is going to take it, and it's his call as to whether he

09:35:32  23 takes it.

09:35:33  24     So for a preliminary injunction, we have a little bit

09:35:35  25 of time to rule on those issues.  So if this motion was solely

| | | |
|---|---|---|
| 09:35:40 | 1 | triggered by a desire to move it along, I will be |
| 09:35:46 | 2 | disappointed.  If it is triggered by what you believe is |
| 09:35:50 | 3 | changed circumstances leading to irreparable injury, that's |
| 09:35:54 | 4 | why I'm dealing with it now for you. |
| 09:35:56 | 5 | MR. GITTLER:  And that, indeed, is our belief, your |
| 09:35:56 | 6 | Honor. |
| 09:35:59 | 7 | THE COURT:  Okay. |
| 09:35:59 | 8 | MR. GITTLER:  We've got approximately -- depending |
| 09:36:03 | 9 | upon which contract one looks at -- about 6- to 700 employees |
| 09:36:10 | 10 | covered by the trade agreement and another several hundred, |
| 09:36:17 | 11 | and at times maybe even more than that, covered by the MPEA |
| 09:36:23 | 12 | agreement. |
| 09:36:24 | 13 | We received information, as your Honor noted, that |
| 09:36:27 | 14 | effective August 1 the MPEA, along with the show managers, |
| 09:36:41 | 15 | show contractors, and, I assume, the exhibitors are going to |
| 09:36:46 | 16 | implement these rules, which were legislated about a month |
| 09:36:53 | 17 | ago, which rules will adversely affect our jurisdiction, our |
| 09:37:00 | 18 | jobs. |
| 09:37:02 | 19 | And I might point out that with jurisdiction and |
| 09:37:05 | 20 | jobs, by changing our contract to allow individuals or |
| 09:37:13 | 21 | companies with whom we have no relationship to do our work, it |
| 09:37:19 | 22 | will be ne'er impossible for us to monitor what losses may |
| 09:37:26 | 23 | attend to affected employees.  We just won't know who they |
| 09:37:32 | 24 | are. |
| 09:37:32 | 25 | And that point was made in a somewhat different |

09:37:35  1  context in our initial filings in the preliminary and are

09:37:41  2  contained in those documents.

09:37:43  3          THE COURT:  All right.  Let's cut to the chase.

09:37:45  4          In order to get a TRO, you need to allege that you

09:37:50  5  have an inadequate remedy at law.  And we know that you have a

09:37:53  6  lawsuit filed, that I will handle or Judge Guzman will handle.

09:37:59  7  We also know that money damages are available to you with that

09:38:05  8  lawsuit, if you were to win that lawsuit.  So we know that

09:38:09  9  those are available.

09:38:09  10         So you need to address what is the inadequate remedy

09:38:13  11 at law and the irreparable injury.  Because the way you stated

09:38:22  12 it in your brief is that is, quote, Harm of one or more of the

09:38:23  13 constitutional violations argued by plaintiffs -- which is

09:38:27  14 really nebulous and circular;

09:38:29  15         Harm in the form of interference with the right to

09:38:32  16 bargain -- which appears not to be the case, since both of the

09:38:35  17 individual firms that have contacted your clients have said

09:38:40  18 that they will bargain with you;

09:38:42  19         And harm in the form of damage of plaintiff's

09:38:45  20 reputation as an effective bargaining agent -- which doesn't

09:38:48  21 appear to exist if there is the ability to bargain;

09:38:54  22         Damage to plaintiff's relationship with its

09:38:56  23 membership -- that's an interesting one, which I would like to

09:38:59  24 hear more about.  I have not seen that as being substantiating

09:39:05  25 a TRO.

09:39:05  1      And then the likely loss of healthcare eligibility,

09:39:09  2  which is based on, from my review of the documents, a rather

09:39:14  3  speculative assessment that the employees will not be able to

09:39:18  4  work the same number of hours.

09:39:20  5      And when we do all of these harms and we're balancing

09:39:25  6  the damages to the defendants versus the plaintiffs, which is

09:39:29  7  one of our last factors, and taking into account society's

09:39:37  8  good as well, I have to ask a few questions, such as, number

09:39:42  9  one, if we're losing business over at the Metropolitan Pier --

09:39:47  10  or McCormick Place, I'll say, I don't know if that's an

09:39:50  11  appropriate thing to call it anymore, whether there's so many

09:39:53  12  titles -- if we're losing business regularly and the

09:39:56  13  legislation comes in, and now we see signs, as documented to

09:39:59  14  me, that there may be an increase in business, if you're

09:40:04  15  losing business, wouldn't you be losing hours worked as it is?

09:40:09  16  So the harm is already being incurred pre-legislation for loss

09:40:16  17  of business that would result in less health benefits if there

09:40:21  18  were less hours, and now we might actually be eradicating that

09:40:25  19  harm because we have more business coming in.

09:40:27  20      So those are all of my initial thoughts.  And since

09:40:30  21  this is a TRO, why don't you cut to the chase and address

09:40:33  22  those initial concerns.

09:40:34  23      MR. GITTLER:  As far as those issues are concerned,

09:40:38  24  your Honor, there are several responses.  One, the obligation

09:40:44  25  to bargain that is referred to in the two letters, it is an

| | | |
|---|---|---|
| 09:40:55 | 1 | obligation that, in our view, merely, one, does not refute |
| 09:41:07 | 2 | irreparable harm.  It is an admission of the impairment. |
| 09:41:13 | 3 | They're saying that we have impaired -- we have |
| 09:41:20 | 4 | alleged nine specific subjects of bargaining in our contracts |
| 09:41:26 | 5 | that cannot be enforced.  The employers have said they cannot |
| 09:41:33 | 6 | and will not discuss these issues -- |
| 09:41:36 | 7 | THE COURT:  And can you put those nine specific -- I |
| 09:41:39 | 8 | read the contract.  What are the nine specific impairments? |
| 09:41:46 | 9 | Because I thought it had to do with who was allowed to put |
| 09:41:49 | 10 | certain things up in the booths, size of the booths, |
| 09:41:54 | 11 | et cetera. |
| 09:41:54 | 12 | MR. GITTLER:  It includes that.  It includes -- that |
| 09:42:00 | 13 | listing -- can I have just one moment? |
| 09:42:02 | 14 | THE COURT:  Absolutely.  I think I do need to have |
| 09:42:05 | 15 | some meat on the bones for this, because it's only in regard |
| 09:42:09 | 16 | to what you're not allowed to do any longer, under your |
| 09:42:14 | 17 | agreement, that we can assess whether you're being harmed |
| 09:42:18 | 18 | irreparably, or if you are being harmed to the extent that you |
| 09:42:21 | 19 | have a lawsuit that may seek damages.  And if you've got a |
| 09:42:24 | 20 | lawsuit that may seek damages, then we don't have equitable |
| 09:42:28 | 21 | relief.  We just have work to do.  So let's talk about the |
| 09:42:31 | 22 | equitable relief. |
| 09:42:31 | 23 | (No response.) |
| 09:42:38 | 24 | THE COURT:  Just a nutshell.  You don't have to be |
| 09:42:39 | 25 | very specific.  Can you help me with that? |

| | | |
|---|---|---|
| 09:42:41 | 1 | MS. ANGELUCCI:  Sure.  I think one of the biggest |
| 09:42:43 | 2 | issues is the work jurisdiction issue. |
| 09:42:44 | 3 | THE COURT:  Okay.  Which is what? |
| 09:42:45 | 4 | MS. ANGELUCCI:  Historically, the Teamsters have been |
| 09:42:48 | 5 | given exclusive authority to perform certain work, docks, |
| 09:42:52 | 6 | delivering things to the exhibitors within the McCormick Place |
| 09:42:55 | 7 | area.  Under the legislation now, the exhibitors, the |
| 09:42:58 | .8 | contractors, and pretty much anybody else can now do the |
| 09:43:01 | 9 | jurisdictional work of the Teamsters. |
| 09:43:03 | 10 | So with regard to the new shows generating work, |
| 09:43:07 | 11 | well, if everybody can do our work, we're not going to be |
| 09:43:09 | 12 | there to do it in the first place.  So we've pretty much lost |
| 09:43:12 | 13 | the ability to do the work in its entirety.  That's one of |
| 09:43:15 | 14 | the -- and one of the most important impairments. |
| 09:43:18 | 15 | The second impairment is -- and this is found in |
| 09:43:21 | 16 | several different areas, but the decrease of overtime hours. |
| 09:43:26 | 17 | I think there's three different sections under 5.4(c) that |
| 09:43:30 | 18 | directly impact that. |
| 09:43:31 | 19 | The two other sections deal with jurisdictional |
| 09:43:34 | 20 | disputes.  Now, MPEA is saying, There's a jurisdictional |
| 09:43:39 | 21 | dispute between anybody.  We're resolving it.  So if Teamsters |
| 09:43:42 | 22 | come up and say, Look, they're doing our work, MPEA gets to |
| 09:43:47 | 23 | decide whether or not that's a valid dispute.  Historically |
| 09:43:50 | 24 | that's been decided by the NLRB. |
| 09:43:53 | 25 | Additionally, there's violations of the contract that |

| | | |
|---|---|---|
| 09:43:55 | 1 | talk about the referral system.  727 has a referral system. |
| 09:43:59 | 2 | Employees are on the books to get the work, and that has been |
| 09:44:03 | 3 | a function of contractors requesting employees through the |
| 09:44:06 | 4 | referral system. |
| 09:44:07 | 5 | Now that has changed and the exhibitors are now able |
| 09:44:11 | 6 | to -- and MPEA is now able to go to the referral system and |
| 09:44:16 | 7 | make direct -- |
| 09:44:16 | 8 | MR. WARNER:  Your Honor, if I may, on that one point, |
| 09:44:19 | 9 | the referral -- the ability of exhibitors to request |
| 09:44:23 | 10 | employees, that is not being implemented on August 1st. |
| 09:44:26 | 11 | MS. ANGELUCCI:  We were not aware of that. |
| 09:44:28 | 12 | THE COURT:  Okay. |
| 09:44:28 | 13 | MR. WARNER:  It's in the memo -- it's in the notice |
| 09:44:30 | 14 | that they -- that -- the rules that are being implemented is |
| 09:44:34 | 15 | in the notice.  They attached it as part of their motion. |
| 09:44:36 | 16 | THE COURT:  Okay. |
| 09:44:39 | 17 | MR. GITTLER:  Do you know when will it be? |
| 09:44:40 | 18 | MR. WARNER:  No.  For some of the reasons that |
| 09:44:43 | 19 | plaintiff points out, there's complexities into how to come up |
| 09:44:47 | 20 | with the mechanism for exhibitors to do that and to coordinate |
| 09:44:51 | 21 | things with all the parties, so that particular part of the |
| 09:44:55 | 22 | statute is going to take some time.  They're working on |
| 09:44:57 | 23 | developing a process.  They may have -- I imagine they |
| 09:45:00 | 24 | probably even talked to the Teamsters representatives about |
| 09:45:03 | 25 | that.  But there's been -- |

09:45:05  1        MS. ANGELUCCI:  Not that we know of.

09:45:06  2        THE COURT:  Okay.

09:45:07  3        MR. GITTLER:  As of this morning, your Honor --

09:45:08  4        THE COURT:  Okay.  This is the way we're going to do

09:45:10  5   it, folks.  You're speaking right now.  What's your name

09:45:12  6   again?

09:45:12  7        MS. ANGELUCCI:  Margaret Angelucci.

09:45:14  8        THE COURT:  All right.  She's speaking right now, and

09:45:16  9   I'll give you a chance to respond.  All right.  So referral

09:45:18  10  system, you can respond to that in a minute.

09:45:20  11       What else?

09:45:20  12       MS. ANGELUCCI:  There's a change in the crew size.

09:45:22  13  The Teamsters have negotiated that effective in 2012 they

09:45:26  14  would agree that certain work could be quanitified, crew sizes

09:45:29  15  made up of two men or women.  They -- under the legislation,

09:45:33  16  it's implemented immediately that that crew size is reduced to

09:45:36  17  two.  So we're now cut out by, obviously, 30 percent of the

09:45:39  18  work.

09:45:39  19       THE COURT:  Okay.

09:45:40  20       MS. ANGELUCCI:  And I believe the last one is the

09:45:43  21  ability to have union representation on the floors.  Under the

09:45:48  22  contract, there was one steward for every six employees.  Now,

09:45:53  23  under the legislation, there's one steward for an entire show

09:45:57  24  per floor.  So that has significantly limited our ability to

09:46:00  25  represent our members, because we don't have representatives

| 09:46:02 | 1 | out there ready and able to address the issues of our members. |
| 09:46:06 | 2 | THE COURT:  Okay.  All right.  Now that we have that, |
| 09:46:09 | 3 | so those are the harms.  And why are -- why is any one of |
| 09:46:17 | 4 | those harms one that is irreparable and not capable of being |
| 09:46:22 | 5 | redressed through monetary damages? |
| 09:46:28 | 6 | MR. GITTLER:  The reason behind that, your Honor, as |
| 09:46:33 | 7 | I indicated a few moments ago, there is no way with the |
| 09:46:37 | 8 | exception of some of the crew size reductions -- and only |
| 09:46:44 | 9 | some -- but there's no way we can monitor how and who this |
| 09:46:51 | 10 | work is going to be lost or lost to.  We have no relationship |
| 09:46:57 | 11 | with the exhibitors, that is, we have no contractual |
| 09:47:01 | 12 | relationship with the exhibitors.  We have no relationship |
| 09:47:03 | 13 | with the show managers.  We do have a contract relationship |
| 09:47:09 | 14 | with the contractor.  The contractor, I don't know -- |
| 09:47:15 | 15 | THE COURT:  So what is impaired then? |
| 09:47:20 | 16 | MR. GITTLER:  What is impaired -- |
| 09:47:21 | 17 | THE COURT:  You have to articulate -- |
| 09:47:23 | 18 | MR. GITTLER:  What is impaired are those terms of our |
| 09:47:27 | 19 | contract, which gave us the legal right to do this work where |
| 09:47:34 | 20 | others could not. |
| 09:47:35 | 21 | THE COURT:  And that's remedy that can be redressed |
| 09:47:39 | 22 | with monetary damages. |
| 09:47:40 | 23 | MR. GITTLER:  But, your Honor, we have no way to |
| 09:47:42 | 24 | identify individuals who are going to be adversely affected. |
| 09:47:49 | 25 | That is a key issue for us. |

| | | |
|---|---|---|
| 09:47:54 | 1 | Additionally -- |
| 09:47:54 | 2 | THE COURT:  I don't understand that.  I'm sorry.  Can |
| 09:47:56 | 3 | you explain what you mean by that? |
| 09:47:58 | 4 | MS. ANGELUCCI:  Let me take a crack. |
| 09:47:59 | 5 | THE COURT:  Sure. |
| 09:48:00 | 6 | MR. GITTLER:  Go ahead. |
| 09:48:01 | 7 | MS. ANGELUCCI:  The -- when the exhibitors are doing |
| 09:48:03 | 8 | the work, there's no way for us to identify that employee John |
| 09:48:08 | 9 | Doe would have done that work but for the violation of the |
| 09:48:11 | 10 | contract. |
| 09:48:11 | 11 | In addition, if we're not in there, there's no way |
| 09:48:14 | 12 | for us to quantify the number of people that would have been |
| 09:48:17 | 13 | doing the work or the hours that would have been performed. |
| 09:48:20 | 14 | THE COURT:  Well, you're not prohibited from being |
| 09:48:22 | 15 | there.  You're still there.  The hours -- you're limited, |
| 09:48:26 | 16 | right? |
| 09:48:26 | 17 | I mean, my understanding of the legislation is that |
| 09:48:29 | 18 | it gives broader ability for others to do what was primarily |
| 09:48:36 | 19 | union work before, so that an exhibitor, for example, in a 300 |
| 09:48:41 | 20 | or less square foot exhibit, can now put up a poster or lights |
| 09:48:46 | 21 | hanging or whatever else, where they before would have to |
| 09:48:49 | 22 | require a union person to come in. |
| 09:48:51 | 23 | MS. ANGELUCCI:  That's kind of the work of the |
| 09:48:53 | 24 | carpenters, but I understand what you're saying. |
| 09:48:54 | 25 | THE COURT:  Okay.  So that's my limited |

| | | |
|---|---|---|
| 09:48:57 | 1 | understanding.  I'm just trying to make it like -- put some |
| 09:49:00 | 2 | meat on the bones.  So if that's the situation or the scenario |
| 09:49:04 | 3 | then, you would have documentation of all exhibitors within |
| 09:49:09 | 4 | the show, right? |
| 09:49:10 | 5 | MS. ANGELUCCI:  Well -- |
| 09:49:11 | 6 | THE COURT:  And you're on the floor, right? |
| 09:49:13 | 7 | MS. ANGELUCCI:  We don't know.  I mean, if they're |
| 09:49:15 | 8 | doing our work, we don't even know if we're going to be there. |
| 09:49:19 | 9 | THE COURT:  Oh, you're assuming that all of the |
| 09:49:20 | 10 | exhibitors can do all of their own work and will not even be |
| 09:49:21 | 11 | there? |
| 09:49:21 | 12 | MS. ANGELUCCI:  Under the legislation, there's |
| 09:49:24 | 13 | nothing that prohibits the exhibitors from doing all the work. |
| 09:49:27 | 14 | There's nothing that says, If you do X amount of work, then -- |
| 09:49:31 | 15 | THE COURT:  Well, that's not what your motion |
| 09:49:33 | 16 | alleged, that you are being completely removed from McCormick |
| 09:49:36 | 17 | Place. |
| 09:49:36 | 18 | MS. ANGELUCCI:  I mean, at this point, because -- |
| 09:49:37 | 19 | THE COURT:  But isn't that speculation? |
| 09:49:39 | 20 | MS. ANGELUCCI:  We don't know what's going to happen. |
| 09:49:40 | 21 | THE COURT:  Okay. |
| 09:49:41 | 22 | MS. ANGELUCCI:  I mean, under the legislation, |
| 09:49:41 | 23 | there's no limitation on that. |
| 09:49:44 | 24 | Also, to follow up on the irreparable harm -- |
| 09:49:44 | 25 | THE COURT:  Well, there is a limitation under the |

| | | |
|---|---|---|
| 09:49:47 | 1 | legislation, right?  I mean, the legislation defines when |
| 09:49:51 | 2 | someone else can do work that you say you normally had the |
| 09:49:54 | 3 | ability to do, and it doesn't take all work away. |
| 09:49:58 | 4 | MR. GITTLER:  It doesn't define when, your Honor. |
| 09:49:59 | 5 | THE COURT:  It defines what the work is. |
| 09:50:01 | 6 | MS. ANGELUCCI:  The only -- |
| 09:50:02 | 7 | MR. GITTLER:  But not when. |
| 09:50:04 | 8 | THE COURT:  Well, what's the distinction with you, |
| 09:50:07 | 9 | Counselor? |
| 09:50:07 | 10 | MR. GITTLER:  The distinction is, as I said -- and |
| 09:50:11 | 11 | apparently not clear enough -- there is no way to police the |
| 09:50:18 | 12 | impairment done to our members.  We can't say, Who did -- Who |
| 09:50:27 | 13 | did our work?  We can't go around and police the exhibits. |
| 09:50:34 | 14 | Technically, your Honor's point -- and I understand |
| 09:50:38 | 15 | it -- is that somebody's going to lose a job, therefore, |
| 09:50:43 | 16 | somebody's going to lose money, therefore we have a remedy at |
| 09:50:47 | 17 | law. |
| 09:50:48 | 18 | We don't know, your Honor, who's going to lose the |
| 09:50:51 | 19 | job -- |
| 09:50:52 | 20 | THE COURT:  But that's speculation of damages.  It's |
| 09:50:55 | 21 | not irreparable harm.  That's speculative damages, which maybe |
| 09:50:59 | 22 | you would need to call in an expert to quantify for you.  I |
| 09:51:02 | 23 | mean, in order to get equitable relief, you have to have -- to |
| 09:51:06 | 24 | me, the strongest part that you have for equitable relief is |
| 09:51:10 | 25 | your interference with your right to bargain.  And that is |

| | | |
|---|---|---|
| 09:51:17 | 1 | unfortunately addressed, I think, in those letters saying, |
| 09:51:21 | 2 | We're still willing to bargain. |
| 09:51:22 | 3 | MS. ANGELUCCI: Your Honor, on -- following up on the |
| 09:51:25 | 4 | irreparable harm, being able to quantify what the damages are, |
| 09:51:29 | 5 | even if that were accurate, which we obviously take issue |
| 09:51:32 | 6 | with, the -- we don't -- who would we sue? GES and Freeman |
| 09:51:39 | 7 | are the largest show managers. They haven't put in -- |
| 09:51:40 | 8 | THE COURT: Well, you're not suing the exhibitors. |
| 09:51:42 | 9 | You're suing -- |
| 09:51:43 | 10 | MS. ANGELUCCI: We can't -- |
| 09:51:44 | 11 | THE COURT: No, but that's not your remedy. |
| 09:51:46 | 12 | Let me hear from the defense. |
| 09:51:48 | 13 | MR. WARNER: Okay. First of all, the issue they |
| 09:51:53 | 14 | raise regarding they can't sue exhibitors raises a huge and |
| 09:51:59 | 15 | insurmountable hurdle for their case on the merits. |
| 09:52:02 | 16 | As you pointed out, your Honor, and as plaintiff |
| 09:52:05 | 17 | pointed out, they have no contractual relationship with the |
| 09:52:08 | 18 | exhibitors. That ruins all -- their entire case. They're |
| 09:52:14 | 19 | alleging a contractual impairment. The provision that they're |
| 09:52:18 | 20 | relying on is a provision in the collective bargaining |
| 09:52:21 | 21 | agreement between the Teamsters and the contractors that |
| 09:52:25 | 22 | employ the Teamsters. |
| 09:52:26 | 23 | That provision says: The company, i.e., the |
| 09:52:31 | 24 | contractor, agrees to recognize the historical jurisdiction of |
| 09:52:35 | 25 | Teamsters work. That provision is not affected in any way by |

| 09:52:38 | 1 | this legislation.  The contractor, if any bit of work -- if an |
| 09:52:42 | 2 | exhibitor hires out a contractor to do any bit of work that |
| 09:52:45 | 3 | falls within the type of work that the Teamsters traditionally |
| 09:52:48 | 4 | do, the Teamsters are doing that work. |
| 09:52:51 | 5 | Plus, there's still a lot of work for Teamsters to do |
| 09:52:54 | 6 | in that regard, where exhibitors are going to continue to hire |
| 09:52:58 | 7 | and need to hire contractors to have union labor to do the |
| 09:53:02 | 8 | work. |
| 09:53:02 | 9 | In the legislation, exhibitors are prohibited from |
| 09:53:10 | 10 | using any equipment, motorized equipment to unload vehicles, |
| 09:53:14 | 11 | unload trucks.  As you may know, your Honor, shows that occur |
| 09:53:17 | 12 | at McCormick Place, the booths, the exhibits, the equipment |
| 09:53:20 | 13 | that's exhibited, they're huge.  There's no way that that |
| 09:53:23 | 14 | equipment is not getting in the building without the |
| 09:53:27 | 15 | assistance of the Teamsters. |
| 09:53:30 | 16 | THE COURT:  So what, in your opinion, is the |
| 09:53:33 | 17 | limitation that the -- what was the purpose of the |
| 09:53:35 | 18 | legislation? |
| 09:53:36 | 19 | MR. WARNER:  Your Honor, quite simply, when -- on the |
| 09:53:39 | 20 | work rules and the rules that allow exhibitors now to do work |
| 09:53:43 | 21 | on their own property, it's as simple as:  I am a small |
| 09:53:48 | 22 | exhibitor.  Everything I need is packed in my car.  I can |
| 09:53:51 | 23 | carry it.  I can carry it myself into the facility.  Under the |
| 09:53:56 | 24 | old regime, that exhibitor had to hire a contractor to then |
| 09:54:04 | 25 | have a Teamster carry the stuff in for him. |

09:54:05   1        What the law says is, Common sense proposition.  I,

09:54:09   2   as a small exhibitor, who probably couldn't afford to attend

09:54:12   3   this show, if I had to pay a contractor to do this work for

09:54:15   4   me, can now attend the show.  I can do my own work.  If I'm

09:54:18   5   perfectly capable of it, if I don't need equipment to do it,

09:54:22   6   if I'm not pulling up semis to the dock to unload my booths

09:54:26   7   and exhibits, I can do that.

09:54:28   8        And when you go -- and I refer you, your Honor, to

09:54:31   9   the chart that's attached as Exhibit G to our preliminary

09:54:36   10  injunction response.  In that chart we go provision by

09:54:41   11  provision.  We identify and cite verbatim the provision of the

09:54:48   12  statute that the Teamsters claim is impairing their

09:54:51   13  contractual relationships.  And then in the middle column we

09:54:56   14  identify the contract- -- the contract provision that they

09:54:59   15  claim is being impaired.

09:55:02   16       And when you go through all of these, what you end up

09:55:08   17  with, the only true conflict -- and we'll concede that this is

09:55:14   18  where it does require a change in what is under their current

09:55:18   19  collective bargaining agreement -- is with the overtime

09:55:19   20  provisions.  And those changes are minimal.

09:55:25   21       The real -- the only change here is that between the

09:55:30   22  hours of 6:00 a.m. and 8:00 a.m. where an employee used to

09:55:39   23  be -- used to be able to earn time and a half, they now get

09:55:42   24  straight time.  Between the hours of 4:30 and 10:00 p.m., they

09:55:46   25  now also get straight time rather than time and a half.  If

| | | |
|---|---|---|
| 09:55:50 | 1 | this is the only possible conflict, that is patently able to |
| 09:55:57 | 2 | be figured out in terms of money damages. |
| 09:56:02 | 3 | If an employee who works those hours who would have |
| 09:56:06 | 4 | gotten overtime under the collective bargaining agreement but |
| 09:56:08 | 5 | does not under the new statute, you can always figure that out |
| 09:56:12 | 6 | later:  hours worked by time and a half. |
| 09:56:15 | 7 | MR. GITTLER:  Your Honor, that -- that is not an |
| 09:56:18 | 8 | accurate statement of the statute.  There are no limits. |
| 09:56:23 | 9 | There had been, by the way, a 300-square-foot limit.  That's |
| 09:56:28 | 10 | just been totally eliminated. |
| 09:56:30 | 11 | They can now -- they, the exhibitors -- |
| 09:56:32 | 12 | MR. WARNER:  Your Honor, if I -- |
| 09:56:32 | 13 | THE COURT:  In a minute.  I'll give you a chance. |
| 09:56:34 | 14 | MR. GITTLER:  -- can now do whatever work they, the |
| 09:56:40 | 15 | exhibitor, feels regardless of its impact on our membership. |
| 09:56:48 | 16 | The representation -- |
| 09:56:52 | 17 | THE COURT:  I find that to be a rather strong |
| 09:56:54 | 18 | statement from reading the new rules that I read, because the |
| 09:57:13 | 19 | in-booth work, if it was -- if you could no longer do any |
| 09:57:18 | 20 | work, then why wouldn't it simply be you don't ever have to |
| 09:57:22 | 21 | use union contractors?  I mean, are you essentially saying |
| 09:57:25 | 22 | that all of your workers are out?  I find that hard to |
| 09:57:29 | 23 | believe. |
| 09:57:29 | 24 | What about the big equipment?  What about the loading |
| 09:57:32 | 25 | and unloading at the docks? |

| | | |
|---|---|---|
| 09:57:34 | 1 | MR. GITTLER:  I don't think I said all will. |
| 09:57:38 | 2 | THE COURT:  All what? |
| 09:57:39 | 3 | MR. GITTLER:  I didn't say all will be out of work. |
| 09:57:43 | 4 | Legally now they can put our members out of work.  Will it |
| 09:57:51 | 5 | happen?  Your Honor, I have represented labor organizations |
| 09:57:57 | 6 | who have worked for employees in companies that at the time |
| 09:58:05 | 7 | nobody ever fathomed they would go out of business.  I was |
| 09:58:09 | 8 | just having a conversation relating to Montgomery Ward and |
| 09:58:13 | 9 | Company. |
| 09:58:14 | 10 | There are companies that are going out of business |
| 09:58:17 | 11 | every day of the week.  I can't speculate on how many will be |
| 09:58:24 | 12 | affected.  I can say to your Honor, as we have in the briefs |
| 09:58:29 | 13 | and in the filings, that what was legally protected is no |
| 09:58:36 | 14 | longer legally protected, and there lies the potential harm. |
| 09:58:43 | 15 | And to use that and counsel's argument as a segue to |
| 09:58:49 | 16 | what I believe is an even more significant point, a point |
| 09:58:54 | 17 | which your Honor touched upon just a few moments ago, what |
| 09:59:00 | 18 | they have done is intruded into our ability to enforce and |
| 09:59:12 | 19 | negotiate terms and conditions, which are mandatory subjects |
| 09:59:17 | 20 | of bargaining, which the NLRB -- over which the NLRB has |
| 09:59:25 | 21 | jurisdiction and which almost every Court that has considered |
| 09:59:30 | 22 | the issue -- and I believe all Courts that have considered the |
| 09:59:34 | 23 | issue -- once you intrude into the bargaining process, a state |
| 09:59:41 | 24 | government, when you intrude into a bargaining process, you |
| 09:59:47 | 25 | lose your authority, you lose your jurisdiction, you lose -- |

23

09:59:52  1   you are preempted from violating the rules of the marketplace

09:59:59  2   between union and employer, or -- excuse me -- and you are

10:00:08  3   also preempted because -- and it's been said here -- you

10:00:15  4   either have or arguably will commit an unfair labor practice.

10:00:22  5   The latter is the Garmon preemption that we have argued

10:00:26  6   extensively in the briefs.  The former is what is referred to

10:00:30  7   as the Machinists preemption.

10:00:34  8          The Machinists preemption -- and I don't think it's

10:00:38  9   an oversimplification -- says, Congress intended to leave

10:00:43  10  bargaining between employers and unions covered by the Act to

10:00:51  11  the free forces of the market, negotiate and agree upon what

10:00:57  12  serves your interest, but the state cannot intrude into that.

10:01:04  13  The minute you do, you're preempted.  The state does not have

10:01:09  14  the authority.

10:01:10  15         The Garmon preemption is the one that says, among

10:01:15  16  other things, If you unilaterally change your terms and

10:01:20  17  conditions of employment, you have almost certainly but at

10:01:25  18  least arguably committed an unfair labor practice.  What we

10:01:30  19  have here, your Honor, is not only a change but a change over

10:01:36  20  which the general assembly, the MPEA, and now two of our

10:01:45  21  contractors have said, We cannot bargain with you about.  We

10:01:51  22  cannot bargain with you about crew size.  We cannot bargain

10:01:55  23  with you about overtime.  We won't even let you bargain about

10:02:00  24  the number of representatives you have on the floor to ensure

10:02:04  25  that your rights are protected.

10:02:07   1          This is something over which, we believe, the state
10:02:14   2    authority had no right to intrude or to rule.
10:02:20   3          THE COURT:  But that's not what they said.
10:02:22   4          MR. GITTLER:  I'm sorry?
10:02:22   5          THE COURT:  They said, Well, we can't change the law,
10:02:24   6    as it impacts our collective bargaining agreements.  We
10:02:27   7    will -- we are willing to meet with you to bargain over the
10:02:31   8    effects of the Reform Act on our employees and your members,
10:02:35   9    so --
10:02:35  10          MR. GITTLER:  But what will we bargain over?
10:02:35  11          THE COURT:  I don't know.  I don't know.
10:02:37  12          MR. GITTLER:  Excuse me.
10:02:38  13          MS. ANGELUCCI:  Your Honor, there's -- there's a
10:02:39  14    difference between issue bargaining, which is bargaining over
10:02:43  15    crew size, overtime, jurisdiction, and impact bargaining or
10:02:47  16    effects bargaining.  They're entirely two different things.
10:02:49  17          What that letter is saying is, We cannot bargain
10:02:53  18    about the issue about overtime.  What we can bargain is how
10:02:55  19    it's going to affect your members.  That's entirely different.
10:02:58  20          The fact that we can't even bargain about the
10:03:01  21    underlying issue is the problem.  We can't bargain overtime;
10:03:06  22    that's in contradiction to the legislation.  We can't bargain
10:03:09  23    jurisdiction; that's in contradiction to the legislation.  All
10:03:12  24    of those things are what is preempted.  And the impact or the
10:03:16  25    effects bargaining is something entirely different, as

| 10:03:19 | 1 | recognized under the NLRA, and that's what those letters say. |
| 10:03:22 | 2 | THE COURT:   Okay.   Defense? |
| 10:03:26 | 3 | MR. WARNER:   First of all, on the preemption issue, |
| 10:03:30 | 4 | Mr. Gittler doesn't even address that the core issue here, and |
| 10:03:34 | 5 | that is the market participant defense.   It's beyond question |
| 10:03:39 | 6 | here that this state in passing this legislation was acting in |
| 10:03:44 | 7 | its capacity as owner and operator of McCormick Place, whose |
| 10:03:50 | 8 | mission is to obtain revenue from rent for show managers and |
| 10:03:56 | 9 | exhibitors who come to McCormick Place to put on shows and |
| 10:03:59 | 10 | then derivatively use those shows to benefit the entire |
| 10:04:06 | 11 | Chicago-area economy, provide jobs, including Teamsters jobs, |
| 10:04:11 | 12 | and including jobs for a lot of other entities and employees |
| 10:04:15 | 13 | that support the tourism and trade show industry. |
| 10:04:21 | 14 | This is squarely within the market participant |
| 10:04:24 | 15 | doctrine.   You can't get any more market oriented than the |
| 10:04:29 | 16 | intent of the legislation here.   What prompted the legislation |
| 10:04:35 | 17 | were customers, exhibitors, and show managers complaining, We |
| 10:04:39 | 18 | don't like the way you do business.   It's too expensive.   It's |
| 10:04:43 | 19 | too burdensome.   It's too much of a hassle.   We're going to |
| 10:04:45 | 20 | take our business elsewhere, if you don't change things. |
| 10:04:49 | 21 | What did the legislature do?   They listened to their |
| 10:04:52 | 22 | customers and they changed things. |
| 10:04:52 | 23 | MR. GITTLER:   Well, your Honor -- |
| 10:04:54 | 24 | MR. WARNER:   That's market -- |
| 10:04:54 | 25 | THE COURT:   No, I give him his chance now. |

26

| | |
|---|---|
| 10:04:56 | 1 |
| 10:05:01 | 2 |
| 10:05:02 | 3 |
| 10:05:05 | 4 |
| 10:05:10 | 5 |
| 10:05:13 | 6 |
| 10:05:17 | 7 |
| 10:05:18 | 8 |
| 10:05:22 | 9 |
| 10:05:26 | 10 |
| 10:05:29 | 11 |
| 10:05:33 | 12 |
| 10:05:38 | 13 |
| 10:05:43 | 14 |
| 10:05:48 | 15 |
| 10:05:52 | 16 |
| 10:05:54 | 17 |
| 10:05:56 | 18 |
| 10:06:01 | 19 |
| 10:06:04 | 20 |
| 10:06:08 | 21 |
| 10:06:14 | 22 |
| 10:06:16 | 23 |
| 10:06:20 | 24 |
| 10:06:25 | 25 |

MR. WARNER:  That is market participant.

MR. GITTLER:  That is -- excuse me.

MR. WARNER:  By definition, under the <u>Boston Harbor</u> case and the other cases cited in our brief, that immediately takes it out of the Garmon and Machinists preemption doctrines.  We don't even need to get to the steps that Mr. Gittler is talking about.

More over, on the jurisdictional issues, union jurisdiction, governed by the NLRA, governed by the terms of the collective bargaining agreement, again, governs the relationship between the union, on the one hand, and the employer, on the other.  Nothing in this legislation impacts that or impairs it in any way.  The legislation says exhibitors, who Mr. Gittler concedes, the union has no contractual relationship with those exhibitors.  Exhibitors can do their own work.  They don't have to give it to contractors, who can then give it to union employees to do.

Now, we will concede, once a contractor who is under the collective bargaining agreement, the trade show agreement with the Teamsters, is hired by an exhibitor, that is Teamsters work.  That is when the NLRA, that is when it kicks in, that is when the collective bargaining agreement kicks in.

Mr. Gittler has asserted no right either under the NLRA or under his -- under the Teamsters collective bargaining agreement that allows him to legally assert that they have a

| | | |
|---|---|---|
| 10:06:29 | 1 | legal right or constitutional right to work from exhibitors |
| 10:06:35 | 2 | that exhibitors don't want to give contractors. |
| 10:06:37 | 3 | Now, historically a regime has developed where it's |
| 10:06:42 | 4 | been in the best interests, frankly, of both the contractors |
| 10:06:46 | 5 | and the unions to say, If you're going -- it's our work, give |
| 10:06:50 | 6 | us the work. |
| 10:06:51 | 7 | The law changes that.  It changes the relationship |
| 10:06:54 | 8 | between the exhibitor and contractor.  It doesn't change the |
| 10:06:58 | 9 | relationship between the contractor and the union.  It doesn't |
| 10:07:01 | 10 | change the union's contractual jurisdiction under the |
| 10:07:05 | 11 | collective bargaining agreement. |
| 10:07:05 | 12 | MR. GITTLER:  That's not correct, your Honor. |
| 10:07:07 | 13 | MR. BERKS:  Your Honor, I have to add something on |
| 10:07:09 | 14 | behalf of the Attorney General as well. |
| 10:07:10 | 15 | THE COURT:  We're on the defendant's side right now, |
| 10:07:12 | 16 | sir, and I really try very hard to give everybody their |
| 10:07:15 | 17 | chance.  So hold your tongue until I give it back to you. |
| 10:07:18 | 18 | All right.  Go ahead. |
| 10:07:21 | 19 | MR. WARNER:  Go ahead. |
| 10:07:21 | 20 | MR. BERKS:  Paul Berks on behalf of the Attorney |
| 10:07:24 | 21 | General, and there's just one issue that I need to raise on |
| 10:07:26 | 22 | behalf of the Attorney General, which is that we have raised |
| 10:07:27 | 23 | an Eleventh Amendment immunity defense.  We have no role in |
| 10:07:31 | 24 | enforcing this statute.  And as the attachments to their TRO |
| 10:07:34 | 25 | motion make clear, the letters that are going out are going |

| | | |
|---|---|---|
| 10:07:39 | 1 | out from the Authority.  They're not being vetted.  They're |
| 10:07:41 | 2 | not being signed by the Attorney General. |
| 10:07:44 | 3 | We don't have any horse in this race, frankly.  We |
| 10:07:46 | 4 | don't have any role in this dispute right now.  We've raised |
| 10:07:50 | 5 | the Eleventh Amendment in opposition to their preliminary |
| 10:07:53 | 6 | injunction.  We'll be raising it in a motion to dismiss |
| 10:07:57 | 7 | tomorrow. |
| 10:07:57 | 8 | To the extent that a TRO is being contemplated here, |
| 10:07:59 | 9 | we want to make it clear that it should not enjoin the |
| 10:08:03 | 10 | Attorney General from doing anything, as she has Eleventh |
| 10:08:06 | 11 | Amendment immunity, which does limit the authority of the |
| 10:08:08 | 12 | Court.  So that defense is sort of necessarily preliminary to |
| 10:08:11 | 13 | any order that might impact our rights. |
| 10:08:15 | 14 | I could speak on the merits.  I think Mr. Warner's |
| 10:08:18 | 15 | doing a fine job.  I don't know that you need a cacophony of |
| 10:08:21 | 16 | voices, but I wanted to make sure that the Attorney General's |
| 10:08:24 | 17 | immunity was before the Court. |
| 10:08:26 | 18 | THE COURT:  Well, I think to the extent that the |
| 10:08:28 | 19 | Attorney General has any position, it would be the validation |
| 10:08:31 | 20 | that was given in support of the preliminary injunction |
| 10:08:34 | 21 | response saying that the trade shows had left, so many trade |
| 10:08:40 | 22 | shows had left McCormick Place, so that the drop in business |
| 10:08:43 | 23 | had been significant and was considered to be a significant |
| 10:08:47 | 24 | harm to the city. |
| 10:08:48 | 25 | So under the prong of the TRO, which has me taking |

10:08:52  1  into account the public interest and whether it's served by

10:08:56  2  granting or denying the relief I think is what -- is one area

10:09:00  3  that to the extent that the Attorney General's position is

10:09:03  4  there, in substantiating the legislation, which may not even

10:09:08  5  be presented from you, but maybe from defendants --

10:09:11  6          MR. BERKS:  No, your Honor, that's correct.

10:09:12  7          THE COURT:  -- shows that now we have also an -- now

10:09:15  8  we have new trade show vendors or contractors, however you

10:09:21  9  call them, who are coming back to the city with the

10:09:25  10  understanding that these new reforms are in place.  And I

10:09:29  11  think that is a factor that has to be addressed under the TRO

10:09:33  12  standard.

10:09:33  13          Let me go back to you, sir, Mr. Gittler, because

10:09:37  14  you'd like to say that --

10:09:39  15          MR. WARNER:  If I may respond --

10:09:40  16          MR. GITTLER:  Thank you, your Honor.

10:09:41  17          MR. WARNER:  -- to a couple other points Mr. Gittler

10:09:43  18  made in his last round --

10:09:43  19          THE COURT:  Okay.  Because you're not done yet?

10:09:45  20  Okay, Mr. Warner, finish up.

10:09:47  21          MR. WARNER:  Okay.  Going back to -- contrary to what

10:09:49  22  Mr. Gittler said, there are limits in the statute as to what

10:09:53  23  work exhibitors can perform.  Specifically -- now I have to

10:10:02  24  find it.  This is in, I believe, 5.4(c), subsection 4.

10:10:08  25          An exhibitor -- exhibitor employees are prohibited at

| 10:10:12 | 1 | any time from using scooters, fork lifts, pallet jacks, |
| 10:10:16 | 2 | condors, scissor lifts, or motorized dollies, or similar |
| 10:10:19 | 3 | motorized or hydraulic equipment on Authority premises. |
| 10:10:24 | 4 | More over, the provision that the -- the only |
| 10:10:27 | 5 | provision in the exhibitor bill of rights governing what work |
| 10:10:30 | 6 | exhibitors can now do that really directly impacts the |
| 10:10:34 | 7 | Teamsters work is the following provision, and let me read it |
| 10:10:38 | 8 | for you. |
| 10:10:39 | 9 | The Authority shall designate areas in its discretion |
| 10:10:43 | 10 | where exhibitors may unload and load exhibitor materials from |
| 10:10:47 | 11 | privately owned vehicles at Authority premises with the use of |
| 10:10:50 | 12 | nonmotorized hand trucks and dollies.  Again, this is the |
| 10:10:54 | 13 | situation of an exhibitor who has -- who can unload their own |
| 10:11:00 | 14 | equipment where they don't need additional help doing it. |
| 10:11:03 | 15 | There's another limit on the work that exhibitors can |
| 10:11:05 | 16 | do.  An exhibitor can only do its own work with its own |
| 10:11:12 | 17 | employees that have been employed by the exhibitor for at |
| 10:11:17 | 18 | least six months.  And there's an audit process in place to |
| 10:11:20 | 19 | check that to make sure that exhibitors aren't bringing in |
| 10:11:24 | 20 | temporary labor or day labor to do that work. |
| 10:11:26 | 21 | So there are tremendous limits on this.  If -- if an |
| 10:11:31 | 22 | exhibitor has a lot of equipment that its own people can't |
| 10:11:37 | 23 | unload, they need to go to the Teamsters.  That doesn't |
| 10:11:41 | 24 | change.  There's plenty of work for everybody. |
| 10:11:43 | 25 | The other point I'd like to make is, again, in the -- |

| | | |
|---|---|---|
| 10:11:53 | 1 | on the issue of whether damage to reputation with their |
| 10:11:57 | 2 | members is any sort of irreparable harm.  Page 12 of our |
| 10:12:03 | 3 | response brief addresses that, as does the <u>East St. Louis</u> |
| 10:12:08 | 4 | <u>Laborers' versus Bellon Wrecking</u> case, 414 F.3d page 704, |
| 10:12:13 | 5 | where the Seventh Circuit stated:  Given the frequency of |
| 10:12:16 | 6 | litigation between unions and employers, union members likely |
| 10:12:20 | 7 | understand that lawsuits take time to resolve disputes and |
| 10:12:23 | 8 | that the absence of an immediate victory does not imply |
| 10:12:28 | 9 | defeat. |
| 10:12:28 | 10 | Unions litigate, arbitrate on behalf of their members |
| 10:12:32 | 11 | all the time.  They litigate the various -- very issues we're |
| 10:12:36 | 12 | talking about here today.  And they get compensation for their |
| 10:12:39 | 13 | members in the form of money damages. |
| 10:12:41 | 14 | Contracting out work, giving work to somebody who the |
| 10:12:47 | 15 | union claims belongs to -- work that they claim belongs to the |
| 10:12:51 | 16 | union.  That is a common issue in dispute between employers |
| 10:12:55 | 17 | and unions.  That is always resolved at arbitration or |
| 10:13:01 | 18 | litigation by an award of money damages.  The parties sit down |
| 10:13:06 | 19 | and calculate, okay, what work would the employer have had to |
| 10:13:13 | 20 | have given to its union employees had this work not been done |
| 10:13:18 | 21 | by somebody else? |
| 10:13:19 | 22 | It is not a difficult thing to do.  It's done all the |
| 10:13:22 | 23 | time.  The fact that the work is being given to third parties |
| 10:13:25 | 24 | doesn't preclude establishing that.  The Court has subpoena |
| 10:13:30 | 25 | powers to get that information. |

| | | |
|---|---|---|
| 10:13:33 | 1 | And, moreover, the statute itself provides for the |
| 10:13:36 | 2 | collection of the information that would be necessary to make |
| 10:13:39 | 3 | those calculations. |
| 10:13:41 | 4 | There's an audit process in place, under the statute, |
| 10:13:46 | 5 | designed to determine what impact is the legislation having on |
| 10:13:50 | 6 | McCormick Place operations.  Are cost savings resulting?  That |
| 10:13:56 | 7 | data could be used to work any issue out that may come up in |
| 10:14:01 | 8 | the future regarding calculation of damages or resolving |
| 10:14:07 | 9 | things through further litigation, if it comes to that. |
| 10:14:10 | 10 | THE COURT:  Okay.  Are you done now, Mr. Warner? |
| 10:14:12 | 11 | MR. WARNER:  Yes, your Honor. |
| 10:14:13 | 12 | THE COURT:  Okay.  So, Mr. Gittler, you can reply. |
| 10:14:16 | 13 | MR. GITTLER:  Thank you, your Honor.  On the last |
| 10:14:17 | 14 | point, if there is no contract clause requiring or allowing |
| 10:14:25 | 15 | performance of the work, there is no remedy that the union |
| 10:14:31 | 16 | has.  We have submitted cases that establish that arbitrators |
| 10:14:40 | 17 | cannot and will not rule against public policy, as stated in |
| 10:14:45 | 18 | local laws, in state laws.  That is just not an accurate |
| 10:14:56 | 19 | statement except in this sense, that what counsel has |
| 10:15:00 | 20 | acknowledged is that things should be the same, but they're |
| 10:15:05 | 21 | really not. |
| 10:15:06 | 22 | The notion that counsel comes to you claiming to |
| 10:15:12 | 23 | represent a market participant in this case is, I think, more |
| 10:15:20 | 24 | than unfair.  I think it's a distortion.  The Boston Harbor |
| 10:15:28 | 25 | case, which is the lead case that established the proposition |

10:15:32  1   counsel is arguing for, was a case where a public entity who
10:15:39  2   is responsible for the Boston Harbor tunnel, the Boston Harbor
10:15:46  3   cleanup said to a general manager, We want to eliminate labor
10:15:55  4   disputes, negotiate a contract with the affected unions.  Once
10:16:06  5   that contract was negotiated, the question was never, your
10:16:13  6   Honor, Does Boston Harbor or any contractor being brought in
10:16:18  7   have a right to change the contract.  That was never the
10:16:24  8   issue.  It has never been an issue in a project labor
10:16:27  9   agreement.
10:16:27  10        The Lavin case, which counsel cited to you in our
10:16:32  11  briefing, your Honor, that was our case.  That was a case
10:16:37  12  where the terms and conditions of employment were accepted by
10:16:44  13  not only the public entity or the employer, but accepted by
10:16:49  14  the contractors that wanted to bid on the work.  They didn't
10:16:53  15  come in and say, We want to do this work, We want to do it
10:17:00  16  under this contract, but we insist that the terms of the
10:17:07  17  contract, the collective bargaining agreement, be changed.
10:17:10  18  That never happened.  It never happened in a project labor
10:17:14  19  agreement case.
10:17:16  20        And that is exactly the harm done by allowing
10:17:21  21  preempted parties to regulate the terms and conditions of
10:17:27  22  employment, because that's the unique thing the general
10:17:31  23  assembly did here.
10:17:34  24        They didn't say to McCormick Place, Go negotiate a
10:17:39  25  contract that you think your clients or your users, whatever

| | |
|---|---|
| 10:17:44 | 1 |
| 10:17:49 | 2 |
| 10:17:55 | 3 |
| 10:18:00 | 4 |
| 10:18:06 | 5 |
| 10:18:10 | 6 |
| 10:18:11 | 7 |
| 10:18:14 | 8 |
| 10:18:17 | 9 |
| 10:18:22 | 10 |

term you want to use, would be happy with.  They didn't say

that.  The general assembly said that the contracts that have

been negotiated cannot be enforced.  The terms and conditions

that were negotiated are void.  They are unenforceable.  That

is not being a market participant.

      The general assembly --

      THE COURT:  But in the Boston Harbor case essentially

what they did is they came in and they said, In spite of the

fact that unions are there and can negotiate for the different

labor aspects of the restoration project, here's the labor

agreement.  We're requiring you to enter into this project

labor agreement based upon our needs, since we own this

property, and we have to look out for the best interests of

the people that we're going to require you to enter into this,

which would impinge upon the same labor concerns that you

would have, if you were trying to negotiate the project as

union workers working on the harbor.

      So the union workers were not able to get the same

type of union contract that they normally would have under

Boston Harbor, because they would have required them to enter

into this labor agreement.

      So I'm not -- I think this is a very complicated

issue.  I think that it is not one that is generally addressed

every day.  But I'm not convinced that I have the slam-dunk

infringement that you see, nor am I convinced, necessarily,

35

| | |
|---|---|
| 10:19:31 | 1 |

that it is a private market participant, although I see many

similarities to the <u>Boston Harbor</u> case, because in that case,

similarly to McCormick Place, the city owns McCormick Place.

The city sees the drop in business, which is documented in the

response to the preliminary injunction and to the TRO.  The

city then -- the state then imposes new terms that enable the

business to increase and it is tailored to a particular

project, which is what <u>Boston Harbor</u> did.  And it is for a

window of -- or concern that is being addressed specifically

by the legislature at that time.

So if they're acting as motivated by this drop in

business, which is well-documented, it's possible <u>Boston</u>

<u>Harbor</u> does apply.  I don't know today.

MR. GITTLER:  Well, your Honor, if you don't know, it

is only my fault for not being clear enough.

THE COURT:  But if I don't know today, then I have

to -- the four prongs of the TRO today are these:  It's

extraordinary relief, as you all know; and the extraordinary

relief has to give me a clear showing, and you carry the

burden of persuasion, so right now that's a problem.

Second -- and that's just on the merits of the case.  Whether

there's a valid defense, I'm not sure, to the issue of the

preemption.

But more importantly, what I have presented -- what I

do have presented before me is a case which shows that damages

10:21:12   1
10:21:15   2
10:21:20   3
10:21:25   4
10:21:30   5
10:21:34   6
10:21:38   7
10:21:41   8
10:21:46   9
10:21:47   10
10:21:51   11
10:21:54   12
10:21:58   13
10:22:02   14
10:22:08   15
10:22:11   16
10:22:15   17
10:22:18   18
10:22:22   19
10:22:27   20
10:22:30   21
10:22:33   22
10:22:38   23
10:22:42   24
10:22:48   25

may be arising.  They may be hard to ascertain, but they can

be remedied with money.  Those are money damages.

So if your members are losing jobs or losing money,

it's possible that it can be remedied with dollars.  And it

appears that under the contract there is a mechanism in place

to help determine what those dollars are.  So in determining

whether there's irreparable harm, I need to take into account

whether you have relief elsewhere, and I think that money

relief is one such relief.

And then I must take into account the balancing of

the public interest, and I think the one factor that I do have

before me is sufficient evidence to show that the public

interest in trying to bring trade shows back to the City of

Chicago in order to have money come into the city both for the

union members who work there as well as the city has been

documented, that's definitely here in response to your motion.

So that actually is weighing in favor of defendants and not

weighing in favor of plaintiffs, because it's a much greater

impact to the community than to simply the members who are

losing types of jobs at McCormick Place.

So I don't believe today you've met your burden to

get a TRO, based upon those findings, but I am more than happy

to dig into this meaty and interesting issue on a preliminary

injunction, as I was before.  And so I will keep open-minded

and read all of the cases on a more advanced level, if this

37

| | | |
|---|---|---|
| 10:22:51 | 1 | case stays with me. |
| 10:22:53 | 2 | So the motion for temporary restraining order is |
| 10:22:54 | 3 | denied today for failure to prove by a clear showing that you |
| 10:23:04 | 4 | have success on the merits -- likelihood of success on the |
| 10:23:07 | 5 | merits and inadequate remedy at law, which I believe you have. |
| 10:23:11 | 6 | Okay.  Thank you. |
| 10:23:13 | 7 | MR. WARNER:  Thank you, your Honor. |
| 10:23:13 | 8 | MS. ANGELUCCI:  Thank you, your Honor. |
| 10:23:14 | 9 | (Concluded at 10:23 a.m.) |
| | 10 | - - - |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | C E R T I F I C A T E |
| | 16 | |
| | 17 | I certify that the foregoing is a correct transcript from |
| | 18 | the record of proceedings in the above-entitled matter. |
| | 19 | |
| | 20 | /s/April M. Metzler, RPR, CRR, FCRR   July 28, 2010 |
| | 21 | April M. Metzler, RPR, CRR, FCRR        Date |
| | 22 | Official Federal Court Reporter |
| | 23 | |
| | 24 | |
| | 25 | |

## /

**/s/April** [1] - 37:20

## 1

**1** [1] - 7:14
**100** [1] - 2:11
**10:00** [1] - 20:24
**10:23** [1] - 37:9
**10C3484** [2] - 3:2, 3:13
**12** [1] - 31:2
**13th** [1] - 2:11
**1900** [1] - 1:22
**1:10-cv-03484** [1] - 1:7
**1st** [1] - 12:10

## 2

**200** [1] - 1:22
**2010** [2] - 1:9, 37:20
**2012** [1] - 13:13
**219** [1] - 2:15
**2318-A** [1] - 2:15
**263-1500** [1] - 1:23
**28** [2] - 1:9, 37:20

## 3

**30** [1] - 13:17
**300** [2] - 2:6, 15:19
**300-square-foot** [1] - 21:9
**312** [3] - 1:23, 2:7, 2:16
**3400** [1] - 2:6
**343-3778** [1] - 2:12

## 4

**4** [1] - 29:24
**408-5154** [1] - 2:16
**414** [1] - 31:4
**4:30** [1] - 20:24

## 5

**5.4(c** [2] - 11:17, 29:24

## 6

**6** [1] - 7:9
**60601** [1] - 2:11
**60604** [1] - 2:16
**60606** [2] - 1:23, 2:7
**6:00** [2] - 6:8, 20:22

## 7

**700** [1] - 7:9
**704** [1] - 31:4
**727** [5] - 1:7, 3:2, 3:13, 3:17, 12:1
**773** [1] - 2:12

## 8

**8:00** [2] - 5:22, 20:22

## 9

**986-0300** [1] - 2:7
**9:25** [1] - 3:1

## A

**A-n-g-e-l-u-c-c-i** [1] - 3:22
**a.m** [4] - 3:1, 20:22, 37:9
**ability** [8] - 8:21, 11:13, 12:9, 13:21, 13:24, 15:18, 17:3, 22:18
**able** [8] - 9:3, 12:5, 12:6, 14:1, 18:4, 20:23, 21:1, 34:18
**above-entitled** [1] - 37:18
**absence** [1] - 31:8
**Absolutely** [1] - 10:14
**accepted** [2] - 33:12, 33:13
**account** [4] - 9:7, 29:1, 36:7, 36:10
**accurate** [3] - 18:5, 21:8, 32:18
**acknowledged** [1] - 32:20
**Act** [2] - 23:10, 24:8
**acting** [2] - 25:6, 35:11
**add** [2] - 5:23, 27:13
**addition** [1] - 15:11
**additional** [1] - 30:14
**Additionally** [2] - 11:25, 15:1
**address** [4] - 8:10, 9:21, 14:1, 25:4
**addressed** [4] - 18:1, 29:11, 34:23, 35:9
**addresses** [1] - 31:3
**admission** [1] - 10:2
**advanced** [1] - 36:25
**adversely** [2] - 7:17, 14:24
**affect** [2] - 7:17, 24:19
**affected** [5] - 7:23, 14:24, 18:25, 22:12, 33:4
**afford** [1] - 20:2
**agent** [1] - 8:20
**ago** [3] - 7:17, 14:7, 22:17
**agree** [2] - 13:14, 23:11
**agreement** [18] - 7:10, 7:12, 10:17, 18:21, 20:19, 21:4, 26:10, 26:19, 26:22, 26:25, 27:11, 33:9, 33:17, 33:19, 34:11, 34:12, 34:21
**agreements** [1] - 24:6
**agrees** [1] - 18:24

**ahead** [3] - 15:6, 27:18, 27:19
**al** [1] - 1:12
**allege** [1] - 8:4
**alleged** [2] - 10:4, 16:16
**alleging** [2] - 5:7, 18:19
**allow** [3] - 5:20, 7:20, 19:20
**allowed** [2] - 10:9, 10:16
**allowing** [2] - 32:14, 33:20
**allows** [1] - 26:25
**almost** [2] - 22:21, 23:17
**Amendment** [3] - 27:23, 28:5, 28:11
**amount** [1] - 16:14
**AND** [1] - 1:11
**ANGELUCCI** [23] - 3:19, 3:22, 11:1, 11:4, 12:11, 13:1, 13:7, 13:12, 13:20, 15:4, 15:7, 15:23, 16:5, 16:7, 16:12, 16:18, 16:20, 16:22, 17:6, 18:3, 18:10, 24:13, 37:8
**Angelucci** [5] - 1:21, 3:20, 3:22, 3:23, 13:7
**anticipated** [1] - 6:15
**appear** [1] - 8:21
**APPEARANCES** [2] - 1:18, 2:3
**apply** [1] - 35:13
**appropriate** [1] - 9:11
**April** [2] - 2:15, 37:21
**April_Metzler@ilnd.uscourts.gov** [1] - 2:17
**arbitrate** [1] - 31:10
**arbitration** [1] - 31:17
**arbitrators** [1] - 32:16
**area** [3] - 11:7, 25:11, 29:2
**areas** [2] - 11:16, 30:9
**arguably** [2] - 23:4, 23:18
**argued** [2] - 8:13, 23:5
**arguing** [1] - 33:1
**argument** [1] - 22:15
**arising** [1] - 36:1
**articulate** [1] - 14:17
**ascertain** [1] - 36:1
**Asher** [1] - 1:20
**aside** [1] - 3:8
**aspects** [1] - 34:10
**assembly** [4] - 23:20, 33:23, 34:2, 34:6
**assert** [1] - 26:25
**asserted** [2] - 5:8, 26:23
**assess** [1] - 10:17
**assessment** [1] - 9:3
**assistance** [1] - 19:15
**assume** [1] - 7:15
**assuming** [1] - 16:9
**attached** [2] - 12:15, 20:9
**attachments** [1] - 27:24
**attend** [3] - 7:23, 20:2, 20:4
**Attorney** [11] - 2:9, 4:10, 4:16, 27:14, 27:20, 27:22, 28:2, 28:10, 28:16, 28:19, 29:3
**audit** [2] - 30:18, 32:4
**August** [2] - 7:14, 12:10

authority [5] - 11:5, 22:25, 23:14, 24:2, 28:11
AUTHORITY [1] - 1:12
Authority [8] - 3:4, 3:15, 4:3, 4:7, 28:1, 30:3, 30:9, 30:11
available [2] - 8:7, 8:9
award [1] - 31:18
aware [1] - 12:11

**B**

B-e-r-k-s [1] - 4:13
balancing [2] - 9:5, 36:10
bargain [17] - 8:16, 8:18, 8:21, 9:25, 17:25, 18:2, 23:21, 23:22, 23:23, 24:7, 24:10, 24:17, 24:18, 24:20, 24:21, 24:22
bargaining [21] - 8:20, 10:4, 18:20, 20:19, 21:4, 22:20, 22:23, 22:24, 23:10, 24:6, 24:14, 24:15, 24:16, 24:25, 26:10, 26:19, 26:22, 26:24, 27:11, 33:17
based [3] - 9:2, 34:12, 36:22
BEFORE [1] - 1:15
behalf [9] - 3:25, 4:3, 4:6, 4:9, 4:15, 27:14, 27:20, 27:22, 31:10
behind [1] - 14:6
belief [1] - 7:5
Bellon [1] - 31:4
belongs [2] - 31:15
benefit [1] - 25:10
benefits [1] - 9:17
BERKS [5] - 4:9, 4:13, 27:13, 27:20, 29:6
Berks [4] - 2:10, 4:9, 4:11, 27:20
best [2] - 27:4, 34:13
Between [1] - 20:24
between [11] - 11:21, 18:21, 20:21, 23:2, 23:10, 24:14, 26:11, 27:8, 27:9, 31:6, 31:16
beyond [1] - 25:5
bid [1] - 33:14
big [2] - 6:18, 21:24
biggest [1] - 11:1
bill [1] - 30:5
bit [3] - 6:24, 19:1, 19:2
Blvd [1] - 1:22
bones [2] - 10:15, 16:2
books [1] - 12:2
booth [1] - 21:19
booths [4] - 10:10, 19:12, 20:6
Boston [10] - 26:3, 32:24, 33:2, 33:6, 34:7, 34:20, 35:2, 35:8, 35:12
brains [1] - 6:4
brief [3] - 8:12, 26:4, 31:3
briefing [1] - 33:11
briefs [2] - 22:12, 23:6
bring [1] - 36:13
bringing [1] - 30:19
broader [1] - 15:18

Brotherhood [2] - 3:3, 3:14
BROTHERHOOD [1] - 1:8
brought [1] - 33:6
building [1] - 19:14
burden [2] - 35:20, 36:21
burdensome [1] - 25:19
business [14] - 9:9, 9:12, 9:14, 9:15, 9:17, 9:19, 22:7, 22:10, 25:18, 25:20, 28:22, 35:4, 35:7, 35:12

**C**

cacophony [1] - 28:15
calculate [1] - 31:19
calculation [1] - 32:8
calculations [1] - 32:3
cannot [9] - 10:5, 23:12, 23:21, 23:22, 24:17, 32:17, 34:3
capable [2] - 14:4, 20:5
capacity [1] - 25:7
car [1] - 19:22
carpenters [1] - 15:24
carry [4] - 19:23, 19:25, 35:19
Case [1] - 1:7
case [20] - 3:10, 8:16, 18:15, 18:18, 26:4, 31:4, 32:23, 32:25, 33:1, 33:10, 33:11, 33:19, 34:7, 35:2, 35:21, 35:25, 37:1
cases [3] - 26:4, 32:16, 36:25
certain [4] - 5:8, 10:10, 11:5, 13:14
certainly [1] - 23:17
certify [1] - 37:17
cetera [1] - 10:11
chance [4] - 13:9, 21:13, 25:25, 27:17
change [13] - 5:9, 13:12, 20:18, 20:21, 23:16, 23:19, 24:5, 25:20, 27:8, 27:10, 30:24, 33:7
changed [5] - 5:7, 7:3, 12:5, 25:22, 33:17
changes [3] - 20:20, 27:7
changing [1] - 7:20
chart [2] - 20:9, 20:10
chase [2] - 8:3, 9:21
check [1] - 30:19
Chicago [7] - 1:9, 1:23, 2:7, 2:11, 2:16, 25:11, 36:14
Chicago-area [1] - 25:11
Circuit [1] - 31:5
circular [1] - 8:14
circumstances [1] - 7:3
cite [1] - 20:11
cited [2] - 26:4, 33:10
City [1] - 36:13
city [7] - 28:24, 29:9, 35:3, 35:4, 35:6, 36:14, 36:15
claim [3] - 20:12, 20:15, 31:15
claiming [1] - 32:22
claims [1] - 31:15
clause [1] - 32:14

cleanup [1] - 33:3
clear [6] - 17:11, 27:25, 28:9, 35:15, 35:19, 37:3
CLERK [2] - 3:2, 3:13
clients [2] - 8:17, 33:25
Cohen [1] - 1:20
colleagues [3] - 5:25, 6:1, 6:11
collection [1] - 32:2
collective [10] - 18:20, 20:19, 21:4, 24:6, 26:10, 26:19, 26:22, 26:24, 27:11, 33:17
column [1] - 20:13
coming [2] - 9:19, 29:9
Commenced [1] - 3:1
commit [1] - 23:4
committed [1] - 23:18
Common [1] - 20:1
common [1] - 31:16
community [1] - 36:19
companies [3] - 7:21, 22:6, 22:10
Company [1] - 22:9
company [1] - 18:23
compensation [1] - 31:12
complaining [1] - 25:17
completely [1] - 16:16
complexities [1] - 12:19
complicated [1] - 34:22
concede [2] - 20:17, 26:18
concedes [1] - 26:14
concern [1] - 35:9
concerned [1] - 9:23
concerns [2] - 9:22, 34:15
Concluded [1] - 37:9
conditions [5] - 22:19, 23:17, 33:12, 33:21, 34:3
condors [1] - 30:2
conflict [2] - 20:17, 21:1
Congress [1] - 23:9
considered [3] - 22:21, 22:22, 28:23
constitutional [2] - 8:13, 27:1
Cont'd [1] - 2:3
contacted [1] - 8:17
contained [1] - 8:2
contemplated [1] - 28:8
context [1] - 8:1
continue [1] - 19:6
contract [19] - 7:9, 7:20, 10:8, 11:25, 13:22, 14:13, 14:19, 15:10, 20:14, 32:14, 33:4, 33:5, 33:7, 33:16, 33:17, 33:25, 34:19, 36:5
Contracting [1] - 31:14
contractor [11] - 14:14, 18:24, 19:1, 19:2, 19:24, 20:3, 26:18, 27:8, 27:9, 33:6
contractors [12] - 7:15, 11:8, 12:3, 18:21, 19:7, 21:21, 23:21, 26:17, 27:2, 27:4, 29:8, 33:14
contracts [2] - 10:4, 34:2
contractual [6] - 14:11, 18:17, 18:19,

20:13, 26:15, 27:10
contradiction [2] - 24:22, 24:23
contrary [1] - 29:21
conversation [1] - 22:8
convinced [2] - 34:24, 34:25
coordinate [1] - 12:20
core [1] - 25:4
correct [3] - 27:12, 29:6, 37:17
cost [1] - 32:6
counsel [4] - 32:19, 32:22, 33:1, 33:10
counsel's [1] - 22:15
Counselor [1] - 17:9
couple [1] - 29:17
course [1] - 5:5
COURT [69] - 1:4, 2:14, 3:6, 3:8, 3:12, 3:18, 3:21, 3:23, 4:1, 4:5, 4:8, 4:11, 4:14, 4:17, 4:19, 5:25, 6:2, 6:7, 6:10, 6:18, 7:7, 8:3, 10:7, 10:14, 10:24, 11:3, 12:12, 12:16, 13:2, 13:4, 13:8, 13:19, 14:2, 14:15, 14:17, 14:21, 15:2, 15:5, 15:14, 15:25, 16:6, 16:9, 16:15, 16:19, 16:21, 16:25, 17:5, 17:8, 17:20, 18:8, 18:11, 19:16, 21:13, 21:17, 22:2, 24:3, 24:5, 24:11, 25:2, 25:25, 27:15, 28:18, 29:7, 29:19, 32:10, 32:12, 34:7, 35:16
Court [5] - 22:21, 28:12, 28:17, 31:24, 37:22
Courts [1] - 22:22
covered [3] - 7:10, 7:11, 23:10
crack [1] - 15:4
crew [6] - 13:12, 13:14, 13:16, 14:8, 23:22, 24:15
CRR [3] - 2:15, 37:20, 37:21
current [1] - 20:18
customers [2] - 25:17, 25:22
cut [3] - 8:3, 9:21, 13:17

D

D'Alba [1] - 1:20
damage [2] - 8:19, 31:1
Damage [1] - 8:22
damages [15] - 8:7, 9:6, 10:19, 10:20, 14:5, 14:22, 17:20, 17:21, 18:4, 21:2, 31:13, 31:18, 32:8, 35:25, 36:2
data [1] - 32:7
Date [1] - 37:21
deal [2] - 5:11, 11:19
dealing [1] - 7:4
Dearborn [1] - 2:15
decide [1] - 11:23
decided [1] - 11:24
decrease [1] - 11:16
defeat [1] - 31:9
Defendant [1] - 2:9
defendant's [1] - 27:15
Defendants [2] - 1:13, 2:5
defendants [4] - 5:6, 9:6, 29:5, 36:17
Defense [1] - 25:2

defense [5] - 18:12, 25:5, 27:23, 28:12, 35:22
define [1] - 17:4
defines [2] - 17:1, 17:5
definitely [1] - 36:16
definition [1] - 26:3
delivering [1] - 11:6
denied [1] - 37:3
denying [1] - 29:2
derivatively [1] - 25:10
designate [1] - 30:9
designed [1] - 32:5
desire [2] - 6:21, 7:1
determine [2] - 32:5, 36:6
determining [1] - 36:6
developed [1] - 27:3
developing [1] - 12:23
difference [1] - 24:14
different [7] - 7:25, 11:16, 11:17, 24:16, 24:19, 24:25, 34:9
Different [1] - 6:19
differently [1] - 6:19
difficult [1] - 31:22
dig [1] - 36:23
direct [1] - 12:7
directly [2] - 11:18, 30:6
disappointed [1] - 7:2
discretion [1] - 30:9
discuss [1] - 10:6
Discussion [1] - 3:7
dismiss [1] - 28:6
dispute [4] - 11:21, 11:23, 28:4, 31:16
disputes [3] - 11:20, 31:7, 33:4
distinction [2] - 17:8, 17:10
distortion [1] - 32:24
DISTRICT [3] - 1:4, 1:4, 1:16
DIVISION [1] - 1:5
dock [1] - 20:6
docks [2] - 11:5, 21:25
doctrine [1] - 25:15
doctrines [1] - 26:6
documentation [1] - 16:3
documented [4] - 9:13, 35:4, 35:12, 36:16
documents [2] - 8:2, 9:2
Doe [1] - 15:9
dollars [2] - 36:4, 36:6
dollies [2] - 30:2, 30:12
done [8] - 15:9, 17:12, 22:18, 29:19, 31:20, 31:22, 32:10, 33:20
down [1] - 31:18
Dr [1] - 2:6
drop [3] - 28:22, 35:4, 35:11
dunk [1] - 34:24

E

earn [1] - 20:23

East [1] - 31:3
EASTERN [1] - 1:5
economy [1] - 25:11
effective [3] - 7:14, 8:20, 13:13
effects [3] - 24:8, 24:16, 24:25
efficient [2] - 4:21, 6:21
either [3] - 6:11, 23:4, 26:23
Eleventh [3] - 27:23, 28:5, 28:10
eligibility [1] - 9:1
eliminate [1] - 33:3
eliminated [1] - 21:10
elsewhere [2] - 25:20, 36:8
employ [1] - 18:22
employed [1] - 30:17
employee [3] - 15:8, 20:22, 21:3
Employees [1] - 12:2
employees [13] - 7:9, 7:23, 9:3, 12:3, 12:10, 13:22, 22:6, 24:8, 25:12, 26:17, 29:25, 30:17, 31:20
employer [4] - 23:2, 26:12, 31:19, 33:13
employers [4] - 10:5, 23:10, 31:6, 31:16
employment [3] - 23:17, 33:12, 33:22
enable [1] - 35:6
end [1] - 20:16
enforce [1] - 22:18
enforced [2] - 10:5, 34:3
enforcing [1] - 27:24
enjoin [1] - 28:9
ensure [1] - 23:24
enter [3] - 34:11, 34:14, 34:20
entire [3] - 13:23, 18:18, 25:10
entirely [3] - 24:16, 24:19, 24:25
entirety [1] - 11:13
entities [1] - 25:12
entitled [1] - 37:18
entity [2] - 33:1, 33:13
equipment [9] - 19:10, 19:12, 19:14, 20:5, 21:24, 30:3, 30:14, 30:22
equitable [4] - 10:20, 10:22, 17:23, 17:24
eradicating [1] - 9:18
essentially [2] - 21:21, 34:7
establish [1] - 32:16
established [1] - 32:25
establishing [1] - 31:24
et [2] - 1:12, 10:11
evidence [1] - 36:12
exactly [1] - 33:20
example [1] - 15:19
except [1] - 32:19
exception [1] - 14:8
exclusive [1] - 11:5
Excuse [1] - 24:12
excuse [3] - 5:6, 23:2, 26:2
Exhibit [1] - 20:9
exhibit [1] - 15:20
exhibited [1] - 19:13

exhibitor [16] - 15:19, 19:2, 19:22, 19:24, 20:2, 21:15, 26:20, 27:8, 29:25, 30:5, 30:10, 30:13, 30:16, 30:17, 30:22
exhibitors [30] - 7:15, 11:6, 11:7, 12:5, 12:9, 12:20, 14:11, 14:12, 15:7, 16:3, 16:10, 16:13, 18:8, 18:14, 18:18, 19:6, 19:9, 19:20, 21:11, 25:9, 25:17, 26:14, 26:15, 27:1, 27:2, 29:23, 30:6, 30:10, 30:15, 30:19
Exhibitors [1] - 26:15
exhibits [4] - 5:18, 17:13, 19:12, 20:7
exist [1] - 8:21
expensive [1] - 25:18
expert [1] - 17:22
explain [1] - 15:3
EXPOSITION [1] - 1:12
Exposition [4] - 3:4, 3:15, 4:3, 4:7
extensively [1] - 23:6
extent [4] - 10:18, 28:8, 28:18, 29:3
extraordinary [2] - 35:18

## F

F.3d [1] - 31:4
facility [1] - 19:23
fact [3] - 24:20, 31:23, 34:9
factor [2] - 29:11, 36:11
factors [2] - 5:7, 9:7
failure [1] - 37:3
falls [1] - 19:3
far [1] - 9:23
fathomed [1] - 22:7
fault [1] - 35:15
favor [2] - 36:17, 36:18
FCRR [3] - 2:15, 37:20, 37:21
Federal [1] - 37:22
FEDERAL [1] - 2:14
few [3] - 9:8, 14:7, 22:17
figure [1] - 21:5
figured [1] - 21:2
filed [1] - 8:6
filing [1] - 5:7
filings [2] - 8:1, 22:13
findings [1] - 36:22
fine [3] - 6:2, 6:3, 28:15
finish [1] - 29:20
firms [1] - 8:17
First [2] - 18:13, 25:3
first [2] - 5:16, 11:12
FI [1] - 2:11
floor [3] - 13:24, 16:6, 23:24
floors [1] - 13:21
folks [2] - 4:17, 13:5
follow [1] - 16:24
following [2] - 18:3, 30:7
foot [2] - 6:21, 15:20
FOR [1] - 1:15
forces [1] - 23:11
foregoing [1] - 37:17

fork [1] - 30:1
form [3] - 8:15, 8:19, 31:13
former [1] - 23:6
forward [1] - 6:12
four [1] - 35:17
Franczek [1] - 2:5
frankly [2] - 27:4, 28:3
free [1] - 23:11
Freeman [1] - 18:6
frequency [1] - 31:5
function [1] - 12:3
future [1] - 32:8

## G

Garmon [3] - 23:5, 23:15, 26:5
General [8] - 4:10, 4:16, 27:14, 27:21, 27:22, 28:2, 28:10, 28:19
general [2] - 23:20, 33:3, 33:22, 34:2, 34:6
General's [3] - 2:9, 28:16, 29:3
generally [1] - 34:23
generating [1] - 11:10
Gentlemen [1] - 3:8
GES [1] - 18:6
GITTLER [34] - 3:5, 3:16, 5:20, 6:1, 6:4, 6:6, 6:13, 7:5, 7:8, 9:23, 10:12, 12:17, 13:3, 14:6, 14:16, 14:18, 14:23, 15:6, 17:4, 17:7, 17:10, 21:7, 21:14, 22:1, 22:3, 24:4, 24:10, 24:12, 25:23, 26:2, 27:12, 29:6, 29:16, 32:13, 35:14
Gittler [11] - 1:20, 1:21, 3:17, 25:4, 26:7, 26:14, 26:23, 29:13, 29:17, 29:22, 32:12
given [4] - 11:5, 28:20, 31:20, 31:23
Given [1] - 31:5
governed [2] - 26:9
governing [1] - 30:5
government [1] - 22:24
governs [1] - 26:10
granting [1] - 29:2
greater [1] - 36:18
Greenfield [1] - 1:20
Guzman [4] - 4:20, 5:13, 8:6

## H

Hagerty [1] - 1:22, 3:24, 4:1
HAGERTY [1] - 3:24
half [3] - 20:23, 20:25, 21:6
hand [2] - 26:11, 30:12
handle [2] - 8:6
hanging [1] - 15:21
happy [2] - 34:1, 36:22
Harbor [10] - 26:3, 32:24, 33:2, 33:6, 34:7, 34:20, 35:2, 35:8, 35:13
harbor [1] - 34:17
hard [1] - 21:22, 27:16, 36:1

harm [13] - 5:10, 8:19, 9:16, 9:19, 10:2, 16:24, 17:21, 18:4, 22:14, 28:24, 31:2, 33:20, 36:7
Harm [2] - 8:12, 8:15
harmed [2] - 10:17, 10:18
harms [3] - 9:5, 14:3, 14:4
hassle [1] - 25:19
health [1] - 9:17
healthcare [1] - 9:1
hear [5] - 5:14, 5:16, 6:12, 8:24, 18:12
help [3] - 10:25, 30:14, 36:6
hire [3] - 19:6, 19:7, 19:24
hired [1] - 26:20
hires [1] - 19:2
historical [1] - 18:24
historically [1] - 27:3
Historically [2] - 11:4, 11:23
Hold [1] - 3:6
hold [1] - 27:17
Honor [42] - 3:5, 3:16, 3:19, 3:24, 4:2, 4:18, 5:20, 6:13, 6:14, 7:6, 7:13, 9:24, 12:8, 13:3, 14:6, 14:23, 17:4, 17:18, 18:3, 18:16, 19:11, 19:19, 20:8, 21:7, 21:12, 22:5, 22:12, 22:17, 23:19, 24:13, 25:23, 27:12, 27:13, 29:6, 29:16, 32:11, 32:13, 33:6, 33:11, 35:14, 37:7, 37:8
Honor's [1] - 17:14
HONORABLE [1] - 1:15
hoping [1] - 4:19
horse [1] - 28:3
hours [10] - 9:4, 9:15, 9:18, 11:16, 15:13, 15:15, 20:22, 20:24, 21:3, 21:6
huge [2] - 18:14, 19:13
hundred [1] - 7:10
hurdle [1] - 18:15
hydraulic [1] - 30:3

## I

i.e [1] - 18:23
identify [4] - 14:24, 15:8, 20:11, 20:14
IL [4] - 1:23, 2:7, 2:11, 2:16
ILLINOIS [1] - 1:4
Illinois [2] - 1:9, 2:9
imagine [3] - 5:2, 5:14, 12:23
immediate [1] - 31:8
immediately [2] - 13:16, 26:4
immunity [3] - 27:23, 28:11, 28:17
impact [5] - 11:18, 21:15, 24:15, 24:24, 28:13, 32:5, 36:19
impacted [1] - 5:9
impacts [3] - 24:6, 26:12, 30:6
impaired [5] - 10:3, 14:15, 14:16, 14:18, 20:15
impairing [1] - 20:12
impairment [4] - 10:2, 11:15, 17:12, 18:19
impairments [2] - 10:8, 11:14
impairs [1] - 26:13

impinge [1] - 34:15
implement [1] - 7:16
implemented [3] - 12:10, 12:14, 13:16
imply [1] - 31:8
important [1] - 11:14
importantly [1] - 35:24
imposes [1] - 35:6
impossible [1] - 7:22
in-booth [1] - 21:19
inadequate [3] - 8:5, 8:10, 37:5
includes [2] - 10:12
including [2] - 25:11, 25:12
increase [2] - 9:14, 35:7
incurred [1] - 9:16
indeed [1] - 7:5
indicate [1] - 6:15
indicated [1] - 14:7
individual [1] - 8:17
individuals [3] - 5:8, 7:20, 14:24
industry [1] - 25:13
information [3] - 7:13, 31:25, 32:2
infringement [1] - 34:25
initial [3] - 8:1, 9:20, 9:22
injunction [9] - 5:1, 5:4, 5:12, 6:24,
20:10, 28:6, 28:20, 35:5, 36:24
injury [2] - 7:3, 8:11
insist [1] - 33:16
insurmountable [1] - 18:15
intended [1] - 23:9
intent [2] - 5:3, 25:16
interest [4] - 23:12, 29:1, 36:11, 36:13
interesting [2] - 8:23, 36:23
interests [2] - 27:4, 34:13
interference [2] - 8:15, 17:25
International [3] - 3:2, 3:13
INTERNATIONAL [1] - 1:7
intrude [4] - 22:23, 22:24, 23:12, 24:2
intruded [1] - 22:18
invoking [1] - 5:9
Ioppolo [2] - 2:10, 4:15
IOPPOLO [2] - 4:15, 4:18
irreparable [9] - 7:3, 8:11, 10:2, 14:4,
16:24, 17:21, 18:4, 31:2, 36:7
irreparably [1] - 10:18
issue [24] - 4:21, 5:12, 6:16, 6:18,
11:2, 14:25, 18:5, 18:13, 22:22, 22:23,
24:14, 24:18, 24:21, 25:3, 25:4, 27:21,
31:1, 31:16, 32:7, 33:8, 34:23, 35:22,
36:23
issues [7] - 6:25, 9:23, 10:6, 11:2,
14:1, 26:8, 31:11
itself [1] - 32:1

**J**

jacks [1] - 30:1
Jackson [1] - 1:22
James [3] - 2:6, 4:4, 4:7
job [3] - 17:15, 17:19, 28:15

jobs [7] - 7:18, 7:20, 25:11, 25:12,
36:3, 36:20
John [1] - 15:8
Jr [1] - 2:5
Judge [4] - 4:19, 4:20, 5:13, 8:6
JUDGE [1] - 1:16
judge [1] - 4:22
judges [1] - 6:19
July [2] - 1:9, 37:20
jurisdiction [10] - 7:17, 7:19, 11:2,
18:24, 22:21, 22:25, 24:15, 24:23, 26:9,
27:10
jurisdictional [4] - 11:9, 11:19, 11:20,
26:8

**K**

keep [1] - 36:24
KENDALL [1] - 1:15
key [1] - 14:25
kicks [2] - 26:21, 26:22
kind [1] - 15:23

**L**

labor [14] - 19:7, 22:5, 23:4, 23:18,
30:20, 33:3, 33:8, 33:18, 34:10, 34:12,
34:15, 34:21
Laborers' [1] - 31:4
largest [1] - 18:7
last [6] - 3:21, 5:22, 9:7, 13:20, 29:18,
32:13
late [1] - 5:21
latter [1] - 23:5
Laughter [2] - 6:5, 6:9
Lavin [1] - 33:10
law [7] - 8:5, 8:11, 17:17, 20:1, 24:5,
27:7, 37:5
laws [2] - 32:18
lawsuit [5] - 8:6, 8:8, 10:19, 10:20
lawsuits [1] - 31:7
lead [1] - 32:25
leading [1] - 7:3
least [2] - 23:18, 30:18
leave [1] - 23:9
left [2] - 28:21, 28:22
legal [2] - 14:19, 27:1
Legally [1] - 22:4
legally [3] - 22:13, 22:14, 26:25
legislated [1] - 7:16
legislation [22] - 9:13, 9:16, 11:7,
13:15, 13:23, 15:17, 16:12, 16:22, 17:1,
19:1, 19:9, 19:18, 24:22, 24:23, 25:6,
25:16, 26:12, 26:13, 29:4, 32:5
legislature [2] - 25:21, 35:10
less [3] - 9:17, 9:18, 15:20
letter [1] - 24:17
letters [4] - 9:25, 18:1, 25:1, 27:25

level [1] - 36:25
lies [1] - 22:14
lifts [2] - 30:1, 30:2
lights [1] - 15:20
likelihood [1] - 37:4
likely [2] - 9:1, 31:6
limit [3] - 21:9, 28:11, 30:15
limitation [3] - 16:23, 16:25, 19:17
limited [3] - 13:24, 15:15, 15:25
limits [3] - 21:8, 29:22, 30:21
Lisa [3] - 2:10, 4:9, 4:16
listened [1] - 25:21
listing [1] - 10:13
litigate [2] - 31:10, 31:11
litigation [3] - 31:6, 31:18, 32:9
load [1] - 30:10
loading [1] - 21:24
local [1] - 32:18
LOCAL [1] - 1:7
Local [3] - 3:2, 3:13, 3:17
Look [1] - 11:22
look [1] - 34:13
looks [1] - 7:9
lose [6] - 17:15, 17:16, 17:18, 22:25
losing [7] - 9:9, 9:12, 9:15, 36:3, 36:20
loss [2] - 9:1, 9:16
losses [1] - 7:22
lost [3] - 11:12, 14:10
Louis [1] - 31:3

**M**

Machinists [3] - 23:7, 23:8, 26:5
Madigan [3] - 2:10, 4:9, 4:16
manager [1] - 33:3
managers [5] - 7:14, 14:13, 18:7, 25:8,
25:17
mandatory [1] - 22:19
Margaret [3] - 1:21, 3:19, 13:7
market [9] - 23:11, 25:5, 25:14, 25:15,
25:24, 26:1, 32:23, 34:5, 35:1
marketplace [1] - 23:1
Marvin [3] - 1:21, 3:5, 3:16
materials [1] - 30:10
matter [1] - 37:18
McCormick [12] - 9:10, 11:6, 16:16,
19:12, 25:7, 25:9, 28:22, 32:6, 33:24,
35:3, 36:20
mean [8] - 15:3, 15:17, 16:7, 16:18,
16:22, 17:1, 17:23, 21:21
meat [2] - 10:15, 16:2
meaty [1] - 36:23
mechanical [1] - 2:24
mechanism [2] - 12:20, 36:5
meet [1] - 24:7
members [13] - 13:25, 14:1, 17:12,
22:4, 24:8, 24:19, 31:2, 31:6, 31:10,
31:13, 36:3, 36:15, 36:19
membership [2] - 8:23, 21:15

**memo** [1] - 12:13
**men** [1] - 13:15
**merely** [1] - 10:1
**merits** [5] - 18:15, 28:14, 35:21, 37:4, 37:5
**met** [1] - 36:21
**Metropolitan** [5] - 3:3, 3:14, 4:3, 4:7, 9:9
**METROPOLITAN** [1] - 1:11
**Metzler** [3] - 2:15, 37:20, 37:21
**Michael** [2] - 2:5, 4:2
**middle** [1] - 20:13
**might** [3] - 7:19, 9:18, 28:13
**minded** [1] - 36:24
**minimal** [1] - 20:20
**minute** [3] - 13:10, 21:13, 23:13
**miss** [1] - 5:24
**missed** [1] - 3:21
**mission** [1] - 25:8
**moment** [1] - 10:13
**moments** [2] - 14:7, 22:17
**monetary** [2] - 14:5, 14:22
**money** [10] - 8:7, 17:16, 21:2, 31:13, 31:18, 36:2, 36:3, 36:8, 36:14
**monitor** [2] - 7:22, 14:9
**Montgomery** [1] - 22:8
**month** [1] - 7:16
**months** [1] - 30:18
**moreover** [1] - 32:1
**morning** [16] - 3:5, 3:16, 3:18, 3:19, 3:23, 3:24, 4:1, 4:2, 4:5, 4:6, 4:8, 4:11, 4:17, 4:18, 6:8, 13:3
**most** [1] - 11:14
**Motion** [1] - 1:10
**motion** [11] - 4:24, 5:1, 5:17, 5:21, 6:25, 12:15, 16:15, 27:25, 28:6, 36:16, 37:2
**MOTION** [1] - 1:15
**motivated** [1] - 35:11
**motorized** [3] - 19:10, 30:2, 30:3
**move** [4] - 3:8, 6:12, 6:19, 7:1
**moved** [2] - 5:1, 5:3
**MPEA** [7] - 2:5, 7:11, 7:14, 11:20, 11:22, 12:6, 23:20
**MR** [59] - 3:5, 3:16, 3:24, 4:2, 4:9, 4:13, 4:15, 4:18, 5:20, 6:1, 6:4, 6:6, 6:13, 7:5, 7:8, 9:23, 10:12, 12:8, 12:13, 12:17, 12:18, 13:3, 14:6, 14:16, 14:18, 14:23, 15:6, 17:4, 17:7, 17:10, 18:13, 19:19, 21:7, 21:12, 21:14, 22:1, 22:3, 24:4, 24:10, 24:12, 25:3, 25:23, 25:24, 26:1, 26:2, 26:3, 27:12, 27:13, 27:19, 27:20, 29:6, 29:15, 29:16, 29:17, 29:21, 32:11, 32:13, 35:14, 37:7
**MS** [24] - 3:19, 3:22, 4:6, 11:1, 11:4, 12:11, 13:1, 13:7, 13:12, 13:20, 15:4, 15:7, 15:23, 16:5, 16:7, 16:12, 16:18, 16:20, 16:22, 17:6, 18:3, 18:10, 24:13, 37:8
**must** [1] - 36:10

**N**

**name** [2] - 3:21, 13:5
**ne'er** [1] - 7:22
**nebulous** [1] - 8:14
**necessarily** [2] - 28:12, 34:25
**necessary** [1] - 32:2
**need** [13] - 8:4, 8:10, 10:14, 17:22, 19:7, 19:22, 20:5, 26:6, 27:21, 28:15, 30:14, 30:23, 36:7
**needs** [1] - 34:12
**negotiate** [6] - 22:19, 23:11, 33:4, 33:24, 34:9, 34:16
**negotiated** [4] - 13:13, 33:5, 34:3, 34:4
**never** [5] - 33:5, 33:7, 33:8, 33:18
**new** [6] - 11:10, 21:5, 21:18, 29:8, 29:10, 35:6
**night** [1] - 5:22
**nine** [3] - 10:4, 10:7, 10:8
**NLRA** [4] - 25:1, 26:9, 26:21, 26:24
**NLRB** [3] - 11:24, 22:20
**nobody** [1] - 22:7
**nonmotorized** [1] - 30:12
**normally** [2] - 17:2, 34:19
**NORTHERN** [1] - 1:4
**noted** [1] - 7:13
**notereading** [1] - 2:25
**Nothing** [1] - 26:12
**nothing** [2] - 16:13, 16:14
**notice** [2] - 12:13, 12:15
**notion** [1] - 32:22
**number** [4] - 9:4, 9:8, 15:12, 23:24
**nutshell** [1] - 10:24

**O**

**o'clock** [1] - 5:22
**obligation** [2] - 9:24, 10:1
**obtain** [1] - 25:8
**obviously** [2] - 13:17, 18:5
**occur** [1] - 19:11
**OF** [3] - 1:4, 1:8, 1:15
**Office** [1] - 2:9
**Official** [1] - 37:22
**OFFICIAL** [1] - 2:14
**old** [1] - 19:24
**Once** [1] - 33:4
**once** [2] - 22:23, 26:18
**one** [24] - 3:6, 7:9, 8:12, 8:23, 9:7, 9:9, 10:1, 10:13, 11:1, 11:13, 11:14, 12:8, 13:20, 13:22, 13:23, 14:3, 14:4, 23:15, 26:11, 27:21, 29:2, 34:23, 36:9, 36:11
**One** [1] - 9:24
**open** [1] - 36:24
**open-minded** [1] - 36:24
**operations** [1] - 32:6
**operator** [1] - 25:7
**opinion** [1] - 19:16

**opposition** [1] - 28:5
**Order** [1] - 1:10
**order** [6] - 5:3, 8:4, 17:23, 28:13, 36:14, 37:2
**ORDER** [1] - 1:15
**organizations** [1] - 22:5
**oriented** [1] - 25:15
**original** [1] - 5:7
**oversimplification** [1] - 23:9
**overtime** [7] - 11:16, 20:19, 21:4, 23:23, 24:15, 24:18, 24:21
**own** [9] - 16:10, 19:21, 20:4, 26:16, 30:13, 30:16, 30:22, 34:12
**owned** [1] - 30:11
**owner** [1] - 25:7
**owns** [1] - 35:3

**P**

**p.m** [1] - 20:24
**packed** [1] - 19:22
**Page** [1] - 31:2
**page** [1] - 31:4
**pallet** [1] - 30:1
**part** [3] - 12:15, 12:21, 17:24
**participant** [6] - 25:5, 25:14, 26:1, 32:23, 34:5, 35:1
**particular** [2] - 12:21, 35:7
**parties** [4] - 12:21, 31:18, 31:23, 33:21
**partners** [3] - 5:23, 6:2, 6:11
**passing** [1] - 25:6
**patently** [1] - 21:1
**Paul** [3] - 2:10, 4:9, 27:20
**pay** [1] - 20:3
**PC** [1] - 2:5
**people** [3] - 15:12, 30:22, 34:14
**per** [1] - 13:24
**percent** [1] - 13:17
**perfectly** [1] - 20:5
**perform** [2] - 11:5, 29:23
**performance** [1] - 32:15
**performed** [1] - 15:13
**person** [1] - 15:22
**persuasion** [1] - 35:20
**PIER** [1] - 1:11
**Pier** [5] - 3:3, 3:14, 4:3, 4:7, 9:9
**Place** [12] - 9:10, 11:6, 16:17, 19:12, 25:7, 25:9, 28:22, 32:6, 33:24, 35:3, 36:20
**place** [5] - 11:12, 29:10, 30:18, 32:4, 36:5
**plaintiff** [4] - 3:17, 3:25, 12:19, 18:16
**Plaintiff** [2] - 1:9, 1:20
**plaintiff's** [2] - 8:19, 8:22
**plaintiffs** [5] - 5:6, 5:16, 8:13, 9:6, 36:18
**plenty** [1] - 30:24
**plural** [1] - 4:11
**Plus** [1] - 19:5

point [10] - 6:17, 7:19, 7:25, 12:8, 16:18, 17:14, 22:16, 30:25, 32:14
pointed [2] - 18:16, 18:17
points [3] - 5:24, 12:19, 29:17
police [2] - 17:11, 17:13
policy [1] - 32:17
position [3] - 6:12, 28:19, 29:3
possible [3] - 21:1, 35:12, 36:4
poster [1] - 15:20
potential [1] - 22:14
powers [1] - 31:25
practice [2] - 23:4, 23:18
pre [1] - 9:16
pre-legislation [1] - 9:16
preclude [1] - 31:24
preempted [5] - 23:1, 23:3, 23:13, 24:24, 33:21
preemption [7] - 23:5, 23:7, 23:8, 23:15, 25:3, 26:5, 35:23
preliminary [11] - 5:1, 5:4, 5:12, 6:24, 8:1, 20:9, 28:5, 28:12, 28:20, 35:5, 36:23
premises [2] - 30:3, 30:11
presence [1] - 6:14
presented [3] - 29:5, 35:24, 35:25
pretty [2] - 11:8, 11:12
primarily [1] - 15:18
private [1] - 35:1
privately [1] - 30:11
problem [2] - 24:21, 35:20
Proceedings [1] - 2:24
proceedings [1] - 37:18
process [5] - 12:23, 22:23, 22:24, 30:18, 32:4
produced [1] - 2:25
prohibited [3] - 15:14, 19:9, 29:25
prohibits [1] - 16:13
project [6] - 33:8, 33:18, 34:10, 34:11, 34:16, 35:8
prompted [1] - 25:16
prong [1] - 28:25
prongs [1] - 35:17
property [2] - 19:21, 34:13
proposition [2] - 20:1, 32:25
protected [3] - 22:13, 22:14, 23:25
prove [1] - 37:3
provide [1] - 25:11
provides [1] - 32:1
provision [11] - 18:19, 18:20, 18:23, 18:25, 20:10, 20:11, 20:14, 30:4, 30:5, 30:7
provisions [1] - 20:20
public [6] - 29:1, 32:17, 33:1, 33:13, 36:11, 36:12
pulling [1] - 20:6
purpose [1] - 19:17
put [7] - 10:7, 10:9, 15:20, 16:1, 18:7, 22:4, 25:9

**Q**

quanitified [1] - 13:14
quantify [3] - 15:12, 17:22, 18:4
questions [1] - 9:8
quickly [2] - 6:20
quite [1] - 19:19
quote [1] - 8:12

**R**

race [1] - 28:3
Radelet [1] - 2:5
raise [2] - 18:14, 27:21
raised [2] - 27:22, 28:4
raises [1] - 18:14
raising [1] - 28:6
Randolph [1] - 2:11
rather [4] - 5:6, 9:2, 20:25, 21:17
read [5] - 6:7, 10:8, 21:18, 30:7, 36:25
reading [1] - 21:18
ready [2] - 4:25, 14:1
real [1] - 20:21
really [4] - 8:14, 27:16, 30:6, 32:21
reason [3] - 4:21, 4:22, 14:6
reasons [1] - 12:18
reassignment [1] - 6:16
received [3] - 5:17, 5:21, 7:13
Recess [1] - 3:11
recognize [1] - 18:24
recognized [1] - 25:1
record [2] - 3:7, 37:18
recorded [1] - 2:24
redressed [2] - 14:5, 14:21
reduced [1] - 13:16
reductions [1] - 14:8
refer [1] - 20:8
referral [6] - 12:1, 12:4, 12:6, 12:9, 13:9
referred [2] - 9:25, 23:6
Reform [1] - 24:8
reforms [1] - 29:10
refute [1] - 10:1
regard [3] - 10:15, 11:10, 19:6
regarding [2] - 18:14, 32:8
regardless [1] - 21:15
regime [2] - 19:24, 27:3
regularly [1] - 9:12
regulate [1] - 33:21
Reilly [3] - 2:6, 4:4, 4:7
relatedness [2] - 4:21, 4:23
relating [1] - 22:8
relationship [11] - 7:21, 8:22, 14:10, 14:12, 14:13, 18:17, 26:11, 26:15, 27:7, 27:9
relationships [1] - 20:13
relief [10] - 10:21, 10:22, 17:23, 17:24, 29:2, 35:18, 35:19, 36:8, 36:9

relying [1] - 18:20
remedied [2] - 36:2, 36:4
remedy [7] - 8:5, 8:10, 14:21, 17:16, 18:11, 32:15, 37:5
removed [1] - 16:16
rent [1] - 25:8
reply [1] - 32:12
Reporter [1] - 37:22
REPORTER [2] - 2:14
represent [2] - 13:25, 32:23
representation [2] - 13:21, 21:16
representatives [3] - 12:24, 13:25, 23:24
represented [1] - 22:5
reputation [2] - 8:20, 31:1
request [1] - 12:9
requesting [1] - 12:3
require [3] - 15:22, 20:18, 34:14
required [1] - 34:20
requiring [2] - 32:14, 34:11
resolve [1] - 31:7
resolved [2] - 6:16, 31:17
resolving [2] - 11:21, 32:8
respond [3] - 13:9, 13:10, 29:15
response [8] - 5:18, 5:21, 10:23, 20:10, 28:21, 31:3, 35:5, 36:16
responses [1] - 9:24
responsible [1] - 33:2
restoration [1] - 34:10
Restraining [1] - 1:10
restraining [1] - 37:2
RESTRAINING [1] - 1:15
result [1] - 9:17
resulting [1] - 32:6
revenue [1] - 25:8
review [1] - 9:2
rights [3] - 23:25, 28:13, 30:5
Rm [1] - 2:15
role [2] - 27:23, 28:4
round [1] - 29:18
RPR [3] - 2:15, 37:20, 37:21
ruins [1] - 18:18
rule [5] - 4:20, 4:25, 6:25, 24:2, 32:17
rules [7] - 7:16, 7:17, 12:14, 19:20, 21:18, 23:1
Ryan [2] - 1:22, 3:24

**S**

Sally [2] - 2:6, 4:6
savings [1] - 32:6
scenario [1] - 16:2
schedule [1] - 6:20
scissor [1] - 30:2
scooters [1] - 30:1
SCOTT [1] - 4:6
Scott [2] - 2:6, 4:6
Second [1] - 35:21

**second** [3] - 3:6, 3:9, 11:15
**sections** [2] - 11:17, 11:19
**see** [4] - 3:9, 9:13, 34:25, 35:1
**seek** [2] - 10:19, 10:20
**sees** [1] - 35:4
**segue** [1] - 22:15
**semis** [1] - 20:6
**sense** [3] - 6:14, 20:1, 32:19
**served** [1] - 29:1
**serves** [1] - 23:12
**set** [1] - 5:18
**Seventh** [1] - 31:5
**several** [3] - 7:10, 9:24, 11:16
**shall** [1] - 30:9
**shooting** [1] - 6:21
**shortly** [1] - 5:14
**show** [14] - 7:14, 7:15, 13:23, 14:13, 16:4, 18:7, 20:3, 20:4, 25:8, 25:13, 25:17, 26:19, 29:8, 36:12
**showing** [2] - 35:19, 37:3
**shows** [9] - 11:10, 9:11, 25:9, 25:10, 28:21, 28:22, 29:7, 35:25, 36:13
**side** [1] - 27:15
**signed** [1] - 28:2
**significant** [2] - 22:16, 28:23
**significantly** [1] - 13:24
**signs** [1] - 9:13
**similar** [1] - 30:2
**similarities** [1] - 35:2
**similarly** [1] - 35:3
**simple** [1] - 19:21
**simply** [3] - 19:19, 21:20, 36:19
**sit** [1] - 31:18
**situation** [2] - 16:2, 30:13
**six** [2] - 13:22, 30:18
**size** [6] - 10:10, 13:12, 13:16, 14:8, 23:22, 24:15
**sizes** [1] - 13:14
**slam** [1] - 34:24
**slam-dunk** [1] - 34:24
**small** [2] - 19:21, 20:2
**society's** [1] - 9:7
**solely** [1] - 6:25
**someone** [1] - 17:2
**somewhat** [1] - 7:25
**sorry** [2] - 15:2, 24:4
**sort** [2] - 28:12, 31:2
**South** [1] - 2:15
**speaking** [2] - 13:5, 13:8
**specific** [4] - 10:4, 10:7, 10:8, 10:25
**specifically** [1] - 35:9
**Specifically** [1] - 29:23
**speculate** [1] - 22:11
**speculation** [2] - 16:19, 17:20
**speculative** [2] - 9:3, 17:21
**spite** [1] - 34:8
**sponte** [1] - 5:3
**square** [1] - 15:20
**squarely** [1] - 25:14

**St** [3] - 2:11, 2:15, 31:3
**standard** [1] - 29:12
**state** [7] - 22:23, 23:12, 23:13, 24:1, 25:6, 32:18, 35:6
**statement** [3] - 21:8, 21:18, 32:19
**STATES** [2] - 1:4, 1:16
**status** [1] - 3:10
**statute** [9] - 5:9, 12:22, 20:12, 21:5, 21:8, 27:24, 29:22, 32:1, 32:4
**stays** [1] - 37:1
**Ste** [2] - 1:22, 2:6
**stenography** [1] - 2:24
**steps** [1] - 26:6
**steward** [2] - 13:22, 13:23
**still** [4] - 5:11, 15:15, 18:2, 19:5
**straight** [2] - 20:24, 20:25
**strong** [1] - 21:17
**strongest** [1] - 17:24
**stuff** [1] - 19:25
**sua** [1] - 5:3
**subjects** [2] - 10:4, 22:19
**submitted** [1] - 32:16
**subpoena** [1] - 31:24
**subsection** [1] - 29:24
**substantiating** [2] - 8:24, 29:4
**success** [1] - 37:4
**sue** [2] - 18:6, 18:14
**sufficient** [1] - 36:12
**suing** [2] - 18:8, 18:9
**support** [2] - 25:13, 28:20
**surprised** [1] - 6:16
**system** [5] - 12:1, 12:4, 12:6, 13:10

## T

**tailored** [1] - 35:7
**Teamster** [1] - 19:25
**Teamsters** [21] - 3:3, 3:14, 11:4, 11:9, 11:21, 12:24, 13:13, 18:21, 18:22, 18:25, 19:3, 19:4, 19:5, 19:15, 20:12, 25:11, 26:20, 26:21, 26:24, 30:7, 30:23
**TEAMSTERS** [1] - 1:8
**Technically** [1] - 17:14
**Temporary** [1] - 1:10
**temporary** [2] - 30:20, 37:2
**TEMPORARY** [1] - 1:15
**term** [1] - 34:1
**terms** [10] - 14:18, 21:2, 22:19, 23:16, 26:9, 33:12, 33:16, 33:21, 34:3, 35:6
**THE** [69] - 1:15, 3:2, 3:6, 3:8, 3:12, 3:13, 3:18, 3:21, 3:23, 4:1, 4:5, 4:8, 4:11, 4:14, 4:17, 4:19, 5:25, 6:2, 6:7, 6:10, 6:18, 7:7, 8:3, 10:7, 10:14, 10:24, 11:3, 12:12, 12:16, 13:2, 13:4, 13:8, 13:19, 14:2, 14:15, 14:17, 14:21, 15:2, 15:5, 15:14, 15:25, 16:6, 16:9, 16:15, 16:19, 16:21, 16:25, 17:5, 17:8, 17:20, 18:8, 18:11, 19:16, 21:13, 21:17, 22:2, 24:3, 24:5, 24:11, 25:2, 25:25, 27:15,

28:18, 29:7, 29:19, 32:10, 32:12, 34:7, 35:16
**therefore** [2] - 17:15, 17:16
**third** [1] - 31:23
**Thomas** [2] - 2:10, 4:15
**thoughts** [1] - 9:20
**three** [1] - 11:17
**titles** [1] - 9:12
**today** [8] - 5:15, 6:14, 31:12, 35:13, 35:16, 35:17, 36:21, 37:3
**tomorrow** [1] - 28:7
**tongue** [1] - 27:17
**totally** [1] - 21:10
**touched** [1] - 22:17
**tourism** [1] - 25:13
**town** [1] - 5:22
**trade** [7] - 7:10, 25:13, 26:19, 28:21, 29:8, 36:13
**traditionally** [1] - 19:3
**transcript** [2] - 2:24, 37:17
**TRANSCRIPT** [1] - 1:15
**treadmill** [1] - 6:7
**tremendous** [1] - 30:21
**triggered** [2] - 7:1, 7:2
**TRO** [15] - 3:12, 5:5, 5:11, 5:15, 5:21, 8:4, 8:25, 9:21, 27:24, 28:8, 28:25, 29:11, 35:5, 35:17, 36:22
**trucks** [2] - 9:11, 30:12
**true** [1] - 20:17
**try** [2] - 3:12, 27:16
**trying** [3] - 16:1, 34:16, 36:13
**tunnel** [1] - 33:2
**two** [8] - 4:22, 9:25, 11:19, 13:15, 13:17, 23:20, 24:16
**type** [2] - 19:3, 34:19
**types** [1] - 36:20

## U

**under** [22] - 10:16, 11:17, 13:15, 13:23, 16:22, 16:25, 20:18, 21:4, 21:5, 25:1, 26:3, 26:18, 26:23, 26:24, 27:10, 28:25, 29:11, 32:4, 33:16, 34:19, 36:5
**Under** [4] - 11:7, 13:21, 16:12, 19:23
**underlying** [1] - 24:21
**unenforceable** [1] - 34:4
**unfair** [3] - 23:4, 23:18, 32:24
**unfortunately** [1] - 18:1
**unilaterally** [1] - 23:16
**union** [20] - 13:21, 15:19, 15:22, 19:7, 21:21, 23:2, 26:8, 26:11, 26:14, 26:17, 27:9, 31:6, 31:15, 31:16, 31:20, 32:15, 34:17, 34:18, 34:19, 36:15
**union's** [1] - 27:10
**unions** [6] - 23:10, 27:5, 31:6, 31:17, 33:4, 34:9
**Unions** [1] - 31:10
**unique** [1] - 33:22
**UNITED** [2] - 1:4, 1:16

**unload** [6] - 19:10, 19:11, 20:6, 30:10, 30:13, 30:23
**unloading** [1] - 21:25
**up** [11] - 10:10, 11:22, 12:19, 13:15, 15:20, 16:24, 18:3, 20:6, 20:16, 29:20, 32:7
**users** [1] - 33:25

## V

**valid** [2] - 11:23, 35:22
**validation** [1] - 28:19
**various** [1] - 31:11
**vehicles** [2] - 19:10, 30:11
**vendors** [1] - 29:8
**verbatim** [1] - 20:11
**versus** [4] - 3:3, 3:14, 9:6, 31:4
**vetted** [1] - 28:1
**victory** [1] - 31:8
**view** [1] - 10:1
**violating** [1] - 23:1
**violation** [1] - 15:9
**violations** [2] - 8:13, 11:25
**VIRGINIA** [1] - 1:15
**voices** [1] - 28:16
**void** [1] - 34:4

## W

**Wacker** [1] - 2:6
**wait** [1] - 5:11
**Ward** [1] - 22:8
**WARNER** [17] - 4:2, 12:8, 12:13, 12:18, 18:13, 19:19, 21:12, 25:3, 25:24, 26:1, 26:3, 27:19, 29:15, 29:17, 29:21, 32:11, 37:7
**Warner** [4] - 2:5, 4:3, 29:20, 32:10
**Warner's** [1] - 28:14
**week** [1] - 22:11
**weighing** [2] - 36:17, 36:18
**well-documented** [1] - 35:12
**willing** [2] - 18:2, 24:7
**win** [1] - 8:8
**window** [1] - 35:9
**women** [1] - 13:15
**workers** [3] - 21:22, 34:17, 34:18
**works** [1] - 21:3
**Wrecking** [1] - 31:4

## Y

**yesterday** [1] - 5:21

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION TO |
| v. | ) | MOTION TO VACATE BRIEFING |
| | ) | SCHEDULE |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
<u>MOTION TO VACATE BRIEFING SCHEDULE</u>**

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and submit their Memorandum of Points and Authorities in Support

of their Ex Parte Motion for Temporary Restraining Order.

Dated: September 15, 2010       Respectfully submitted,

Alan Gura (admitted pro hac vice)     David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC         Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405    4300 Commerce Court, Suite 300-3
Alexandria, VA 22314           Lisle, IL 60532
703.835.9085/Fax 703.997.7665     630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/_____    By: /s/ David G. Sigale/_____
    Alan Gura                    David G. Sigale

                                 Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
<u>MOTION TO VACATE BRIEFING SCHEDULE</u>

The motion to vacate the briefing schedule – the city's *third* motion to disrupt an

established schedule in as many weeks – is frivolous. Just as the previous two motions were

denied (once by this Court and once by Judge Guzman, see below), so too should this motion be

denied, and the Defendant instructed to file no further motions of this kind until the preliminary

injunction hearing is concluded October 1. Twice was too many times already.

But the instant motion does have one item of value. At least – and at last – the City finally

admits its strategy: to delay this case as long as possible so that Judge Guzman might relate it,

because the City is unhappy with the prospect of *this* Court ruling on the motion. Mot., ¶ 16

Respectfully: (1) Judge Guzman will be ruling on the Rule 40.4 motion; rearguing that

motion here (because Judge Guzman indicated he might deny it) is a complete waste of time;

(2) discovery was not only unnecessary, as the Court suggested earlier, but Defendant has

radically exceeded the scope of authorized discovery and conducted discovery in abusive fashion;

and (3) *none* of Defendant's arguments are correct. The Blue Line range is indeed coming to

Chicago after October 1 – as may be additional ranges – and the irreparable harm will continue to

occur unless the law is enjoined. The city has no defense. The case could well end October 1 if the

preliminary injunction hearing is converted to a trial on the merits, as allowed by Rule 65.

1

<u>STATEMENT OF FACTS</u>

On August 24, this Court made the following finding:

> There's little basis for discovery needed at this point. And most of what you are doing is arguing your cases on the law that exists now and the facts that you have now. I don't think you need it. I was generous enough to give you the 30 days. I don't think you need more than that. Today is only the 24th, and that gives you all of the rest of this week, next week, and two more weeks into September. That's plenty of time to do what you need to do, based upon what you said you needed it for yesterday, so the oral request [to extend the preliminary injunction schedule] is denied. I am going to continue with this schedule.

Tr., 8/24/10, p. 80 l. 2-5.  It is important to recall what discovery was allowed. Here is what the

city initially wanted:

> THE COURT: Can you give me some sense of what that would be, of how many individuals you intend to depose or gather information from, so I have some sense of that for a fast track analysis?
>
> MR. WORSECK: I don't know that we would need to spray [sic: stray] beyond the plaintiffs to the lawsuit.

Tr., 8/23/10, p. 18, l. 19-24.

The amount of discovery eventually conducted would be heavy on a regular schedule, and

is unconscionable in the context of a fast-track described by the Court. For almost the first six

days, nothing occurred. This time was completely wasted. At 3:23 p.m. on August 30, Defendant

served far-reaching interrogatories and requests for production on all six plaintiffs, and noticed

the depositions of all plaintiffs as well as two third parties.  But although Defendant took nearly a

week to craft this discovery, it wanted the responses to everything *within 48 hours* – on

September 1, with the first depositions proceeding the following day, September 2. And on

August 31, Defendant served deposition notices of three additional non-parties.

2

But that is not all. Judge Guzman had entered an order setting a September 15 deadline for Plaintiffs to respond to the Rule 40.4 motion. Defendant noticed a motion for September 1 – the due date of their 48 hour discovery barrage – in front of Judge Guzman, requesting that he allow Defendant to file an additional brief in support of its Rule 40.4 motion – but cut Plaintiffs' opposition time from September 15 to September 7, the day after Labor Day.

In other words, Defendant waited to serve a massive discovery demand with a very narrow window, set to coincide with hearing on a motion to deprive Plaintiffs of their time to oppose another motion. At the hearing on the September 1 motion, however, Defendant did not so much argue their motion to deprive Plaintiffs of their time. It launched immediately into argument on why the Rule 40.4 motion should be granted right then and there.

For his part, Judge Guzman expressed great skepticism of Defendant's Rule 40.4 motion, advising Defendant that the fact that different judges might make different rulings on the same issue is not a ground for relation, and that he welcomes opinions different from his own because he learns from them. The September 15 deadline stood (Plaintiffs' request for additional time was denied). Defendant then filed another set of authority with Judge Guzman in support of its Rule 40.4 motion, in addition to its new brief.

This tactic, of setting impossible discovery deadlines around other events, was repeated last week. On Thursday evening, more discovery was served by Defendant – another set of written discovery demanding response in less than 24 hours. But as Defendant knew full well, the following 24 hours would see three of its depositions proceed, including the deposition of Mr. Tilbor in Boston. And never mind what the *Plaintiffs*, who are the ones who needed to respond to the unrealistic discovery requests, might have been doing in that short time frame.

Plaintiffs might have filed for a protective order and sanctions, but instead had to conserve their resources and file an emergency motion dealing with the fact that Mr. Tilbor's deposition would imminently commence without the benefit of Plaintiffs having been served with his subpoena duces tecum (or that of Accurate Perforating set for Monday).[1]

Later that day, while Plaintiffs' counsel were at the depositions, Defendant served a third set of written discovery.

And on Monday of this week – the discovery deadline – Defendant served a request for inspection of Mr. Tilbor's range in Chicago on September 24 – despite the fact that counsel were in Boston deposing Mr. Tilbor on Friday, during the discovery period. *That* would have been the time to examine the range.

Of course, on September 24, the range must be available for training. Plaintiffs are not paying $15,000 to bring a gun range to Chicago so that the Defendant can waste precious training time, time that by definition would have been found by the Court as necessary to secure constitutional rights. If the City is still curious about the range, Mr. Tilbor provided a list of numerous law enforcement agencies that use it. And it is inevitable that Defendant, if allowed access to the range, would imagine some problem with the range and rush to interfere with the training.

Discovery ended on September 13. Plaintiffs have no intention of complying with the time-barred and abusive request for inspection. If the temporary restraining order is issued, Defendant's attempts to "inspect" the range during the training period would violate that order.

---

[1]Defendant claims the motion was filed at 3 a.m., but counsel met and conferred by telephone the previous evening.

4

In sum, Defendant has noticed 11 depositions, originally within 13 days (one deposition of a non-party was continued at Defendant's requests), and has served three sets of written discovery. It continues to serve discovery after the deadline. It serves discovery demanding impossible deadlines surrounding its *other* discovery and motions practice. It repeatedly files motions attacking the schedule. Yet it has the temerity to claim that the discovery schedule is too burdensome for it to file a brief.

And the manner in which Defendant's discovery is conducted is at times abusive. The deposition of SAF's Director of Operations, Julianne Versnel, lasted well over five hours, beginning with a line of improper questioning inquiring into Versnel's conversations with her attorney. Then the topic shifted into SAF's corporate purpose. Defendant's counsel, who is not a member or shareholder of SAF, has never contributed to SAF, and does not serve on SAF's Board of Directors, argued at great length with Versnel that SAF's corporate purpose does not allow it to preserve gun rights in the fashion sought by this lawsuit.

Then counsel argued with Versnel about nearly each and every single word in the SAF-Blue Line contract, apparently suggesting the contract did not accomplish SAF's stated purpose of bringing the range to Chicago, either because only SAF, the corporate entity, could use the range (as opposed to its invitees), or because the range would be unavailable. Mr. Tilbor's declaration, submitted with the motion for TRO, terminates these arguments:

> 10. Blue Line has a contract with the Second Amendment Foundation (SAF) to operate the Blue Line range in Chicago, so that members of the general public may obtain the range training required by the City of Chicago to own guns. Blue Line fully endorses SAF's project. The Blue Line range is perfect for this application. . .
>
> 13. After the first visit to Chicago, ending September 30, Blue Line will continue offering the range's availability to SAF throughout the service agreement year. Our contract does

5

not allow us to deny SAF access to the range after the initial visit. I see no reason why the Blue Line range could not return to Chicago following its next appointment, consistent with our contract.

Tilbor Decl., 9/12/10.

Ms. Versnel's deposition saw ominous questions being asked about how the range landlord might have legal problems with the city owing to its contract with SAF. Subsequently, that first landlord's representative terminated the lease as of November 1, and at his deposition – which lasted an astonishing four hours (for writing a form industrial lease on a parking lot) – gave a series of conflicting, irrational answers about its relationship with SAF, eventually conceding that he understood the range would be operational on his property. But in any event, as noted in the TRO papers, Plaintiffs now have secured a second lease from a property owner who has less at stake vis a vis the city's regulatory bureaucracy, and who cannot be harassed with a four hour deposition because discovery is now closed.

<u>ARGUMENT</u>

I. THE CITY'S ARGUMENTS GO TO THE MERITS OF THE MOTION, NOT THE SCHEDULE FOR HEARING IT.

As with its unsuccessful motion before Judge Guzman to eviscerate Plaintiffs' time to brief the Rule 40.4 motion, the City again uses a scheduling motion to argue the alleged merits of its case. If the City believes that under the facts, Plaintiffs are not entitled to a preliminary injunction, then it can file a brief making that argument at the appointed date. And if it can make these arguments now, then it can certainly make them later.

In theory, any scheduling motion can disguise a substantive opposition by claiming that the underlying motion lacks merit, therefore, it should not be scheduled. This is not constructive.

6

II.     THE CITY'S ARGUMENTS REGARDING RANGE AVAILABILITY LACK MERIT.

Even if this were the time to argue the preliminary injunction, the City's arguments regarding the range's availability are frivolous. First, Mr. Tilbor's interpretation of his form service agreement contract as valid is correct. *Restatement (Second) of Contracts*, § 33 (1981), Comment d. ("[v]alid contracts are often made which do not specify the time for performance"). The fact that the range has intervening appointments does not reduce its obligation to return to Chicago, either in SAF's view or in Blue Line's. Respectfully, it is not for the City to argue with the parties to a contract that they are wrong, especially when the parties have undertaken significant steps to enforce the contract.

SAF is plainly interested in having Mr. Tilbor return. It contracted for the range's availability through July 26, 2011, and has secured a new property for this purpose through at least mid-November. Exh. D.

Nor does SAF need to move for a TRO each and every time the truck crosses the city's borders. *Krislov* v. *Rednour*, 226 F.3d 851, 858 (7th Cir. 2000) (court may rule "where the challenged situation is likely to recur and the same complaining party would be subjected to the same adversity") (citations omitted). "[T]he challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Super Tire Eng'g Co.* v. *McCorkle*, 416 U.S. 115, 122 (1974).

And SAF is not the only range provider wishing to bring a mobile range to Chicago. Fidelity Investigative has had the same idea, so that it could serve its own customers. Queen Decl., ¶ 5. The preliminary injunction would likely cause *several* ranges to be brought to Chicago.

SAF is not merely trying to vindicate its own interests; it is trying to secure the enjoyment of constitutional rights for everyone.

Finally, Defendant has taken aggressive discovery of Plaintiff Action Target, which has nothing to do with the Blue Line range, but which would take advantage of any preliminary injunction to start lining up customers for the construction of permanent ranges. Defendant cannot have it both ways, taking discovery of a plaintiff range builder on the basis that it is necessary for the preliminary injunction, then ignoring the very real business of this Plaintiff in claiming nothing would occur October 1 because *a different range* would not be here the next day. Obviously, Defendant believes Action Target will begin constructing ranges with the granting of a preliminary injunction.

## III.   DISCOVERY IS NOT AN EXCUSE TO AVOID THE PRELIMINARY INJUNCTION MOTION.

The argument that City needs relief from its briefing deadline because of the onerous discovery schedule is not well-taken. The discovery schedule and the briefing deadlines were both set at the same time, and the City has already lost the motion to reconsider this during the hearing on August 24. Some limit must be imposed on the number of times the City can ask for reconsideration of the same briefing schedule.

The only discovery served on the City was a request to identify any testifying witnesses and provide documents the City would offer on October 1. But the City's discovery conduct has been extreme, especially for a fast-track preliminary injunction. Plaintiffs welcome the City's deadline to file a brief in this case, as it might have the effect, if only for a moment, of slowing down the service of new discovery requests and repeated baseless threats of discovery motions.

8

The Court should know that consistent with its incorrect suggestion that "critical unanswered questions remain," Mot., at ¶ 7, the City has already advised that it wants to reopen discovery, a request that Plaintiffs will oppose.[2] All that remains is the City's endless speculation that gun ranges must be inherently, unacceptably dangerous, an allegation that Plaintiffs and Mr. Tilbor will never concede in discovery, regardless of how many additional hours they must sit at a deposition, being endlessly questioned as to their knowledge of "all local and federal regulations." Mot., at ¶ 7. Virtually every article in commerce today is heavily regulated by multiple government agencies. That is no excuse to avoid the question of whether *Defendant's* laws are unconstitutional, or irreparably harm Plaintiffs and the public.

Nor should Plaintiffs have to endure this process. Under Illinois law, it would be the Defendant's burden, not the Plaintiffs', to show why their range is dangerous. "[T]he location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice." *Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995). This is particularly true as gun ranges are constitutionally-protected. Plaintiffs know what is commonly known, at least within the firearms, law enforcement, and defense communities, although it will hopefully soon be common knowledge in this city: that mobile gun ranges are perfectly safe, and in ordinary usage throughout the United States.

---

[2]Plaintiffs have also repeatedly opposed Defendant's statements, at the end of nearly each deposition, to keep them "open" for continuation on a later date. These announcements serve only to delay the proceedings and harass the witnesses.

9

<u>CONCLUSION</u>

The motion to vacate the briefing schedule and preliminary injunction hearing – essentially, a premature and improper opposition to the preliminary injunction, and the second such motion leveled at the Court's schedule – lacks any merit and should be denied.

Dated: September 15, 2010   Respectfully submitted,

Alan Gura (admitted pro hac vice)  David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC   Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405  4300 Commerce Court, Suite 300-3
Alexandria, VA 22314   Lisle, IL 60532
703.835.9085/Fax 703.997.7665  630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/     By: /s/ David G. Sigale/
  Alan Gura       David G. Sigale
            Attorneys for Plaintiffs

10

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 15, 2010, he served a copy of the above Memorandum of Points and Authorities, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura