# United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:10–cv–05135
### *Internal Use Only*

Ezell et al., v. City of Chicago
Assigned to: Honorable Virginia M. Kendall
Case in other court:  10–03525
Cause: 42:1983 Civil Rights Act

Date Filed: 08/16/2010
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/22/2010 | 44 | 4 | MOTION by Defendant City Of ChicagoDefendant's Emergency Motion for Leave to Allow Additional Discovery or in the Alternative to Bar Certain Witnesses (Hirsch, Rebecca) (Entered: 09/22/2010) |
| 09/23/2010 | 47 | 32 | *Amended* NOTICE of Motion by Rebecca Alfert Hirsch for presentment of motion for miscellaneous relief 44 before Honorable Virginia M. Kendall on 9/28/2010 at 09:00 AM. (Hirsch, Rebecca) (Entered: 09/23/2010) |
| 09/23/2010 | 48 | 34 | MOTION by Defendant City Of Chicago for extension of time to file answer *Filed as Emergency Motion* (Hirsch, Rebecca) (Entered: 09/23/2010) |
| 09/27/2010 | 50 | 37 | MOTION by Plaintiffs Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc.in limine *no. 1: to exclude six witnesses* (Attachments: # 1 Memorandum in Support)(Gura, Alan) (Entered: 09/27/2010) |
| 09/27/2010 | 52 | 50 | REPLY by Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. to MOTION by Plaintiffs Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. for preliminary injunctionMOTION by Plaintiffs Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. for permanent injunction 4 , memorandum in opposition to motion 42 (Gura, Alan) (Entered: 09/27/2010) |
| 09/27/2010 | 54 | 65 | MEMORANDUM by Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. in Opposition to motion for miscellaneous relief 44 (Sigale, David) (Entered: 09/27/2010) |
| 09/28/2010 | 56 | 77 | RESPONSE by Action Target, Inc., Joseph I. Brown, Rhonda |

| | | | Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. to MOTION by Defendant City Of Chicago for extension of time to file answer *Filed as Emergency Motion* 48 (Sigale, David) (Entered: 09/28/2010) |
|---|---|---|---|
| 09/28/2010 | 57 | 81 | NOTICE by All Plaintiffs re response to motion, 56 (Sigale, David) (Entered: 09/28/2010) |
| 09/28/2010 | 58 | 82 | MINUTE entry before Honorable Virginia M. Kendall:Defendants motions for extension of time to answer 40 , 48 is granted to 10/8/2010 for an answer or to otherwise plead to plaintiff's complaint. Defendant's Emergency Motion for Leave to Allow Additional Discovery or in the Alternative to Bar Certain Witnesses 44 is granted. Plaintiff's motion in limine #1 to exclude the testimony of six witnesses 50 is denied as to Dan Bartoli. Defendants are required to submit a summary statement of Dan Bartoli to plaintiff. The motion is also denied as to Pattie Scudiero and dismissed as moot as to the other four witnesses by agreement of the parties. Plaintiff's oral motion to depose Pattie Scudiero is granted and limited to one hour. Defendant's are permitted to depose the property owner and real estate owner each, but limited to one hour. Miss Versnell may also be deposed, but limited to one hour regarding new information. Plaintiffs must provide a copy of the new contract to defendant. (tsa, ) (Entered: 09/28/2010) |
| 10/01/2010 | 60 | 83 | MOTION by Amicus National Rifle Association for leave to file *Brief as Amicus Curiae* (Attachments: # 1 Exhibit Brief of Amicus Curiae National Rifle Association, # 2 Exhibit, # 3 Exhibit, # 4 Notice of Affiliates)(Cooper, Charles) (Entered: 10/01/2010) |
| 10/01/2010 | 61 | 115 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–5278746. (Cooper, Charles) (Entered: 10/01/2010) |
| 10/01/2010 | 62 | 117 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–5278846. *Motion of David H. Thompson for Leave to Appear Pro Hac Vice.* (Cooper, Charles) (Entered: 10/01/2010) |
| 10/01/2010 | 63 | 119 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–5278888. *Motion of Jesse Panuccio for Leave to Appear Pro Hac Vice.* (Cooper, Charles) (Entered: 10/01/2010) |
| 10/01/2010 | 64 | 121 | MINUTE entry before Honorable Virginia M. Kendall:Preliminary Injunction hearing held on 10/1/2010 and continued to 10/4/2010 at 09:30 AM.Advised in open court notice (tsa, ) (Entered: 10/04/2010) |
| 10/04/2010 | 66 | 122 | MINUTE entry before Honorable Virginia M. Kendall:Preliminary Injunction hearing held on 10/4/2010. The Court will rule by mail.Advised in open court notice (tsa, ) |

| | | | |
|---|---|---|---|
| | | | (Entered: 10/05/2010) |
| 10/08/2010 | 67 | 123 | MOTION by Defendant City Of Chicago to dismiss *plaintiffs' complaint* (Hirsch, Rebecca) (Entered: 10/08/2010) |
| 10/12/2010 | 78 | 128 | MEMORANDUM Opinion and Order Signed by the Honorable Virginia M. Kendall on 10/12/2010.(tsa, ) (Entered: 10/12/2010) |
| 10/13/2010 | 79 | 146 | MINUTE entry before Honorable Virginia M. Kendall:Defendant's motion to dismiss 67 is entered and briefed as follows: Responses due by 10/28/2010. Replies due by 11/4/2010. Ruling will be made by mail. Parties need not appear in court on 10/14/2010. Mailed notice (tsa, ) (Entered: 10/13/2010) |
| 10/28/2010 | 80 | 147 | MEMORANDUM by Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. in Opposition to motion to dismiss 67 (Gura, Alan) (Entered: 10/28/2010) |
| 10/28/2010 | 81 | 164 | NOTICE of appeal by Action Target, Inc., Joseph I. Brown, Rhonda Ezell, William Hespen, Illinois State Rifle Association, Second Amendment Foundation, Inc. regarding orders 77 , 78 Filing fee $ 455, receipt number 0752−5367812. (Gura, Alan) (Entered: 10/28/2010) |
| 11/01/2010 | 85 | 166 | MOTION by Defendant City Of Chicago to stay *proceedings pending appeal or in the alternative for extension of time* (Hirsch, Rebecca) (Entered: 11/01/2010) |
| 11/09/2010 | 87 | 172 | MINUTE entry before Honorable Virginia M. Kendall:Motion for leave to appear pro hac vice 61 , 62 , 63 is granted. Mailed notice (nf, ) (Entered: 11/10/2010) |
| 11/15/2010 | 88 | 173 | MINUTE entry before Honorable Virginia M. Kendall:Defendant's motion to stay 85 is entered and briefed as follows: Responses due by 12/6/2010. Replies due by 12/22/2010. Status hearing set for 12/22/2010 at 09:00 AM. The response is stayed on motion 67 until the Courts ruling on the motion to stay 85 . Defendant's reply in support is entered and continued until the motion to stay is ruled upon. Status hearing set for 11/17/2010 is stricken. Parties are to provide a status report by 12/20/2010. Advised in open court notice (tsa, ) (Entered: 11/16/2010) |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EZELL, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10-CV-5135 |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT'S EMERGENCY MOTION FOR LEAVE TO ALLOW ADDITIONAL DISCOVERY OR IN THE ALTERNATIVE TO BAR CERTAIN WITNESSES

Defendant City of Chicago (the "City"), by its attorney, Mara S. Georges, Corporation Counsel for the City of Chicago, respectfully moves this Court for leave to conduct additional discovery before the commencement of the preliminary injunction hearing in this case, or in the alternative, to bar certain individuals from testifying at the preliminary injunction hearing. In support of its motion, the City states as follows:

### Introduction

1.      Plaintiffs filed their Complaint and Motion for a Preliminary Injunction ("Plaintiffs' Motion") on August 16, 2010.

2.      On August 22, 2010, Plaintiffs filed a motion for temporary restraining order ("TRO"), which the Court denied on August 24, 2010. That day, the Court allowed the parties to conduct discovery but set a discovery cut-off date of September 13, 2010. The Court also set the hearing on Plaintiffs' Motion for October 1, 2010.

3.      Since August 24, the City has been actively and diligently pursuing discovery related

1

to the numerous issues raised by Plaintiffs' Motion.  The City has served written discovery and document requests and has taken ten depositions, including: (a) individual Plaintiffs Ezell, Hespen, and Brown; (b) Julianne Versnel, Director of Operations of Plaintiff Second Amendment Foundation ("SAF"); (c) Richard Pearson, Executive Director of Plaintiff Illinois State Rifle Association ("ISRA"); and (d) Chris Hart, Midwest Range Consultant for Plaintiff Action Target, Inc.  The City also deposed four third parties, including: (a) Jerry Tilbor, President of Blue Line Corporation, the entity that contracted with SAF to provide the mobile range unit; (b) Larry Cohen, the Chairman of Accurate Perforating Corporation ("Accurate"), the entity that leased the property to SAF for storage of a trailer; (c) a representative from a suburban gun range that offers the one-hour range training; and (d) a representative from an academy in the City that offers the four-hour classroom training.

4.      On September 16, Plaintiffs submitted interrogatory responses that identified eight individuals who may testify at the preliminary injunction hearing: individual Plaintiffs Ezell, Brown, and Hespen; Versnel; Pearson; Don Moran, president of ISRA; Beverly Hayes of Chicago Industrial Real Estate, LLC; and Leo Solarte of First Western Properties.  *See* Plaintiffs' Responses to Defendant's Third Set of F. R. Civ. P. 33 Interrogatories and F. R. Civ. P.  34 Requests for Production, attached as Exhibit A.

5.      Three of Plaintiffs' proposed witnesses – Hayes, Solarte, and Moran – have not been deposed, and the City has had no opportunity to depose them.  Two of Plaintiffs' proposed witnesses – Versnel and Pearson – have been deposed, but the City should be entitled to resume both of their depositions.  With respect to Versnel, Plaintiffs have provided new information since her deposition on September 2 revealing that she has continued to make efforts to secure both a new mobile range unit and a new site for the mobile range.  With respect to Pearson, he has not yet produced relevant

documents and, once he does so, should be questioned about them.  Finally, last minute discovery responses indicate that there are two additional persons with knowledge that the City needs to depose, Gillespie Properties, LLC (the owner of 6331 S. Bell, a second proposed location for the mobile range) and Arms to Bear (a possible supplier of a mobile range to SAF).

6.     For the reasons set forth below, the City respectfully requests that this Court permit the City to resume the depositions of Versnel and Pearson and to allow the City to take the depositions of Hayes, Solarte, Moran, Gillespie Properties, LLC, and a representative from Arms to Bear.  In the alternative, the City requests that the Court limit the testimony of Versnel and Pearson and bar Hayes, Solarte, and Moran from testifying at all.

## Argument

7.     The discovery process and its corresponding rules are designed "to promote liberal discovery in an effort to narrow the issues for trial and prevent unfair surprise." *EEOC v. Staffing Network*, 2002 WL 31473840, *4 (N.D. Ill. Nov. 4, 2002).  Due process therefore requires that the City be able to depose all relevant witnesses, especially those Plaintiffs intend to rely on at trial, in order to adequately prepare its defense and not be ambushed or suffer prejudice at trial.  *See, e.g., Anglin v. Sears, Roebuck & Co.*, 139 F. Supp.2d 914, 918-19 (N.D. Il. 2000) (defendant prejudiced if plaintiff's previously undisclosed witnesses allowed to testify where defendant did not have opportunity to depose witnesses); *Boynton v. Monarch*, 1994 WL 463905, * (N.D. Ill. Aug. 25, 1994) (it would constitute unfair surprise to defendant to admit testimony of witness where defendant had no opportunity to depose witness).

8.     If the Court does not grant the City leave to resume the depositions of Versnel and Pearson, and leave to take the depositions of the additional witnesses listed above, then Plaintiffs

should be barred from introducing their testimony at trial. *See, e.g., Hill v. Porter Mem. Hosp.,* 90 F.3d 220, 224 (7th Cir. 1996) (courts routinely bar witnesses from testifying at trial where witness has not been produced to Defendant in timely manner); *Scaggs v. Consolidated Rail Corp.,* 6 F.3d 1290, 1295 (7th Cir. 1993) (barring testimony or other evidence is appropriate sanction where party would be prejudiced or subject to unfair surprise if evidence admitted).

### Julianne Versnel

9.      Ms. Versnel was deposed in this case on September 2, 2010.  Over the objection of Plaintiffs' counsel, the City did not conclude Ms. Versnel's deposition.  As of September 2, SAF had only identified the Accurate Perforating location for operation of the mobile range.  However, on September 9, a week after her deposition, the City learned in an e-mail from Plaintiffs' counsel that SAF was considering leasing a new site – 6300-6400 S. Bell Street – for purposes of operating the mobile range.  On September 13, the City learned that SAF had purportedly executed a lease for 6300-6400 S. Bell.

10.     Moreover, during the deposition of Mr. Hart of Action Target taken on September 10, the City learned that Ms. Versnel had continued to engage in discussions – subsequent to her deposition on September 2 – about obtaining mobile ranges in lieu of or in addition to Blue Line's mobile range, and about using other locations besides the Accurate site and 6300-6400 S. Bell.

11.     The City did not have an opportunity to depose Ms. Versnel about SAF's plans to lease 6300-6400 S. Bell Street or SAF's plans to obtain additional ranges and/or locations before the close of discovery.  On September 10, 2010, the City took three depositions: (a) Mr. Tilbor of Blue Line (in Boston); (b) Mr. Hart of Action Target; and (c) a suburban gun range.  On September 13, the City took two depositions: (a) Mr. Cohen of Accurate; and (b) a suburban gun range.  Moreover,

4

Plaintiffs strenuously objected to the City's proposal of double-tracking or scheduling any depositions over the weekends in order to be able to conduct all relevant discovery before the cut-off date of September 13.

12.     In addition, on Monday, September 13, Plaintiffs filed their second motion for a TRO, and the City spent the next three days preparing its written response to that motion and attending the Court's September 15 hearing and September 16 ruling on the TRO motion.  The City expended further resources trying to determine whether and when Plaintiffs' second motion for TRO would be heard, due to Plaintiffs' failure to properly notice the motion for hearing.  On September 14, the City filed a motion to vacate the preliminary injunction schedule and to grant the City more time to file its written response to Plaintiffs' motion, but the Court denied the City's motion.

13.     For these reasons, the City could not depose Ms. Versnel before the close of discovery regarding SAF's supposed lease for 6300-6400 S. Bell Street.  The City respectfully requests, therefore, that it be granted leave to resume Ms. Versnel's deposition.  Testimony regarding the S. Bell location is critical, as the lessor of the first site (Accurate) has terminated that lease, and Plaintiffs' plan appears to be to use the S. Bell site as their primary base of operation.  In the alternative, Ms. Versnel should be barred from offering any testimony regarding her actions since the date of her deposition, including testimony regarding SAF's purported lease of 6300-6400 S. Bell and operation of the mobile range on that, or any other, property. *See, e.g., Scaggs*, 6 F.3d at 1295.

### Leo Solarte

14.     As soon as the City learned that SAF was investigating a site on S. Bell as a new location to operate a mobile range, the City propounded additional interrogatories and requests for production of documents on Plaintiffs, seeking information about that location.  Plaintiffs answered

these discovery requests on September 13, the discovery cut-off date, and in those responses, identified Mr. Leo Solarte as the individual with whom SAF communicated regarding the S. Bell property. *See* Plaintiff Second Amendment Foundation's Answers to Defendant City of Chicago's Second Set of Interrogatories to Plaintiffs, attached as Exhibit B. Plaintiffs stated that Ms. Versnel discussed with Mr. Solarte the possibility of bringing the mobile range to 6331 S. Bell, the nature of the property, issues of liability and insurance, and a possible lease. *Id.* Plaintiffs also provided the City documents regarding this property, including copies of email correspondence between Ms. Versnel and Mr. Solarte and an unsigned land lease, dated September 11, between Gillespie Properties LLC (the owner of 6331 S. Bell) and SAF.

15.     On September 16, 2010, Plaintiffs identified Mr. Solarte as a witness who may testify at the preliminary injunction hearing. Plaintiffs stated that his testimony would concern the property at 6331 South Bell, including the lease to SAF and the characteristics and details of the property. *See* Exhibit A at 3.

16.     The City has not had an opportunity to depose Mr. Solarte. As discussed above, the first time the City learned about Mr. Solarte or the 6331 S. Bell property was on September 9, two days before the close of discovery. Five depositions were already scheduled to, and did, occur before the close of discovery – three on Friday, September 10, and two on Monday, September 13. And since September 13, the last day of the discovery period, the City has had to respond to Plaintiffs' second motion for TRO and motion for preliminary injunction.

17.     For these reasons, the City respectfully requests that it be granted leave to conduct Mr. Solarte's deposition, or, in the alternative, that Mr. Solarte be barred from testifying at the preliminary injunction hearing. *See, e.g., Scaggs,* 6 F.3d at 1295.

6

**Gillespie Properties**

18.      In addition to Mr. Solarte, the City should be given an opportunity to depose a representative from Gillespie Properties, LLC ("Gillespie"), the owner of 6331 S. Bell.  Plaintiffs have not identified Gillespie on their witness list, but the City is entitled to take its deposition.  The property owner would be the actual contracting party with SAF, and thus would have knowledge of the specific, authorized uses of the property, terms of any lease, and licensing, zoning, or other land regulations specific to the property.  Indeed, the deposition of Accurate revealed information conflicting with Plaintiffs' account regarding the validity of the lease, the nature and scope of the lease, and authorized uses of the property.  Therefore, testimony from Gillespie would be highly relevant to SAF's ability to situate and operate a mobile range at 6331 S. Bell, and necessary to the City's ability to adequately prepare its defense.

**Beverly Hayes**

19.      Plaintiffs also identified Ms. Beverly Hayes as a potential testifying witness.  *See* Ex. A. at 2.  Ms. Hayes is the real estate agent who was involved with helping SAF secure the lease for trailer storage with Accurate.

20.      Given the short time period for discovery, the number of depositions already scheduled, and the intervening emergency motions filed by Plaintiffs, the City did not have an opportunity to take Ms. Hayes's deposition.  The City should be allowed to take her deposition not only because Plaintiffs have identified her as a potential trial witness, but also because her role in SAF's efforts to secure a site for the mobile range has taken on increasing significance as the case has progressed.

21.      First, Plaintiffs' supplemental discovery makes clear that SAF has been investigating

7

other sites, beyond Accurate and S. Bell, as potential locations for a mobile range.  Ms. Hayes is likely to have relevant knowledge about these other sites.  And second, there is a discrepancy between SAF's testimony that its lease with Accurate Perforating would allow the mobile range to be open to the public, and the testimony of Mr. Cohen, Accurate's Chairman, who testified to the contrary.  Ms. Hayes, as the go-between for communications between SAF and Accurate, may have discoverable information about what was discussed regarding the terms of the lease and permitted uses.

22.     Therefore, the City respectfully requests that it be granted leave to conduct Ms. Hayes's deposition, or, in the alternative, that Ms. Hayes be barred from testifying at the preliminary injunction hearing.  *See, e.g., Scaggs,* 6 F.3d at 1295.

### Richard Pearson

23.     Mr. Pearson identified two categories of documents during his deposition on September 8 that still have not been produced to the City despite repeated requests.  First, Mr. Pearson identified a document that sets forth the rules of the range and safety protocols for the ISRA range at Bonfield, Illinois.  Second, when discussing whether he had begun working on the rules of the range and safety protocols for the mobile range site in Chicago, he testified that he had started making some notes on a sketch pad.  The City's counsel asked him, both during the deposition and in a letter the next day, to supplement ISRA's discovery responses by producing these documents immediately.  *See* September 9 Letter from Andrew Worseck to Plaintiffs' Counsel, attached as Exhibit C.

24.     To date, ISRA has not produced this material and has no basis to withhold it.  Rules of the range and other safety protocols ISRA intends to utilize for its operation of any mobile range

within the City is highly relevant to the public health and safety issues implicated by Plaintiffs'

request for a preliminary injunction.   The City therefore requests that this Court order Plaintiffs to

produce this material immediately.

26. 25. Furthermore, the City should be allowed to continue Mr. Pearson's deposition (which

was also left open over Plaintiffs' objection) after it has received these documents, in order to have

a fair opportunity to question him regarding their contents.

26. The City respectfully requests, therefore, that it be granted leave to resume Mr.

Pearson's deposition.   In the alternative, the City requests that Mr. Pearson be barred from offering

any testimony regarding his actions since the date of his deposition, including testimony regarding

ISRA's rules of the range and safety protocols with respect to the Bonfield range, mobile range, or

any other range it may operate in the City.   *See, e.g., Scaggs,* 6 F.3d at 1295.

### Don Moran

27. Plaintiffs have also identified Mr. Moran, the president of ISRA, as a witness who

may testify regarding the plans for operations and protocols for the mobile range.   *See* Ex. A. at 2.

He is a previously undisclosed witness who the City has had no opportunity to depose regarding the

subject matter of his knowledge and potential testimony.

28. Therefore, the City respectfully requests that it be granted leave to depose Mr. Moran

or, in the alternative, that Mr. Moran be barred from testifying at the preliminary injunction hearing.

*See, e.g., Scaggs,* 6 F.3d at 1295.

### Representative From Arms To Bear

29. As discussed above, during Mr. Hart's deposition on September 10, he revealed that

Ms. Versnel continued to have conversations with him, as late as September 8, regarding the

possibility of finding and leasing additional ranges to bring to Chicago. Specifically, Mr. Hart testified that on September 8, he called Ms. Versnel to inform her that one of Action Target's sales people had located a mobile range owned by a company called Arms to Bear that might be available for lease to SAF for a two-week period beginning on October 1. Mr. Hart further testified that he told Ms. Versnel that he would have the owner of Arms to Bear, a gentleman named Kevin, contact her to explore the possibility of leasing this mobile range. Mr. Hart did not know whether Kevin had been in touch with Ms. Versnel or what had been discussed between the two of them since that time.

30.     This evidence raises the possibility that SAF has secured a second mobile range – different from the range provided by Blue Line – to bring to Chicago. The City should be given an opportunity to depose Kevin from Arms to Bear, to discover, among other things: (1) if Arms to Bear has entered into any agreements with SAF to lease a mobile range; (2) the terms of any such lease and the dates SAF would first have possession of the range; (3) specifications of the range, including its age and size, how many target points it has, what safety mechanisms it contains, and compliance with federal and state environmental regulations. Moreover, the City is entitled to discover the nature of the conversations Ms. Versnel had with Arms to Bear, including ongoing efforts to secure additional ranges from Arms to Bear.

31.     Accordingly, the City respectfully requests that it be granted leave to depose the relevant individual from Arms to Bear to prevent unfair surprise or prejudice at trial. *See, e.g., Scaggs,* 6 F.3d at 1295.

WHEREFORE, the City respectfully requests that this Court grant it leave to conduct additional discovery, or in the alternative, to bar the individuals identified above from testifying at the preliminary injunction hearing in this case, and all other relief the Court deems just.

Date: September 22, 2010                    Respectfully submitted,

                                            MARA S. GEORGES,
                                            Corporation Counsel for the City of Chicago

                                            By:      /s/ Rebecca Alfert Hirsch
                                                     Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RHONDA EZELL, JOSEPH I. BROWN,　　　　　）
WILLIAM HESPEN, ACTION TARGET, INC.,　　）
SECOND AMENDMENT FOUNDATION, INC.,　　）
and ILLINOIS STATE RIFLE ASSOCIATION,　　）
　　　　　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　Plaintiffs,　　　　　　　）　　　No.  10 CV 5135
　　　　　　　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　　）
CITY OF CHICAGO,　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　Defendant.　　　　　　　）

**PLAINTIFFS' RESPONSES TO DEFENDANT'S THIRD SET OF F.R.CIV.P. 33 INTERROGATORIES
AND F.R.CIV.P. 34 REQUESTS FOR PRODUCTION**

TO:　　Michael Forti, Esq.
　　　　Andrew W. Worseck, Esq.
　　　　City of Chicago Department of Law
　　　　30 North LaSalle Street, Suite 1230
　　　　Chicago, IL 60602

　　　　NOW COME the Plaintiffs, RHONDA EZELL, JOSEPH I. BROWN, WILLIAM HESPEN, ACTION

TARGET, INC., SECOND AMENDMENT FOUNDATION, INC., and ILLINOIS STATE RIFLE

ASSOCIATION, by and through GURA & POSSESSKY, PLLC, and LAW FIRM OF DAVID G. SIGALE,

P.C., their attorneys, and for their Responses to the Third Set of discovery requests pursuant to

F.R.Civ.P. 33 and 34 propounded by the Defendant, CITY OF CHICAGO, states as follows:

**F.R.CIV.P. 33 INTERROGATORIES**

　　　　1.　　　　Identify all lay witnesses testifying on behalf of Plaintiffs at the preliminary

injunction hearing in this action set for October 1, 2010 at 1:00 p.m.  For each testifying

witness, identify the subject matter of his/her testimony.

**ANSWER:**

Rhonda Ezell may testify regarding her health conditions, her experiences with criminal attempts against her property, her difficulty in traveling outside of the City, and her desire to exercise her Second Amendment rights by practicing the use of firearms at a range in the City. She may testify how the deadlines and terms in the City's responsible firearms ownership ordinance affect her ability to possess firearms. She may also testify as to any fact or lay opinion discussed in her deposition.

Joseph I. Brown may testify regarding his desire to obtain the necessary training for a CFP permit, and to exercise his Second Amendment rights by practicing the use of firearms, at a range in the City. He may testify how the deadlines and terms in the City's responsible firearms ownership ordinance affect his ability to possess firearms. He may also testify as to any fact or lay opinion discussed in his deposition.

William Hespen may testify regarding his desire to obtain the necessary training for a CFP permit, and to exercise his Second Amendment rights by practicing the use of firearms, at a range in the City. He may testify how the deadlines and terms in the City's responsible firearms ownership ordinance affect his ability to possess firearms. He may also testify as to any fact or lay opinion discussed in his deposition.

Julianne Versnel, Second Amendment Foundation, 12500 NE 10th Place, Bellevue, WA 98005, may testify regarding her efforts on behalf of Second Amendment Foundation to secure both a mobile range, and a location to store it in Chicago, so that Chicago residents may obtain the necessary training to obtain a CFP permit. She may testify as to any documents relevant to these efforts. She may testify as to her arrangement with ISRA to operate the mobile range in a safe, legal and efficient manner once it has arrived. She may also testify as to any fact or lay opinion discussed in her deposition.

Richard Pearson, Illinois State Rifle Association, P.O. Box 637, Chatsworth, IL 60921, may testify regarding the plans for operations and protocols for the mobile range. He may testify how ISRA personnel and agents can safely and efficiently operate the mobile range for both the users and the public. He may also testify as to any fact or opinion discussed in his deposition.

Don Moran, Illinois State Rifle Association, P.O. Box 637, Chatsworth, IL 60921, may testify regarding the plans for operations and protocols for the mobile range.

Beverly Hayes, Chicago Industrial Real Estate, LLC, 3350 South Kedzie Avenue, Chicago, IL 60623, may testify regarding her efforts on behalf of SAF to secure a location to place the mobile range in Chicago, and as to any conversations she had with any prospective landlords and/or their agents.

Leo Solarte, First Western Properties, 4431 North Milwaukee Avenue, Unit B, Chicago, IL 60630, may testify regarding the 6331 South Bell property, including the Lease to SAF and the characteristics and details about the property.

Plaintiffs also reserve the right to call any individual whose deposition has been taken, who may testify as to any fact or opinion disclosed during said deposition.

Plaintiffs also reserve the right to call any witness designated by Defendant.

Plaintiffs reserve the right to use deposition testimony of unavailable witnesses.

Plaintiffs reserve the right to timely supplement these disclosures.

Plaintiffs also reserve the right to call no witnesses.

 

2.       Identify all opinion witnesses testifying on behalf of Plaintiffs at the preliminary injunction hearing in this action set for October 1, 2010 at 1:00 p.m.  For each expert witness: (1) identify the subject matter of his/her testimony; (2) identify his/her expert opinions and conclusions and the bases therefor; (3) identify his/her qualifications as an expert witness; and (4) identify any written reports pertaining to the witness's testimony.

**ANSWER:**

None at this time, though Plaintiffs reserve the right to timely supplement these disclosures.

**F.R.CIV.P. 34 REQUEST FOR PRODUCTION**

1.       All written statements and/or reports of any Plaintiff or witness testifying on behalf of Plaintiffs at the preliminary injunction hearing, including but not limited to all reports and drafts of reports prepared by any expert witness.

**RESPONSE:**    None except for the declarations attached to Plaintiffs' Motion for Temporary Restraining Order, and deposition transcripts, all of which Defendant has or can obtain independently.

2.      All documents relating to the qualifications of any expert witness, including but not limited to a *curriculum vitae.*

**RESPONSE:**     The CV of Richard Pearson was disclosed during his deposition.


3.      All documents, exhibits or other tangible evidence that Plaintiffs intend to introduce into evidence, or otherwise use, at the preliminary injunction hearing set for October 1, 2010 at 1:00 p.m.

**RESPONSE:**

- Leases for Accurate and Bell, already disclosed.

- Accurate termination notice, already disclosed.

- Blue Line-SAF contract, already disclosed.

- Satellite images of Bell and Accurate properties as used in depositions.

Plaintiffs reserve the right to timely supplement these disclosures.


One of the Attorneys for Plaintiffs

**<u>PROOF OF SERVICE</u>**

The undersigned certifies, under penalty of perjury pursuant to F.R.Civ.P. 11, that on

September 16, 2010, the attached document was hand-delivered to one of the above-listed

recipients.

_____
One of the Attorneys for Plaintiffs

Alan Gura (admitted *pro hac vice*)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085
alan@gurapossessky.com

David G. Sigale, Esq. (#6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
Corporate West I
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
630.452.4547
dsigale@sigalelaw.com

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, JOSEPH I. BROWN, | ) | |
| WILLIAM HESPEN, ACTION TARGET, INC., | ) | |
| SECOND AMENDMENT FOUNDATION, INC., | ) | |
| and ILLINOIS STATE RIFLE ASSOCIATION, | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10 CV 5135 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF SECOND AMENDMENT FOUNDATIONS'S ANSWERS TO DEFENDANT CITY OF CHICAGO'S SECOND SET OF INTERROGATORIES TO PLAINTIFFS**

TO:     Andrew W. Worseck, Esq.
        City of Chicago Department of Law
        30 North LaSalle Street, Suite 1230
        Chicago, IL 60602
        Fax No. (312) 742-3925

NOW COMES the Plaintiff, SECOND AMENDMENT FOUNDATION, by and through GURA

& POSSESSKY, PLLC, and LAW FIRM OF DAVID G. SIGALE, P.C., its attorneys, and for its Answers

to the Second Set of F.R.Civ.P. 33 Interrogatories propounded by the Defendant, CITY OF

CHICAGO, states as follows:

1.      Identify all communications that have occurred between any Plaintiff or

Plaintiff's attorney and Accurate Perforating Corporation since September 2, 2010, and, for

each communication, identify: (a) all participants in the communication, (b) the date of the

communication, (c) the nature, purpose, and content of the communication, and (d) any

documents relating to the communication.

**ANSWER:**

Objection. To the extent the interrogatory is directed at Plaintiffs' counsel, it is not appropriate to direct interrogatories to counsel. *See Hickman* v. *Taylor*, 329 U.S. 495, 504 (1947); *See also, e.g., Kustom Signals v. Applied Concepts*, 181 F.R.D. 489, 494 (D. Kan. 1998) ("Interrogatories are to be answered by *parties*, not attorneys. *See also* Fed.R.Civ.P. 33 (titled 'Interrogatories to Parties')"). The information from counsel is also equally available by other means, is not relevant, and not necessary for the preparation of Defendant's case. Notwithstanding the above objection, and without waiving same, Plaintiff answers as follows:

September 3, 2010: I (Julianne Versnel) spoke with Larry Cohen. He informed me that he wanted to change the location of the property we would occupy with the mobile range. He indicated that his lawyer would be calling me on Tuesday.

September 7, 2010: Mr. Lurie called me (Julianne Versnel). I asked him to follow up on the call from Mr. Cohen on September 3, 2010. He told me he didn't know anything about the lease because he had not been involved in it. He talked about the cost of the interrogatories and deposition to Mr. Cohen. Mr. Lurie called Alan Gura and conferenced him in. I don't recall what he said, if anything; he was travelling and did not stay on the call for very long. Then, Mr. Lurie conferenced Mr. Cohen into the conversation with us. He asked Mr. Cohen who had prepared the lease and Mr. Cohen said that someone named Ginger in their office had prepared the lease. The lawyer said that the property should have been a sublease not a lease. Accurate Perforating actually leases from what I believe was called 3636 Kenzie LLC. Mr. Cohen indicated that he did not want to be visited by various city inspectors and involved in litigation that could cost him $50,000. I offered to have SAF help defray Mr. Cohen's cost of dealing with the city's retaliation but that subject was not pursued. Mr. Cohen said he would provide me with another piece of property from another LLC. Mr. Lurie asked me to provide him a copy of the lease. Mr. Lurie said Mr. Cohen was staying on the line and that I should leave the conference call. The lease was faxed to Mr. Lurie. Documents: 2 PDF files of emails, 1 fax cover sheet.

September 7, 2010: Mr. Lurie left a message on my cell phone: I have transcribed it below. Document: Audio file.

"Hi Julianne, this is Mike Lurie calling you regarding Larry Cohen. I am calling you on your cell. I am calling you from my cell. I am on a busy train. Larry Cohen called me back, talked to somebody else. Also he called me back, said he has made a decision that he's going to terminate the lease. He's going to send out a 30 day notice terminating the lease. He does not

want to get involved in any litigation, the middle of any litigation or disputes whatsoever. He should have thought of that before he got into this. I am not going to excuse the judgment. But the fact of the matter is that was then and now is now. I know that this is obviously not what you people want to hear. I appreciate that. It will probably set you back, give you aggravation, do all those things. Probably just set you back from a time point, time point of view. Probably no legal harm, just wasted your time. Anyway you got my office number, my cell number. He told me that tomorrow he's going to send out a notice of cancelation, a notice of termination of the lease. Under Illinois law he's got to give you 30 days notice and I think the lease which said September 15th so it will be terminated October 15th. He's probably going to send you back the 2500 bucks, I don't know. He should. That's that. Call me or you. Alan Gura can call me if there's anything he wants to discuss even though there's really nothing more that I can tell you. You know I just got involved several days ago. I am telling you what I know. Okay that's it. Thank you."

September 8, 2010: I called Mr. Cohen and left a message regarding the termination date of the lease since I had not received any paper work from him. Document: See PDF of note.

September 9, 2010: A fax was on our office fax around 8:00 A.M. confirming the termination date of October 31, 2010. Document already provided.

September 11, 2010: I saw for the first time a fax that had come into my office on August 30, 2010 from Larry Cohen, confirming the beginning of the Lease effective August 31, 2010.


2.      In light of the September 8, 2010 Notice of Termination of Industrial Building

Lease issued by Accurate Perforating Corporation to SAF, state whether SAF and/or ISRA still

plan to place and/or operate the mobile firing range on the property described in the Lease,

and, if so, state the dates the range will be placed and/or operated on the property.

**ANSWER:**      Yes, specific dates are unknown but before October 12, 2010.


3.      With respect to any location where the mobile firing range may be placed and/or

operated, state whether members of the public using the range will be permitted to bring and

use their own weapons to the range, or whether arms will be supplied to users of the range. If

the latter, identify the person or entity that will supply the arms, and the number and type(s) of

arms that will be provided.

**ANSWER:**      ISRA will have primary responsibility for the daily operation of the range, so I do not know.  However, upon information and belief, ISRA's state-certified trainers will be supplying two types of firearms: semi-automatic pistols and revolvers, suitable for training new shooters.  Persons obtaining CFP training will be allowed to try either type of handgun or both.  At this time, it is anticipated that members of the public will not be allowed to bring their own firearms.

      4.      Identify all communications that have occurred between any Plaintiff or

Plaintiff's attorney and Fidelity Investigative Training Academy concerning the use or operation

of the mobile range and, for each communication, identify: (a) all participants in the

communication, (b) the date of the communication, (c) the nature, purpose, and content of the

communication, and (d) any documents relating to the communication.

**ANSWER:**

      Objection. To the extent the interrogatory is directed at Plaintiffs' counsel, it is not appropriate to direct interrogatories to counsel. *See Hickman* v. *Taylor*, 329 U.S. 495, 504 (1947); *See also, e.g., Kustom Signals v. Applied Concepts*, 181 F.R.D. 489, 494 (D. Kan. 1998) ("Interrogatories are to be answered by *parties*, not attorneys. *See also* Fed.R.Civ.P. 33 (titled 'Interrogatories to Parties')").  The information from counsel is also equally available by other means, is not relevant, and not necessary for the preparation of Defendant's case. Notwithstanding the above objection, and without waiving same, Plaintiff answers as follows:

- Conversation between Julianne Versnel and Andre Queen of Fidelity Security on September 9, 2010.

I spoke with Andre Queen of Fidelity Security. We discussed the *Chicago v. Haworth* decision. We discussed *McDonald v Chicago*. We discussed the new Chicago ordinance. He told me that his company was being deposed the following week. We discussed the lack of shooting ranges in Chicago. We discussed the investment opportunities for a permanent indoor range in Chicago. Action Target was mentioned as a possible vendor. We discussed a company called LaserShot that uses simunition which would not count toward range time for the Chicago permit.  We discussed that Fidelity Security provided training to Chicago residents but that they had to go outside of the city for the range time.  We discussed that the cost for this varied from day to day based on the availability of the range.  We discussed that Maxon's has only five lanes

and was closed on Mondays.  We discussed how far out G.A.T. was.  He mentioned that he had trained Rhonda Ezell.  We discussed how difficult it was to get "into" a range and "to" a range. We discussed that a number of people in Chicago used public transportation and it was their only means of travel.  We discussed the possibility of letting Fidelity use the mobile range for a couple of days after the Federal Judge allowed it in the city.  We also discussed the specific of the range requirement training, *i.e.* how many shooters could be on a line, how many rounds they shot on average.  We then chatted about Second Amendment rights in general, he directed me to their website.  We commented on an Oleg Volk photo.  We agreed to speak at another time.

5.       Describe all efforts taken to date, or any plans, to secure a site to place and/or

operate the mobile range at any location in Chicago other than the property described in the

Accurate Perforating Corporation Lease, including but not limited to efforts to lease property at

6300-6400 S. Bell, Chicago, Illinois.

**ANSWER:**
- I contacted Beverly Hayes and told her that we needed a property. She said she would look. No definite location was discussed.
- Viewed available listings on Loopnet.com. I contacted 3 owners/agents of property by email. The specific properties were:

  6301-6401 S. Bell, Chicago. IL

  3434-3440 W. 51st, Chicago, IL

  6200 W. 51st St., Chicago, IL.

- Robert Duffing responded to me via phone that that one of the properties on 51st was available but I told him that we had secured property. He followed up with email.

- Leo Solarte responded to me about the property on South Bell.

6.       For each location identified in response to Interrogatory No. 5 above, identify all

communications with the property owner or any real estate or other agent acting on its behalf,

and for each communication, identify: (a) all participants in the communication, (b) the date of

the communication, (c) the nature, purpose, and content of the communication, and (d) any

documents relating to the communication.

**ANSWER:**

- Robert Duffing responded to me via phone that that one of the properties on 51st was available but I told him that we had secured property. He followed up with email. Documents: PDF of Note and email.
- Leo Solarte responded to me about the property on South Bell.

    1. Initial e-mail contact from Mr. Solarte. (September 8, 2010)
    2. Telephone call from Mr. Solarte. Discussion regarding property on South Bell Avenue, which is a former car overflow lot that was paved. It has an electric fence, very bright security lights. It was several lots combined in the past. Right now a wrecking company is occupying part of the lot on a temporary basis. I told Mr. Solarte the Second Amendment Foundation was looking to bring a mobile range to the City of Chicago so that residents could complete the one hour of range time required to get a CFP. I told him that the range could not come into the city of Chicago unless ordered by a Federal Judge. I told him that we are currently litigating the issue. He said he would check with the owner. Document: Note of call.
    3. Conversation with Mr. Solarte re: lease and liability. I told him SAF would carry insurance.
    4. Folllow up e-mail from Mr. Solarte (September 8, 2010)
    5. Follow up e-mail to Mr. Solarte. (September 8, 2010)
    6. Follow up e-mail from Mr Solarte. (September 10, 2010)
    7. Follow up e-mail from Mr. Solarte. (September 10, 2010)
    8. Follow up e-mail to Mr. Solarte. (September 11, 2010)

    Document: Lease dated September 11, 2010.

7.      With respect to the property at 6300-6400 S. Bell: (a) Identify all person(s)

owning or acting on behalf of the property owner, (b) provide their phone numbers, (c)

describe the property and any structures thereon, and (d) identify the zoning classification that applies to the property.

**ANSWER:**

Realtor:  Leo Solarte, First Western Properties, (773) 908-3803

Property is located at 6331 South Bell, Lots 14-24

Property was an overflow parking lot for a Western Avenue car dealer.  It is 2 acres in total.

The property has an electric fence, barbed wire at the top of the fence on the street side. There are high powered lights. The lot is paved. There is currently a portion occupied by a wrecking company.  The zoning is M1-2 (Limited Manufacturing District).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _12th_ day of September, 2010.

_____

JULIANNE H. VERSNEL

With respect to objections only:

_____
David G. Sigale

Alan Gura (admitted *pro hac vice*)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085
alan@gurapossessky.com

David G. Sigale, Esq. (#6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
Corporate West I
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
630.452.4547
dsigale@sigalelaw.com

# Exhibit C



**City of Chicago**
**Richard M. Daley, Mayor**

**Department of Law**

Mara S. Georges
Corporation Counsel

Constitutional and Commercial
Litigation
Suite 1230
30 North LaSalle Street
Chicago, Illinois 60602-2580
(312) 744-4342
(312) 742-3925 (FAX)
http://www.cityofchicago.org

**VIA FACSIMILE AND U.S. MAIL**

September 9, 2010

Alan Gura
Gura & Possessky, PLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314

David G. Sigale
Law Firm of David G. Sigale, P.C.
Corporate West I
4300 Commerce Court, Suite 300-3
Lisle, IL 60532

**Re: Ezell v. City of Chicago, 10 C 5135**

Dear Counsel:

    As discussed in yesterday's deposition of Mr. Pearson, the City requests the immediate production of: (1) the ISRA rules of the range/safety protocols used at the ISRA Bonfield range, and (2) Mr. Pearson's notes, and any other documents, including but not limited to communications with SAF or Blue Line, reflecting rules of the range/safety protocols to be used at the mobile range in Chicago.

                                        Sincerely,

                                        Andrew Worseck

                                        Andrew Worseck
                                        312-744-7129





**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EZELL, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**AMENDED NOTICE OF EMERGENCY MOTION**</u>

**PLEASE TAKE NOTICE** that on **Tuesday, September 28 at 9:00 a.m.**, or as soon thereafter as counsel may be heard, the undersigned will appear before the **Honorable Virginia M. Kendall** or any judge sitting in her stead, in **Room 1403** of the Dirksen Federal Courthouse, 219 S. Dearborn, Chicago, Illinois, and present **Defendant's Emergency Motion For Leave To Allow Additional Discovery Or In The Alternative To Bar Certain Witnesses,** copies of which are served upon you, herewith.

Date: September 23, 2010

Respectfully submitted,

MARA S. GEORGES,
Corporation Counsel for the City of Chicago

By:     /s/ Rebecca Hirsch
Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I, Rebecca Hirsch, an attorney, hereby certify that on this, the 23th day of September, 2010, I caused a copy of the forgoing **Defendant's Amended Notice of Motion** via electronic notification on the following counsel of record:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314
Fax No. 703-997-7665

David G. Sigale
Law Firm of David G. Sigale, P.C.
Corporate West I
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
Fax No. 630-596-4445

Rebecca Hirsch

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EZELL, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S EMERGENCY MOTION FOR EXTENSION OF TIME
TO ANSWER OR OTHERWISE PLEAD TO PLAINTIFFS' COMPLAINT**

Defendant City of Chicago (the "City"), by its attorney, Mara S. Georges, Corporation Counsel for the City of Chicago, respectfully requests an extension of time to answer Plaintiffs' Complaint until October 25, 2010, and in support thereof, states as follows:

1.      On August 16, 2010, Plaintiffs filed their Complaint in this action, alleging that the City's Responsible Gun Owners Ordinance (the "Ordinance") violates their constitutional rights by prohibiting shooting ranges and/or firearm training within the City.  On the same day, Plaintiffs filed a motion for preliminary injunction and an accompanying memorandum of law in support thereof.

2.      As this Court is well aware, since the time that Plaintiffs filed their Complaint approximately one month ago, the City and its counsel have devoted an extraordinary amount of time and energy defending against Plaintiffs' allegations and various motions.  Specifically, in the last month, the City has: (1) prepared for and attended three emergency hearings sought by Plaintiffs: two motions for a temporary restraining order and a motion to quash a deposition; (2) prepared three written memoranda in response to Plaintiffs' two motions for temporary restraining order and their motion for a preliminary injunction; and (3) engaged in discovery in preparation for the preliminary

injunction hearing set for October 1, 2010, including propounding written discovery, reviewing discovery responses and documents produced by Plaintiffs, and preparing for and conducting ten depositions.

3.      Furthermore, between now and October 1, the City's counsel must prepare for the preliminary injunction hearing, which will involve culling through deposition testimony and other evidence to identify support for its factual assertions, preparing its legal argument, preparing for direct and cross-examination of witnesses, drafting stipulations, preparing motions in limine, and identifying trial exhibits. The City also anticipates preparing and submitting a post-trial brief at the conclusion of the hearing.

4.      Therefore, the City's time has been, and will continue to be, devoted to the substantive issues in the case in the next several weeks. The filing of a response to the Complaint is certainly not necessary to advance these substantive issues. Accordingly, the City respectfully requests that it be given until October 25 to file its answer or otherwise plead to Plaintiffs' Complaint.

5.      When the City and Plaintiffs' counsel conferred via email about this issue on September 14, Plaintiffs' counsel stated that he would give the City until September 24 to file its response, regardless of the Court's ruling with repect to his second motion for temporary restraining order.

6.      For the reasons explained above, September 24 is not a workable deadline for the City to file its response because it has been busy responding to Plaintiffs' motions and its time and attention will be consumed for the next few weeks with preparing for the preliminary injunction hearing. The City has clearly been actively participating in and defending against this case, and

Plaintiffs will not be prejudiced by granting the City until October 25, 2010 to file its answer.

WHEREFORE, the City respectfully requests that this Court grant the City leave to file its

answer to Plaintiffs' Complaint on or before October 25, 2010, and grant it such further relief as the

Court deems just and appropriate.

Date: September 22, 2010                    Respectfully submitted,

                                           MARA S. GEORGES,
                                           Corporation Counsel for the City of Chicago

                                           By:    /s/ Rebecca Alfert Hirsch
                                                  Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | PLAINTIFFS' MOTION IN LIMINE #1: |
| | ) | TO EXCLUDE TESTIMONY OF |
| Plaintiffs, | ) | SIX WITNESSES |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFF'S MOTION IN LIMINE # 1: TO EXCLUDE**
**THE TESTIMONY OF SIX WITNESSES**

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and pursuant to Federal Rules of Evidence 402 and 403, submit

their motion in limine #1, to order Defendant and is attorneys to refrain from calling to the stand

the following witnesses: (1) Dan Bartoli; (2) an unnamed representative of the Chicago Police

Department claiming guns are dangerous; (3) Carl Byrd; (4) Pattie Scudiero; (5) an unnamed

representative of the city's Department of the Environment; (6) Joy Adelizzi; or any of their

designees.

This motion is brought upon the attached memorandum of points in authorities in support thereof; the pleadings, files and records on file in this action; and such written and oral documentation as my be presented at a hearing; and is made upon the following grounds:

1.      These witnesses have no relevant testimony to offer, FRE 402; and

2.      The probative value of these witnesses, if any, is outweighed by the undue delay and waste of time inherent in calling them, FRE 403.

The motion is made without prejudice to Plaintiffs' objections to written testimony, to which the parties have stipulated as to form in the interest of judicial economy, or to further motions in limine with respect to thee stipulated witnesses should Defendant seek their live testimony, as opposed to offering their written testimony.

WHEREFORE, plaintiff respectfully prays that the motion be granted.

Dated: September 27, 2010                    Respectfully submitted,

Alan Gura (admitted pro hac vice)        David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                    Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405        4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                          Lisle, IL 60532
703.835.9085/Fax 703.997.7665            630.452.4547/Fax 630.596.4445

By:    /s/ Alan Gura/                          By:      /s/ David G. Sigale/
        Alan Gura                                        David G. Sigale

                                                    Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 27, 2010, he served a copy of the above Motion, and this certificate of service, on:

> Andrew W. Worseck
> City of Chicago Department of Law
> 30 N. LaSalle Street, Suite 900
> Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| Plaintiffs, | ) | PLAINTIFFS' MOTION IN LIMINE #1: |
| | ) | TO EXCLUDE SIX WITNESSES |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE #1: TO EXCLUDE SIX WITNESSES

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and through undersigned counsel, and submit their Memorandum of Points and Authorities in Support of their Motion in Limine #1: To Exclude Six Witnesses.

Dated: September 27, 2010    Respectfully submitted,

Alan Gura (admitted pro hac vice)  David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC    Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405  4300 Commerce Court, Suite 300-3
Alexandria, VA 22314     Lisle, IL 60532
703.835.9085/Fax 703.997.7665  630.452.4547/Fax 630.596.4445


By: /s/ Alan Gura/_____  By: /s/ David G. Sigale/_____

  Alan Gura          David G. Sigale

              Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION IN LIMINE #1: TO EXCLUDE SIX WITNESSES

PRELIMINARY STATEMENT

The parties' efforts to meet and confer regarding the upcoming hearing on the motion for a preliminary injunction have been modestly successful. Some agreements aimed at streamlining the proceedings have been reached, and additional progress might well take place.

However, there does appear to be a fundamental difference of opinion as to what the upcoming hearing is supposed to accomplish. Efforts to meet and confer over this particular issue have not succeeded.

Plaintiffs believe that the hearing was set for a Friday afternoon because it was not expected to be particularly lengthy, and that any evidence must be relevant and efficiently designed to respond to the issues before the Court, namely: whether Plaintiffs are irreparably harmed by the challenged law, and whether an injunction would be in the public interest. Indeed, Plaintiffs maintain that no evidence is actually necessary to establish these points, but concede that is a legal argument, and like arguments relating to the likelihood of success on the merits, it is purely a question of law beyond the ken of any witness.

Defendant, on the other hand, has noticed at least six witnesses who appear irrelevant to the case. Defendant apparently envisions a lengthy trial designed to prove various public policy concepts that are simply not at issue and, indeed – are largely not contested by the Plaintiffs.

The Court should grant this motion to ensure that the hearing focuses on the actual dispute between the parties, and is concluded at some reasonable time.

1

ARGUMENT

The testimony of the following witnesses noticed by Defendant would violate Federal Rules of Evidence 402, as they are irrelevant, or at the very most, any probative value of theirs is outweighed by considerations of "undue delay" and "waste of time" within the meaning of Rule 403. Plaintiffs would agree to have some of these witnesses testify by written declaration, and forego their right to cross-examine them, reserving the right to object to the admissibility of the declarations. But there simply is no point in having all these individuals testify live.

A.   Sergeant Dan Bartoli or his designee

Defendant submits that Sgt. Bartoli would "testify as to the rules and protocols used at firing ranges to protect public health, welfare, and safety."

This testimony is irrelevant. None of the rules and protocols used at firing ranges are at issue in this case.

In any event, Chicago's ordinance is clear: only state-certified trainers, trained by the State Police, can provide the training recognized by the city, and it would be pointless for Plaintiffs to utilize any trainers who are not state-certified. Chi. Mun. Code § 8-20-120(a)(7).

The City would probably like to speculate that Plaintiffs will be unsafe, but the fact is that only state-certified trainers whose judgment is, according to Chicago's code, presumptively adequate, will be providing the training. Sgt. Bartoli is not offered for the objectionable purpose of speculating that Plaintiffs' state-certified trainers will do something wrong. Since there is no dispute as to what the appropriate training protocols *are*, this testimony is simply not relevant. If the City believes that the State Police is unsafe in its training and certification of trainers, it should have required other certification in its ordinance. This is not the forum for that dispute.

2

B.    Unidentified Police Representative

Defendant would like to call an unknown witness to discuss "the dangers of allowing firearms outside the home, including the dangers of carrying, transporting, transferring, and discharging firearms."

This witness is irrelevant. Nothing in this lawsuit addresses Chicago's laws governing the carrying, transportation, and transfer of firearms. Plaintiffs seek only to discharge guns at a range. Regardless of whether there is a right to use a range inside the city, the question is a legal and historical one, not a factual one:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2821 (2008); *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 177 L. Ed. 2d 894, 926 & 929 (2010).

The City is not entitled to relitigate *Heller* and *McDonald* under the guise of claiming guns are dangerous. The question of whether ranges are within the scope of constitutional protection is not one of interest balancing, but whether that much was understood by the people in 1791 (or, as the Second Amendment applies to Chicago only by operation of the Fourteenth Amendment, in 1868). Plaintiffs strongly object to having a trial about the inherent value of the Second Amendment right. This is simply not allowed under *Heller* and *McDonald*.

C.     Carl Byrd, First Deputy Commissioner, City of Chicago Building Department.

Mr. Byrd or his designee would testify to "the City's enforcement of the Building Code . . . the need to develop Building Code provisions that would need to be regulate [sic] shooting ranges . . . and the costs of such enforcement and regulation."

This testimony would be irrelevant and a waste of time. There are no building code provisions at issue, and the Plaintiffs are not challenging the City's ability to enact a building code or to have that building code reach gun ranges. The City is welcome to repeal its law, and replace its total prohibition with a regulatory regime.

But the City cannot seriously claim that it may ban gun ranges entirely, then complain that it has not had the opportunity to regulate their construction. If and when the City enacts some relevant regulations – and *if* those regulations are litigated (which is far from obvious and in any event, completely speculative at this point) – then perhaps Mr. Byrd's testimony would be relevant.

But this week, the Plaintiffs are challenging only the laws that have actually been enacted. The Court cannot render advisory opinions about a legal regime that does not exist, and taking testimony about some alleged "need" to regulate something that is currently forbidden is an abstract philosophical discussion, not one that has anything to do with this case.

D.     Patti Scudiero, Commissioner, Department of Zoning and Land Use Planning.

Ms. Scudiero or her designee "may testify as to: the requirements of the City's zoning ordinance and its prohibition of firing ranges," the importance of zoning, and the alleged "need" to develop zoning laws covering shooting ranges.

4

This testimony is less relevant and worthy of the Court's time than a discussion of the value of having a building code. The City's zoning ordinance, to the extent it might be relevant (and it is not relevant), is within judicial notice under Federal Rule of Evidence 201. There is no need to have a witness testify about the existence or content of the zoning ordinance, and waste time reading the zoning ordinance into the record.

And as with the building code, there is no challenge to the zoning code, and no zoning provision is at issue here. The Supreme Court upheld the use of zoning ordinances in *Village of Euclid* v. *Ambler Realty*, 272 U.S. 365 (1926), and as much as Defendant wishes to re-argue *Heller*, Plaintiffs have no dispute with *Euclid*. But gun ranges have existed on these shores since well before *Euclid* and the zoning laws approved therein. Indeed, America's fourth-largest city, Houston, famously gets along without any zoning ordinance at all – yet it has many safe and uncontroversial gun ranges.

Again, if the City wants to enact a zoning law – and *if* that law is challenged – then perhaps Ms. Scudiero's testimony might be instructive in that action. But it is not relevant here, where the City has not zoned gun ranges but banned them entirely. And if the City were to use the zoning code to ban all gun ranges, then that law would be no more or less constitutional than the law challenged in this case, because zoning considerations cannot disguise a complete ban that is otherwise unconstitutional. *See Renton v. Playtime Theaters, Inc.,* 475 U.S. 41 (1986). In such a hypothetical case, Ms. Scuderio's testimony would be irrelevant, just as it is irrelevant in this non-hypothetical case, which nonetheless, has nothing to do with any non-existent zoning laws.

E.    Unidentified Department of the Environment Representative

This individual would discuss the "environmental and health concerns associated with a mobile range, the regulations that would need to be developed to properly regulate shooting ranges, and the costs of such enforcement and regulation."

The same purely hypothetical problems that plague the previous two witnesses render this one utterly speculative. In any event, as a matter of state law, ranges are not beyond the ability to render safe:

> the risk of harm to persons or property [from shooting], even though great, can be virtually eliminated by the exercise of reasonable or even "utmost" care under the circumstances . . . the use of firearms is a matter of common usage and the harm posed comes from their misuse rather than from their inherent nature alone . . . the location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice [and] target practice is of some social utility to the community . . .

*Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995).

And if gun ranges are constitutionally protected, the City's wholly optional regulatory costs are irrelevant. People do not lose their rights because the government decides it is too expensive to regulate or otherwise accommodate them. The City's social cost argument was expressly rejected in *McDonald*, 177 L. Ed. 2d at 924. The Bill of Rights does not command the government to regulate anything, and its provision are not conditioned on any enabling legislation.

F.    Joy Adelizzi, Deputy Commissioner for Business Affairs and Licensing

Ms. Adelizzi or her designee would testify "as to the requirements of the City's licensing scheme" and "why" it is so necessary for public health and safety, etc.

This is irrelevant. The City's belief in the value of business licensing regulations is not remotely at issue in this case. The only "regulation" at issue is the prohibition of gun ranges.

Presumably, if ranges were not banned, then the City would tax and license their operation in the same manner that it does any other lawful business. Any unique licensing requirement, applied to ranges, may or may not be litigated in the future. Again, the matter is entirely speculative because ranges are banned, not regulated.

## CONCLUSION

This case is decidedly not about the desirability of building codes, zoning codes, environmental regulations, or business licensing laws – *none of which are before the Court*. Of course the City can regulate gun ranges – but it has not done so. It has *banned* gun ranges, and no amount of time spent discussing the zoning, building, environmental, and business licensing codes that have not yet been enacted, and which have nothing to do with the range ban, would make any relevant fact more or less true.

Neither is it appropriate for the Court to hear testimony about whether the carrying, transportation, transfer or discharge of firearms is dangerous, when this case has nothing to do with the carrying, transportation, or transfer of firearms, and with respect to the discharge of firearms, deals only with the *legal* question of whether that activity is within a constitutionally-enumerated right. The Supreme Court has just instructed that such rights cannot be defined by policy arguments and contests over social science.

The Court did not err in believing this hearing could be conducted on a single Friday afternoon. The evidentiary issues concern irreparable harm and the public interest, not abstract matters of political philosophy or speculation over non-existent laws.

The City's witness list must be reined in, and this motion supplies the vehicle for that necessary remedy. Respectfully, the motion should be granted.

Dated: September 27, 2010        Respectfully submitted,

Alan Gura (admitted pro hac vice)      David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC             Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405      4300 Commerce Court, Suite 300-3
Alexandria, VA 22314               Lisle, IL 60532
703.835.9085/Fax 703.997.7665       630.452.4547/Fax 630.596.4445

By:   /s/ Alan Gura/           By:   /s/ David G. Sigale/
     Alan Gura                  David G. Sigale
                                    Attorneys for Plaintiffs

8

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 27, 2010, he served a copy of the above Memorandum of Points and Authorities, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN REPLY TO |
| Plaintiffs, | ) | DEFENDANT'S OPPOSITION TO |
| | ) | MOTION FOR PRELIMINARY |
| v. | ) | INJUNCTION |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and submit their Memorandum of Points and Authorities in Reply to

Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction.

Dated: September 27, 2010        Respectfully submitted,

Alan Gura (admitted pro hac vice)      David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC           Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405      4300 Commerce Court, Suite 300-3
Alexandria, VA 22314             Lisle, IL 60532
703.835.9085/Fax 703.997.7665       630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/ _____    By: /s/ David G. Sigale/ _____

    Alan Gura                      David G. Sigale

                             Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PRELIMINARY STATEMENT

The City's opposition misstates the law, and fails to offer any actual showing that would

sustain its range ban even if the range ban were subject to a lower standard of review. The

opposition does make clear, however, that the City has no valid defense against this challenge.

Accordingly, even if the Court does not conclude that Plaintiffs have shown irreparable harm, it is

pointless to continue this case any further. The Court should convert the hearing to a trial on the

merits, per Fed. R. Civ. Proc. 65(a)(2), and issue a permanent injunction.

* * *

The Second Amendment protects the right to use arms in the most ordinary way that they

are used: at a gun range. The notion that the Second Amendment does not reach beyond the home

has been rejected both by the Supreme Court as well as by the Seventh Circuit.

Even if the Second Amendment does not secure the right to use a gun range per se, it does

protect, undoubtedly, the right to keep arms at home for self-defense. It is the City, not Plaintiffs,

that mandates regular range training as a condition of keeping arms at home. Banning a required

step in obtaining arms for home self-defense cannot be constitutional.

And beyond even this much, it is undeniable – indeed, it is the basis of Defendant's

training requirement – that practice and training improve proficiency, and thus, safety. What

reason, apart from the promotion of safety, could there be for Defendant's training requirement?

Banning ranges frustrates people's ability to use guns in self-defense in the home, and makes gun

ownership needlessly dangerous. And while Defendant does not seriously address the issue, the

1

fact is that the First Amendment squarely protects the right to give and receive gun training, just as it protects *all* forms of training.

Thus, the first two forms of irreparable harm in this case – the ban on a right to use gun ranges, and the frustration of obtaining guns for home self-defense – are not fact-specific. The third form of irreparable harm is only slightly based on a factual argument. Obviously, the banning of gun ranges in a 231 square mile area is going to increase the costs involved in obtaining range training. But burdening the exercise of fundamental constitutional rights, without substantial justification, is not permitted.

To justify this frustration of constitutional rights, the City offers absolutely nothing, describing its interest as "to limit the impact that a proliferation of firearms has on public health, safety and welfare." Def. Br. at 21. And the City argues not only that banning all ranges somehow serves this nebulous purpose, it argues –  in the face of repeated directly contrary recent rulings by the Supreme Court and Seventh Circuit – that gun regulation is subject to rational basis review. But even the one scholar to whose pre-*Heller* and *McDonald* work Defendant looks has publicly declared his support of Plaintiffs' position in this case.

<u>ARGUMENT</u>

## I.    THE SECOND AMENDMENT PLAINLY EXTENDS BEYOND THE HOME, AND PROTECTS THE RIGHT TO PRACTICE WITH GUNS AT A RANGE.

The question of whether the Second Amendment secures the right to visit a gun range has not previously been reached by a court, because as far as Plaintiffs are aware, Chicago's range ban is unique.  This is reason enough to suspect that it is unconstitutional. *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 177 L. Ed. 2d 894, 926 (2010) (plurality opinion) (rarity of Chicago's

handgun ban counsels against its constitutionality). But this is not to say the issue is strictly one of first impression. The guidance on the topic is extensive, and points uniformly in one direction.

The Seventh Circuit has already rejected the City's argument that the Second Amendment limits its protection only to gun possession within the home: "[T]he Second Amendment creates individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open [in *District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008)]." *United States* v. *Skoien*, 2010 U.S. App. LEXIS 14262 at *5 (7th Cir. July 13, 2010) (en banc) (emphasis added).

Although Plaintiffs take issue with the concept that the Second Amendment "creates" rights as opposed to preserving pre-existing rights, the basic idea – that the Second Amendment is not limited to the home – is incontrovertible. Although *Heller* does not require invalidating all laws regulating guns in public, "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Ca. 2010).

The Second Amendment applies "*most notably* for self-defense within the home," *McDonald*, 177 L. Ed. 2d at 922 (emphasis added), "where the need for defense of self, family, and property is most acute," *Heller*, 128 S. Ct. at 2717, but not exclusively so. For example, "Americans valued the ancient right [to keep and bear arms] . . . for self-defense *and hunting*." *Heller*, 128 S. Ct. at 2801 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . .  state constitutional guarantees [of the right to arms]." *McDonald*, 177 L. Ed. 2d at 921 n.27. Hunting does not occur inside the home.

Describing Second Amendment rights, the Supreme Court invoked Senator Sumner's famous "Bleeding Kansas" speech: "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest." *Heller*, 128 S. Ct. at 2807 (citation omitted). And in setting out the common-use test for protected arms, the Supreme Court has made clear that the Second Amendment secures arms possessed "for lawful purposes like self defense." *Heller*, 128 S. Ct. at 2815.

Indeed, the Supreme Court was all but forced to declare the Second Amendment applies outside the home, given the way in which the District of Columbia litigated its case. The District offered that the term "bear arms" had an exclusive idiomatic meaning, effectively, to soldier or go into battle, and that "keep and bear arms" was a unitary concept referring only to a right to possess weapons in the context of military duty  The Supreme Court was required to address this argument to reach its judgment, and rejected it. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 128 S. Ct. at 2793 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 128 S. Ct. at 2793 (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); Black's Law Dictionary 214 (6th Ed. 1998)); *see also Heller*, 128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms . . ."), at 2817 ("the right to keep *and carry* arms") (emphasis added). "[B]ear arms means . . . simply the carrying of arms . . ." *Heller*, at 2796.

Having defined the Second Amendment's language as including a right to "carry" guns for self-defense, the Supreme Court helpfully noted several exceptions that prove the rule. Explaining

4

that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.*, at 2817 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 2817, confirming both that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans are *not* presumptively lawful in non-sensitive places.

All of this activity takes place outside the home.

Finally, as the City notes, the Court was "guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 128 S. Ct. at 2788 (citations and internal quotation marks omitted). And in elucidating the normal and ordinary meaning of the right to arms, the Court observed, "No doubt, a citizen . . . [who] *practices in safe places the use of [a handgun]*, and in due time teaches his sons to do the same, exercises his individual right." *Heller*, 128 S. Ct. at 2812 (citation omitted) (emphasis added). This is not a useless snippet. It was included for the reason that it sheds light on the scope of the right.

It is difficult to imagine that practicing the use of guns at a range is not among the "other entitlements" of the Second Amendment outside the home. *Skoien*, at *5. Even the dissenters in *Heller* recognized the majority to have secured a right to arms for "self-defense, *recreation, and other lawful purposes*." *Heller*, 128 S. Ct. at 2845 n.38 (Stevens, J., dissenting) (emphasis added), at 2869 (Breyer, J., dissenting).

5

II.     REGARDLESS OF WHICH, IF ANY, STANDARD OF REVIEW IS UTILIZED, THE
        RANGE BAN IS PRESUMPTIVELY UNCONSTITUTIONAL.

Because the challenged laws forbid the exercise of protected activity, without more, they

must be struck down. *See Heller*, 128 S. Ct. at 2818 (Functional firearm ban "makes it impossible

for citizens to use [firearms] for the core lawful purpose of self-defense and is hence

unconstitutional."). But even if the case is governed by some standard of review – any standard of

review -- the outcome is the same.

At the outset, Defendant's suggestion that this case could be governed by rational basis

review is frivolous. The Supreme Court emphatically rejected this proposition, and the Seventh

Circuit has followed suit. "There may be narrower scope for operation of the presumption of

constitutionality when legislation appears on its face to be within a specific prohibition of the

Constitution, such as those of the first ten amendments . . ." *United States* v. *Carolene Products

Co.*, 304 U.S. 144, 152, n. 4 (1938). Quoting this famous footnote, the Supreme Court recently

added, "[T]he [rational basis] test could not be used to evaluate the extent to which a legislature

may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against

double jeopardy, the right to counsel, *or the right to keep and bear arms*." *Heller*, 128 S. Ct. at

2818 n.27 (citing *Carolene Prods.*) (emphasis added).

Underscoring its rejection of rational basis review for gun laws, the Supreme Court added:

We know of no other enumerated constitutional right whose core protection has been
subjected to a freestanding "interest-balancing" approach. The very enumeration of the
right takes out of the hands of government--even the Third Branch of Government--the
power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A
constitutional guarantee subject to future judges' assessments of its usefulness is no
constitutional guarantee at all. Constitutional rights are enshrined with the scope they were
understood to have when the people adopted them, whether or not future legislatures or
(yes) even future judges think that scope too broad.

6

*Heller*, 128 S. Ct. at 2821; *McDonald*, 177 L. Ed. 2d at 926 & 929.

*Heller* added that particular types of gun laws might be "presumptively lawful," precisely because they reflect "longstanding prohibitions" that may fall outside "the full scope of the Second Amendment." *Heller*, 128 S. Ct. at 2816-17. No such presumptive allowance is made for laws that would be within the Second Amendment's scope. And finally, removing all doubt as to the presumptive invalidity of nontraditional gun laws, the Supreme Court confirmed that the Second Amendment secures a fundamental right. *McDonald*, 177 L. Ed. 2d at 921 (plurality opinion) & 938 (Thomas, J., concurring). "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Under this analysis, the government carries the burden of proving the constitutionality of the challenged law. *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010).

The Seventh Circuit has applied intermediate scrutiny in Second Amendment cases, which requires that there be a "strong showing" that the regulation is "substantially related to an important governmental objective." *Skoien*, at *10, and Defendant is correct that the circuit has done so only in the dangerous persons categorical area, reserving other levels of scrutiny for other types of Second Amendment cases.

But it is wrong to suggest that the Seventh Circuit has reserved for the peaceful, law-abiding people a *lower* level of review than is employed for violent felons, drug abusers, and other dangerous individuals arguably covered by a presumptive exception. The Seventh Circuit has suggested overbreadth is a possible alternative mode of analysis. *United States* v. *Yancey*, 2010 U.S. App. LEXIS 18442 at *10 (7th Cir. Sep. 3, 2010); *United States* v. *Williams*, 2010 U.S.

App. LEXIS 16194 at *19 (7th Cir. Aug. 5, 2010). Overbreadth is a strict scrutiny doctrine, where laws are rejected because they are not narrowly tailored.

Nonetheless, the City invokes the work of noted UCLA Law Professor Adam Winkler relating to standards of review. This reliance is badly misplaced. Regardless of whether the cited article truly reflects the City's position, it predates *Heller*'s rejection of rational basis, and *McDonald*'s finding that the Second Amendment secures a fundamental right, as well as the Seventh Circuit's opinions applying intermediate review.[1] But notably, Prof. Winkler agrees that Chicago's range ban is unconstitutional: "Reasonable gun control is one thing, this another. Chicago requires 1 hour on range for handgun permit but bars ranges." www.twitter.com/ adamwinkler, Aug. 16, 2010, 3:18 p.m. (citation omitted) (last visited Sept. 26, 2010).

Of course the range ban could not survive higher standards of scrutiny, either, because the City cannot even aver an important governmental interest. "[L]imiting the impact of the proliferation of firearms," Def. Br. at 21, is merely one way of saying, "*Heller* was wrong." Of course the Second Amendment secures the proliferation of firearms. The proliferation of firearms may strike the City as an evil, but the American people have decided that it is so beneficial as to be protected in the Bill of Rights. The City's reasoning is also impermissibly circular. The City "has taken the effect of the statute and posited that effect as the [its] interest. If accepted, this sort of circular defense can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored." *Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120 (1991). The other concerns, congregation, illegal transfer, gun trafficking, theft, and the

---

[1] For a different view of the same material examined by Winkler, *see* David Kopel & Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1 (2010).

limitation on carrying (a constitutionally protected activity in itself), are not even rationally related to a ban on gun ranges.

But most inappropriate is the view that ranges can be banned because regulating them would be too burdensome for the City: "the ban eliminates the need to integrate the operation of firing ranges into the City's otherwise established regulatory schemes." Def. Br. at 21. On this view, perhaps the people should be thankful the City does not find the "need" to regulate bookstores and churches too burdensome. The City appears not to understand the concept of "rights." A "right" entitles an individual to do something, and is not dependent on the graces of the government. The notion that the government may ban outright whatever it finds too difficult to regulate is not a constitutional doctrine. If gun ranges are constitutionally protected, the City's wholly optional regulatory costs are irrelevant. People do not lose their rights because the government decides it is too expensive to regulate or otherwise accommodate them. In any event, the City's social cost argument was expressly rejected in *McDonald*, 177 L. Ed. 2d at 924. Continuing this argument with *McDonald* is frivolous.

III.   INSTRUCTION DOES NOT LOSE FIRST AMENDMENT PROTECTION MERELY BECAUSE IT INVOLVES FIRING GUNS.

Ignoring Plaintiffs' survey of cases showing that the First Amendment protects demonstrative and physical instruction, Defendant tries to convert the claim into one for "shooting a gun [as] expressive activity." Def. Br. at 12. This is not an accurate statement of either Plaintiffs' position, or the case law.

But Defendant's argument truly fails in the attempt to limit the Fourth Circuit's directly on-point decision in *Edwards* v. *City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999). Describing the

training in that case, Defendant claims that "presumably," the *Edwards* class was limited to verbal and written instruction, and physical demonstration. Def. Br. at 12. No such limitation is contained in the Fourth Circuit's opinion, and there is no need to "presume" anything. Gun training classes for concealed carry licenses – the training at issue in *Edwards – always* require live-fire training. The North Carolina law at issue in *Edwards* is no exception: its prescribed course "involves the actual firing of handguns." N.C. Gen. Stat. § 14-415.12(a)(4).

Training and education frequently require physical experience. A driver's education course would not lose First Amendment protection because part of the instruction involves driving with an instructor. Likewise for gun training. In any event, the type of training in *Edwards* is not factually distinguishable.

## IV.   PLAINTIFFS AND THE PUBLIC SUFFER IRREPARABLE HARM.

The facts indicate that there is a range shortage that is discouraging people from complying with the city's laws and exercising their rights. Defendant's claims that the harm in this case can be reduced to money damages, and thus is not subject to preliminary injunctive relief, is baseless. Irreparable harm is presumed in many "money damages" cases. *See, e.g*, *Computer Assocs. Int'l* v. *Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004) (trade secret misappropriation and copyright infringement). Irreparable harm is also presumed in First Amendment cases, *National People's Action* v. *Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990), and there is no reason to suppose the same is not true of Second Amendment cases, although the question appears to be one of first impression.

The Second Amendment secures an interest in self-defense. When people cannot defend themselves from violent crime, they are shot, stabbed, beaten, raped, and otherwise maimed. And

these are only the worst outcomes. Money damages will not compensate for people who are dead or injured because they had no gun with which to defend themselves, or because someone was not proficient in the use of their gun. It is absurd to suggest that irreparable harm can be presumed where a person might be frustrated in reading a book or securing a copyright, but will not be presumed where the failure to secure the right will end with serious bodily harm or death.

Individuals wishing to assert their constitutional rights cannot be told to move along. The Constitution, with its Bill of Rights, is in full effect in the City of Chicago. *See McDonald*. The notion that individuals should simply go to the suburbs to exercise their rights is nothing more than what the Supreme Court has rejected, yet again, in *McDonald*, the idea that constitutional rights may be abandoned because "conditions and problems differ from locality to locality." *McDonald*, 177 L. Ed. 2d at 924. The only condition that matters is one that applies uniformly in Chicago and its suburbs: the operative, functioning condition of the Constitution.

In the First Amendment context, "[i] is not sufficient to say that neighboring communities permit the type of speech that the challenged ordinance bans . . . . the government may not simply point to neighboring communities that permit the speech as a defense to their ordinance that bans that type of speech from its jurisdiction." *Palmetto Props., Inc.* v. *County of DuPage*, 160 F. Supp. 2d 876, 883 (N.D. Il. 2001) (citing *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) ("[One] is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place") (quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939)).

Gun training is speech, but the concept works for all constitutional rights. Chicago could not, for example, ban abortion clinics on the grounds that they are available in the suburbs. *Cf.*

11

*Carey* v. *Population Svcs.*, 431 U.S. 678, 689 (1977) ("the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition") (footnotes omitted). Gun ranges are places of the Second Amendment and, to the extent that training is conducted there, the First. They are protected from complete bans.

## V.  GUN RANGES ARE NOT INHERENTLY DANGEROUS.

The City argues too heavily, and irresponsibly, about the particulars of the mobile range Plaintiffs would bring to Chicago. But this is a speculative distraction from the real issues in this case, which are primarily legal. The mobile range is merely a method of redressing the imminence of the harm wrought by the City's registration deadlines. In the absence of these deadlines, or in the absence of a mobile range, the factual issues relating to this proposed remedy would slip away, leaving only the core legal issues at the heart of this case. In the absence of a range ban, there will be ranges in Chicago. If not this perfectly safe and appropriate range, some other range.

Of course there is nothing wrong with the range Plaintiffs would bring to Chicago. Nobody has ever been hurt by a bullet fired within it, the range is used constantly by police and civilians alike, and there is no reason to suppose it would suddenly have any deleterious effects on its surroundings. This particular range, however, is only itself a target for the City's general objection to gun ranges, writ large.

Sheer speculation that there must be something inherently wrong with the operation of a gun range – an activity that is banned nowhere else, and which has occurred safely and uneventfully throughout the entire course of American history, is unavailing. The amorphous fears

of gun ranges are not merely irrelevant; they are rejected at law. The Illinois Court of Appeals, for example, held shooting at a range is not an ultrahazardous activity because, inter alia,

> the risk of harm to persons or property, even though great, can be virtually eliminated by the exercise of reasonable or even "utmost" care under the circumstances . . . the use of firearms is a matter of common usage and the harm posed comes from their misuse rather than from their inherent nature alone . . . the location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice [and] target practice is of some social utility to the community . . .

*Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995). The same court has upheld Illinois' range protection statute. *Miller v. Fulton County Zoning Bd. of Appeals*, 337 Ill. App. 3d 210, 785 N.E.2d 532 (Ill. App. 2003).

<u>CONCLUSION</u>

The City has no legal defense, and the irreparable harm is readily apparent.

The motion should be granted. Indeed, given the clarity of the legal issues presented on the merits, the Court should advance the trial and issue a final judgment, for Plaintiffs.

Dated: September 27, 2010          Respectfully submitted,

Alan Gura (admitted pro hac vice)          David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                     Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405          4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                       Lisle, IL 60532
703.835.9085/Fax 703.997.7665             630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/                         By: /s/ David G. Sigale/
    Alan Gura                                  David G. Sigale

                                           Attorneys for Plaintiffs

13

CERTIFICATE OF SERVICE

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 27, 2010, he served a copy of the above Memorandum of Points and Authorities, and this certificate of service, on:

> Andrew W. Worseck
> City of Chicago Department of Law
> 30 N. LaSalle Street, Suite 900
> Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, JOSEPH I. BROWN, | ) | |
| WILLIAM HESPEN, ACTION TARGET, INC., | ) | |
| SECOND AMENDMENT FOUNDATION, INC. | ) | |
| and ILLINOIS STATE RIFLE ASSOCIATION., | ) | Case No. 10 CV 5135 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION TO |
| v. | ) | MOTION TO |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR LEAVE TO ALLOW ADDITIONAL DISCOVERY OR IN THE**
**ALTERNATIVE TO BAR CERTAIN WITNESSES**

COME NOW the Plaintiffs, RHONDA EZELL, JOSEPH I. BROWN, WILLIAM HESPEN, ACTION

TARGET, INC., SECOND AMENDMENT FOUNDATION, INC. and ILLINOIS STATE RIFLE

ASSOCIATION, and submit their Memorandum of Points and Authorities in Opposition to the

Defendant's Motion for Leave to Allow Additional Discovery or Bar Witnesses.

**INTRODUCTION**

On August 24, 2010, the Court set this matter for a preliminary injunction hearing on

October 1, 2010, expedited from the October 15, 2010 date the Court had set the day before.

The Court did this because it recognized the immediacy and importance of the issues Plaintiffs

present.

Since then, the hearing date has been the subject of many efforts by the City to change

it.  These include outright Motions to do so, as well attempts to derail said hearing by way of a

L.R. 40.4 Motion still pending in Judge Guzman's Court.  Despite these efforts, the October 1,

2010 date has held firm.

On August 23 and 24, 2010, the City sought and received leave to take limited discovery. Though this discovery was intended to encompass only the Plaintiffs, the City served deposition subpoenas on virtually every person whose name arose in the case before the August 13, 2010 deadline ordered by the Court (also the subject of multiple efforts by the City to change). Between September 2 and 13, 2010, Plaintiff's counsel collectively attended ten different depositions in two states. These depositions included all Plaintiffs, the Plaintiff's landlord, the owner of the subject mobile range, the owner (and would-be competitor of Plaintiff Action Target, Inc.) of an unrelated gun range outside the City, and the owner of a security training company that does not even have a firearms range.

Now, incredibly, and three business days before the hearing, Defendant seeks not only to take more depositions, but also to punish Plaintiffs for disclosing information virtually as soon as they receive it. These requests are burdensome and harassing, would not lead to any relevant testimony, and are yet more attempts to delay the proceedings, and harass the Plaintiffs and their counsel. Accordingly, Defendant's Motion should be denied.

## STATEMENT OF FACTS

1.      *Ezell* was filed on August 16, 2010, and discretely alleges that the firing range ban in the City of Chicago, as made law by the recently-enacted firearms ordinance and any other related-laws the City would use to perpetuate such a ban, is unconstitutional pursuant to the First and Second Amendments to the United States Constitution.

2.      Since *Ezell*'s filing, Judge Kendall conducted a lengthy hearing on Plaintiffs' first Motion for a TRO. Though it was denied without prejudice, Judge Kendall recognized that the

2

specter of irreparable harm was looming closer every day (based on deadlines placed in the new firearms ordinance), and ordered both an expedited hearing date and discovery schedule. This was on August 24, 2010, when Judge Kendall expedited the hearing date and discovery schedule she had entered the day before.  This was all due, according to Judge Kendall, to the immediacy of the issues presented in *Ezell*.

      3.      On August 24, this Court made the following finding:

> There's little basis for discovery needed at this point. And most of what you are doing is arguing your cases on the law that exists now and the facts that you have now. I don't think you need it. I was generous enough to give you the 30 days. I don't think you need more than that. Today is only the 24th, and that gives you all of the rest of this week, next week, and two more weeks into September. That's plenty of time to do what you need to do, based upon what you said you needed it for yesterday, so the oral request [to extend the preliminary injunction schedule] is denied. I am going to continue with this schedule.

Tr., 8/24/10, p. 80 l. 2-5.

      4.      It is important to recall what discovery was allowed. Here is what the City initially wanted:

> THE COURT: Can you give me some sense of what that would be, of how many individuals you intend to depose or gather information from, so I have some sense of that for a fast track analysis?
>
> MR. WORSECK: I don't know that we would need to spray [sic: stray] beyond the plaintiffs to the lawsuit.

Tr., 8/23/10, p. 18, l. 19-24.

      5.      Between August 24 and September 1, 2010, no depositions took place.  Since September 2, 2010, all six Plaintiffs have been deposed, as well as four non-parties.  These

include the Plaintiff SAF's landlord (who terminated his Lease with SAF upon receiving the subpoena for deposition and subpoena *duces tecum* from Defendant), a would-be competitor from a gun range outside the City, a security company owner without a firearms range, and the owner of the mobile range company that contracted with SAF.

6.      In addition, Defendant sent multiple written discovery requests to Plaintiffs, all due in the range of 24 to 72 hours, which were followed-up with threats of motions to compel if Plaintiffs did not immediately respond, or demands and Motions for more depositions and discovery if Plaintiffs did.  Defendant's instant Motion is one such example.

7.      Now, Defendant seeks to take five more depositions, and continue two others, even though those witnesses have been deposed for approximately five hours each.  These five depositions are another landlord, its real estate agent, the real estate agent of the first landlord, the President of Plaintiff ISRA (despite deposing the Executive Director of ISRA for approximately five hours), and a mobile range supplier with whom Plaintiffs have no current relationship.

8.      As for continuing the deposition of Julianne Versnel of Plaintiff SAF, Defendant claims this is necessary because Versnel found a new site for the mobile range (after the first lessor terminated the Lease upon receiving a subpoena from Defendant), and made contacts about a backup range.  There is absolutely nothing about these occurrences that requires another deposition: as to the former, the relevant documents have been submitted and they speak for themselves, and as to the latter nothing has happened.  Even if a backup range were procured the contract would be submitted to Defendant.  As past depositions have amply demonstrated, there would be no reason to subject Versnel to a continued deposition over a

document.

9.      Defendant also wishes to continue the five hour deposition of Pearson, who answered all questions asked of him.  The "new" document is the ISRA Rules of the Range booklet used by ISRA at its outdoor range in Bonfield, Illinois, which is irrelevant because Pearson is not a state-certified trainer, and can testify about the contents of the booklet, the contents of which are all common-sense.  There is no legitimate reason to question him further, but especially before the October 1, 2010 hearing.

10.      Plaintiffs continue to maintain these depositions are irrelevant to the proceedings, and that Defendant's request continues to ignore the fact that discovery closed two weeks ago.  The discovery closure date was not set arbitrarily, but after careful consideration of the issues and the upcoming hearing date.

11.      As if the requests to take more depositions are not meritless enough, Defendant actually seeks to bar Plaintiffs' witnesses from testifying as a form of sanction, as if Plaintiffs committed wrongdoing by disclosing persons' names literally as soon as Plaintiffs learned of their existence, including on the holiday of Rosh Hashannah, which both of Plaintiffs' counsel were supposed to be observing at the time.  This absurd sanctions request ignores both Plaintiffs' prompt actions and the court-ordered discovery schedule.

## ARGUMENT

"District courts have broad discretion in matters relating to discovery."  *Patterson v. Avery Dennison Corporation*, 281 F.3d 676, 681 (7th Cir. 2002).  "Under Rules 26(c) and (d), Federal Rules of Civil Procedure, a court may limit the scope of discovery or control its sequence."  *Sommerfield v. City of Chicago*, 613 F.Supp.2d 1004, 1013 (N.D.IL 2009).  "The

Supreme Court has cautioned that the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense.... Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." *Sommerfield*, 613 F.Supp.2d at 1016 (quoting *Herbert v. Lando,* 441 U.S. 153, 177 (1979)).

**Defendant's additional discovery requests are improper and harassing, and the request for sanctions is without merit.**

Sought-After Continued Deposition of Julianne Versnel

The deposition of Julianne Versnel lasted more than five hours. It began with improper questions about Versnel's conversations with her attorney, veered into irrelevant questions about Plaintiff SAF's corporate purpose, and then moved into questions about the minutiae of the SAF-Blue Line lease.

On one topic of discussion, however, the Defendant was prescient. The Defendant's attorney questioned that the lessor, Accurate Perforating, may have legal troubles because of its contract with SAF. That lessor terminated its lease after receiving a subpoena from Defendant, forcing SAF and Plaintiffs to make alternative arrangements.

Plaintiffs have disclosed the new lease. Its terms speak for itself. There is no relevance to continuing to depose Versnel about a document that is unambiguous on its face and requires no additional interpretation.

Further, Plaintiffs find it particularly disingenuous that Defendant complains about the filing of a second TRO on September 13, 2010. First, Plaintiff's counsel attended two

6

depositions at Defendant's office on September 13.  Second, any discovery that was not already

scheduled by September 13, the closing date of discovery, was not going to be taken, regardless

of Plaintiffs' TRO Motion.

Simply put, the preliminary injunction hearing is in four days, discovery has been closed

for weeks, the Defendant already deposed Versnel for five hours,   and there is no showing of

relevance or need for the continued burden on Versnel, other than Defendant seems to want it.

The request should be denied.

Sought-After Deposition of Leo Solarte

Solarte is a real estate agent who brokered the Lease between SAF and Gillespie

Properties which was required after Accurate Perforating terminated SAF's lease.  As noted

above, the Lease itself is unambiguous and speaks for itself.  Defendant offers nothing to show

why such a deposition is needed or relevant, especially after the close of discovery.  All

Defendant offers is that Plaintiffs have disclosed the name, therefore Defendant should get to

depose him.  Defendant has offered nothing more.  That is insufficient, and is no reason to

vacate the Court's thought-out discovery schedule.

Sought-After Deposition of Gillespie Properties

This is the lessor with whom SAF contracted for a vacant lot to put the mobile range

after Accurate Perforating terminated its lease.  The lease has been disclosed.  It is

unambiguous on its face.  It is burdensome and harassing to suggest a deposition is necessary

about the validity, nature and scope of the lease, or about "authorized uses of the property."

Plaintiffs have already seen one lease canceled as a result of legal contact by the Defendant, as

well as one four-hour deposition about the plain language of a lease.  There is no need for

another such deposition, which will have no purpose except to harass and intimidate the

witness.  Plaintiffs assert, moreover, this is exactly what the Defendant is after.  Short of this,

however, Defendant has offered nothing to show why such a deposition is relevant or

necessary.  The request should be denied.

<u>Sought-After Deposition of Beverly Hayes</u>

Hayes was the real estate agent who brokered the SAF-Accurate Perforating lease.  She

is not a party to any contract, is not a member of SAF, and has no other involvement in this

case.  Other than her conversations with Larry Cohen of Accurate Perforating and Versnel (both

of which were deposed for hours), she has no bearing on this case, and Defendant has offered

no reason for wanting her deposition other than her name has tangentially come up.  In light of

the history and scheduling of this case, the request should be denied.

<u>Sought-After Continued Deposition of Richard Pearson</u>

Pearson is the Executive Director of Plaintiff ISRA, and was deposed extensively for

approximately five hours on September 8, 2010.  Defendant seeks to continue his deposition

over speculation about some scribbled notes, the relevance to any of the issues in this case

being ephemeral, and over the ISRA Rules of the Range, which Plaintiffs have tendered to

Defendant, is all common-sense, and about which Pearson testified extensively.  This is nothing

more than Defendant's attempt to unduly burden and harass the Plaintiffs and witnesses, while

achieving nothing that would actually bear on the issues.  Pearson already complied once.  The

Defendant's post-discovery request to depose Pearson again should be denied.

<u>Sought-After Deposition of Don Moran</u>

Moran is the president of ISRA.  At the very least, Defendant knew of Moran on

8

September 8, 2010, when Pearson testified about him.  Defendant could also have gone to

ISRA's website at any time prior to September 13, 2010 to find his information.  Defendant has

offered nothing to suggest why Moran's deposition is now required.

Sought-After Deposition of Representative of Arms To Bear

Arms to Bear is a Nevada company with whom Versnel of SAF spoke regarding the

supplying of a mobile range as a backup to the Blue Line range.  There is no contract.  It is

literally someone Versnel talked to.  Nevertheless, Defendant wants to depose someone from

the company because of the "possibility" SAF has secured Arms to Bear's services.  Of course,

Plaintiffs would be required to disclose this if it were the case, and would in all certainly want to

disclose such an arrangement.  Further, should such a contract be executed, Plaintiffs will

timely notify Defendant, obviating Defendant's need to speculate and needlessly explore

"possibilities," especially well after discovery has closed.  This is perhaps the most egregious

example of Defendant seeking to burden and harass Plaintiffs by deposing everyone whose

name gets mentioned.  It is an outrageous and irrelevant request, and should be denied.

**Defendant's Motion to Bar Testimony is Meritless**

Plaintiffs have disclosed information to Defendant as soon as it occurs, including during

observance of the Rosh Hashannah holiday.  Perhaps in the days before Blackberry and e-mail

this would not have been possible, but through those means Plaintiffs have kept Defendant

constantly updated.  Plaintiffs' counsel's reward was additional written discovery requests

"requiring" compliance in 24 hours, and this Motion to bar the testimony and witnesses

Plaintiffs promptly disclosed.

Leaving aside the issue of whether the second lease was necessary due to the actions of

9

Defendant causing Accurate Perforating to terminate the original lease, Plaintiffs notified

Defendants immediately regarding the second lease.  Defendants have the lease, the deposit

check, and the e-mail communications regarding same.  Barring evidence because it arose

through no fault of Plaintiffs towards the end of the discovery schedule is a baseless request

that ignores both the original latitude granted Defendant by the Court for conducting discovery

in the first place, and the realities of human interaction.  Plaintiffs did not even attempt to

delay or hide the information; it turned the information over immediately.  Perhaps Defendant

should have begun discovery sooner than August 30, 2010.  The five to six wasted days before

then were entirely Defendant's fault.  Sanctioning Plaintiff is unwarranted, as Plaintiffs have

done nothing wrong in complying with Defendant's fast-track discovery schedule.  The request

for sanctions should be denied.

**CONCLUSION**

Defendants' Motion is without merit.  Discovery closed weeks ago, Plaintiffs bent over

backward to comply with the multiple written and oral discovery levied by the Defendant.

Plaintiffs' counsel attended ten depositions, including on the last day of discovery, and even

had the unique experience of doing two depositions at the same time: breaking from one to

conduct a second, and then continuing the first one afterwards.

Unsurprisingly, Defendant has filed another Motion to extend discovery, which has been

at least twice denied already.  Discovery closed weeks ago.  The hearing date of October 1,

2010 is approaching, with much preparation still to do by Plaintiffs' counsel.  The Court should

put a stop to Defendants' repeated attempts to harass Plaintiffs after they jumped through

every one of Defendant's hoops, often with all due haste.  They have offered no legitimate

10

reasons why any of the depositions/continued depositions would lead to discoverable or

relevant evidence.  Defendant simply wants to force a deposition of everyone whose name has

been connected with Plaintiff's efforts, despite the lack of probative value.  The request to

sanction Plaintiffs for <u>complying</u> with Defendant's requests is disingenuous at best.  The Court

should put a stop to Defendant's tactics, and deny the Motion with prejudice.


WHEREFORE, the Plaintiffs, RHONDA EZELL, JOSEPH I. BROWN, WILLIAM HESPEN,

ACTION TARGET, INC., SECOND AMENDMENT FOUNDATION, INC. and ILLINOIS STATE RIFLE

ASSOCIATION, respectfully request this Honorable Court to deny Defendants' Motion in its

entirety, and to grant Plaintiffs any and all relief deemed just and proper.

Respectfully submitted,


_____/s/ David G. Sigale_____
One of the Attorneys for Plaintiffs


Alan Gura (admitted *pro hac vice*)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085
alan@gurapossessky.com

David G. Sigale, Esq. (#6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
Corporate West I
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
630.452.4547
dsigale@sigalelaw.com

**CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING**

The undersigned certifies that:

      1.      On September 27, 2010, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

      2.      Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

                                    /s/ David G. Sigale
                                    Attorney for Plaintiffs

12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, JOSEPH I. BROWN, | ) | |
| WILLIAM HESPEN, ACTION TARGET, INC., | ) | |
| SECOND AMENDMENT FOUNDATION, INC. | ) | |
| and ILLINOIS STATE RIFLE ASSOCIATION., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 10 CV 5135 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR EXTENSTION OF TIME TO ANSWER OR OTHERWISE PLEAD TO PLAINTIFF'S COMPLAINT**

COME NOW the Plaintiffs, RHONDA EZELL, JOSEPH I. BROWN, WILLIAM HESPEN, ACTION TARGET, INC., SECOND AMENDMENT FOUNDATION, INC. and ILLINOIS STATE RIFLE ASSOCIATION, and submit their Response to the Defendant's Motion for Extension of Time to Answer or Otherwise Plead to Plaintiffs' Complaint.

**STATEMENT OF FACTS**

1.      Plaintiffs filed their Complaint on August 16, 2010, and served process on Defendant on August 17, 2010.

2.      On September 14, 2010, Plaintiffs' counsel notified Defendant it was technically in default, and advised Defendant to correct the situation immediately.

3.      Defendant asked until October 12, 2010, to respond, and Plaintiffs allowed until September 24, 2010, because Plaintiffs wish the Answer prior to the October 1, 2010 hearing.

4.      As of the date of writing this document, Defendant has still not filed an Answer

or alternative responsive pleading to the Complaint.

## ARGUMENT

F.R.Civ.P. 12(a)(1)(A)(i) requires a response within 21 days after service of summons and complaint.  In this case, a response was due on September 8, 2010.  After that, Defendant could and can be held in default.  *See*  F.R.Civ.P. 55(a).

The entry of default judgment is not an abuse of discretion when the defendant fails to file an answer, despite an extension of time and a warning that further failure to answer would result in default, and the defendant demonstrated ability to file numerous documents other than answer.  *See*, *e.g.*, *U.S. v. Minson*, 13 Fed. Appx. 416 (7th Cir. 2001); *See also* F.R.Civ.P.55(a). This is exactly the case here, except that the extension was from Plaintiff's counsel as opposed to being from the Court.

Plaintiffs assert the failure to answer is not merely technical.  The Answer allows Plaintiffs to know which facts are in dispute, which may have significant impact on the upcoming preliminary injunction hearing and beyond.  It also potentially allows the Court to know what issues are disputed, which may significantly aid the Court.  Defendant's counsel has stated that it has made clear through other filings what its legal position is, but that is not a substitute for an official pleading laying out what facts are agreed-upon, and which legal defenses it is choosing to assert.  This failure of Defendant is prejudicing Plaintiffs.

Nor does Plaintiffs' counsel accept the assertion that Defendant's counsel is busy. Defendant has five attorneys assigned to this case, and all but one have found time to file various Motions in this case ever since August 24, 2010.  This include the Local Rule 40.4 Motion before Judge Guzman, a Motion to shorten Plaintiffs' response time to said L.R.40.4

Motion, a Motion for additional discovery, and a Motion to vacate the preliminary injunction hearing.  Surely one of them can find time to draft a responsive pleading.

As to the extension date Defendant requests, to Plaintiff's counsel Defendant sought an unacceptable due date of October 12, 2010.  To this Court, Defendant seeks a more unacceptable date of October 25, 2010.  At a minimum, Plaintiffs request the Court order the Defendant to respond to the Complaint before the preliminary injunction hearing on October 1, 2010.  Plaintiffs respectfully assert they have the right to formally know what issues are undisputed and which are in dispute at the preliminary injunction hearing.

WHEREFORE, the Plaintiffs, RHONDA EZELL, JOSEPH I. BROWN, WILLIAM HESPEN, ACTION TARGET, INC., SECOND AMENDMENT FOUNDATION, INC. and ILLINOIS STATE RIFLE ASSOCIATION, respectfully request this Honorable Court to deny Defendants' Motion in its entirety, and to grant Plaintiffs any and all relief deemed just and proper.

Respectfully submitted,

_____/s/ David G. Sigale_____
One of the Attorneys for Plaintiffs

Alan Gura (admitted *pro hac vice*)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085
alan@gurapossessky.com

David G. Sigale, Esq. (#6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
Corporate West I
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
630.452.4547
dsigale@sigalelaw.com

3

**CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING**

The undersigned certifies that:

      1.      On September 28, 2010, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

      2.      Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                                                         /s/ David G. Sigale
                                                            Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-5135 |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**NOTICE OF ELECTRONIC FILING**</u>

The undersigned certifies that:

On September 28, 2010, the Plaintiffs electronically filed their <u>Plaintiffs' Response to Defendant's Motion for Extension of Time to Answer or Otherwise Plead to Plaintiffs' Complaint</u> with the District Court Clerk *via* CM/ECF filing system;

      1.     Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

                                                      <u>   /s/ David G. Sigale      </u>
                                                         Attorney for Plaintiffs

| | |
|---|---|
| Alan Gura (admitted *pro hac vice*) | David G. Sigale (Atty. ID# 6238103) |
| Gura & Possessky, PLLC | Law Firm of David G. Sigale, P.C. |
| 101 N. Columbus Street, Suite 405 | Corporate West I |
| Alexandria, VA 22314 | 4300 Commerce Court, Suite 300-3 |
| 703.835.9085/Fax 703.997.7665 | Lisle, IL 60532 |
| | 630.452.4547/Fax 630.596.4445 |

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1**
**Eastern Division**

Rhonda Ezell, et al.

                Plaintiff,

v.
                                    Case No.: 1:10–cv–05135
                                    Honorable Virginia M. Kendall

City Of Chicago

                Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, September 28, 2010:

      MINUTE entry before Honorable Virginia M. Kendall:Defendants motions for extension of time to answer [40], [48] is granted to 10/8/2010 for an answer or to otherwise plead to plaintiff's complaint. Defendant's Emergency Motion for Leave to Allow Additional Discovery or in the Alternative to Bar Certain Witnesses[44]is granted. Plaintiff's motion in limine #1 to exclude the testimony of six witnesses [50] is denied as to Dan Bartoli. Defendants are required to submit a summary statement of Dan Bartoli to plaintiff. The motion is also denied as to Pattie Scudiero and dismissed as moot as to the other four witnesses by agreement of the parties. Plaintiff's oral motion to depose Pattie Scudiero is granted and limited to one hour. Defendant's are permitted to depose the property owner and real estate owner each, but limited to one hour. Miss Versnell may also be deposed, but limited to one hour regarding new information. Plaintiffs must provide a copy of the new contract to defendant.(tsa, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RHONDA EZELL, et al,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MOTION OF THE NATIONAL RIFLE ASSOCIATION FOR LEAVE
TO FILE *INSTANTER* A BRIEF AS AMICUS CURIAE**

The National Rifle Association ("NRA"), a not-for-profit membership association representing members who seek to exercise and protect their Second Amendment rights, respectfully submits this Motion for Leave to File *Instanter* a Brief as Amicus Curiae in this matter.  For the reasons set forth below, the NRA respectfully requests that this Court grant the motion and permit the filing of the amicus brief attached hereto as Exhibit A.

**THE INTEREST OF AMICUS CURIAE**

1.      The NRA is America's foremost and oldest defender of Second Amendment rights.  Founded in 1871, the NRA today has approximately four million members, including residents of Chicago, and its programs reach millions more.  The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA also collects and publishes real-life examples of citizens from all walks of life whose lawful possession of firearms enabled them to protect themselves from violent criminals.

2.      The NRA and its members have numerous interests that will be substantially affected by the outcome of this litigation.  First and foremost, the NRA's Chicago members'

Second Amendment rights are directly infringed by the City's ban on firearms ranges and training.  Ensuring that this Court applies the appropriate standard of review to Plaintiffs' challenge is thus critically important to the NRA's Chicago members.

3.      Second, the NRA and/or its members are often litigants in cases raising Second Amendment issues, and the appropriate post-*Heller* standard of review is a central feature of many, if not all, of these cases.  *See, e.g.*, *Heller v. District of Columbia*, No. 10-7036 (D.C. Cir. appeal filed Apr. 1, 2010); *D'Cruz v. BATFE*, No. 5:10-cv-140-C (N.D. Tex. filed Sept. 8, 2010), *D'Cruz v. McCraw*, No. 5:10-cv-141-C, (N.D. Tex. filed Sept. 8, 2010); *Peruta v. County of San Diego*, No. 3:09-cv-02371 (S.D. Cal. filed Oct. 23, 2009).

## THE NRA'S AMICUS BRIEF WILL AID THIS COURT'S CONSIDERATION OF A CRITICALLY IMPORTANT ISSUE

4.      "A federal district court's decision to grant amicus status to an individual, or an organization, is purely discretionary.  Relevant factors in determining whether to allow an entity the privilege of being heard as an amicus include whether the proffered information is timely, useful, or otherwise."  *United States v. Board of Educ. of the City of Chicago*, No. 80-5124, 1993 U.S. Dist. LEXIS 14307, at *7-8 (N.D. Ill. Oct. 8, 1993) (citations and quotation marks omitted).[1]

---

[1] One judge of this Court has adopted Judge Posner's view that amicus curiae participation should be permitted only in "'a case in which a party is inadequately represented; or in which the would-be amicus has a direct interest in another case that may be materially affected by a decision in th[e] case [at issue]; or in which the amicus has a unique perspective or specific information that can assist the court beyond what the parties can provide.'"  *Jones Day v. Blockshopper LLC*, No. 08-4572, 2008 U.S. Dist. LEXIS 94442, at *18 (N.D. Ill. Nov. 13, 2008) (quoting *Voices for Choices v. Illinois Bell Telephone Co.*, 339 F.3d 542, 545 (7th Cir. 2003) (Posner, J., chambers opinion)).  But the Seventh Circuit's standard for briefs submitted in that court are an interpretation of Fed. R. App. P. 29, which does not govern amicus briefs submitted in district courts, and Judge Posner's view of the utility of amicus participation has not been regularly followed by this Court and has found little support in other courts across the country. *See, e.g.*, *Neonatology Associates, P.A. v. Commissioner of Internal Revenue*, 293 F.3d 128, 130,

5.      This Court has historically and repeatedly granted membership organizations similar to the NRA leave to file amicus briefs where the outcome of the litigation could have a substantial impact on the organization's members.  *See, e.g.*, *A.R.D.C. v. Harris*, 595 F. Supp. 107, 109 n.2 (N.D. Ill. 1984) (noting that Chicago Bar Association appeared as amicus curiae in case pertaining to Illinois Attorney Registration and Disciplinary Commission); *Board of Educ.*, 1993 U.S. Dist. LEXIS 14307 at *9-10 (granting two organizations leave to file because they "represent interests that will be significantly affected by the resolution of th[e] matter," granting another organization leave to file because its "interest in th[e] proceedings [wa]s substantial," and granting a fourth organization leave to file because its members' "information and concerns may be useful in the resolution of the matter"); *United States v. Board of Educ. of City of Chicago*, 663 F. Supp. 2d 649, 661 (N.D. Ill. 2009) (amici "participation was welcome and helpful and contributed to the clarity of the issues"); *Center for Individual Freedom v. Madigan*, minute order, No. 10-4383 (N.D. Ill., Aug. 20, 2010) (in case dealing with campaign-disclosure law, granting leave to public interest organization focused on public policy regarding elections) (attached as Ex. B).

6.      For example, just a few months ago, Judge Dow granted four trade associations leave to file amicus briefs in a case raising constitutional challenges to Illinois's liquor regulations.  Judge Dow credited the associations' contentions that their "members would be … affected" by the pending litigation and noted that the proffered briefs were helpful to the court (i)

---

131-33 (3d Cir. 2002) (Alito, J., chambers opinion) (recognizing the "small body of judicial opinions that look with disfavor on motions for leave to file amicus briefs," but concluding that Rule 29 does not contain the limitations suggested in those opinions and explaining that a much more permissive standard is "the predominant practice").  Indeed, in its recent Second Amendment cases, the Supreme Court itself has welcomed dozens of amicus briefs.  In any event, the NRA and its members easily satisfy the second of Judge Posner's standards: as noted above, the NRA and its members are currently litigating several Second Amendment cases in which their interests may be materially affected by the standard of review adopted.

because they "assert[ed] legal arguments, some of which are new and others of which add[ed] new twists on arguments that the parties ha[d] already raised," (ii) because the issues raised in the litigation were important, and (iii) because the case was proceeding on an expedited track. *Anheuser-Busch, Inc. v. Schnorf*, docket order, No. 10-cv-1601, at 2, 3-4 (N.D. Ill. June 1, 2010) (attached as Ex. C).

7.     In an earlier TRO hearing, this Court stated that "the most important thing … is to determine what standard we are going to use here."  Tr. of Hr'g of Aug. 24, 2010 at 73:16-19. The Court reiterated the importance of this issue at the hearing of September 28, 2010.  The NRA's amicus brief focuses on this issue—namely, the appropriate framework for reviewing Second Amendment challenges in the wake of the Supreme Court's decisions in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010). As in *Anheuser-Busch*, the NRA's proffered brief offers arguments, perspectives, and elaborations on this issue that are simply not be found in any of the briefs submitted by the parties to date.  The NRA respectfully submits, therefore, that as in *Anheuser-Busch*, the brief offered here be helpful to the Court as it seeks to resolve a critically important constitutional issue on an expedited basis.

## CONCLUSION

For the foregoing reasons, the NRA respectfully requests that the Court grant this motion for leave to file a brief as amicus curiae.

Dated: October 1, 2010                              Respectfully submitted,


Stephen Kolodziej                               s/ Charles J. Cooper
Atty. ID # 6216375                              Charles J. Cooper*
BRENNER FORD MONROE & SCOTT LTD.                David H. Thompson*
33 N. Dearborn St., Suite 300                   Jesse Panuccio*

Chicago, IL  60602
Tel: (312) 781-1970
Fax: (312)781-9202
Email: skolodziej@brennerlawfirm.com

COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Motion for admission *pro hac vice*
forthcoming

*Counsel for Amicus Curiae*
*The National Rifle Association*

**CERTIFICATE OF SERVICE**

  I, Charles J. Cooper, hereby certify that on this 1st day of October, 2010, I caused a copy

of the foregoing to be served by electronic filing on:

Counsel for Plaintiffs

| | |
|---|---|
| Alan Gura | David G. Sigale |
| Gura & Possessky, PLLC | Law Firm of David G. Sigale |
| 101 N. Columbus St. | Corporate West I |
| Suite 405 | 4300 Commerce Court, Suite 300-3 |
| Alexandria, VA  22314 | Lisle, IL  60532 |
| (703) 835-9085 | (630) 452-4547 |
| Email: alan@gurapossessky.com | dsigale@sigalelaw.com |

Counsel for Defendant

Michael A. Forti
Andrew W. Worseck
Mardell Nereim
Rebecca Alfert Hirsch
William Macy Aguiar
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 N. LaSalle St., Suite 1230
Chicago, IL  60602
(312) 744-9010
mforti@cityofchicago.org
aworseck@cityofchicago.org
mnereim@cityofchicago.org
rebecca.alfert@cityofchicago.org
waguiar@cityofchicago.org

       s/ Charles J. Cooper
       Charles J. Cooper

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RHONDA EZELL, et al,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## BRIEF OF THE NATIONAL RIFLE ASSOCIATION
## AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS

---

Stephen Kolodziej
Atty. ID# 6216375
BRENNER FORD MONROE & SCOTT LTD.
33 N. Dearborn St., Suite 300
Chicago, IL  60602
(312) 781-1970

Charles J. Cooper
David H. Thompson
Jesse Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
(202) 220-9600

*Counsel for Amicus Curiae*
*The National Rifle Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTEREST OF AMICUS CURIAE ............................................................................................... 1

BACKGROUND AND SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT .................................................................................................................................. 3

CONCLUSION ............................................................................................................................... 12

**TABLE OF AUTHORITIES**

**Cases**                                                                      **Page**

*Burdick v. Takushi*, 504 U.S. 428 (1992) ........................................................8

*Clark v. Jeter*, 486 U.S. 456 (1988) ...............................................................5

*D'Cruz v. BATFE*, No. 5:10-cv-140-C (N.D. Tex. filed Sept. 8, 2010) ...........1

*D'Cruz v. McCraw*, No. 5:10-cv-141-C (N.D. Tex. filed Sept. 8, 2010) .........1

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)............................ *passim*

*Heller v. District of Columbia*, No. 10-7036 (D.C. Cir. appeal filed Apr. 1, 2010)......................1

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999)...................6

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010) ..........................2, 6, 7, 8, 10

*Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335 (D.C. Cir. 1998) ......................................6

*Owner-Operator Independent Drivers, et al. v. Lindley*, No. 2:10-cv-2010 (E.D. Cal. filed July 28, 2010)........................1

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ......5

*Peruta v. County of San Diego*, No. 3:09-cv-02371 (S.D. Cal. filed Oct. 23, 2009)......................1

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)......................8

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...................5

*Thompson v. Western States Medical Center*, 535 U.S. 357 (2002)................8

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) ...................8

*Ullmann v. United States*, 350 U.S. 422 (1956)..........................................11

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938).......................5

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009) .............3, 7

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)............................9

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ................3

*United States v. Skoien*, __ F.3d __, No. 08-3770, 2010 U.S. App. LEXIS 14262 (7th Cir. July 13, 2010)........................4, 9, 10

*United States v. Stevens*, 130 S. Ct. 1577 (2010)....................................9, 10

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................10

*United States v. Williams*, __ F.3d __, No. 09-3174, 2010 U.S. App. LEXIS 16194 (7th Cir. Aug. 5, 2010) ........................4

*United States v. Yancey*, __ F.3d __, No. 09-1138, 2010 U.S. App. LEXIS 18442

(7th Cir. Sept. 3, 2010) ............................................................................................. 4

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ...........................................................................................11

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
    471 U.S. 626 (1985) .............................................................................................6

## <u>Other</u>

Municipal Code of Chicago § 8-20-110 .........................................................................2

Municipal Code of Chicago § 8-20-120 .........................................................................2

Municipal Code of Chicago § 8-20-280 .........................................................................2

Municipal Code of Chicago § 8-24-010 .........................................................................2

FEDERALIST NO. 29 ...........................................................................................................4

Letter XVIII, *Letters from the Federal Farmer to the Republic* 124 (W. Bennett ed. 1978).........4

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
    An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009)...............9

## INTEREST OF AMICUS CURIAE

The NRA is America's foremost and oldest defender of Second Amendment rights. Founded in 1871, the NRA today has approximately four million members and its programs reach millions more. The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA also collects and publishes real-life examples of citizens from all walks of life whose lawful possession of firearms enabled them to protect themselves from violent criminals. The NRA's membership includes Chicago residents.

The NRA and its members have numerous interests that will be substantially affected by the outcome of this litigation. First and foremost, the NRA's Chicago members' Second Amendment rights are directly infringed by the City's ban on firearms ranges and training. Range training allows NRA members to become proficient at the safe and effective handling of firearms. Ensuring that this Court applies the appropriate standard of review to Plaintiffs' challenge is thus critically important to the NRA and its Chicago members.

Second, the NRA and/or its members are often litigants in cases raising Second Amendment issues, and the appropriate post-*Heller* standard of review is a central feature of many, if not all, of these cases. *See, e.g.*, *Heller v. District of Columbia*, No. 10-7036 (D.C. Cir. appeal filed Apr. 1, 2010); *D'Cruz v. BATFE*, No. 5:10-cv-140-C (N.D. Tex. filed Sept. 8, 2010), *D'Cruz v. McCraw*, No. 5:10-cv-141-C, (N.D. Tex. filed Sept. 8, 2010); *Peruta v. County of San Diego*, No. 3:09-cv-02371 (S.D. Cal. filed Oct. 23, 2009); *Owner-Operator Independent Drivers, et al. v. Lindley*, No. 2:10-cv-2010 (E.D. Cal. filed July 28, 2010).

## BACKGROUND AND SUMMARY OF ARGUMENT

The Supreme Court has declared that the Second Amendment preserves the fundamental right to keep and bear arms. *See District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); *McDonald v. Chicago*, 130 S. Ct. 3020 (2010). The City of Chicago has long objected to, and banned, its residents' exercise of their Second Amendment rights. In grudging acknowledgement that *Heller* and *McDonald* would require the City to do *something* about its patently unconstitutional total handgun ban, the Mayor and City Council hastily amended the City's firearms ordinances to ban *most* but not all exercise of Second Amendment rights. At issue in this case is the City's complete ban on training with a firearm. *See* Municipal Code of Chicago § 8-20-280 ("Shooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited…."); *id.* § 8-24-010 ("No person shall fire or discharge any firearm within the city, except in the [sic] lawful self-defense or defense of another…."). Enactment of the law was akin to recognizing that the First Amendment prohibits a ban on books but then banning literacy. And this ban is particularly pernicious and perverse because the City *requires* a resident to obtain range training before he or she may possess, keep, or carry a firearm in the City. *Id.* §§ 8-20-110, -120. In other words, the City now conditions the right to keep and bear arms on obtaining range training but simultaneously bans range training.

The Plaintiffs—law-abiding residents of Chicago—challenge this ban as an infringement of their rights under the Second and Fourteenth Amendments. The case thus presents the question of what analytical framework lower courts should utilize in adjudicating Second Amendment challenges after *Heller* and *McDonald*. In *McDonald*, the Supreme Court specifically rebuffed Chicago's contention that Second Amendment rights are subject to "interest balancing," 130 S. Ct. at 3047 (plurality) (citing *Heller*, 128 S. Ct. at 2820-21), and informed the

City that it could no longer view the right to keep and bear arms "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *id.* at 3044. Ignoring these holdings, the City still maintains that Second Amendment rights are not to be protected by the courts with the same vigilance as other rights.  Instead, the City amazingly suggests that rational basis scrutiny or interest-balancing—both of which the Supreme Court has now *twice* rejected— are the appropriate analytical frameworks in Second Amendment cases.

As demonstrated below, the question after *Heller* and *McDonald* is not whether strict scrutiny or lesser scrutiny applies to Second Amendment challenges, but whether tiers-of-scrutiny analysis should be applied instead of, or in addition to, the historically sensitive analysis employed in *Heller*.  If a tiers-of-scrutiny framework is to be adopted, however, *Heller* and *McDonald* allow only for strict scrutiny.

## <u>ARGUMENT</u>

Generally, the Supreme Court reviews constitutional challenges within the familiar tiers-of-scrutiny framework, wherein laws that infringe on constitutional rights are subject to heightened scrutiny and those that do not are subject to deferential rational-basis review.  In *District of Columbia v. Heller*, however, the Court eschewed levels of scrutiny in favor of a more historically sensitive analysis.  *See* 128 S. Ct. 2783, 2817-18 (2008).  Subsequent to *Heller* some lower courts have nonetheless proceeded to analyze Second Amendment claims under the tiers-of-scrutiny framework, and there has been some debate as to whether intermediate or strict scrutiny applies.  *Compare United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009) (applying strict scrutiny), *with United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009) (applying intermediate scrutiny on theory that Second Amendment rights are not fundamental).  The Seventh Circuit has reserved the question, at least with respect to all cases

not concerning disarmament of criminals.  *See United States v. Skoien*, __ F.3d __, No. 08-3770, 2010 U.S. App. LEXIS 14262, at *11 (7th Cir. July 13, 2010) (en banc) (assuming without deciding that intermediate scrutiny applied to law banning possession by those convicted of misdemeanor crimes of domestic violence and refusing to "get more deeply into the 'levels of scrutiny' quagmire"); *United States v. Williams*, __ F.3d __, No. 09-3174, 2010 U.S. App. LEXIS 16194, at *16 (7th Cir. Aug. 5, 2010) (applying intermediate scrutiny to felon-in-possession statute "without determining that it would be the precise test applicable to all challenges to gun restrictions"); *United States v. Yancey*, __ F.3d __, No. 09-1138, 2010 U.S. App. LEXIS 18442, at *5-6 (7th Cir. Sept. 3, 2010) (applying *Skoien* "framework" to challenge to ban on firearms possession by unlawful drug user but "again reserve[ing] the question whether a different kind of firearm regulation might require a different approach").[1]

---

[1] Remarkably, it is the City's position that the Seventh Circuit's reservation implies that bans on the exercise of Second Amendment rights of law-abiding citizens should be subject to *lesser* scrutiny than bans relating to criminals. This contention turns *Heller* on its head. The Supreme Court recognized that exercise of the right to keep and bear arms by law-abiding citizens is at the very core of the Second Amendment, 128 S. Ct. at 2821, whereas bans pertaining to convicted criminals and other dangerous persons may be outside the scope of the right as a historical matter, *id.* at 2816-17.

At bottom, the City is really arguing that the right to train with a firearm—to become proficient in the "use [of] arms in defense of hearth and home," *id.* at 2821—is outside the scope of the Second Amendment. There is little to this argument. As the Supreme Court explained in *Heller*, the Second Amendment's prefatory clause, while not "suggest[ing] that preserving the militia was the only reason Americans valued the ancient right," does show that the founding generation believed that codification of the right would "prevent elimination of the militia," 128 S. Ct. at 2801, which consisted of "all males physically capable of acting in concert for the common defense," *id.* at 2799. The prefatory clause's reference to a "well-regulated militia" was thus a reference to "'the body of the people, *trained* to arms.'" *Id.* at 2800 (citing Va. Declaration of Rights § 13 (1776), in 7 Thorpe 3812, 3814) (emphasis added). *See also id.* ("the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and *training*") (emphasis added). *See also* FEDERALIST NO. 29 (the federal army cannot be a threat to the people "while there is a large body of citizens, little, if at all, inferior to them in discipline and the use of arms"); Letter XVIII, *Letters from the Federal Farmer to the Republic* 124 (W. Bennett ed. 1978) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them."). The founding

While *Heller* did not definitively fix the methodology for reviewing Second Amendment challenges, the debate that remains open is not between strict and intermediate scrutiny, but between strict scrutiny and the framework applied in *Heller*. In this regard, it is noteworthy that the Chief Justice, a member of the *Heller* majority, expressly suggested at oral argument in *Heller* that the inquiry into levels of scrutiny was atextual and unhelpful. *See* Tr. of Oral Argument at 44, *Heller*, 128 S. Ct. 2783. If a level-of-scrutiny analysis is to be employed in Second Amendment cases going forward, however, *Heller* and *McDonald* create no great mystery on what type of scrutiny applies.

When a law interferes with "fundamental constitutional rights," it is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). *See also id.* at 17 (if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution, [it] thereby requir[es] strict judicial scrutiny"); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights … are given the most exacting scrutiny"); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution"); *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) ("There

---

generation thus clearly understood that for the right to keep and bear arms to mean anything at all, the people had to become proficient with those arms.

The same goes for the generation that incorporated the Second Amendment against the states. For example, *Heller* credited two significant constitutional treatises penned by Thomas Cooley as representative of the Reconstruction-era understanding of the right to keep and bear arms. In "his 1880 work, General Principles of Constitutional Law," Cooley explained: "'to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms.'" *Heller*, 128 S. Ct. at 2811-12 (quoting page 271). And in his "massively popular 1868 Treatise on Constitutional Limitations, Cooley explained that "'[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms.'" 128 S. Ct. at 2811 (quoting page 350).

may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments ….").[2]

   *Heller* explained that Blackstone "cited the arms provision of the [English] Bill of Rights as one of the fundamental rights of Englishmen," and that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." 128 S. Ct. at 2798. And it was this fundamental "pre-existing right" that the Second Amendment "codified." *Id.* at 2797 (emphasis omitted). Thus, it is unsurprising that the Court, in *McDonald*, explained that the "decision in *Heller* points unmistakably to [an affirmative] answer" to the question of "whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty." *McDonald*, 130 S. Ct. at 3036. Indeed, *McDonald* laid to rest any doubt on this question, declaring that "the right to bear arms was fundamental to the newly formed system of government." *Id.* at 3037. *See also id.* ("This is surely powerful evidence that the right was regarded as fundamental in the sense relevant here."); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3042 ("In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights

---

   [2] *See also Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Hutchins v. District of Columbia*, 188 F.3d 531, 536 (D.C. Cir. 1999) ("any government impingement on a *substantive* fundamental right to free movement would be measured under a strict scrutiny standard"); *Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1340 (D.C. Cir. 1998) (citing *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966), for "holding that strict scrutiny applies to classifications that burden fundamental rights").

necessary to our system of ordered liberty.").[3]  Accordingly, regulatory burdens on the

fundamental rights secured by the Second Amendment are subject to strict scrutiny.  *See*

*Engstrum*, 609 F. Supp. 2d at 1231-32.

This conclusion is buttressed by the fact that while the *Heller* Court did not engage in a

traditional strict-scrutiny analysis, it did explicitly and definitively reject application of rational

basis review[4] and also Justice Breyer's proposed "interest-balancing" approach, which was, at

least implicitly, a form of intermediate scrutiny.  *See Heller*, 128 S. Ct. at 2821; *McDonald*, 130

S. Ct. at 3050 (plurality) ("[W]hile [Justice Breyer's] opinion in *Heller* recommended an

interest-balancing test, the Court specifically rejected that suggestion.").  Justice Breyer

denominated his test "interest-balancing," rather than intermediate scrutiny, not because he was

adopting a less demanding test, but because of his view that the government's interest in

regulating firearms—some version of protecting the safety and lives of the public—would

always be important or compelling.  Thus, in Justice Breyer's view, whether the standard of

review were strict (compelling) or intermediate (important), the government interest would

always be sufficient and application of the test would involve a search for the appropriate degree

---

[3] *See also id.* at 3037 ("The right to keep and bear arms was considered no less
fundamental by those who drafted and ratified the Bill of Rights."); *id.* at 3038 n.17
("Abolitionists and Republicans were not alone in believing that the right to keep and bear arms
was a fundamental right"); *id.* at 3040 (holding that the 39th Congress's "efforts to safeguard the
right to keep and bear arms demonstrate that the right was still recognized to be fundamental");
*id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to
keep and bear arms as a fundamental right deserving of protection."); *id.* at 3059 (Thomas, J.,
concurring in part and in judgment) (agreeing that "the right to keep and bear arms … is
'fundamental' to the American 'scheme of ordered liberty.'").

[4] 128 S. Ct. at 2818 n.27 ("Obviously, the [rational basis] test could not be used to
evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the
freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to
keep and bear arms….  If all that was required to overcome the right to keep and bear arms was a
rational basis, the Second Amendment would be redundant with the separate constitutional
prohibitions on irrational laws, and would have no effect.").

of fit, i.e., interest-balancing.  *See Heller*, 128 S. Ct. at 2851-52 ("I would simply adopt such an interest-balancing inquiry explicitly.").  There is, however, no doubt that in defending his approach, Justice Breyer relied on cases such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which are undeniably intermediate scrutiny cases.  *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting).  Even more revealingly, Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992).  *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting).  That is the case on which the United States principally relied in advocating that the Court adopt intermediate scrutiny.  *See* Brief of United States at 8, 24, 28, *Heller*, 128 S. Ct. 2783.  Thus, Justice Breyer's interest-balancing test is nothing other than intermediate scrutiny, and the Court's rejection of that approach in *Heller* and *McDonald* forecloses this Court from adopting intermediate scrutiny in Second Amendment cases.[5]

Contrary to Justice Breyer's rejected *dissenting* suggestion, *Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting), *Heller*'s underlying logic—that the right is subject to strict scrutiny—is entirely consistent with its dictum stating that certain types of restrictions, such as possession by

---

[5] Ignoring this repeated holding, the City would have this Court adopt the interest-balancing inherent in the Supreme Court's abortion cases—the "undue burden" framework.  But the Court adopted the undue-burden test in the abortion context because there are two rights at stake in such cases, not one, and thus interest-balancing is inherent in the nature of "the central holding of *Roe*" itself.  *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 871-72 (1992) (plurality) ("[I]t must be remembered that *Roe v. Wade* speaks with clarity in establishing not only the woman's liberty but also the State's important and legitimate interest in potential life.") (quotation marks omitted).  This is why, "subsequent to viability, the State … may … regulate, and even proscribe, abortion."  *Id.* at 879 (quotation marks omitted).  In the Second Amendment context, however, the Supreme Court has now twice made clear that such balancing is not inherent in the nature of the right.  *Heller*, 128 S. Ct. at 2821 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach…. The Second Amendment … is the very *product* of an interest-balancing by the people…."); *id.* at 2822 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."); *McDonald*, 130 S. Ct. at 3045, 3047 (plurality).

felons and the mentally ill, are "presumptively lawful," *Heller*, 128 S. Ct. at 2817 & n.26.  First, a state's interest in prohibiting firearm possession by violent felons and the insane is self-evidently compelling.  Thus, it was of no great moment that the *Heller* Court, in dicta, suggested that in future cases the government might easily prove that it considered and acted upon a compelling interest justifying these laws.  This Court need not over-read "presumptively lawful" to mean more than that.

Second, the *Heller* Court may simply have been stating that based on its preliminary historical research, these laws appear to fall outside the bounds of the right as understood at the time of the Founding, with future cases and briefing available to test that proposition and refine and sharpen the precise contours of the right as understood at the Founding.  *See id.* at 2821 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views.  The Second Amendment is no different. … [T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[W]e think the better reading, based on the text and structure of *Heller*, is … that these longstanding limitations are exceptions to the right to bear arms."); *Skoien*, __ F.3d at __, 2010 U.S. App. LEXIS 14262, at *6 ("That *some* categorical limits are proper is part of the original meaning …."); *United States v. Stevens*, 130 S. Ct. 1577, 1584-86 (2010) (categories of speech not protected by First Amendment are based on historical exemptions at time of the Framing and not judicial interest balancing); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1449 (2009) ("Sometimes, a constitutional right

isn't violated by a restriction because the restriction is outside the terms of the right as set forth

by the constitution.").  Indeed, in his concurring opinion in *McDonald*, Justice Scalia specifically

explained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the

scope of the right, not its lack of fundamental character."  *McDonald*, 130 S. Ct. at 3056 (Scalia,

J., concurring).  Strict scrutiny in the First Amendment context, after all, is not foreclosed by the

recognition that there are reasonable limits on the scope of the right.  *See United States v.*

*Stevens*, 130 S. Ct. 1577, 1584-86 (2010).

Third, the logic behind the suggestion—that *Heller*'s recognition of "presumptively

lawful" regulations precludes application of strict scrutiny—would also preclude application of

intermediate scrutiny.  It is rational-basis review that affords a presumption of legality to

challenged regulations, putting the burden of proof on the party challenging the regulation.  But

intermediate scrutiny, like strict scrutiny, puts the burden on the government to justify the

challenged regulation.  *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 519 (1996).  This

reality only further suggests that this dicta in *Heller* was not a coded instruction to lower courts

to apply intermediate scrutiny, but rather was simply a preliminary statement of what logic and

historical research might bear out in future cases.  *Skoien*, __ F.3d at __, 2010 U.S. App. LEXIS

14262, at *5 ("We do not think it profitable to parse these passages of *Heller* as if they contained

an answer ….  They are precautionary language ….  [T]he Justices have told us that the matters

have been left open.");

To conclude, as some courts have in the wake of *Heller*, that Second Amendment rights

deserve some lesser protection than other fundamental constitutional rights is to conclude,

contrary to what *is* explicit in *Heller* and *McDonald*, that Second Amendment rights are not

fundamental and exist on a lower plateau than other constitutional rights.  But no enumerated

constitutional right is "less 'fundamental' than" others, and there is "no principled basis on which to create a hierarchy of constitutional values …." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982).  "To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it.  This is to disrespect the Constitution." *Ullmann v. United States*, 350 U.S. 422, 428-29 (1956).  Accordingly, the Court in *Heller* repeatedly treated the Second Amendment right with equal dignity to that afforded other fundamental rights.  *See* 128 S. Ct. at 2791-92 (Second Amendment, like First Amendment, extends protections to instruments that were not in existence at Founding); *id.* at 2797 ("Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"); *id.* at 2799, 2816 (Second Amendment, like other constitutional rights, has historical boundaries); *id.* at 2821 (holding that the "Second Amendment is no different" from the First Amendment, in that it was the product of interest-balancing by the People).  And in *McDonald*, the Court flatly "reject[ed]" the argument "that the Second Amendment should be singled out for special—and specially unfavorable—treatment."  *Id.* at 3043..  *See also id.* at 3044 (plurality) (rejecting argument that the Second Amendment right should be "treat[ed] … as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

Thus, if a level-of-scrutiny analysis is to apply, it is strict scrutiny that governs judicial review of government burdens on Second Amendment rights, as with other fundamental constitutional rights.  In such cases, a reviewing court must first ask whether the challenged law burdens a right within the scope of the Second Amendment as originally understood and, if so, then whether the law serves a compelling state interest through narrowly tailored means.  In any

11

event, whether this Court applies strict scrutiny or an approach more akin to *Heller* itself, there is no doubt that the flat bans at issue in this case are unconstitutional.

## **CONCLUSION**

For the foregoing reasons, Amicus respectfully submits that the Second Amendment challenge in this case should, can only, be reviewed pursuant to the framework followed in *Heller*, 128 S. Ct. 2783, or strict scrutiny.

Dated: October 1, 2010                                    Respectfully submitted,


Stephen Kolodziej                                        s/ Charles J. Cooper
Atty. ID # 6216375                                       Charles J. Cooper*
BRENNER FORD MONROE & SCOTT LTD.                         David H. Thompson*
33 N. Dearborn St., Suite 300                            Jesse Panuccio*
Chicago, IL  60602                                       COOPER & KIRK, PLLC
Tel: (312) 781-1970                                      1523 New Hampshire Ave., NW
Fax: (312)781-9202                                       Washington, D.C.  20036
Email: skolodziej@brennerlawfirm.com                     Tel: (202) 220-9600
                                                         Fax: (202) 220-9601
                                                         Email: ccooper@cooperkirk.com

                                                         *Motion for admission *pro hac vice*
                                                         forthcoming

                                                         *Counsel for Amicus Curiae*
                                                         *The National Rifle Association*

## <u>CERTIFICATE OF SERVICE</u>

I, Charles J. Cooper, hereby certify that on this 1st day of October, 2010, I caused

a copy of the foregoing to be served by electronic filing on:

<u>Counsel for Plaintiffs</u>

Alan Gura                          David G. Sigale
GURA & POSSESSKY, PLLC             LAW FIRM OF DAVID G. SIGALE
101 N. Columbus St.                Corporate West I
Suite 405                          4300 Commerce Court, Suite 300-3
Alexandria, VA  22314              Lisle, IL  60532
(703) 835-9085                     (630) 452-4547
Email: alan@gurapossessky.com      dsigale@sigalelaw.com

<u>Counsel for Defendant</u>

Michael A. Forti
Andrew W. Worseck
Mardell Nereim
Rebecca Alfert Hirsch
William Macy Aguiar
CITY OF CHICAGO, DEPARTMENT OF LAW
Constitutional and Commercial Litigation Division
30 N. LaSalle St., Suite 1230
Chicago, IL  60602
(312) 744-9010
mforti@cityofchicago.org
aworseck@cityofchicago.org
mnereim@cityofchicago.org
rebecca.alfert@cityofchicago.org
waguiar@cityofchicago.org

s/ Charles J. Cooper
Charles J. Cooper

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.0.3
### Eastern Division

Center for Individual Freedom

                        Plaintiff,

v.                                       Case No.: 1:10–cv–04383

                                       Honorable William T. Hart

Lisa M. Madigan, et al.

                        Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, August 20, 2010:

      MINUTE entry before Honorable William T. Hart: Illinois Campaign for Political Reform motion for leave to file a brief amicus curiae in support of the challenged disclosure provisions of the Illinois Election Code and the defendants charged with enforcing them is granted.No court appearance required on 8/26/2010.Mailed notice(slb, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# EXHIBIT C

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert M. Dow, Jr. | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 1601 | **DATE** | 6/1/2010 |
| **CASE TITLE** | Anheuser-Busch, Inc., et al. vs. Schnorf, et al. | | |

**DOCKET ENTRY TEXT**

Before the Court are (1) Proposed Intervenor-Defendant the Wine & Spirits Distributors Association's ("WSDI") motion to intervene [39], (2) Proposed Intervenor-Defendant WSDI's motion for leave to file instanter its opposition to Plaintiffs' motion for summary judgment [76], and (3) the motion of the Associated Beer Distributors of Illinois ("ABDI") for leave to file instanter its *amicus curiae* brief [81]. For the reasons stated below, the WSDI's motion to intervene [39] is respectfully denied without prejudice; however, the WSDI's motion for leave to file instanter its opposition to Plaintiffs' motion for summary judgment [76] is granted in part and the WSDI is given leave to file its opposition brief [76, Ex. 1] as an *amicus* brief. The ABDI's motion [81] is granted. Plaintiff is given until 6/8/10 to file responses to the *amicus* briefs, and this case remains set for oral argument on 6/16/10 at 10:00 a.m.

■[ For further details see text below.]                                               Docketing to mail notices.

---

## STATEMENT

### I.     Background

Plaintiffs filed a lawsuit on March 10, 2010 challenging the Illinois Liquor Control Commission's construction of the Illinois Liquor Control Act of 1934 on several federal constitutional grounds. The lawsuit was spurred by Plaintiffs' contention that the Commission's action unlawfully blocked a "significant and important business transaction" – namely, the acquisition by Anheuser Busch, Inc. (an out-of-state brewer of beer) of City Beverages (an in-state distributor of beer). Most immediately, Plaintiffs seek a declaration that the Commission's construction violates the Commerce Clause. The Court has granted Plaintiffs' request for expedited briefing on that claim – a request that the State Defendants, represented by the Illinois Attorney General, did not oppose – and has set the matter for oral argument on June 16.

In addition to the original parties, two additional parties have filed motions seeking to participate in the lawsuit. The Wine & Spirits Distributors Association ("WSDI") contends that it should be given leave to intervene, both as of right and permissively in the exercise of the Court's discretion. The Associated Beer Distributors of Illinois ("ABDI"), which like the WSDI is a trade association, requests that it be given leave to file an *amicus curiae* brief. The Attorney General does not oppose either motion; Plaintiffs oppose both. The Court took full briefing on the motion to intervene and heard oral argument from all interested parties on the motion for leave to file the *amicus* brief.

The WSDI is comprised of family-owned licensed distributors of alcoholic beverages, which handle the majority of all wine and spirits distributed in Illinois. It asserts an interest in this litigation on the basis of its

**STATEMENT**

contentions that (i) Plaintiffs' lawsuit challenges the three-tier distribution system of beer, wine, and spirits in Illinois and (ii) success in the lawsuit may have very serious negative consequences for the WSDI's members. In support of its motion, the WSDI contends that it would present arguments beyond those raised by the party Defendants and in fact already has set forth those arguments in writing, both in its intervention papers and in its proposed response to Plaintiffs' motion for summary judgment on their Commerce Clause claim.

The ABDI represents more than sixty licensed Illinois beer distributors. Like the WSDI, the ABDI contends that the interests of its members would be adversely affected by a successful challenge to Illinois' current three-tier regulatory system. The ABDI contends that its proposed *amicus* brief will assist the Court by providing a unique historical and policy perspective and by presenting alternative views on the merits and potential remedies in this case.

II.    **Analysis**

    A.    **Intervention as of Right**

Federal Rule of Civil Procedure 24(a)(2) establishes four requirements for intervention as of right:  (1) the applicant must seek to intervene in a timely manner; (2) the applicant must claim an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; (4) existing parties must not be adequate representatives of the applicant's interest. *Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941, 945-46 (7th Cir. 2000); *Wade v. Goldschmidt*, 673 F.2d 182, 185 (7th Cir. 1982). The Seventh Circuit has stressed that "[i]ntervention as of right will not be allowed unless all requirements of the Rule are met." *Sokaogon Chippewa Community*, 214 F.3d at 946. In addition, before intervention of right will be granted, the applicant "must have a stake in the litigation," which some courts have equated to standing in the Article III sense. *Id.* However, where it is clear that the application to intervene as of right founders on one or more of the Rule 24 requirements, the Seventh Circuit has indicated that there is no need to explore "what the outer boundaries of standing to intervene might be." *Id.*

In this instance, the Court need not resolve either the standing issue or whether the WSDI can satisfy all of the Rule 24 requirements, because "the requirement of proving inadequacy of representation by the existing parties" presents an insurmountable "stumbling block," at least at this stage of the litigation. *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 101 F.3d 503, 508 (7th Cir. 1996). As Judge Posner has written, that requirement "is taken seriously" because "[i]ncreasing the number of parties to a suit can make the suit unwieldy." *Id.* And here there are two presumptions in play concerning the adequacy of the current Defendants that undermine the case for allowing intervention. First, where the would-be intervenor and an existing party have the same ultimate objective, a presumption of adequacy of representation arises. See, *e.g.*, *American Nat'l Bank & Trust Co. v. City of Chicago*, 865 F.2d 144, 148 n.3 (7th Cir. 1989). In this case, at a minimum, the existing party Defendants and the proposed intervenor have the same ultimate objective of defeating Plaintiffs' challenge to the existing three-tier system of regulation. In addition, and perhaps even more significantly, there is a presumption of adequate representation where, as here, the party representative is a governmental body or officer charged by law with representing the interests of the proposed intervenor. See *id.* at 147-48; see also *Menominee Indian Tribe of Wisc. v. Thompson*, 164 F.R.D. 672, 676 (W.D. Wis. 1996). There is no suggestion that the State Defendants are not adequately defending this lawsuit, and it is well established that disagreements on tactics, including whether and in what manner to make certain legal arguments, is not a compelling justification for allowing intervention as of right. See *United States v. City of Los Angeles*, 288 F.3d 391, 402-03 (9th Cir. 2002) (denying intervention as of right where the differences

between the proposed intervenors and the party were "merely differences in strategy, which are not enough to justify intervention as a matter of right"); 7C Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 1909 (3d ed. 2007) ("A mere difference of opinion concerning the tactics with which the litigation should be handled does not make inadequate the representation of those whose interests are identical with that of an existing party or who are formally represented in the lawsuit").

In view of the foregoing discussion, at this stage of the case the Court can do no better than to quote language from a recent Seventh Circuit decision addressing a hypothetical scenario that fits our circumstances to a T: "[h]ad the association sought to intervene earlier, its motion would doubtless (and properly) have been denied on the ground that the state's attorney general was defending the statute and that adding another defendant would simply complicate the litigation." *Flying J, Inc. v. J.B. Van Hollen*, 578 F.3d 569, 572 (7th Cir. 2009) (holding that trade association was entitled to intervene as of right on appeal where state attorney general declined to appeal adverse district court judgment). The WSDI's motion to intervene as of right therefore is respectfully denied at this time without prejudice.

### B.  Permissive Intervention

In the alternative, the WSDI asks the Court to grant permissive intervention pursuant to Federal Rule of Civil Procedure 24(b). "The grant or denial of permissive intervention lies within the discretion of the district court (*Sokaogon Chippewa Community*, 214 F.3d at 949), which is to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b). The Court is persuaded that the rationale for denying intervention as of right set forth above – namely, that "the state's attorney general [is] defending the statute and that adding another defendant would simply complicate the litigation" (*Flying J*, 578 F.3d at 572) – applies equally to permissive intervention. See *Menominee Indian Tribe*, 164 F.R.D. at 678 ("When intervention of right is denied for the proposed intervenor's failure to overcome the presumption of adequate representation by the government, the case for permissive intervention disappears"). That conclusion is reinforced by the approach suggested in several previous cases (and adopted here, see below) that the Court allow the would-be intervenor who cannot make the cut under Rule 24 nevertheless to participate in the litigation as *amicus curiae*.

### C.  Amicus Status

As the Court stated at the hearing on the ABDI's motion for leave to file an *amicus* brief, the critical question in considering such a motion is whether the moving party is a friend of the Court or simply a friend of a party. Here, the Court is satisfied that both the WSDI and the ABDI fall sufficiently into the former category to allow both to participate in this litigation as *amicus curiae*. In regard to the WSDI specifically, the Court's research has revealed several cases in which proposed intervenors who cannot satisfy all of the Rule 24(a) factors and likewise fall short on permissive intervention under Rule 24(b) have been given the opportunity to make their views known to the Court (and to other parties) through the vehicle of an *amicus* brief. See, *e.g.*, *Maine v. Director, United States Fish & Wildlife Serv.*, 262 F.3d 13, 19 (1st Cir. 2001) (noting that "amicus-plus status" enabled proposed intervenor to present its legal arguments on the merits); *Menominee Indian Tribe*, 164 F.R.D. at 678 (allowing proposed intervenor to participate as amicus curiae); *United States v. Brooks*, 164 F.R.D. 501, 507 (D. Or. 1995) (same). And in regard to both trade associations, based on its review of the briefs in question – the WSDI's brief in opposition to summary judgment and the ABDI's *amicus* filing – the Court concludes that the *amici* raise issues worthy of the Court's attention as to which Plaintiffs should be given an opportunity to respond. Both association assert legal arguments, some of which are new and others of which add new twists on arguments that the parties already have raised. While the

**STATEMENT**

Court is sensitive to Plaintiffs' concerns about the additional burden of responding to the arguments of the *amici*, a number of the arguments (*e.g.*, jurisdiction, constitutional avoidance) raise points that the Court would be obliged at least to consider on its own, with or without the assistance of the parties' written and oral submissions. Given the importance of the issues raised in this litigation and the expedited track on which the first specific issue – the Commerce Clause challenge – is proceeding to decision, the Court finds on balance that participation by the *amici* and additional briefing by Plaintiffs will be helpful to the Court. Accordingly, the WSDI's motion for leave to file a brief in opposition to Plaintiffs' motion for summary judgment [76] will be granted in part, and the WSDI's opposition brief [76, Ex. A] will be accepted as an *amicus* brief. In addition, the ABDI's motion for leave to file its *amicus* brief instanter [81] is granted. Plaintiff is given until 6/8/10 to file responses to both *amicus* briefs, and this case remains set for oral argument on 6/16/10 at 10:00 a.m.

Finally, the Court adds a caveat: if at a later stage of the litigation – indeed, even after a decision is rendered (see *Flying J*, 578 F.3d at 572-73) – it becomes evident that the Attorney General is not adequately representing the interests of the parties who seek to uphold the existing scheme against Plaintiffs' challenges to it, then this Court may revisit the matter of intervention. See, *e.g.*, *Maine*, 262 F.3d at 21. But for now, there will be no additional parties and two new *amici*.

**III.     Conclusion**

For the reasons stated above, the WSDI's motion to intervene [39] is respectfully denied without prejudice; however, the WSDI's motion for leave to file instanter its opposition to Plaintiffs' motion for summary judgment [76] is granted in part and the WSDI is given leave to file its opposition brief [76, Ex. 1] as an *amicus* brief. The ABDI's motion for leave to file an *amicus* brief instanter [81] is granted. Plaintiff is given until 6/8/10 to file responses to the *amicus* briefs, and this case remains set for oral argument on 6/16/10 at 10:00 a.m.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RHONDA EZELL, et al,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**L.R. 3.2 Notification of Affiliates**

Pursuant to Local Rule 3.2 of the United States District Court for the Northern District of Illinois, Amicus Curiae National Rifle Association, a nonprofit corporation, hereby states that it has no publicly held affiliates.

Dated: October 1, 2010                    Respectfully submitted,


| | |
|---|---|
| Stephen Kolodziej | s/ Charles J. Cooper |
| Atty. ID # 6216375 | Charles J. Cooper* |
| BRENNER FORD MONROE & | David H. Thompson* |
| SCOTT LTD. | Jesse Panuccio* |
| 33 N. Dearborn St., Suite 300 | COOPER & KIRK, PLLC |
| Chicago, IL  60602 | 1523 New Hampshire Ave., NW |
| Tel: (312) 781-1970 | Washington, D.C.  20036 |
| Fax: (312)781-9202 | Tel: (202) 220-9600 |
| Email: | Fax: (202) 220-9601 |
| skolodziej@brennerlawfirm.com | Email: ccooper@cooperkirk.com |

*Motion for admission *pro hac vice* forthcoming

*Counsel for Amicus Curiae*
*The National Rifle Association*

## United States District Court  Northern District of Illinois
## MOTION FOR LEAVE TO APPEAR PRO HAC VICE

| Case Title: | Plantiff(s) |
|---|---|
| VS. | |
| | Defendant(s) |

| Case Number: | Judge: |
|---|---|

I, _____ hereby apply to the Court

under Local Rule 83.14 for permission to appear and participate in the above-entitled action on behalf of

_____ by whom I have been retained.

I am a member in good standing and eligible to practice before the following courts:

| Title of Court | Date Admitted |
|---|---|
| | |
| | |
| | |
| | |

I have currently, or within the year preceding the date of this application, made pro hac vice applications to this Court in the following actions:

| Case Number | Case Title | Date of Application (Granted or Denied)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

*If denied, please explain:
(Attach additional form if necessary)

Pursuant to Local Rule 83.15(a), applicants who do not have an office within the Northern District of Illinois must designate, at the time of filing their initial notice or pleading, a member of the bar of this Court having an office within this District upon who service of papers may be made.

**Has the applicant designated local counsel?**   **Yes** ◯          **No** ◯

If you have not designated local counsel, Local Rule 83.15(b) provides that the designation must be made within thirty (30) days.

Has the applicant ever been:

**censured, suspended, disbarred, or witherwise disciplined by any court?**    Yes ○    No ○

**or is the applicant currently the subject of an investigation of the applicant's professional conduct?**    Yes ○    No ○

**transferred to inactive status, voluntarily withdrawn, or resigned from the bar of nay court?**    Yes ○    No ○

**denied admission to the bar of any court?**    Yes ○    No ○

**held in contempt of court?**    Yes ○    No ○

NOTE: If the answer to *any* of the above questions is yes, please attach a brief description of the incident(s) and the applicant's current status before any court, or any agency thereof, where disciplinary sanctions were imposed, or where an investigation or investigations of the applicant's conduct may have been instituted.

I have read the Rules of Professional Conduct for the Northern District of Illinois, effective November 12, 1991 (Local Rules 83.50 through 83.58), and the Standards for Professional Conduct within the Seventh Federal Judicial Circuit, effective December 15, 1992, and will faithfully adhere to them.  I declare under penalty of perjury that the foregoing is true and correct.

S/

| Date | | Electronic Signature of Applicant | |
|---|---|---|---|

| Applicant's Name | Last Name | First Name | Middle Name/Initial |
|---|---|---|---|
| Applicant's Law Firm | | | |
| Applicant's Address | Street Address | | Room/Suite Number |
| | City | State | ZIP Code | Work Phone Number |

**(The pro hac vice admission fee is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date, and shall be paid to the Clerk.  No admission under Rule 83.14 is effective until such time as the fee has been paid.)**

**NOTE:**  Attorneys seeking to appear pro hac vice may wish to consider filing a petition for admission to the general bar of the Court.  The fee for admission to the General Bar is $150.00  The fee for pro hac vice admission is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date.  Admission to the general bar permits an attorney to practice before this Court.  Pro hac vice admission entitles an attorney to appear in a particular case only.  Application for such admission must be made in each case; and the admission fee must be paid in each case.

(Revised 06/08)

# United States District Court  Northern District of Illinois
## MOTION FOR LEAVE TO APPEAR PRO HAC VICE

| | |
|---|---|
| Case Title: Rhonda Ezell et al. | Plantiff(s) |
| VS. | |
| City of Chicago | Defendant(s) |

| | |
|---|---|
| Case Number:  10-cv-5135 | Judge:  Virginia M. Kendall |

I, _____David H. Thompson_____ hereby apply to the Court

under Local Rule 83.14 for permission to appear and participate in the above-entitled action on behalf of

_____Amicus Curiae National Rifle Association_____ by whom I have been retained.

I am a member in good standing and eligible to practice before the following courts:

| Title of Court | Date Admitted |
|---|---|
| United States Supreme Court | 11/16/98 |
| United States Court of Appeals for the Second Circuit | 2/5/98 |
| United States Court of Appeals for the Third Circuit | 2/3/04 |
| United States Court of Appeals for the Fourth Circuit | 9/25/02 |

I have currently, or within the year preceding the date of this application, made pro hac vice applications to this Court in the following actions:

| Case Number | Case Title | Date of Application (Granted or Denied)* |
|---|---|---|
| 10-4184 | Brett Benson et al. vs. City of Chicago et al. | 7/6/10 |
| | | |
| | | |
| | | |

*If denied, please explain:
(Attach additional form if necessary)

Pursuant to Local Rule 83.15(a), applicants who do not have an office within the Northern District of Illinois must designate, at the time of filing their initial notice or pleading, a member of the bar of this Court having an office within this District upon who service of papers may be made.

**Has the applicant designated local counsel?   Yes ⦿          No ○**

If you have not designated local counsel, Local Rule 83.15(b) provides that the designation must be made within thirty (30) days.

Has the applicant ever been:

**censured, suspended, disbarred, or witherwise disciplined by any court?**    Yes ◯    No ⊙

**or is the applicant currently the subject of an investigation of the applicant's professional conduct?**    Yes ◯    No ⊙

**transferred to inactive status, voluntarily withdrawn, or resigned from the bar of nay court?**    Yes ◯    No ⊙

**denied admission to the bar of any court?**    Yes ◯    No ⊙

**held in contempt of court?**    Yes ◯    No ⊙

NOTE: If the answer to *any* of the above questions is yes, please attach a brief description of the incident(s) and the applicant's current status before any court, or any agency thereof, where disciplinary sanctions were imposed, or where an investigation or investigations of the applicant's conduct may have been instituted.

I have read the Rules of Professional Conduct for the Northern District of Illinois, effective November 12, 1991 (Local Rules 83.50 through 83.58), and the Standards for Professional Conduct within the Seventh Federal Judicial Circuit, effective December 15, 1992, and will faithfully adhere to them.  I declare under penalty of perjury that the foregoing is true and correct.

| October 1, 2010 | S/  David H. Thompson |
|---|---|
| Date | Electronic Signature of Applicant |

| Applicant's Name | Last Name<br><br>Thompson | | First Name<br><br>David | Middle Name/Initial<br><br>H. |
|---|---|---|---|---|
| Applicant's Law Firm | Cooper & Kirk, PLLC | | | |
| Applicant's Address | Street Address<br><br>1523 New Hampshire Ave, NW | | | Room/Suite Number |
| | City<br><br>Washington | State<br><br>DC | ZIP Code<br><br>20036 | Work Phone Number<br><br>202-220-9600 |

**(The pro hac vice admission fee is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date, and shall be paid to the Clerk.  No admission under Rule 83.14 is effective until such time as the fee has been paid.)**

**NOTE:**   Attorneys seeking to appear pro hac vice may wish to consider filing a petition for admission to the general bar of the Court.  The fee for admission to the General Bar is $150.00  The fee for pro hac vice admission is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date.  Admission to the general bar permits an attorney to practice before this Court.  Pro hac vice admission entitles an attorney to appear in a particular case only.  Application for such admission must be made in each case; and the admission fee must be paid in each case.

(Revised 06/08)

# United States District Court  Northern District of Illinois
# MOTION FOR LEAVE TO APPEAR PRO HAC VICE

| | |
|---|---|
| Case Title: Rhonda Ezell et al. | Plantiff(s) |
| VS. | |
| City of Chicago | Defendant(s) |

| | |
|---|---|
| Case Number:  10-cv-5135 | Judge:  Virginia M. Kendall |

I, _____ Jesse M. Panuccio _____ hereby apply to the Court

under Local Rule 83.14 for permission to appear and participate in the above-entitled action on behalf of

_____ Amicus Curiae National Rifle Association _____ by whom I have been retained.

I am a member in good standing and eligible to practice before the following courts:

| Title of Court | Date Admitted |
|---|---|
| District of Columbia | 6/16/08 |
| Florida | 10/20/06 |
| United States Supreme Court | 4/19/10 |
| United States Court of Appeals for the Tenth Circuit | 11/14/06 |

I have currently, or within the year preceding the date of this application, made pro hac vice applications to this Court in the following actions:

| Case Number | Case Title | Date of Application (Granted or Denied)* |
|---|---|---|
| 10-4184 | Brett Benson et al. v. City of Chicago et al. | 7/6/10 |
| | | |
| | | |
| | | |

*If denied, please explain:
(Attach additional form if necessary)

Pursuant to Local Rule 83.15(a), applicants who do not have an office within the Northern District of Illinois must designate, at the time of filing their initial notice or pleading, a member of the bar of this Court having an office within this District upon who service of papers may be made.

**Has the applicant designated local counsel?     Yes ⦿          No ◯**

If you have not designated local counsel, Local Rule 83.15(b) provides that the designation must be made within thirty (30) days.

Has the applicant ever been:

**censured, suspended, disbarred, or witherwise disciplined by any court?**      **Yes** ○     **No** ◉

**or is the applicant currently the subject of an investigation of the applicant's professional conduct?**      **Yes** ○     **No** ◉

**transferred to inactive status, voluntarily withdrawn, or resigned from the bar of nay court?**      **Yes** ○     **No** ◉

**denied admission to the bar of any court?**      **Yes** ○     **No** ◉

**held in contempt of court?**      **Yes** ○     **No** ◉

NOTE: If the answer to *any* of the above questions is yes, please attach a brief description of the incident(s) and the applicant's current status before any court, or any agency thereof, where disciplinary sanctions were imposed, or where an investigation or investigations of the applicant's conduct may have been instituted.

I have read the Rules of Professional Conduct for the Northern District of Illinois, effective November 12, 1991 (Local Rules 83.50 through 83.58), and the Standards for Professional Conduct within the Seventh Federal Judicial Circuit, effective December 15, 1992, and will faithfully adhere to them. I declare under penalty of perjury that the foregoing is true and correct.

| October 1, 2010 | S/   Jesse M. Panuccio |
|---|---|
| Date | Electronic Signature of Applicant |

| Applicant's Name | Last Name<br>Panuccio | First Name<br>Jesse | Middle Name/Initial<br>M. |
|---|---|---|---|
| Applicant's Law Firm | Cooper and Kirk, PLLC | | |

| Applicant's Address | Street Address<br>1523 New Hampshire Ave, NW | | Room/Suite Number |
|---|---|---|---|
| | City<br>Washington | State<br>DC | ZIP Code<br>20036    Work Phone Number<br>202-220-9600 |

**(The pro hac vice admission fee is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date, and shall be paid to the Clerk. No admission under Rule 83.14 is effective until such time as the fee has been paid.)**

**NOTE:** Attorneys seeking to appear pro hac vice may wish to consider filing a petition for admission to the general bar of the Court. The fee for admission to the General Bar is $150.00  The fee for pro hac vice admission is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date. Admission to the general bar permits an attorney to practice before this Court. Pro hac vice admission entitles an attorney to appear in a particular case only. Application for such admission must be made in each case; and the admission fee must be paid in each case.

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1
### Eastern Division

Rhonda Ezell, et al.

                    Plaintiff,

v.                                     Case No.: 1:10–cv–05135

                                     Honorable Virginia M. Kendall

City Of Chicago

                    Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, October 1, 2010:

      MINUTE entry before Honorable Virginia M. Kendall:Preliminary Injunction hearing held on 10/1/2010 and continued to 10/4/2010 at 09:30 AM.Advised in open court notice(tsa, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1**
**Eastern Division**

Rhonda Ezell, et al.

                          Plaintiff,

v.                                     Case No.: 1:10–cv–05135
                                     Honorable Virginia M. Kendall

City Of Chicago

                          Defendant.

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, October 4, 2010:

      MINUTE entry before Honorable Virginia M. Kendall:Preliminary Injunction hearing held on 10/4/2010. The Court will rule by mail.Advised in open court notice(tsa, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EZELL, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendant City of Chicago (the "City"), by its attorney, Mara S. Georges, Corporation

Counsel for the City of Chicago, and pursuant to Fed. R. Civ. P. 12(b)(6), hereby moves to dismiss

Plaintiffs' Complaint on the grounds set forth below.[1]

**Background**

1.      On August 16, 2010, Plaintiffs filed their Complaint in this action, alleging that the

City's Responsible Gun Owners Ordinance (the "Ordinance") violates their constitutional rights by

prohibiting shooting ranges and/or firearm training within the City.

2.      Six Plaintiffs have brought this action.  Three of the Plaintiffs – Rhonda Ezell

("Ezell"), Joseph Brown ("Brown"), and William Hespen ("Hespen") – are individuals residing in

the City of Chicago. *See* Compl., ¶¶ 1,2,3.  Plaintiffs allege that they would frequent gun ranges in

the City, for purposes of both completing the one-hour training requirement under the Ordinance and

for recreational shooting, if such ranges existed.  *Id*. at ¶¶ 28, 30-33.

3.      The other three Plaintiffs are organizations: (1) Action Target, Inc. ("Action Target"),

---

[1] The City intends to file a memorandum in support of this motion after the Court enters a
briefing schedule.

a Utah company engaged in the design and construction of gun ranges; (2) Second Amendment Foundation, Inc. ("SAF"), a Washington state non-profit group whose purposes include education, research, publishing and legal action focusing on the constitutional right to privately own and possess firearms; and (3) Illinois State Rifle Association ("ISRA"), an Illinois non-profit group whose purposes include securing the constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation.  *Id*. at ¶¶ 4, 5, 6.  Both SAF and ISRA have brought this action on behalf of themselves and their individual members.  *Id*. at ¶¶ 5, 6.

4.      Plaintiffs assert two counts in their Complaint.  First, in Count I, Plaintiffs allege that the City's ban on the operation of gun ranges within the City violates their Second Amendment right to keep and bear arms. *Id*. at ¶ 47.  In Count II, Plaintiffs allege that the City's ban on gun ranges violates their First Amendment right to free speech.  *Id*. at ¶ 50.  Plaintiffs' claims fail for the reasons set forth below.

### Plaintiffs' Claims Fail As A Matter of Law

**A.      Plaintiffs Have Failed to State a First Amendment Claim.**

5.      Plaintiffs allege that, "by banning gun ranges open to the public, and by effectively banning the loan, rental, and borrowing of functional firearms at ranges open to the public," the City is violating their First Amendment rights to free speech.  Compl., ¶ 49.

6.      The only activities prohibited by the range ban is the operation of or shooting of guns at a gun range.  Those activities are not encompassed by the First Amendment.

7.      No court has ever held that firing a gun or using a shooting range is conduct protected by the First Amendment.  And, in *Northern Indiana Gun & Outdoor Shows, Inc*., 104 F. Supp.2d 1009, 1013-14 (N.D. Ind. 2000), the court held that bringing guns to a gun show to show them off,

2

have them repaired, or sell them did not convey a particular message or contain an expressive

component, and thus fell outside the scope of the First Amendment.  Therefore, the First Amendment

claim should be dismissed as a matter of law as against all Plaintiffs.

**B.      The Organizational Plaintiffs Cannot State Any Second Amendment Violation.**

8.      Plaintiffs Action Target, SAF, and ISRA do not possess any right protected by the

Second Amendment, and thus cannot state any cognizable Second Amendment claim.

9.      The only right under the Second Amendment recognized by the Supreme Court is an

*individual* right to keep and bear arms for purposes of self-defense.  *See District of Columbia v.*

*Heller*, 128 S. Ct. 2783, 2799 (2008); *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010)

(plurality opinion).  Organizations do not possess the rights of individuals.

10.      Accordingly, the Second Amendment claims brought by Action Target, SAF, and

ISRA should be dismissed as a matter of law.

**C.      Plaintiffs' Claim that the Second Amendment Protects the Right to Shoot Guns at a
          Range Fails as a Matter of Law.**

11.      Plaintiffs allege that the Ordinance violates their Second Amendment rights because

the Second Amendment "secures the right to operate firearms at a range, for purposes of learning

about firearms, gaining proficiency with firearms, obtaining any training required as a condition of

firearms ownership, recreation, and competition; and the right to own an operate a range for these

purposes." Compl., ¶ 45.

12.      Plaintiffs have failed to state a claim that the Ordinance's prohibition on shooting

ranges violates their Second Amendment rights because there is no Second Amendment right to

operate or shoot at a gun range.

3

13.     The only right recognized under the Second Amendment is the right to possess handguns in the home for purposes of self-defense. *Heller*, 128 S. Ct. at 2799; *McDonald,* 130 S. Ct. at 3050 (2010) (plurality opinion). *See also United States v. Skoien*, --- F.3d --- , 2010 WL 2735747, at *1 (7th Cir. July 13, 2010) (*en banc*) (*Heller* recognized right to "keep[] operable handguns at home for self-defense").

14.     *Heller* warned readers "not to treat [it] as containing broader holdings than the Court set out to establish." *Skoien*, 2010 WL 2735747, at *1 (quoting *Heller,* 128 S. Ct. at 2816-17 & n.26 (cautioning that opinion should not be read to "cast doubt" on various "presumptively lawful" restrictions on arms use)).

15.     Nothing in the analysis of the *Heller* Court, whose task it was to discern the "original understanding" of the Second Amendment at the time of its ratification in 1791, *Heller*, 128 S. Ct. at 2816, suggests or indicates that the Second Amendment encompasses operating or shooting at gun ranges.

16.     Moreover, although the Ordinance requires training as a condition to gun ownership, that requirement does not bring the operation of or shooting at gun ranges within the scope of the Second Amendment.  Municipal ordinances cannot alter the meaning and scope of the United States Constitution.

17.     Accordingly, there is no cognizable right under the Second Amendment to operate or shoot at a gun range, and Plaintiffs' claim based on this theory should be dismissed.

18.     The City intends to file a memorandum in support of this motion, which it is in the process of preparing.  Therefore, the City requests that the Court enter a briefing schedule on this motion.

WHEREFORE, for the above reasons, Defendant City of Chicago respectfully requests that

the Court dismiss Plaintiffs' Complaint on the grounds set forth above and enter a briefing schedule.


Date: October 8, 2010                          Respectfully submitted,

                                               MARA S. GEORGES,
                                               Corporation Counsel for the City of Chicago

                                               By:      /s/ Rebecca Alfert Hirsch
                                               Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RHONDA EZELL, JOSEPH I. BROWN, WILLIAM HESPEN, ACTION TARGET, INC., SECOND AMENDMENT FOUNDATION, INC., AND ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) ) ) ) ) | Case No. 10 C 5135 Judge Virginia M. Kendall |
| Plaintiffs, v. CITY OF CHICAGO, Defendant. | ) ) ) ) ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

Prior to the Supreme Court's decision in *District of Columbia v. Heller*, 128 S.Ct. 2783, (2008), the City of Chicago ("City") enforced a complete ban on the possession and use of handguns within its borders.  In  *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court extended its holding in *Heller* to the states and the City was required to draft a new ordinance that would comply with the holding that an individual's Second Amendment right to possess a handgun in the home for self-defense was now applicable to the states.  In response, the Chicago City Council determined that it would pass an ordinance that "provides for the reasonable regulation of firearms in compliance with the rulings of the Supreme Court, but still is effective in protecting the public from the potential deadly consequences of gun violence in our city."  (Prelim. Inj. Hr'g, Def. Exh. 1, Chicago Responsible Gun Ownership Ordinance.)  Possession of firearms within the City is now allowed pursuant to the requirement that residents obtain a Chicago Firearms Permit ("CFP").  *See* Chi. Mun. Code § 8-20-110(a).  The permit requires that each resident obtain an affidavit signed by

a firearms instructor showing that the applicant has completed a firearm training and safety course which includes four hours of classroom instruction and one hour of firing range training.

The problem for Plaintiffs is that the same ordinance prohibits the operation of any firing ranges within the City's borders.  *See* Chi. Mun. Code § 8-20-280.  Three individual residents, Rhonda Ezell, Joseph I. Brown, William Hespen, the Second Amendment Foundation,  the Illinois State Rifle Association, and a company in the business of designing and building firing ranges, Action Target, Inc., filed suit alleging that their Constitutional rights were violated by requiring them to travel outside of the City's borders to obtain the one-hour of firing range training.

Six days after filing their Complaint, Plaintiffs moved for a temporary restraining order seeking to enjoin the City from enforcing the ordinance.  Plaintiffs claim that their Second Amendment rights have been violated due to the firing range ban because they now must travel outside of the City limits in order to obtain their one-hour of range training in order to obtain their CFP and possess a firearm.  They assert that the Second Amendment is violated by the City's ordinance in that it has linked possession with the firing range training, and as a result, by banning firing ranges within its borders, the City is, in effect, prohibiting their possession of firearms.  They brought an emergency TRO on the theory that an amnesty provision within the ordinance expires today, October 12, 2010,  and that they (both the individual plaintiffs and the organizations that represent other firearm owners) would not be able to complete the range training prior to that time. The amnesty provision within the ordinance applies to all residents who already possess firearms. *See* Chi. Mun. Code § 8-20-140(d)(2).  Those individuals must also obtain a CFP for the firearms in their possession by that date in order to continue to possess them.  Residents were notified of this requirement publicly on July 7, 2010.  Plaintiffs conjecture that approximately several thousand

individuals possess firearms in the City and that the deadline therefore could not be met by all residents because no firing ranges exist within the City's borders. Plaintiffs seek to bring a mobile firing range into the City in order to aid its residents in meeting this amnesty deadline. Without this help, according to Plaintiffs, many residents will not be able to obtain their permits.

At that first TRO hearing, this Court held that the parties had not established irreparable harm and denied the motion. Plaintiffs at that time had failed to demonstrate that the individual defendants could not travel outside of the City to obtain range training within the remaining seven week period leading up to the amnesty deadline. The Court, however, provided the parties a period of time for expedited discovery, followed by a full briefing schedule on the preliminary injunction motion, and set a preliminary injunction hearing prior to the ordinance's deadline. The parties embarked on their discovery, returning occasionally to court to hammer out their discovery disputes.

Approximately three weeks after their first emergency TRO motion, Plaintiffs filed a second motion for a temporary restraining order on September 13, 2010, this time alleging that changed circumstances existed which required them to return to the Court seeking emergency relief prior to the Court's scheduled preliminary hearing. Specifically, Plaintiffs claimed that they now had a contract in place to bring in a mobile firing range and they had obtained a location on the south side of the City where the range could be placed in order for residents to obtain training at that location. This Court denied the second motion for TRO again for failure to meet the burden of irreparable harm and for failure to demonstrate that there was no adequate remedy at law. The Court informed Plaintiffs that the existence of a remedy for the alleged violation (the ability to bring in the mobile range) did not relieve them of the requirement to show that they were being irreparably harmed by the City's ordinance which required them to travel outside of the City to obtain the firing range

3

training.  The parties then completed their expedited discovery and their briefing on the preliminary

injunction and the Court held a hearing over a two-day period where both sides were permitted to

present factual evidence and to argue the law.

Now after the benefit of full briefing, an amicus brief filed by the National Rifle Association,

and two days of witness testimony, this Court concludes that Plaintiffs have failed to meet their

burden in establishing that they have suffered an irreparable injury and that they have no adequate

remedy at law.  Plaintiffs' preliminary injunction motion is therefore denied for the following

reasons.

## I.  Summary of Testimony

The Court allowed the parties to conduct expedited discovery in order to present support for

the preliminary injunction within the time-frame permitted that would allow the Court to analyze the

issues prior to the amnesty period expiring.  After this expedited discovery period and after full

briefing on the preliminary injunction, the Court held a hearing at which time the parties presented

witness testimony and argument over a two-day period.  Plaintiffs called three witnesses: Christopher

Hart, a firing range consultant; Julianne Versnell, the Director of Operations for the Second

Amendment Foundation; and Richard Pearson, the Executive Director of the Illinois State Rifle

Association.  None of the individual plaintiffs was called as a witness.  In response, the City called

two witnesses: Pattie Scudiero, Commissioner of the Chicago Department of Zoning and Land Use

Planning; and Sgt. Dan Bartoli the former Range Master for the Chicago Police Department.

### A.  Christopher Hart

Christopher Hart is the Midwest Range Consultant for Action Target, Inc.  Action Target

builds and services firing ranges for law enforcement and public use, though the vast majority of

4

their business is for law enforcement agencies.  Within Chicago, Action Target manages the U.S. Postal Service range, Federal Reserve range, and the Customs and Border Protection range.  Action Target has also proposed retrofits for the Federal Air Marshall's range near O'Hare airport.  The Postal Service range is near a hotel and a playground.  The Federal Reserve range is located on the seventeenth floor in downtown Chicago, among office buildings.  Action Target did not build or choose the location of any of the Chicago ranges, they merely retrofit them or have proposed to retrofit them.  Action Target also manages Mega Sports, Inc. in Plainfield, a suburb of Chicago.  Mr. Hart believes there is a market for public ranges in Chicago, but he has not had conversations with potential investors since July, when he spoke to them about joining the instant lawsuit.

Mobile ranges use equipment similar to those used in outdoor ranges.  The additional factors that Hart would consider for a mobile range include sound control and parking.  Hart knows of mobile ranges used at the ILEDA Conference where a mobile range is parked in a hotel parking lot and is used by law enforcement officers all day without complaints.  In addition, Arms to Bear uses a mobile range in Nevada that is open to both law enforcement and the general public.  However, Hart is only aware of three ranges in the United States that are open to both law enforcement and the general public.  Hart estimates it costs $30,000 - $50,000 to construct a shooting range lane, plus an additional $15,000 - $30,000 per lane for ventilation.  It takes nine to twelve months to construct a permanent range.  Action Target does not monitor accidents at ranges.

### B. Julianne Versnell

Julianne Versnell is the Director of Operations of the Second Amendment Foundation ("SAF"), a non-profit based in the state of Washington.  SAF has 650,000 members in the United States, 1700 of whom reside in Chicago.  SAF coordinated with the other plaintiffs in this case to

secure two locations and contract with them regarding the placement of a mobile range.  Versnell

spoke with Rich Pearson of the Illinois State Rifle Association ("ISRA") about potential safety

issues.  ISRA will be responsible for managing the proposed Chicago mobile range, which will be

in a truck provided by Blue Line.  Firearms will be provided at the range; customers will not be

allowed to bring their own guns.  There will also be security guards on site.

Versnell does not have first-hand knowledge of the mobile range she is contracting to bring

to Chicago, she is relying entirely on what Blue Line's President Jerry Tilbor says.  Her contract is

for one week beginning October 6, 2010 although she has the ability to contract for other weeks.

Versnell also does not know if ISRA has ever operated a mobile range.  Versnell has not been

personally to examine either of the properties she has contracted with, but she did speak to one of

the property owners and a real estate agent about placing a mobile range there. Versnell likened this

process to a "learning experience" and she does not know which property she would use if the Court

granted the preliminary injunction.

### C.  Richard Pearson

Richard Pearson is the Executive Director of the Illinois State Rifle Association.  ISRA owns

a shooting range sixty miles away in Bonfield, IL where it trains members of the public and educates

them about gun safety.  It does not have any experience operating a mobile range and Pearson had

not spoken to anyone with experience operating a mobile range prior to October 1, 2010, nor has

Pearson spoken to anyone from the City of Chicago about operating a mobile range.  Pearson has

spoken to four range instructors and will work with them and ISRA to develop the teaching element

of gun training for the mobile range.  Pearson will develop and write a safety protocol for the mobile

range after the truck arrives, and he expects it will take him fifteen minutes to adjust his safety

protocol from a permanent outdoor range to a mobile range.

      The only weapons to be used at the proposed Chicago mobile range will be one revolver and one semi-automatic pistol, provided by ISRA. The guns will not be stored overnight at the range. The mobile range will be by appointment only. Each training session is expected to last one hour and five minutes per person, and no previous classroom experience will be required. Pearson is not aware of the location of the closest hospital to the mobile range site, or if toilets and hand-washing facilities will be available or allowed on site. Pearson admits that if hand-washing facilities are not allowed on-site, he would be forced to look for a new location to place the mobile range.

      D. Pattie Scudiero

      Pattie Scudiero is the Commissioner of the Chicago Department of Zoning and Land Use Planning, a position she has held since 2008. She has been a Zoning Administrator since 2006. Every property in Chicago is zoned for something. When new uses for properties arise that were not in the original zoning ordinance, her office assesses the new uses and then recommends an assessment to the city council. Though she has never been to a gun range, Scudiero believes they would fall within the intensive use category because they could pose a threat to the health, safety, and welfare of residents. Therefore, the ranges, if allowed in Chicago, would be zoned for the manufacturing districts. Manufacturing districts typically contain businesses utilizing incinerators, or involved in rock-crushing, adult uses, catering, or other types of light industry. Scudiero believes gun ranges would also have to apply for a special use permit with the Chicago Zoning Board of Appeals. Special use permits require that neighbors get notice and a public hearing before the permit is issued. Scudiero does not think the 6300 S. Bell site is appropriate for a mobile range.

      Scudiero's office does not control any of the federal firing ranges located in Chicago. She

does not see any harm in allowing the Chicago Police Department ("CPD") to operate firing ranges in the city because they do not allow public access.  Scudiero did not participate in drafting the Chicago Firearms Ordinance 8-20-280.  She also has no personal knowledge regarding the noise or pollution that emanate from a firing range.  She has not heard of any complaints from residents about the CPD firing ranges.

### E.  Sgt. Dan Bartoli

Dan Bartoli has been with the CPD since 1995.  Until two weeks ago, he was the Range Master for the CPD, and in this capacity he supervised all firearms training within the CPD and its approximately 13,500 members.  The CPD has six ranges in Chicago, and they are limited to CPD or military use and do not allow public access.  They are also all permanent ranges, with 24/7 security from sworn officers.

Bartoli sees mobile ranges as a threat to public safety because they are in the open and raise issues concerning human traffic management.  Bartoli advised anyone seeking to open and operate a mobile range that they should use opaque permanent fencing, have only one entrance, a secure parking lot, a separate area for loading and unloading of weapons, and a separate area for live fire. Bartoli also counseled that people do not follow directions at ranges, and even CPD officers will violate the rules and bring their own guns to the range.  Bartoli sees this as being a problem for a mobile range, with armed customers wanting advice on how to use their particular gun even if ISRA is providing weapons to use during live fire.  He also sees customers bringing their own guns to the range as a safety risk to themselves, as they will be more prone to crime and theft in the parking lot.

Bartoli noted that all of his permanent ranges had washrooms with lucrative amounts of cold running water and soap.  He estimates it takes him two to three days to set up a brand new facility

8

and its standard operating procedure.  Bartoli thinks the Accurate Perforating site is problematic because of the many other businesses on site, and that the 6300 S. Bell property is problematic because of the single-family residents who live nearby and the train cars on the lot.

Bartoli agrees that training can help prevent accidents and can make you safer.  The CPD has a total of forty-five firing lanes at its five ranges and its Academy in Chicago.  The CPD is looking to expand this number because it is having difficulty training one-third of the CPD force (approximately 13, 500 officers) each year on so few lanes.  Bartoli does not believe the CPD ranges have a negative effect on the neighborhoods they are in.

## II.  Standard of Review

Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865 (1997) (emphasis in original).  In the Seventh Circuit, a court must consider the following factors in deciding whether to grant a preliminary injunction: (i) the presence of irreparable harm to the moving party; (ii) the absence of an adequate remedy at law; (iii) the balance of the harms between the parties; (iv) the prospect of some likelihood of success on the merits of the claim; and (v) the public interest.  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386-88 (7th Cir. 1984).  The first two factors must be considered at the threshold, for when the moving party cannot make any showing of irreparable harm and has no likelihood of success on the merits, a motion for preliminary injunction ordinarily will be denied on that ground alone.  *See Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 463 (7th Cor. 2001); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992).  Under the "sliding scale" approach employed in this circuit, "the more likely the plaintiff will succeed

9

on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief. *Id.* at 895-96 (internal quotations and citations omitted).

## III.  The City's Ordinance

The City's ordinance requires the following:

Subject to subsection (d), it is unlawful for any person to carry or possess a firearm without a CFP.
*Chi. Mun. Code § 8-20-110*

Notwithstanding any provision of this chapter to the contrary, a person has 90 days after the effective date of this 2010 ordinance to register a firearm, including a handgun, which had not been previously registered; provided that the person and firearm meet all the requirements of this ordinance.
*Chi. Mun. Code § 8-20-140(d)(2)*

Shooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited; provided that this provision shall not apply to any governmental agency.  The discharge of a firearm in an area where hunting is permitted shall not be a violation of this section.
*Chi. Mun. Code § 8-20-280*

## IV.  Analysis

Although Plaintiffs have alleged that any violation of the Second Amendment leads to an irreparable harm, no Court has yet to reach such a broad conclusion.  The Second Amendment, as construed in *Heller*, protects "the right to possess a handgun in the home for the purpose of self-defense." *McDonald v. City of Chicago*, 130 S Ct. At 3050.  The Seventh Circuit has cautioned that any general expressions in Heller "must be read in light of the subject under consideration." *U.S. v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*); *see U.S. v. Yancey*, --- F.3d ---, 09-1138, 2010

10

WL 3447736 at *2 (7th Cir. Sept. 3, 2010) (some categorical bans on firearms are constitutional, not just those in existence at the time of the Second Amendment's ratification). The Seventh Circuit has applied intermediate scrutiny to laws categorically prohibiting possession of a firearm by different classes of individuals. *See Skoien*, 614 F.3d 638, (Constitution permits Congress to bar those convicted of domestic violence crimes from possessing firearms); *Yancey*, 2010 WL 3447736, (barring unlawful users of or addicts to any controlled substance from firearm possession is constitutional); *U.S. v. Williams*, --- F.3d ---, 09-3174, 2010 WL 3035483 (7th Cir. Aug. 5, 2010) (barring felons from firearm possession is constitutional). However, the Court "reserved the question of whether a different kind of firearm regulation might require a different approach." *Yancey*, 2010 WL 3447736 at *2. Although Plaintiffs urge this Court to apply either strict scrutiny or intermediate scrutiny to the requirement that residents obtain firing range training outside of the City in order to obtain their CFPs, this Court notes that the Seventh Circuit has only applied intermediate scrutiny to laws that absolutely prohibit possession of a firearm by an individual. *See Skoien*, 614 F.3d 638, *Yancey*, 2010 WL 3447736, *Williams*, 2010 WL 3035483. Because the firing range ban does not categorically prohibit any individual resident from possessing a firearm but instead requires them to travel outside of the City's borders for one hour of firing range training, this Court declines to adopt the intermediate scrutiny standard.[1]

A.  Irreparable Harm

First, and most importantly, Plaintiffs have failed to establish the irreparable harm they have suffered by requiring them to travel outside of the City's borders to obtain their firing range permits.

---

[1] As will be addressed later in this Opinion, even if the Court were to apply intermediate scrutiny to the issue before the Court, Plaintiffs still fail to meet their burden of demonstrating irreparable harm.

Ezell already traveled to a firing range outside of the City, completed her firing range training and received a CFP for the handgun she possesses. (Prelim. Inj. Hr'g, Def. Exh. 28, Deposition of Rhonda Ezell at 33:1-6.)  Brown has visited a firing range in Morton Grove between 250-270 times per year, has been to the ISRA range in Bonfield, IL and has not completed his range training yet because "he has not gotten around to it." (Prelim. Inj. Hr'g, Def. Exh. 26, Deposition of Joseph Brown at 14:17-22.)  Hespen has also visited the ISRA range at least ten times in the past year and regularly drives to gun shops with firing ranges outside of the City.  (Prelim. Inj. Hr'g, Def. Exh. 29, Deposition of William Hespen at 42-45.)  Not one of the individual plaintiffs appeared at the hearing in order to testify that s/he was unable to travel outside of the City's borders to obtain the one-hour range training and all three have shown that they are capable of doing so and have done so in the past.  Finally, Plaintiff Action Target, a company that designs and constructs firing ranges, has alleged that it is being harmed by not being able to construct a range within the City.  Yet, Action Target has no current plans to construct a range, has not searched for a location to construct a range, and would not be able to construct a range in less than nine months.

Here, the City's borders are artificial boundaries allegedly keeping Plaintiffs from completing their training. In truth, there are fourteen firing ranges within fifty miles of the City's limits any one of which may actually be closer to an individual's residence than the one being proposed to be brought into the City's borders for training.  Seven of these ranges are within twenty-five miles of the City.  For example, a resident of the west side of Chicago may travel six miles to Illinois Gun Works in Elmwood Park in order to obtain the one hour of training; whereas, if Plaintiff's proposed mobile range were erected at 6300 S. Bell, she would need to travel over fifteen miles to the mobile range to obtain training.  Therefore, the City's boundaries are merely  artificial borders allegedly preventing

an individual from obtaining a permit and allegedly creating an undue burden on that individual. When, in truth, based on the Court's example, it may actually be easier for a particular resident to obtain training outside of the City's borders. Plaintiffs have failed to meet their burden to show how the travel outside of the City's borders is more onerous and therefore irreparable.

Further, the City correctly notes that even if a particular resident needed to travel further to obtain his firing range time, that added travel expense is a quantifiable expense that can be easily calculated as damages if this Court were to determine the end result of this dispute in Plaintiffs' favor; therefore, they can not establish that there is no adequate remedy at law. Court cases are resolved on a daily basis through the awarding of damages. If a resident is permitted to exercise her right to possess a firearm but is required to travel outside of the borders to do so, she can calculate the cost of travel and those monetary damages can be awarded to her in the event of her success on the merits. Even if that resident did not comply with the amnesty period and was therefore not permitted to possess that particular firearm, she would still be able to possess another firearm by going through the permitting process. Again, her damages for the loss of the firearm in her possession can be equated to a dollar amount and therefore can be remedied through traditional means. The ordinance does not categorically prevent her possession; it merely requires one step of her training to be completed outside the City's borders.

Second, the organizations do not have the necessary standing to demonstrate their irreparable harm. The Supreme Court's rulings in *Heller* and *McDonald* addressed an individual's right to possess a firearm within his home and did not address an organization's right. Even if they did, the organizations have failed to present sufficient evidence to support their position that their constituency has been unable to comply with the statute. Throughout oral argument, Plaintiffs

13

repeatedly cite to the number of individuals who are conjectured to possess weapons within the City alleging at various times that the number is as high as several thousand individuals.  This conjecture is an estimate, of course, because for years no one had the right to possess weapons within the City and as such there are no registration records for past possession.  Plaintiffs have not presented evidence demonstrating, for example, that thousands of residents have not been able to comply with the requirements of the ordinance within the time frame allotted by the statute; nor have they presented evidence of thousands of residents who are seeking relief from the amnesty provision. Although they argue that thousands most likely need training by the amnesty deadline, they fail to support that claim with any evidence.  Interestingly, although Plaintiffs have spent a significant portion of their oral argument on their ability to bring in a mobile range to the City in order to aid those who need to complete range training and cite to their ability to bring that range within the borders as evidence that they are being Constitutionally harmed, they have also set forth evidence that one mobile range could only accommodate the training of a few hundred residents within a month[2], thereby weakening their argument that the mobile ranges are essential to the residents while arguing that there are thousands who must comply.  Plaintiffs ISRA and SAF also claim that firing ranges outside of the City cannot adequately serve the number of residents seeking to have their one-hour of range training.  Yet, they have failed to support this argument with evidence of any one resident who has been unable to travel to such a range and has been unable to obtain range training due to this alleged inadequacy.

Finally, even if this Court were to apply intermediate scrutiny to the City's ban on firing

---

[2] Based on Plaintiffs' representation that twenty-four individuals a day can receive their one-hour of CFP training on a mobile range each day.

14

ranges, the City has presented sufficient evidence to meet its burden under this standard that its objective is an important one and that its objective is advanced by means substantially related to that objective. *See Williams*, 2010 WL 3035483 at *6. At the preliminary injunction hearing, the City presented evidence that firing ranges would fall within the intensive use category and be zoned for manufacturing districts. This level of zoning is required for types of businesses which have high levels of risk to the public whether through environmental, social, or chemical harms. The City has presented evidence that firing ranges must be highly regulated due to the risks that can be inflicted upon the surrounding community including the risk of stray bullets, the risk that individuals transporting weapons to the range are at higher likelihood of being targets for criminals who would seek to obtain the weapons, and the risk of contamination from the residue of the lead that is left on individuals who use the weapons (requiring appropriate washing facilities to remove the residue). The City has elucidated its long history of careful zoning to ensure the health and safety of its residents and since no zoning has been established to cover a firing range within the City, it is unable to enforce any health or safety restrictions. Historically, the City would review such proposed businesses and determine what those risks are and would also permit residents to object to the placement of such high-risk enterprises prior to granting permission for the placement of such a business within a particular area of the city. None of these safeguards are in place today to ensure that these risks are addressed appropriately and as such the City has presented adequate evidence that the safety of its citizens is at risk when compared to the minimal inconvenience of traveling outside of the City for a one-hour course.

B.  Likelihood of Success on the Merits

The body of law involving various firearms' ordinances is evolving on an almost weekly basis. *See U.S. v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *U.S. v. Yancey*, 2010 WL 3447736 at *2 (7th Cir. Sept. 3, 2010); *U.S. v. Williams*, 2010 WL 3035483 (7th Cir. Aug. 5, 2010).  Two facts are certain: neither the Supreme Court nor any other Circuit has addressed the regulation of firearms range training ordinances; and the Seventh Circuit has left open for another day the issue of what standard of scrutiny should apply to other types of firearms ordinances.  *See Skoien*, 2010 WL 2735747 at *3.  Suggesting that firing a weapon at a firing range is tantamount to possessing a weapon within one's residence for self-defense would be establishing law that has not yet been expanded to that breadth.  Preliminary injunctions are not appropriately used in such instances.  *See, e.g., Vega v. Lantz*, 03 C 2248, 2007 WL 3025285 at *3 (D. Conn. Oct. 16, 2007) (court declining to analyze likelihood of success on the merits because it was a matter of first impression); *I.P. Lund Trading ApS v. Kohler Co.*, 11 F. Supp. 2d 112, 115 (D. Mass. 1998) ("[T]he preliminary injunction stage is an inappropriate setting to address such constitutional issues, especially those that are, to a degree, issues of first impression").  Further, although the City has linked possession to the requirement that its residents complete a one-hour range training course, the City does not have the ability to  create a Constitutional right to that training.  The Court must still analyze that use and determine whether the individual's right to possess firearms within his residence expands to the right to train with that same firearm in a firing range located within the City's borders.

C.  Inadequate Remedy at Law

As discussed above, each of the individual plaintiffs has the ability to quantify the damages suffered if required to obtain range training outside of Chicago and therefore monetary damages can

16

be calculated in the event of success on the merits.  Again, each Plaintiff is entitled to possess a weapon and therefore his Second Amendment right is not being completely impinged.  The Second Amendment provides that each may possess a weapon; it does not include the right to have training on that weapon within a specific distance from their residence.  At any given point in the City, a resident can travel no more than twenty miles to a firing range to complete the range training requirement.

### D.  Balancing of the Harms

The City has adequately presented its position that it has an interest in protecting its residents from the potential harmful effects of firing ranges within its borders.  It has set forth reasoning that ranges must be highly regulated due to the potential health and safety risks to both the users of the range and the neighboring community.  Balanced against the inconvenience suffered by Plaintiffs having to drive a further distance to obtain range training outside of its borders, an inconvenience which all of them have been willing to incur in the past, and which all of them have done on numerous occasions, the City has successfully shown that the balance of harms weighs in its favor.

## V.  First Amendment

Plaintiffs also allege, however peripherally, that their First Amendment rights are also being impacted by the firing range requirement.  This issue was presented with little support in the briefs and was not elucidated at the hearing.  Most likely because Plaintiffs remain entitled to discuss the possession and use of firearms.  No evidence has been presented that suggests that a ban on firing ranges chills residents' desire or ability to possess a firearm.  *See, .e.g., N. Ind. Gun & Outdoor Shows, Inc.*, 104 F. Supp.2d 1009, 1013-14 (N.D. Ind. 2000) (no First Amendment protection for conduct of bringing guns to a gun show due to lack of particular message).  Further, the four-hour

classroom training is permitted within the City's borders.  Plaintiffs have failed to support their argument with any facts in the record and therefore this argument also fails.

## VI.  Conclusion

Plaintiffs have failed to support their contention that they have been irreparably harmed by the City's ban on firing ranges.  Each individual plaintiff has the ability to travel to have firing range training conducted outside of the City's borders and the organizational Plaintiffs have failed to support their contention that residents are unable to obtain their training outside the City with any evidence.  Even if Plaintiffs could demonstrate that they were harmed by the new ordinance, that harm can be remedied through monetary damages in the likelihood that they succeed on the merits.  Finally, no court has expanded the breadth of the Second Amendment right of possession within one's residence as established in *Heller* to the right to train at a firing range within one's municipality and therefore there is questionable likelihood of success on the merits.  Therefore, Plaintiffs' motion for preliminary injunction is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: October 12, 2010

18

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1
### Eastern Division

Rhonda Ezell, et al.

                 Plaintiff,

v.                                  Case No.: 1:10–cv–05135
                                  Honorable Virginia M. Kendall

City Of Chicago

                 Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 13, 2010:

      MINUTE entry before Honorable Virginia M. Kendall:Defendant's motion to dismiss[67] is entered and briefed as follows: Responses due by 10/28/2010. Replies due by 11/4/2010. Ruling will be made by mail. Parties need not appear in court on 10/14/2010. Mailed notice(tsa, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION TO DISMISS |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and through undersigned counsel, and submit their Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss.

Dated: October 28, 2010        Respectfully submitted,

| | |
|---|---|
| Alan Gura (admitted pro hac vice) | David G. Sigale (Atty. ID# 6238103) |
| Gura & Possessky, PLLC | Law Firm of David G. Sigale, P.C. |
| 101 N. Columbus Street, Suite 405 | 4300 Commerce Court, Suite 300-3 |
| Alexandria, VA 22314 | Lisle, IL 60532 |
| 703.835.9085/Fax 703.997.7665 | 630.452.4547/Fax 630.596.4445 |

By: /s/ Alan Gura/             By: /s/ David G. Sigale/
       Alan Gura                               David G. Sigale

                                         Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

PRELIMINARY STATEMENT

Defendant City of Chicago mandates that individuals wishing to possess firearms obtain a Chicago Firearms Permit. This permit can only be issued to applicants who first complete range training, and the process must be repeated every three years. Existing firearm registrants must obtain the new permit, and training, upon expiration of their current permits.

Notwithstanding its mandate that prospective gun owners obtain, and maintain, training at a gun range, the City bans the operation of gun ranges.

The gun range ban is flatly unconstitutional. The Second Amendment guarantees the right to train with firearms so that individuals can be safe and proficient in their use, in addition to securing the right to engage in recreational shooting. If there is a right to keep and bear arms – and there most certainly is such a fundamental, individual right secured in our Constitution – there is inherent within that right, a right to actually *use* arms for traditional lawful purposes. There is absolutely nothing more basic, more plain, more obviously inherent in the possession of guns than the use of those guns at a gun range. Gun ranges may be regulated in the interest of public health and safety, but a complete ban on gun ranges is unconstitutional.

Even were there no right to use guns at a gun range, there is obviously a right to use guns for self-defense in the home, and a law banning gun ranges unconstitutionally impedes the exercise of self-defense in the home by making that exercise less likely to succeed.

1

Nor is it constitutional to mandate training as a condition of gun ownership, and then ban the training. Although strict scrutiny secures gun rights, the prohibition of a gun licensing pre-requisite fails any level of scrutiny.

The range ban also violates the First Amendment. The Supreme Court has just reaffirmed that training individuals is protected First Amendment activity, and as the Fourth Circuit held, gun training, specifically, is protected speech.

Finally, there is no question that membership organizations can file civil rights cases, both to assert the rights of their members, and their own organizational interests in advancing their causes. Additionally, corporate entities can and do file civil rights cases to defend their own rights, and the rights of their customers, to engage in constitutionally-protected activity.

<u>ARGUMENT</u>

I.      THE USE AND OPERATION OF GUN RANGES LIE AT THE SECOND AMENDMENT'S CORE.

"[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). Unsurprisingly, the Supreme Court has noted that the rights to use and operate a gun range are inherent in the Second Amendment: "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the use of it, and in due time teaches his sons to do the same*, exercises his individual right." *District of Columbia* v. *Heller*, 128 S. Ct. at 2812 (citation omitted) (emphasis added).

2

"[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms . . ." *Heller*, 128 S. Ct. at 2811-12 (citation omitted). Indeed, to the extent the availability of "[a] well-regulated militia" supplies a reason for the right's codification, U.S. Const. amend. II, "the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training." *Heller*, 128 S. Ct. at 2800. "The militia consisted of the people bearing their own arms when called to active service, arms which they kept and hence knew how to use." *United States* v. *Emerson*, 270 F.3d 203, 235 (5th Cir. 2001). "An effective militia requires not only that people have guns, but that they be able to shoot them with more danger to their adversaries than themselves." *Silveira* v. *Lockyer*, 328 F.3d 567, 587 (9th Cir. 2003) (Kleinfeld, J., dissenting).

In *Heller*, neither the D.C. Circuit nor the Supreme Court bothered to engage in any balancing test or other extended analysis before striking down Washington, D.C.'s ban on the possession of functional firearms for self-defense, as that law literally contradicted a "core" aspect of Second Amendment rights. *Heller*, 128 S. Ct. at 2818. A complete ban on gun ranges and traditional gun range activity must meet the same fate.

The Seventh Circuit has already rejected the City's argument that the Second Amendment limits its protection only to gun possession within the home: "[T]he Second Amendment creates individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open [in *Heller*]." *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (emphasis added).

3

Although Plaintiffs take issue with the concept that the Second Amendment "creates" rights as opposed to preserving pre-existing rights, the basic idea – that the Second Amendment is not limited to the home – is incontrovertible. Although *Heller* does not require invalidating all laws regulating guns in public, "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Ca. 2010).

The Second Amendment applies "*most notably* for self-defense within the home,*"* *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3044 (2010) (plurality op.) (emphasis added), "where the need for defense of self, family, and property is most acute," *Heller*, 128 S. Ct. at 2717, but not exclusively so. For example, "Americans valued the ancient right [to keep and bear arms] . . . for self-defense *and hunting*." *Heller*, 128 S. Ct. at 2801 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . .  state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. Hunting does not occur inside the home.

Describing Second Amendment rights, the Supreme Court invoked Senator Sumner's famous "Bleeding Kansas" speech: "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest." *Heller*, 128 S. Ct. at 2807 (citation omitted). And in setting out the common-use test for protected arms, the Supreme Court has made clear that the Second Amendment secures arms possessed "for lawful purposes like self defense." *Heller*, 128 S. Ct. at 2815.

Indeed, the Supreme Court was all but forced to declare the Second Amendment applies outside the home, given the way in which the District of Columbia litigated its case. The District

offered that the term "bear arms" had an exclusive idiomatic meaning, effectively, to soldier or go into battle, and that "keep and bear arms" was a unitary concept referring only to a right to possess weapons in the context of military duty  The Supreme Court was required to address this argument to reach its judgment, and rejected it. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 128 S. Ct. at 2793 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 128 S. Ct. at 2793 (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); Black's Law Dictionary 214 (6th Ed. 1998)); *see also Heller*, 128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms . . ."), at 2817 ("the right to keep *and carry* arms") (emphasis added). "[B]ear arms means . . . simply the carrying of arms . . ." *Heller*, at 2796.

Having defined the Second Amendment's language as including a right to "carry" guns for self-defense, the Supreme Court helpfully noted several exceptions that prove the rule. Explaining that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.*, at 2817 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 2817, confirming both that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans are *not* presumptively lawful in non-sensitive places.

All of this activity takes place outside the home.

5

It is difficult to imagine that practicing the use of guns at a range is not among the "other entitlements" of the Second Amendment outside the home. *Skoien*, at 640. Even the dissenters in *Heller* recognized the majority to have secured a right to arms for "self-defense, *recreation, and other lawful purposes*." *Heller*, 128 S. Ct. at 2845 n.38 (Stevens, J., dissenting) (emphasis added), at 2869 (Breyer, J., dissenting).

Leaving recreation aside, it is beyond dispute that practicing with one's gun at a range tends to increase proficiency and effectiveness. A homeowner wishing to exercise the right of self defense with a firearm would be at a severe disadvantage in doing so absent access to a gun range for practice.

II.   REGARDLESS OF WHICH, IF ANY, STANDARD OF REVIEW IS UTILIZED, THE RANGE BAN IS PRESUMPTIVELY UNCONSTITUTIONAL.

Because the challenged laws forbid the exercise of protected activity, without more, they must be struck down. *See Heller*, 128 S. Ct. at 2818 (Functional firearm ban "makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence unconstitutional."). But even if the case is governed by some standard of review – any standard of review -- the outcome is the same.

The Supreme Court emphatically rejected the notion that rational basis has any place at all in Second Amendment analysis. "There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . ." *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152, n. 4 (1938). Quoting this famous footnote, the Supreme Court recently added, "[T]he [rational basis] test could not be used to evaluate the

6

extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, *or the right to keep and bear arms*." *Heller*, 128 S. Ct. at 2818 n.27 (citing *Carolene Prods*.) (emphasis added). "If a rational basis were enough, the Second Amendment would not do anything." *Skoien*, 614 F.3d at 641.

Finally, removing all doubt as to the presumptive invalidity of nontraditional gun laws, the Supreme Court confirmed that the Second Amendment secures a fundamental right. *McDonald*, 130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring). "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Under this analysis, the government carries the burden of proving the law "furthers a compelling interest and is narrowly tailored to achieve that interest," *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010) (citation omitted), a burden that cannot be met where less restrictive alternatives are available to achieve the same purpose. *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004); *see also United States* v. *Engstrum*, 609 F. Supp. 2d 1227, 1331-32 (D. Utah 2009) (applying strict scrutiny in Second Amendment analysis).

The Seventh Circuit has applied intermediate scrutiny in Second Amendment challenges to laws arguably falling within *Heller*'s list of longstanding prohibitions that may be presumptively lawful. But it is wrong to suggest that the Seventh Circuit has reserved for the peaceful, law-abiding people a *lower* level of review than is employed for violent felons, drug abusers, and other dangerous individuals arguably covered by a presumptive exception. The Seventh Circuit has suggested overbreadth is a possible alternative mode of analysis. *United States* v. *Yancey*, 2010 U.S. App. LEXIS 18442 at *10 (7th Cir. Sep. 3, 2010); *United States* v. *Williams*, 616 F.3d 685 (7th Cir. 2010). Overbreadth is a strict scrutiny doctrine.

7

The motion to dismiss fails to disclose *any* governmental interest in banning gun ranges. Defendant has posited that gun ranges are dangerous, but this argument has all been post-hoc rationalization for a law upon which the city council did not even bother making any finding. This is a forbidden exercise of the rational basis test. It cannot be sustained, especially given the incredibly broad application of the law. If there is any sort of harm that is caused by gun ranges, then the government should regulate them in a manner narrowly tailored to address whatever harm they supposedly cause.

> [T]he risk of harm to persons or property, even though great, can be virtually eliminated by the exercise of reasonable or even "utmost" care under the circumstances . . . the use of firearms is a matter of common usage and the harm posed comes from their misuse rather than from their inherent nature alone . . . the location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice [and] target practice is of some social utility to the community . . .

*Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995).[1]

Defendant has attempted to justify its gun ban by reference to the zoning laws.[2] The Court should ignore such argument because "this asserted governmental interest is a mere restatement of the prohibition itself, not a justification for it." *Church of Lukumi Babalu Aye* v. *City of*

---

[1]Some of Defendant's previously asserted interests are absurd. The notion that there is any harm from people driving through the city with locked, disassembled, and unloaded guns in the trunks of their cars – even if it could be accepted – would not sustain a gun range ban that increases the distances traveled by people to go to a gun range (the City has also suggested Plaintiff Ezell should use public transportation to take her gun to the range). The idea that gun ranges are attractive to criminal activity defies common sense and experience. In any event, "[t]he theft argument is paternalistic. Why can't customers make their own assessments of risk? . . . there is no 'thieves veto'" of constitutionally-protected activity. *New Albany DVD, LLC* v. *City of New Albany*, 581 F.3d 556, 560 (7th Cir. 2009).

[2]The Court may recall that Defendant's zoning authority testified she had absolutely nothing to do with the range ban's enactment, and had never studied or considered the issue of gun range zoning.

8

*Hialeah*, 508 U.S. 520, 539 n.* (1993). In any event, the Supreme Court forbids the use of zoning to extinguish constitutional rights. In the landmark case of *Renton* v. *Playtime Theaters, Inc.*, 475 U.S. 41 (1986), the Supreme Court upheld restrictive zoning of adult establishments, to the extent these businesses were regulated for their secondary effects. Yet recognizing that these businesses nonetheless engaged in protected expression, the Court held: "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Renton*, 475 U.S. at 53. Ever since, adult zoning ordinances are measured largely by whether they effectively prohibit adult establishments, or merely limit their location pursuant to constitutional standards. *See*, *e.g. BBI Enters.* v. *City of Chicago*, 874 F. Supp. 890, 895 (N.D. Ill. 1995).

Of course gun ranges are not pornographic establishments. Lawful gun owners who would obtain a CFP must undergo multiple background checks, and all instructors are state-certified police trainers. The only secondary effects of a gun range, apart from noise that can be mitigated, is the offense such establishments give to gun rights opponents. Even in the adult bookstore context, regulators must come up with actual evidence justifying the regulation, not merely "the conjecture of their attorneys." *Palmetto Properties, Inc.* v. *County of DuPage*, 160 F. Supp. 2d 876, 882 (N.D. Ill. 2001); *see also Annex Books, Inc.* v. *City of Indianapolis*, 2010 U.S. App. LEXIS 20214 (7th Cir. Oct. 1, 2010).

III.   THE FIRST AMENDMENT GUARANTEES A RIGHT TO PROVIDE AND RECEIVE INSTRUCTION IN THE USE OF FIREARMS AT A GUN RANGE.

The Supreme Court has long recognized that teaching and learning are protected by the First Amendment. *See*, *e.g. Keyishian* v. *Board of Regents*, 385 U.S. 589, 603 (1967) (First

9

Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Sweezy* v.
*New Hampshire*, 354 U.S. 234, 249-50 (1957) (plurality) ("right to lecture . . .could not be
seriously debated," and noting that "teachers and students must always remain free to inquire, to
study and to evaluate, to gain new maturity and understanding").

One week before the Supreme Court decided *McDonald*, the high court also decided
*Holder* v. *Humanitarian Law Project*, 130 S. Ct. 2705 (2010). *Holder* considered the question of
whether Congress could ban, as material support for terrorist organizations, "plaintiffs' speech to
[terrorist] groups [that] imparts a 'specific skill' or communicates advice derived from
'specialized knowledge.'" *Holder*, at 2724. Rejecting the government's arguments that such
training and educational efforts were merely conduct with some communicative aspects, *Holder*,
at 2724, the Court nonetheless upheld, under strict scrutiny, a prohibition on the provision of
material support "in the form of speech" to designated terrorist organizations, *id.*: "direct
training" in "specific skills" of advocacy, and "teach[ing]" how to "present claims for relief."
*Holder*, at 2729.

Of course, teaching and learning, the conveyance and receipt of knowledge, are not
limited to advocacy or expression. "Even dry information, devoid of advocacy, political
relevance, or artistic expression, has been accorded First Amendment protection." *Universal City
Studios* v. *Corley*, 273 F.3d 429, 446 (2d Cir. 2001) (citations omitted). And protected teaching
includes demonstrative and experiential conduct, not strictly oral conversation. For example,
"instructing children on the topics of geography and fiber arts is a form of speech protected under
the First Amendment." *Goulart* v. *Meadows*, 345 F.3d 239, 248 (4th Cir. 2003).

10

As is the provision of hands-on gun training. *Edwards* v. *City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999). In *Edwards*, a police officer asserted a valid First Amendment claim challenging his punishment for teaching a handgun safety class, completion of which was required for individuals wishing to obtain state permits to carry guns. "[T]he form of the [officer's] speech, presumably verbal as well as some written instruction accompanied by physical demonstrations . . . was entitled to protection." *Edwards*, 178 F.3d at 247. Indeed, because the speech concerned "a categorically public issue, the proper method of safely carrying a concealed handgun, knowledge of which is a prerequisite to obtaining a state permit . . . it occupies the highest rung of the hierarchy of First Amendment values." *Id.* (citation omitted).

This argument has been made by Plaintiffs repeatedly, specifically, and emphatically, in various pleadings and in open court, and Defendant has never responded to it except by speculating – incorrectly – that the training at issue in *Edwards* did not involve the firing of guns at a range. It did. *See* N.C. Gen. Stat. § 14-415.12(a)(4). Defendant has also mischaracterized the argument as a claim that the First Amendment protects, without more, the shooting of guns, but this description has no basis in the complaint or in Plaintiffs' argument, which specifically disclaimed and rejected it.

Even if the gun training and range use were merely conduct, the range ban's impact on gun education would nonetheless constitute a First Amendment violation. Because the range ban and associated laws undeniably burden expression, the laws can only survive if they are

> within the constitutional power of the Government; if [they] further[] an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

11

*United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). The laws fail all four factors. It is not within the city's constitutional power to ban all gun ranges— doing so violates the Second Amendment. The city has no interest, let alone an important or substantial one, in banning all gun ranges. It maintains its own ranges, has historically had ranges open to the public, and initiated the ban only as a form of resisting *McDonald*. Indeed, the governmental interest here is precisely the suppression of gun education. And even if the city's actions were merely a form of regulating gun range activity in furtherance of some legitimate interest, a total ban is plainly overbroad.

IV.   PLAINTIFF MEMBERSHIP ORGANIZATIONS PLAINLY STATE A SECOND AMENDMENT CLAIM.

"There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth* v. *Seldin*, 422 U.S. 490, 511 (1975). When a group is forced to spend resources, devoting its time and energy to dealing with certain conduct, it has standing to challenge that conduct. *See*, *e.g.*, *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

SAF and ISRA educate, research, and publish about gun control and its consequences. They have to educate their members, and the public, about the government's enforcement of gun laws. When people have questions about the government's firearms policies, they turn to SAF and ISRA. The government's enforcement of the challenged provisions thus directly impacts the organizations. *Bellwood* v. *Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). Accordingly, SAF and ISRA have organizational standing in this case, and assert claims, on their on their own behalf.

Even more plainly, an association may bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

12

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *United Food & Commercial Workers Union Local 751* v. *Brown Group*, Inc., 517 U.S. 544, 553 (1996) (citation omitted).

The first prong is easily met: the individual plaintiffs are members and supporters of SAF and ISRA. As they have standing, so do the organizations. *See, e.g. Springfield Branch, NAACP* v. *City of Springfield*, 139 F. Supp. 2d 990, 993 (C.D. Ill. 2001) (concluding that NAACP clearly had standing with respect to racial discrimination claims, where two African-American members were plaintiffs). Indeed, since many SAF and ISRA members are impacted by the challenged laws, representational standing is apparent. The second prong of the representational standing test, that the interests at issue in the litigation are "germane to the organization's purpose," is self-evidently met here.

The third and final prong of the associational standing test is that neither the claim asserted nor the relief requested requires the participation of all individual members in the lawsuit. "[S]o long as the nature of the claim and the relief sought does not make individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511. That each individual member's claim for relief may differ based on unique facts does not prevent an association from seeking injunctive and declaratory relief relating to the standards to be applied in such cases. *International Union, United Auto., etc.* v. *Brock*, 477 U.S. 274, 288 (1986); *see also Retired Chicago Police Ass'n* v. *City of Chicago*, 7 F.3d 584, 601 (7th Cir. 1994). This case involves no individualized determinations whatsoever,

13

but is and will be constrained to the simple and straightforward legal questions in the Complaint. Therefore, no individualized proof will be necessary and the participation of individual SAF and ISRA members will not be required.  As nothing about this case will require the participation of every SAF and ISRA member, the third and final representational standing element is met.

V.    ORGANIZATIONS CAN ASSERT CONSTITUTIONAL RIGHTS.

Defendant asserts that "organizations do not possess the rights of individuals," Motion at ¶ 9, but tellingly, this argument is only made against the Second Amendment challenges, not the First Amendment claim.[3]

The argument is frivolous. It is limited to the Second Amendment claim only because the Second Amendment field is too young to have yet produced an example of the constitutional principle in action: "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."*Craig* v. *Boren*, 429 U.S. 190, 195 (1976) (citations omitted).

A full list of cases demonstrating this concept would be long indeed. For the First Amendment, *see, e.g. Annex Books*, *supra*; *City of Renton*, *supra; BBI Enters., supra; Palmetto Properties, supra.* For abortion rights, *see Stenberg* v. *Carhart*, 530 U.S. 914, 922 (2000) (male abortion provider has standing to assert abortion right); *Planned Parenthood* v. *Casey*, 505 U.S. 833, 845 (1992) (plaintiffs asserting abortion rights: "five abortion clinics and one physician representing himself as well as a class of physicians who provide abortion services"). For

---

[3]Organizations indeed have First Amendment rights. *See, e.g. Citizens United, supra; Church of Lukumi Babalu Aye, supra.* Defendant may not agree with Plaintiffs' First Amendment claim, but that is a different argument than asserting that Plaintiffs are incapable of asserting First Amendment rights.

14

contraceptives, *see Carey* v. *Population Svcs.*, 431 U.S. 678 (1977) ("a corporation primarily

engaged in the mail-order retail sale of nomedical contraceptive devices"). For the Equal

Protection Clause (gender discrimination), *see Craig*, 429 U.S. at 192 ("a licensed vendor of

3.2% beer").

      If a bookstore can pursue a First Amendment challenge to restrictions on pornography,

and if an abortion clinic can assert the right to abortion, it defies credulity to assert that an

organizational entity that constructs, operates, or supplies a gun range cannot assert a Second

Amendment claim. After all, it is not the bookstore that views pornography, nor is it the abortion

clinic that engages in family planning decisions. But their customers do, and the right to provide

the products and services are thus protected.

CONCLUSION

      Defendant's motion to dismiss must be denied.

Dated:  October 28, 2010          Respectfully submitted,

Alan Gura (admitted pro hac vice)     David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC          Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405    4300 Commerce Court, Suite 300-3
Alexandria, VA 22314           Lisle, IL 60532
703.835.9085/Fax 703.997.7665      630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/             By: /s/ David G. Sigale/
    Alan Gura                David G. Sigale

                           Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on October 28, 2010, he served a copy of the above Memorandum of Points and Authorities, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | **NOTICE OF APPEAL** |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**NOTICE OF APPEAL**

**NOTICE IS HEREBY GIVEN** that Rhonda Ezell, Joseph I. Brown, William Hespen,

Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association,

plaintiffs in the above named case, hereby appeal to the United States Court of Appeals for the

Seventh Circuit from the order denying plaintiffs' motion for preliminary and permanent

injunctive relief, entered in this action on the 12th day of October, 2010.

Dated: October 28, 2010                    Respectfully submitted,

Alan Gura (admitted pro hac vice)          David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                     Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405          4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                       Lisle, IL 60532
703.835.9085/Fax 703.997.7665             630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/                        By: /s/ David G. Sigale/
    Alan Gura                                 David G. Sigale

                                           Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on October 28, 2010, he served a copy of the above Notice of Appeal, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura_____
Alan Gura

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EZELL, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION FOR STAY OF PROCEEDINGS**
**PENDING APPEAL OR, IN THE ALTERNATIVE, FOR EXTENSION**
**OF TIME TO FILE REPLY IN SUPPORT OF MOTION TO DISMISS**

Defendant City of Chicago (the "City"), by its attorney, Mara S. Georges, Corporation Counsel for the City of Chicago, respectfully moves this Court for an order staying further proceedings of this matter until resolution of Plaintiffs' appeal of the Court's October 12, 2010 order denying Plaintiffs' request for a preliminary injunction. In the alternative, the City requests an extension of time to file its reply in support of its Motion to Dismiss Plaintiffs' Complaint ("Motion") until November 19, 2010. In support thereof, the City states as follows:

1.      Plaintiffs filed their Complaint in this action on August 16, 2010, alleging that the City's Responsible Gun Owners Ordinance (the "Ordinance") violates their constitutional rights by prohibiting shooting ranges and/or firearm training within the City. On the same day, Plaintiffs filed a motion for preliminary injunction and an accompanying memorandum of law in support thereof.

2.      Plaintiffs subsequently filed two motions for a temporary restraining order, on August 22, and September 13, both of which were denied by this Court. The Court also entered a discovery and briefing schedule on Plaintiffs' motion for preliminary injunction, culminating in a two-day evidentiary hearing that took place on Friday, October 1, and Monday, October 4, 2010.

3.     Because of the time and energy devoted to defending against Plaintiffs' three motions for emergency injunctive relief, the City sought an extension of time to answer or otherwise plead to Plaintiffs' Complaint until October 25, 2010.  On September 28, the Court granted the City's motion, but required its responsive pleading to be filed within ten days, on or before October 8, 2010.

4.     On October 8, the City filed its Motion.  Because only four days had passed since the end of the preliminary injunction hearing, the City was not able to adequately prepare and file its supporting memorandum at that time.  Accordingly, the City requested in the Motion an opportunity to file a supporting memorandum setting forth in detail the legal bases for its Motion.

5.     On October 12, the Court issued its memorandum opinion and order denying Plaintiffs' motion for preliminary injunction.  On October 13, by minute order, the Court entered a briefing schedule on the City's Motion, requiring Plaintiffs to file their response by October 28, with the City's reply due one week later, on November 4, 2010.

6.     On October 28, Plaintiffs filed their opposition to the City's Motion.  At the same time, Plaintiffs also filed their Notice of Appeal "from the order denying plaintiffs' motion for preliminary and permanent injunctive relief, entered in this action on the 12th day of October."  *See* Plfs.' Notice of Appeal, docket entry # 81.

**The Court Should Stay Further Proceedings Until Resolution of Plaintiffs' Appeal**

7.     It does not make sense for this Court to decide the substantive issues presented in the City's Motion – or for the case to proceed any further – until Plaintiffs' appeal has been decided by the Seventh Circuit.  Accordingly, the Court should exercise its discretion to stay this matter pending resolution of the appeal.  *See, e.g., Clinton v. Jones*, 520 U.S. 681, 706 (1997) (district court "has

2

broad discretion to stay proceedings as an incident to its power to control its own docket."); *Pfizer, Inc. v. Apotex Inc.*, 640 F. Supp.2d 1006, 1007 (N.D. Ill. 2009) ("The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"), *quoting Landis v. North American Co.*, 299 U.S. 248, 254 (1936).

8.     In deciding whether to grant a stay, the Court should consider factors such as: (1) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (2) whether a stay will simplify the issues in question and streamline the trial; and (3) whether a stay will reduce the burden of litigation on the parties and on the court. *See, e.g., Pfizer*, 640 F. Supp.2d at 1007; *GE Business Financial Servs., Inc. v. Spratt*, 2009 WL 1064608, *1 (N.D. Il April 20, 2008).

9.     A stay could both simplify the issues in question and reduce the burden of litigation on the parties and the Court.  Many of the issues raised in the City's Motion are intertwined with the question of likelihood of success on the merits which will be presented to the Seventh Circuit in Plaintiffs' appeal of the denial of the preliminary injunction.  For example, the City has moved for Plaintiffs' Second Amendment claims to be dismissed because there is no Second Amendment right to operate or shoot guns at a gun range.  *See* Motion, pp. 3-4.  In its order denying the preliminary injunction, the Court held that "no court has expanded the breadth of the Second Amendment right of possession within one's residence as established in *Heller* to the right to train at a firing range within one's municipality and therefore there is questionable likelihood of success on the merits." October 12 Mem. Op., p.18.

10.     Likewise, the City argued in its Motion that Plaintiffs' First Amendment claims fail as a matter of law, and the Court, in denying the preliminary injunction, found that "Plaintiffs remain

3

entitled to discuss the possession and use of firearms." October 12 Mem. Op., p. 17. Thus, the validity of Plaintiffs' legal theories supporting both their First and Second Amendment claims will undoubtedly be raised and addressed to some degree in the current appeal. It would be inefficient and potentially unnecessary for the Court, in the meantime, to rule on the City's Motion. In resolving the appeal, the Seventh Circuit may provide guidance on how this Court should evaluate Plaintiffs' claims going forward. And if this Court moves forward now, its resolution of certain issues may ultimately conflict with the Seventh Circuit's resolution of the appeal. Accordingly, because many of the issues overlap, a stay of proceedings will reduce the burden of litigation on the parties and streamline the Court's resolution of the issues. *See Pfizer*, 640 F. Supp.2d at 1007.

11.     Furthermore, a stay will not unduly prejudice or tactically disadvantage Plaintiffs in any manner. Plaintiffs chose to appeal this Court's decision and have the Seventh Circuit weigh in on the issues. The case is less than three months old, and a significant amount of the fact discovery has already been completed due to the expedited preliminary injunction schedule. No prejudice will result to Plaintiffs in waiting until after the Seventh Circuit has ruled before moving forward with the substantive issues in the case. *See, e.g.*, *Cook Medical Inc. v. Griffin*, 2008 WL 2691093, *1-2 (S.D. Ind. July 3, 2008) (although permitting discovery to move forward, court stayed dispositive motions pending resolution of appeal of preliminary injunction). Accordingly, the Court should stay further proceedings in this case until the Seventh Circuit has resolved Plaintiffs' appeal.

### In the Alternative, The City Requests Additional Time to File Its Reply

12.     In the alternative, the City respectfully requests that it be given additional time to file its reply in support of its Motion. Plaintiffs' response was filed on October 28 and, under the Court's briefing schedule, the City only has five business days to prepare and file its reply. Plaintiffs' 15-

page brief sets forth many novel legal issues and issues of first impression, and City requires more than five business days to respond to them. Moreover, the City first had to evaluate how Plaintiffs' Notice of Appeal, filed the same day as their response, impacted the Motion.

13.    In addition, because of the amount of time the City attorneys devoted to this case in the past two months, they now have other pressing matters which require their attention, including two other challenges to the City's Ordinance. *See Benson, et al. v. City of Chicago, et al*., Case No. 10-cv-4184 (pending before Judge Guzman), and *Second Amendment Arms, et al. v. City of Chicago, et al*., Case No. 10- cv-4257 (currently pending before Judge Dow).[1]

14.    Finally, as discussed above, this case has been pending for less than three months and there are currently no other deadlines in place. There will be no prejudice to Plaintiffs in allowing the City an additional two weeks to file its reply.

15.    This is the City's first motion for extension. Counsel for the City conferred with counsel for Plaintiffs on November 1, who stated that they did not oppose this request for extension.

16.    Accordingly, for these reasons, the City requests that it be allowed an additional two weeks, until November 19, 2010, to file its reply in support of its Motion.

WHEREFORE, the City respectfully requests that the Court stay further proceedings of this matter until resolution of Plaintiffs' appeal of the Court's October 12, 2010 order denying Plaintiffs' request for a preliminary injunction. In the alternative, the City requests an extension of time to file its reply in support of its Motion up to an including November 19, 2010, and grant it such further relief as the Court deems just and appropriate.

---

[1]The City has moved to reassign *Second Amendment Arms* to Judge Guzman as related to *Benson*. That motion is currently being briefed by the parties.

Date: November 1, 2010                     Respectfully submitted,

                                           MARA S. GEORGES,
                                           Corporation Counsel for the City of Chicago

                                           By:    /s/ Rebecca Alfert Hirsch
                                                  Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants

6

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Virginia M. Kendall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 5135 | **DATE** | 11/9/2010 |
| **CASE TITLE** | Ezell et al vs. City of Chicago | | |

**DOCKET ENTRY TEXT**

Motion for leave to appear pro hac vice [61]. [62]. [63] is granted.

Docketing to mail notices.

| | Courtroom Deputy Initials: | TSA |
|---|---|---|

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.1.1**
**Eastern Division**

Rhonda Ezell, et al.

                    Plaintiff,

v.                                  Case No.: 1:10–cv–05135
                                  Honorable Virginia M. Kendall

City Of Chicago

                    Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, November 15, 2010:

      MINUTE entry before Honorable Virginia M. Kendall:Defendant's motion to stay[85] is entered and briefed as follows: Responses due by 12/6/2010. Replies due by 12/22/2010. Status hearing set for 12/22/2010 at 09:00 AM. The response is stayed on motion [67] until the Courts ruling on the motion to stay [85]. Defendant's reply in support is entered and continued until the motion to stay is ruled upon. Status hearing set for 11/17/2010 is stricken. Parties are to provide a status report by 12/20/2010. Advised in open court notice(tsa, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.