No. 10-3525

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

RHONDA EZELL, WILLIAM HESPEN, JOSEPH BROWN,
ACTION TARGET, INC., SECOND AMENDMENT FOUNDATION, INC.,
AND ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs-Appellants,

v.

CITY OF CHICAGO,

Defendant-Appellee.

Appeal from an Order of the United States District Court
for the Northern District of Illinois
The Hon. Virginia M. Kendall, District Judge
District Court No. 10-CV-5135

BRIEF *AMICUS CURIAE* OF BRETT BENSON, KENNETH PACHOLSKI, KATHRYN TYLER,
MICHAEL HALL, RICK PERE, AND ILLINOIS ASSOCIATION OF FIREARMS RETAILERS
IN SUPPORT OF APPELLANTS URGING REVERSAL

Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA  70471
Tel: (985) 626-5052
Email: bkoukoutchos@gmail.com

Charles J. Cooper*
David H. Thompson
Jesse Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com
* Counsel of Record

*Counsel for Amici Curiae
Brett Benson, et al.*

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 10-3525

Short Caption: Ezell et al. v. City of Chicago

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[  ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Brett Benson, Kenneth Pacholski, Kathryn Tyler, Michael Hall, Rick Pere, and

Illinois Association of Firearms Retailers

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooper & Kirk, PLLC; Brenner, Ford, Monroe & Scott Ltd.; and the Law Offices of Brian S. Koukoutchos

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   Illinois Association of Firearms Retailers:  None

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   Illinois Association of Firearms Retailers:  None

---

Attorney's Signature: _____   Date: 12/14/10

Attorney's Printed Name: Charles J. Cooper

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes  [X]   No [ ]

Address: 1523 New Hampshire Ave. NW

Washington, D.C. 20036

Phone Number: 202-220-9600          Fax Number: 202-220-9601

E-Mail Address: ccooper@cooperkirk.com

rev. 01/08 AK

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ..............................................................................1

BACKGROUND AND SUMMARY OF ARGUMENT .........................................2

ARGUMENT ........................................................................................................3

I.  THE CITY'S DECISION TO OUTLAW FIREARMS PRACTICE AND SHOOTING RANGES WHILE MAKING SUCH PRACTICE A PREREQUISITE TO LEGAL POSSESSION OF A FIREARM SHOULD BE ANALYZED—AND STRUCK DOWN— UNDER THE FRAMEWORK EMPLOYED BY THE SUPREME COURT IN *HELLER*. ......5

II.  STRICT SCRUTINY OF REGULATIONS INFRINGING THE CORE SECOND AMENDMENT RIGHT TO ARMED SELF DEFENSE IN THE HOME WOULD BE CONSISTENT WITH THE SUPREME COURT'S DECISION IN *HELLER*. .................11

III. THE "REASONABLE REGULATION" STANDARD URGED BY CHICAGO IS FORECLOSED BY THE SUPREME COURT'S DECISION IN *HELLER*. ....................16

IV. UNDER *HELLER*, INTERMEDIATE SCRUTINY IS UNACCEPTABLE FOR REGULATIONS THAT CONCERN THE CORE SECOND AMENDMENT RIGHT OF ARMED SELF-DEFENSE IN THE HOME. ........................................................... 21

V.  THE CITY'S PROPOSED "UNDUE BURDEN" ANALYSIS IS WITHOUT PRECEDENT AND IS SIMPLY ANOTHER FORM OF THE INTEREST-BALANCING THAT WAS EMPHATICALLY REJECTED IN *HELLER*. ..........................................................24

VI. THE ORDINANCE CANNOT MEET RATIONAL BASIS REVIEW. .........................26

CONCLUSION ....................................................................................................26

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                      **<u>Page</u>**

*Burdick v. Takushi*, 504 U.S. 428 (1992)...................................................22

*Chicago v. Taylor*, 774 N.E.2d 22 (Ill.App.Ct. 2002) ............................. 18

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008).................................. *passim*

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) ..........................13

*Kalodimos v. Village of Morton Grove*, 470 N.E.2d 266 (Ill. 1984).......................20

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010) ................................ *passim*

*Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004) ........................................19

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)...............12

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992)................................24

*Robertson v. City of Denver*, 874 P.2d 325 (Colo. 1994)............................18, 19, 20

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ........................12, 13

*Trinen v. City of Denver*, 53 P.3d 754 (Colo.App. 2002)........................................18

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) ...........................21

*Ullmann v. United States*, 350 U.S. 422 (1956) ........................................13

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009)...........................4

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).......................................15

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ..........................4

*United States v. Skoien*, 614 F.3d 638 (7th Cir. July 13, 2010)...4, 15, 16, 23, 24, 26

*United States v. Stevens*, 130 S. Ct. 1577 (2010) ...................................15

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010)...............................4, 23, 24

*United States v. Yancey*, 621 F.3d 681, No. 09-1138,
    2010 U.S. App. LEXIS 18442 (7th Cir. Sept. 3, 2010)......................4, 16, 23, 24

*Valley Forge Christian College v. Americans United for Separation
    of Church & State, Inc.*, 454 U.S. 464 (1982)....................................13

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)……………..13

**Other**

U.S.Const. Amend. II ................................................................................20

Ill. Const., Art. I, § 22 ...........................................................................20

Municipal Code of Chicago § 8-20-110 .............................................3, 6

Municipal Code of Chicago § 8-20-120 .............................................3, 6

Municipal Code of Chicago § 8-20-280 ..........................................1, 2, 6

Municipal Code of Chicago § 8-24-010 ............................................2, 6

FEDERALIST NO. 29 ....................................................................................8

GENERAL PRINCIPLES OF CONSTITUTIONAL LAW .........................................8

Letter XVIII, *Letters from the Federal Farmer to the Republic* 124
    (W. Bennett ed. 1978) ..............................................................8

TREATISE ON CONSTITUTIONAL LIMITATIONS in 1868 ................................9

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for
    Self-Defense: An Analytical Framework and a Research Agenda*,
    56 UCLA L. REV. 1443 (2009) .............................................15

Adam Winkler, *Scrutinizing the Second Amendment*,
    105 MICH. L. REV. 683 (2007).............................................17, 18, 19

## INTEREST OF AMICI CURIAE

Amici Brett Benson, Kenneth Pacholski, Kathryn Tyler, Michael Hall, and Rick Pere are residents of the City of Chicago and are plaintiffs in *Benson v. City of Chicago*, No. 1:10-cv-04184 ("*Benson*"), currently pending in the United States District Court for the Northern District of Illinois. That suit challenges several provisions of Chicago's gun ordinance pursuant to the Second and Fourteenth Amendments to the United States Constitution, including the primary provision at issue in this appeal, Chicago Mun. Code § 8-20-280. *See* First Amended Complaint, *Benson*, Doc. No. 24 at 14-17.

Amicus Illinois Association of Firearm Retailers ("ILAFR") is a non-profit entity organized under the law of Illinois and Section 501(c)(6) of the Internal Revenue Code to promote the interests of the firearm retail industry and the protection of Second Amendment rights. ILAFR has members who desire to sell firearms and to operate shooting ranges inside Chicago city limits for patronage by law-abiding residents and would do so but for Chicago's gun ordinance. ILAFR is also a plaintiff in *Benson*.

Amici's direct interest in their challenge to Chicago's gun ordinance may be materially affected by this case through the operation of stare decisis. All parties have consented to Amici's filing this brief.

Counsel for amici have authored this brief in whole. Neither the parties nor the parties' counsel have contributed money intended to fund the preparation or submission of this brief. The National Rifle Association has contributed money intended to fund the entire cost of preparing and submitting this brief.

## BACKGROUND AND SUMMARY OF ARGUMENT

The Supreme Court has declared that the Second Amendment preserves the fundamental right to keep and bear arms. *See District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); *McDonald v. Chicago*, 130 S. Ct. 3020 (2010). The City of Chicago has long objected to, and banned, its residents' exercise of their Second Amendment rights. Because of the Supreme Court decision in *McDonald* requiring the City to repeal its unconstitutional ban on handguns, the City hastily amended its ordinances to ban most, but not quite all, exercise of Second Amendment rights. At issue in this case is the City's prohibition on training with a firearm. *See* Municipal Code of Chicago § 8-20-280 ("Shooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited…."); *id.* § 8-24-010 ("No person shall fire or discharge any firearm within the city, except in the [sic] lawful self-defense or defense of another…."). Enactment of the law was akin to acknowledging that the First Amendment prohibits a ban on books but then outlawing literacy. And this ban is particularly pernicious and perverse because

the City *requires* a resident to obtain range training before he or she may possess a firearm in the City. *Id.* §§ 8-20-110, -120. In other words, the City now conditions the right to keep and bear arms on obtaining range training but simultaneously bans range training.

The Plaintiffs are law-abiding citizens who challenge this ban under the Second and Fourteenth Amendments. The *McDonald* Court rejected Chicago's contention that Second Amendment rights are subject to "interest balancing," 130 S. Ct. at 3047 (plurality) (citing *Heller*, 128 S. Ct. at 2820-21), and warned the City that it could not treat the right to bear arms "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *id.* at 3044. Ignoring these holdings, the City insists that Second Amendment rights do not deserve the same judicial vigilance as other rights, but are instead to be protected only with rational-basis scrutiny or interest-balancing—approaches that the Supreme Court has now rejected *twice*. This Court should reject the City's recycled analytical frameworks and instead review—and strike down—the City's training ban under the approach employed by the Supreme Court in *Heller*.

## ARGUMENT

In *Heller*, the Court eschewed the hierarchy of scrutiny employed in other areas of constitutional law in favor of a historical analysis attuned to the particular firearms regulation being challenged. *See* 128 S. Ct. at 2817-18. The Chief

Justice, a member of the *Heller* majority, remarked during oral argument that any inquiry into levels of scrutiny was both atextual and unhelpful. *See* Tr. of Oral Argument at 44, *Heller*, 128 S. Ct. 2783. Although some lower courts have nonetheless applied the familiar tiers-of-scrutiny framework,[1] this Court has reserved the question, at least with respect to cases that do not concern disarmament of criminals. *See United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*) (assuming without deciding that intermediate scrutiny applies to law banning possession by those convicted of domestic violence and refusing to "get more deeply into the 'levels of scrutiny' quagmire"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny to law barring possession by felons "without determining that it would be the precise test applicable to all challenges to gun restrictions"); *United States v. Yancey*, 621 F.3d 681, 683, No. 09-1138, 2010 U.S. App. LEXIS 18442, at *5-6 (7th Cir. Sept. 3, 2010) (applying *Skoien* to a ban on firearms possession by drug addicts but "again reserv[ing] the question whether a different kind of firearm regulation might require a different approach"). No trip into the quagmire is required here; the Court can, and should, decide this case with the methods employed by the Supreme Court Court in *Heller*.

---

[1] *Compare United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009) (applying strict scrutiny), *with United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009) (applying intermediate scrutiny on theory that Second Amendment rights are not fundamental).

I.   **THE CITY'S DECISION TO OUTLAW FIREARMS PRACTICE AND SHOOTING RANGES WHILE MAKING SUCH PRACTICE A PREREQUISITE TO LEGAL POSSESSION OF A FIREARM SHOULD BE ANALYZED—AND STRUCK DOWN—UNDER THE FRAMEWORK EMPLOYED BY THE SUPREME COURT IN _HELLER_.**

In _Heller_ the Supreme Court held that self-defense is "the _central component_" of the right to keep and bear arms, 128 S. Ct. at 2801 (emphasis in original), and that the right to possess a handgun in the home for defensive use lies at the very "core" of the Second Amendment, _id._ at 2818, 2821. In _McDonald,_ the Court explained to Chicago that its prior firearms ordinance was doomed because it "effectively bann[ed] handgun possession by almost all private citizens who reside in the City." 130 S. Ct. at 3026. That conclusion was unaffected by the fact that the ordinance did not prohibit handgun possession by residents altogether; the Court noted that the ordinance permitted Chicago residents to own handguns if they were "store[d] outside of the city limits." _Id._ at 3027. The implicit principle is that a government prohibition on exercise of an enumerated, fundamental right is unconstitutional even if that law permits such exercise outside that particular government's jurisdiction. This is not a surprising proposition; we state it only because Chicago's defense of its ban on firearms training rests on the contrary proposition. Chicago's proscription on training, which Chicago itself mandates as a condition for exercising Second Amendment rights, is not saved by the fact that Chicago does not ban such training if it takes place outside the city limits.

In Chicago one cannot possess a firearm without a Chicago Firearms Permit, § 8-20-110, and no Permit can be obtained without completing a course of training at a shooting range, § 8-20-120.[2]  Yet such training is comprehensively outlawed: shooting ranges are illegal, § 8-20-280, and discharging a firearm for training purposes is illegal, § 8-24-010.  To be sure, the Chicago ordinance does not forbid range training *outside* the city.  But this is a mere jurisdictional tautology:  any government's regulatory power extends only to its territorial borders.  Chicago does not gain a license to infringe a fundamental right within its jurisdiction simply because its residents are free to leave the jurisdiction to exercise that right.  Perhaps Chicago residents can obtain the firearms training that Chicago requires in neighboring towns.  But surely a city's (or a state's) power to outlaw exercise of a constitutional right does not turn on whether its neighbors have likewise proscribed the same right.  If Chicago can prohibit the very firearms training that it mandates as a prerequisite to exercising the right to keep and bear arms, simply because such training is available in another town, then *that town, too* can outlaw Second Amendment rights, as could the State of Illinois, so long as some neighboring State did not.[3]

_____

[2] In one crucial respect, Chicago's restriction on firearms possession is broader than the District of Columbia handgun ban struck down in *Heller*.  Chicago's prohibition on firearms training infringes not only Second Amendment rights with respect to handguns, but the right to keep and bear *any* kind of firearm.

[3] Chicago contends that the need to travel to firing ranges in other counties or cities

The right to train with a firearm—to become proficient in the "use [of] arms in defense of hearth and home," 128 S. Ct. at 2821—is integral to the right to keep and bear arms.  As the Court explained in *Heller*, the Second Amendment's prefatory clause, while not "suggest[ing] that preserving the militia was the only reason Americans valued the ancient right," does show that the Framers believed that codification of the right would "prevent elimination of the militia," *id.* at 2801, which consisted of "all males physically capable of acting in concert for the common defense," *id.* at 2799.  The prefatory clause's reference to a "well-regulated militia" was thus a reference to " 'the body of the people, *trained* to arms.' "  *Id.* at 2800 (citing Va. Declaration of Rights § 13 (1776), in 7 Thorpe 3812, 3814) (emphasis added).  *See also id.* ("the adjective 'well-regulated'

---

to obtain the required training is not a constitutionally significant burden on the right to keep and bear arms.  This same argument was considered in *Heller*.  The dissenters, assuming *arguendo* that the Second Amendment protects an individual right to self-defense, 128 S. Ct. at 2847 (Breyer, J., dissenting), observed that, "while the District law prevents citizens from training with handguns *within the District,* the District consists of only 61.4 square miles of urban area. The adjacent States do permit the use of handguns for target practice, and those States are only a brief subway ride away. Of course, a subway rider must buy a ticket, and the ride takes time. It also costs money to store a pistol, say, at a target range, outside the District. But given the costs already associated with gun ownership and firearms training, I cannot say that a subway ticket and a short subway ride (and storage costs) create more than a minimal burden." *Id.* at 2862-63 (citing, *inter alia*, a map of the area's public transit system)(original emphasis).  But of course that was a *dissenting* opinion.  The majority considered and rejected the dissent's approach of analyzing the "proportionality" of a "burden" on Second Amendment rights.  *See* 128 S. Ct. at 2819-21.

implies nothing more than the imposition of proper discipline and *training*")
(emphasis added).  *See also* FEDERALIST NO. 29 (the federal army cannot be a
threat to the people "while there is a large body of citizens, little, if at all, inferior
to them in discipline and the use of arms"); Letter XVIII, *Letters from the Federal
Farmer to the Republic* 124 (W. Bennett ed. 1978) ("[T]o preserve liberty, it is
essential that the whole body of the people always possess arms, and be taught
alike, especially when young, how to use them.").  Thus the Framers understood
that, for the right to bear arms to mean anything, the people had to become
proficient with those arms.

Those who wrote and ratified the Fourteenth Amendment to protect the right
to bear arms against State infringement, *see McDonald*, 130 S. Ct. at 3040-42,
likewise understood the Second Amendment in this way.  In *Heller* the Court
quoted at length from two constitutional treatises by jurist and law professor
Thomas Cooley, which it deemed representative of the Reconstruction-era
understanding of the right to keep and bear arms.  In his 1880 work, GENERAL
PRINCIPLES OF CONSTITUTIONAL LAW, Cooley explained that " 'to bear arms
implies something more than the mere keeping; it implies the learning to handle
and use them in a way that makes those who keep them ready for their efficient
use; in other words, it implies the right to meet for voluntary discipline in arms.' "
*Heller*, 128 S. Ct. at 2811-12 (quoting page 271).  And in his "massively popular"

TREATISE ON CONSTITUTIONAL LIMITATIONS in 1868, Cooley explained that " '[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms.' " 128 S. Ct. at 2811 (quoting page 350). Thus the right was understood to encompass " 'knowledge' " and " 'familiarity' " with firearms: " 'a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right.' " *Id.* at 2812 (quoting B. Abbott, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880)). *See also id.* at 2812 (the right to arms " 'would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons,' " and therefore the Second Amendment was intended " '[t]o preserve this privilege' ") (quoting J. Pomeroy, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES 152-153 (1868)).

On this point of training with arms for effective exercise of the Second Amendment right, the decision in *Heller* could be understood as unanimous. The dissenters accepted that "training in the use of weapons" was an element of the Second Amendment right (assuming *arguendo* that it is an individual right, a premise the dissenters disputed). 128 S. Ct. at 2862 (Breyer, J., joined by Stevens, Souter and Ginsburg, JJ., dissenting). Like the opinion of the Court, the dissent quoted Professor Cooley's conclusion "that the Second Amendment protects

'learning to handle and use [arms] in a way that makes those who keep them ready for their efficient use.' " *Id.* (quoting GENERAL PRINCIPLES OF CONSTITUTIONAL LAW at 271). Justice Breyer noted that a host of military officers appearing as *amici* in *Heller* confirmed the importance of training in " 'marksmanship and safety' " to effective exercise of Second Amendment rights. *Id.* at 2862; *see also id.* (a " 'well-regulated militia—whether *ad hoc* or as part of our organized military—depends on recruits who have familiarity and training with firearms-rifles, pistols, and shotguns' ") (quoting *amicus* briefs).

In arguing that the District of Columbia's ordinance did not infringe the right to train with firearms, Justice Breyer explained that "[t]he law permits residents to engage in activities that will increase their familiarity with firearms" and "they may operate those weapons within the District 'for lawful recreational purposes,' " which "plainly include actually using and firing the weapons, as evidenced by a specific D.C. Code provision contemplating the existence of local firing ranges.' " 128 S Ct. at 2862 (Breyer, J., dissenting).[4]

The City's prohibition on firearms training is therefore an infringement of the right to bear arms as it was understood when the Second and Fourteenth

---

[4] The *Heller* dissent went on to opine that barring handgun training in the city was not an undue burden on the Second Amendment right if residents could train outside the jurisdiction. 128 S. Ct. at 2862. But, as previously discussed *supra* at n.3, that analysis was rejected by the Court.

Amendments were adopted.   But it is not necessary to decide that question today because the City's ban on training that the City itself requires for exercise of Second Amendment rights is arbitrary, irrational and therefore incapable of surviving any standard of review applicable to enumerated, fundamental constitutional rights.

## II.   STRICT SCRUTINY OF REGULATIONS INFRINGING THE CORE SECOND AMENDMENT RIGHT TO ARMED SELF DEFENSE IN THE HOME WOULD BE CONSISTENT WITH THE SUPREME COURT'S DECISION IN *HELLER.*

Although the Supreme Court has not had occasion to definitively fix a comprehensive methodology for reviewing all Second Amendment challenges, the debate that remains open after *Heller* and *McDonald* is not between strict and intermediate scrutiny, but between strict scrutiny and the framework applied in *Heller* itself.   As explained above, the latter is sufficient to decide this case and is therefore the appropriate framework to apply here.   However, if a level-of-scrutiny analysis is to be employed in some Second Amendment cases, *Heller* and *McDonald* mandate that any such analysis begin with the recognition that the individual right to bear arms in self-defense is a *fundamental* enumerated right. *McDonald* declared that this right was considered "fundamental by those who drafted and ratified the Bill of Rights," 130 S. Ct. at 3037, and that "the Framers and ratifiers of the Fourteenth Amendment" likewise "counted the right to keep

and bear arms among those fundamental rights necessary to our system of ordered liberty," *id.* at 3042.[5]

It is equally well established that "strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983). Although it did not have occasion to hold strict scrutiny applicable to regulations impinging on the core of the Second Amendment, the *Heller* Court reaffirmed that there is " 'narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments.' " 128 S. Ct. at 2817 n.27 (quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938)). *See also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1,

---

[5] *See also id.* at 3036 (the "decision in *Heller* points unmistakably to [an affirmative] answer" to the question of "whether the right to keep and bear arms is fundamental to our scheme of ordered liberty.")(emphasis omitted); *id.* at 3037 ("the right to bear arms was fundamental to the newly formed system of government"); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3038 n.17 ("Abolitionists and Republicans were not alone in believing that the right to keep and bear arms was a fundamental right"); *id.* at 3040 (holding that the 39th Congress's "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection."); *id.* at 3059 (Thomas, J., concurring in part and in judgment) (agreeing that "the right to keep and bear arms … is 'fundamental' to the American 'scheme of ordered liberty.' ").

16 (1973) (when a law interferes with enumerated "fundamental constitutional rights," it is subject to "strict judicial scrutiny"); *id.* at 17 (if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution, [it] thereby requir[es] strict judicial scrutiny"); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Hutchins v. District of Columbia*, 188 F.3d 531, 536 (D.C. Cir. 1999) ("any government impingement on a *substantive* fundamental right to free movement would be measured under a strict scrutiny standard") (emphasis in original)).

To conclude, as some courts have in the wake of *Heller*, that Second Amendment rights deserve some lesser protection than other fundamental rights is to conclude, contrary to what *is* explicit in *Heller* and *McDonald*, that Second Amendment rights exist on some sort of lower plateau. But no enumerated constitutional right is "less 'fundamental' than" others, and there is "no principled basis on which to create a hierarchy of constitutional values …." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982). "To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution." *Ullmann v. United States*, 350 U.S. 422, 428-29 (1956).

Accordingly, the Court in *McDonald* "reject[ed]" the argument "that the Second Amendment should be singled out for special—and specially unfavorable—treatment." 130 S. Ct. at 3043. *See also id.* at 3044 (plurality) (rejecting argument that the Second Amendment right should be "treat[ed] … as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

Thus, if a level-of-scrutiny analysis is to apply to the City's regulation of the core Second Amendment right of armed self-defense in the home, it should be strict scrutiny. Contrary to Justice Breyer's argument in *Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting), the Court's underlying logic is entirely consistent with its dictum that certain types of restrictions, such as possession of firearms by felons, are "presumptively lawful," *Heller*, 128 S. Ct. at 2817 & n.26. The *Heller* Court was simply offering the preliminary observation that such laws appear to fall outside the scope of the Second Amendment right to bear arms, just as perjury and obscenity have always been understood to be outside the scope of the First Amendment right to free speech. *See id.* at 2821 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different."). The Court had no occasion to prematurely map the

scope of the Second Amendment: "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* In his concurring opinion in *McDonald*, Justice Scalia explained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the scope of the right, not its lack of fundamental character." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring). Strict scrutiny in the First Amendment context, after all, is not foreclosed by the recognition that there are reasonable limits on the scope of the right. *See United States v. Stevens*, 130 S. Ct. 1577, 1584-86 (2010) (categories of speech not protected by First Amendment are based on historical exemptions at time of the Framing and not judicial interest balancing).[6]

---

[6] As this Court explained in *Skoien*, "We do not think it profitable to parse these passages of *Heller* as if they contained an answer …. They are precautionary language …. [T]he Justices have told us that the matters have been left open." 614 F.3d at 640. *See also United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[W]e think the better reading, based on the text and the structure of *Heller*, is … that these longstanding limitations [*e.g.* for possession by felons] are exceptions to the right to bear arms."); *Skoien*, 614 F.3d at 640 ("That *some* categorical limits are proper is part of the original meaning …."); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1449 (2009) ("Sometimes, a constitutional right isn't violated by a restriction because the restriction is outside the terms of the right as set forth by the constitution.").

**III.** **THE "REASONABLE REGULATION" STANDARD URGED BY CHICAGO IS FORECLOSED BY THE SUPREME COURT'S DECISION IN *HELLER*.**

The City urges this Court to review the firing-range ban under the "reasonable regulation" standard that many state courts apply under their own constitutional provisions concerning firearms. But this path is forbidden by *Heller*, where the Supreme Court explicitly and definitively rejected application of any standard of review requiring mere reasonableness or rationality: "Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms…. If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." 128 S.Ct. at 2818 n.27. This Court has repeatedly confirmed that teaching. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. July 13, 2010) (en banc) ("If a rational basis were enough, the Second Amendment would not do anything, because a rational basis is essential for legislation in general.")(citing *Heller*); *United States v. Yancey*, 621 F.3d 681, No. 09-1138, 2010 U.S. App. LEXIS 18442, at *5 (7th Cir. Sept. 3, 2010) (citing *Heller*).

The "reasonable regulation" standard now touted by the City is rational-basis review by another name. The City cites not a single federal judicial

16

authority for analyzing Second Amendment rights under the "reasonable regulation" standard.  This standard is exclusively a creation of *state* jurisprudence applying *state* constitutional provisions involving firearms.   Chicago's only supposed authority for applying this state-law doctrine to the Second Amendment is a single, pre-*Heller* law review article.  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007).  Professor Winkler actually proposed this state-law standard to the Supreme Court in *Heller,* and even touted Chicago's then-total ban on handguns.  *See* Brief of Law Professors Erwin Chemerinsky and Adam Winkler as *Amici Curiae* in Support of Petitioner, in No. 07-290, at 7.  But the Supreme Court ignored Professor Winkler's standard, although it was favorably cited by the dissent.  *See* 128 S.Ct. at 2853 (Breyer, J., dissenting).

Professor Winkler freely admits that the state-court "reasonable regulation" standard is equivalent to "rational basis" scrutiny:  "in ordinary practice both standards are extremely deferential.  Rational basis review has been characterized as 'virtually none in fact' because nearly every law subject to it survives judicial scrutiny.  Similarly, nearly all laws survive the reasonable regulation standard. … Like rational basis, the reasonable regulation standard tends to be, more than anything else, shorthand for broad judicial deference." Winkler, *supra*, 105 MICH.

L. Rev. at 718-19.[7]  Indeed, Professor Winkler concedes that "[s]tate courts

commonly use the rational basis and reasonable regulation language

interchangeably." *Id.* at 718 n.198.  *See also Robertson v. City of Denver*, 874 P.2d

325, 331 (Colo. 1994) (requiring the law to be "reasonably related to a legitimate

governmental interest"); *Chicago v. Taylor*, 774 N.E.2d 22, 29 (Ill.App.Ct. 2002)

(requiring the law to be "rationally related to a legitimate governmental interest");

*Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo.App. 2002) (referring to the

"rational basis test"); Winkler, 105 Mich. L. Rev. at 686 n.12 (collecting cases).[8]

_____

[7] As Professor Winkler notes, the "reasonable regulation" and "rational basis" tests
do differ, as a formal matter, in their focus: "Under rational basis review, the
question is whether the law is a rational means of furthering legitimate
governmental ends.  The court applying rational basis review does not formally
consider the extent of the burden on the individual; what matters is whether there
are reasonable objectives served by the law … [whereas] [u]nder the reasonable
regulation test applied to gun control, the question is whether the challenged law is
a reasonable method of regulating the right to bear arms. Even a law backed by
legitimate governmental ends, though, can burden the right too much and be
unconstitutional under the reasonable regulation test.  If a state attempted to disarm
its citizenry completely, such a law might well survive rational basis review….
Under a reasonable regulation standard, however, a complete ban on firearms
would effectively do away with the underlying right, and, as a result, such a law
could not be a reasonable regulation of the right." Winkler, 105 Mich. L. Rev. at
716-17.  As Professor Winkler concludes, however, this is a mere difference in
analytic focus and the "reasonable regulation" and "rational basis" tests are (i)
identical in their nearly total deference to legislatures and (ii) equivalent in their
outcomes. *Id.* at 717-19 & nn. 198, 214.

[8] The *Robertson* case from the Colorado Supreme Court is one of the City's
authorities for application of mere reasonableness review here.  [cite][City cited
the case in its Opp to Gura's 2d Motion for TRO at 15, so is likely to cite again]

The abject deference to state legislatures embodied by the "reasonable regulation" standard cannot be reconciled with the federal doctrine announced in *Heller*. As Professor Winkler concedes—although to his mind, it is a virtue rather than a vice—the "defining characteristic of all the [state] right-to-bear-arms decisions is the relatively small amount of argument courts offer to justify their determinations of reasonableness. Their reasoning is often only barely spelled out, raising the suspicion that they believe that little explanation is necessary. Such a process is typical of highly deferential review, where the conclusion that a law is valid is based primarily on the fact of deference rather than on a careful balancing of the interests." Winkler, 105 MICH. L. REV. at 720 n.214. Consequently, the only firearms regulation that is even theoretically threatened by the anemic "reasonable regulation" standard employed by state courts is "a complete ban on firearms." *Id.* at 717. *See also Robertson*, 874 P.2d at 329-30 & n.10 (collecting cases). "So long as a gun control measure is 'not a total ban on the right to bear arms,' the courts will consider it a mere regulation of the right." Winkler, 105 MICH. L. REV. at 717.[9]

This confirms the stark contrast between the federal constitutional right recognized in *Heller* and the various firearms rights recognized in state constitutions. The City's error is asking this Court to equate federal constitutional

---

[9] The quotation Professor Winkler uses in this passage is from *Mosby v. Devine*, 851 A.2d 1031, 1045 (R.I. 2004).

apples with state constitutional oranges. Whereas the Second Amendment provides that "the right of the people to keep and bear arms shall not be infringed," U.S. Const. Amend. II, the various state rights are often expressly subjugated to the state's police power. *See, e.g.,* Ill. Const., Art. I, § 22. Thus "the right to arms secured by the Illinois Constitution … is subject … to *substantial infringement* in the exercise of the police power even though [the right] operates on the individual level." *Kalodimos v. Village of Morton Grove*, 470 N.E.2d 266, 278 (Ill. 1984) (applying "rational-basis test")(emphasis added). And whereas some state supreme courts have held that state rights to bear arms are *not* fundamental, *see, e.g., Robertson,* 874 P.2d at 330-31, 335, the federal Supreme Court has squarely held that the Second Amendment's "right to keep and bear arms is fundamental to *our scheme of ordered liberty*," *McDonald*, 130 S.Ct. at 3036 (emphasis added)— that is, to the *federal* scheme of liberty. *See also id.* at 3037 ("the right to bear arms was fundamental to the newly formed system of government"); *id.* ("the right was regarded as fundamental in the sense relevant here."); *Heller*, 128 S.Ct. at 2798. The federal and state firearms guarantees are simply different, as are the respective doctrines governing their application.

Therefore *Heller*'s explicit rejection of mere "reasonableness" or "rationality" review is sufficient to dispose of the City's suggestion that this Court

displace *Heller*'s historical inquiry with the standard of review that state courts apply to their various firearms rights.

## IV. UNDER *HELLER*, INTERMEDIATE SCRUTINY IS UNACCEPTABLE FOR REGULATIONS THAT CONCERN THE CORE SECOND AMENDMENT RIGHT OF ARMED SELF-DEFENSE IN THE HOME.

Chicago's ordinance, like the municipal ordinance struck down in *Heller*, regulates the very core of the Second Amendment: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 128 S.Ct. at 2821. *See id.* at 2818. The City conditions a law-abiding citizen's possession of a firearm in her own home for self defense on her completion of firearms training, including at least an hour of instruction in firing the weapon at a shooting range. Yet the City simultaneously outlaws firing ranges and flatly forbids any discharge of a firearm for training purposes. Thus, like the law invalidated in *Heller*, the City's ordinance reaches into the home to regulate the fundamental core of the Second Amendment. Therefore, application of "intermediate scrutiny" is inappropriate here for the same reasons it was unacceptable in *Heller*.

In his dissent in *Heller*, Justice Breyer argued that the proper standard of review should be drawn from "cases applying intermediate scrutiny" in the First Amendment context, such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997). 128 S. Ct. at 2860 (Breyer, J., dissenting); *see also id.* at 2852, 2855-56. He contended that "[t]here is no cause here to depart from the standard set

forth in *Turner.*" *Id.* at 2860.[10]  Justice Breyer called his test "interest-balancing,"

rather than intermediate scrutiny, not because he was adopting a less demanding

test, but because of his view that the government's interest in regulating firearms—

some version of protecting the safety and lives of the public—would always be

important or compelling.  In Justice Breyer's view, whether the standard of review

were strict (compelling) or intermediate (important), the government interest

would always be sufficient and application of the test would involve a search for

the appropriate degree of fit—that is, interest-balancing.  *See Heller*, 128 S. Ct. at

2851-52 ("I would simply adopt such an interest-balancing inquiry explicitly.").

Thus Justice Breyer's proposed interest-balancing test was nothing other than

intermediate scrutiny, and the Supreme Court rejected it, however it might be

labeled:

> We know of no other enumerated constitutional right whose core
> protection has been subjected to a freestanding "interest-balancing"
> approach. The very enumeration of the right takes out of the hands of
> government—even the Third Branch of Government—the power to
> decide on a case-by-case basis whether the right is *really worth*
> insisting upon. A constitutional guarantee subject to future judges'
> assessments of its usefulness is no constitutional guarantee at all. …
> The Second Amendment, … [l]ike the First, … is the very *product* of
> an interest-balancing by the people—which Justice Breyer would now
> conduct for them anew.   And whatever else it leaves to future

---

[10] It is equally revealing that Justice Breyer invoked *Burdick v. Takushi*, 504 U.S.
428 (1992).  *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting).  That is the case
on which the United States, appearing as an *amicus* in *Heller*, principally relied in
unsuccessfully urging the Court to adopt intermediate scrutiny.  *See* Brief of
United States in No. 07-290, at 8, 24, 28.

evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Heller*, 128 S. Ct. at 2821 (emphasis in original). *See also McDonald*, 130 S. Ct. at 3050 (plurality) ("[W]hile [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion.").

Therefore, *Heller* forbids the application of mere intermediate scrutiny to a regulation, such as that here, that regulates—and effectively outlaws—the possession by law-abiding citizens of firearms for self-defense in the home.

This Court's recent Second Amendment decisions—*Skoien, Williams, Yancey*—do not point to, let alone require, application of intermediate scrutiny to the range-training requirement at issue here. Those cases involved categorical bans on possession of firearms by convicted felons (*Williams,* 616 F.3d at 692), convicted perpetrators of domestic violence (*Skoien*, 614 F.3d at 639), and confessed drug addicts with multiple arrests for possession of narcotics (*Yancey*, 2010 U.S. App. LEXIS 18442 at *1). Therefore, those cases could not, even by implication, establish the form of scrutiny applicable to firearms regulations affecting the core Second Amendment rights of law-abiding individuals. Indeed, in all three cases this Court expressly disavowed any intent to prescribe a broader rule governing other Second Amendment cases, and "reserve[d] the question whether a different kind of firearm regulation might require a different approach."

*Yancey, supra*, at *5-6.  *See Williams*, 616 F.3d at 692; *Skoien*, 614 F.3d at 642. Therefore nothing in those decisions prevents this Court from following the direction set by the Supreme Court in *Heller*, which rejected intermediate scrutiny or similar forms of interest-balancing for claims involving state regulations of the central Second Amendment right to self-defense in the home.[11]

## V. THE CITY'S PROPOSED "UNDUE BURDEN" ANALYSIS IS WITHOUT PRECEDENT AND IS SIMPLY ANOTHER FORM OF THE INTEREST-BALANCING THAT WAS EMPHATICALLY REJECTED IN *HELLER*.

The City suggests, almost in passing, that this Court should apply the "undue burden" analysis set employed in abortion cases.  There is absolutely no precedent for this, and for good reason:  the Supreme Court adopted the undue-burden test in that context because there are two rights at stake in such cases, not one, and thus interest-balancing is inherent in the nature of "the central holding in *Roe*" itself. *See Planned Parenthood v. Casey*, 505 U.S. 833, 871-72 (1992) (plurality).  But in the Second Amendment context, the Court has ruled that such balancing is not inherent in the nature of the right.  *See Heller*, 128 S. Ct. at 2821 ("We know of no other enumerated constitutional right whose core protection has been subjected to a

---

[11] Oddly, the City contends that this Court's reservation of the issue in *Skoien, Williams* and *Yancey* implies that bans on the exercise of Second Amendment rights by law-abiding citizens should be subject to *less* scrutiny than bans relating to criminals.  This astonishing argument turns *Heller* on its head.  The Supreme Court recognized that the self-defense rights of law-abiding citizens lie at the very core of the Second Amendment, 128 S. Ct. at 2821, whereas categorical bans pertaining to convicted criminals and drug addicts may be outside the scope of the right altogether, *id.* at 2816-17.

freestanding 'interest-balancing' approach…. The Second Amendment … is the very *product* of an interest balancing by the people") (emphasis in original); *id.* at 2822 ("the enshrinement of constitutional rights necessarily takes certain policy choices off the table"); *McDonald*, 130 S. Ct. at 3045, 3047 (plurality).

Although the dissenters in *Heller* did not cite *Casey*, they did propose the very analysis of burdens that the City here urges upon this Court: "The ultimate question is whether the statute imposes burdens that, when viewed in light of the statute's legitimate objectives, are disproportionate." *Heller,* 128 S. Ct. at 2854 (Breyer, J., joined by Stevens, Souter and Ginsburg, JJ., dissenting). Asking whether a law "*disproportionately* burden[s] Amendment-protected interests," *id.* at 2865 (emphasis in original), is the same as asking whether the law imposes an *undue* burden. *See also id.* at 2848 (asking whether "the law imposes a burden upon gun owners that seems proportionately" too great); *id.* at 2852 (asking "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects"). The majority of the *Heller* Court fully considered the dissent's approach of analyzing the "proportionality" of the "burden" on Second Amendment rights, 128 S. Ct. at 2819—and flatly rejected it, *id.* at 2820-21. This Court should do the same.

## VI. THE ORDINANCE CANNOT MEET RATIONAL BASIS REVIEW.

In any event, this Court need not decide the level of scrutiny to apply to the firing range ban because the ban, combined with the training requirement, cannot withstand even rational basis review. Even if a city may condition exercise of Second Amendment rights on completion of firearms training, or even if a city may outlaw firearms training within its jurisdiction—questions that need not be resolved today—it is utterly arbitrary and senseless for a city to simultaneously mandate and forbid such training. Therefore here, as in *Heller*, the City's ordinance "would fail constitutional muster" "[u]nder any of the standards of scrutiny that [the courts] have applied to enumerated constitutional rights." 128 S. Ct. at 2817-18. Indeed, insofar as the City's ordinance speaks out of both sides of its mouth—outlawing the very training that it requires as a condition for exercise of Second Amendment rights—that ordinance is manifestly irrational and therefore doomed under even the forgiving standard of rational-basis scrutiny.

## CONCLUSION

For the foregoing reasons, Amicus respectfully submits that the Second Amendment challenge in this case can, and should, be reviewed pursuant to the framework followed in *Heller,* without wading into what this Court aptly describes as "the 'levels of scrutiny' quagmire." *Skoien*, 614 F.3d at 641-42.

Dated: December 14, 2010

Respectfully submitted,

Charles J. Cooper*
David H. Thompson
Jesse Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com
* Counsel of Record

Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052
Email: bkoukoutchos@gmail.com

*Counsel for Amici Curiae
Brett Benson, Kenneth Pacholski,
Kathryn Tyler, Michael Hall, Rick
Pere, and Illinois Association of
Firearms Retailers*

# CERTIFICATE OF COMPLIANCE

The undersigned certifies under Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure that the attached amicus brief complies with the type-volume limitation established by Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Pursuant to the word count feature of the word processing program used to prepare this brief, the brief contains 6,826 words, exclusive of matters that may be omitted under Rule 32(a)(7)(B)(iii).

Dated: December 14, 2010

David H. Thompson
*Attorney for Amici Curiae Brett Benson, Kenneth Pacholski, Kathryn Tyler, Michael Hall, Rick Pere, and Illinois Association of Firearms Retailers*

## CERTIFICATE OF SERVICE

I, Megan Smith, hereby certify that on this 14th day of December, 2010 I

caused a copy of the foregoing to be served by electronic mail and U.S. mail on:

Counsel for Plaintiffs

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus St.
Suite 405
Alexandria, VA 22314
(703) 835-9085
Email: alan@gurapossessky.com

David G. Sigale
LAW FIRM OF DAVID G. SIGALE
Corporate West I
4300 Commerce Court, Suite 300-3
Lisle, IL 60532
(630) 452-4547
dsigale@sigalelaw.com

Counsel for Defendant

Michael A. Forti
Andrew W. Worseck
Mardell Nereim
Rebecca Alfert Hirsch
William Macy Aguiar
CITY OF CHICAGO, DEPARTMENT OF LAW
Constitutional and Commercial Litigation Division
30 N. LaSalle St., Suite 1230
Chicago, IL 60602
(312) 744-9010
mforti@cityofchicago.org
aworseck@cityofchicago.org
mnereim@cityofchicago.org
rebecca.alfert@cityofchicago.org
waguiar@cityofchicago.org

The brief was also filed this day by dispatch to the Clerk via Federal

Express.

Megan Smith