## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

RHONDA EZELL, WILLIAM HEPSEN, JOSEPH BROWN,
ACTION TARGET, INC., SECOND AMENDMENT FOUNDATION, INC.,
AND ILLINOIS STATE RIFLE ASSOCIATION,

*Plaintiffs-Appellants,*

v.

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from an Order of the United States District Court
for the Northern District of Illinois
The Hon. Virginia M. Kendall, District Judge
District No. 10-CV-5135

BRIEF OF HISTORIANS AND LEGAL SCHOLARS
PAUL FINKELMAN, STANLEY N. KATZ, DAVID THOMAS KONIG,
PATRICK J. CHARLES, AND ROBERT J. SPITZER AS *AMICI CURIAE*
IN SUPPORT OF APPELLEE

Charles F. Smith
155 N. Wacker Dr.
Chicago, IL  60606
(312) 407-0700

Clifford M. Sloan
    *Counsel of Record*
Geoffrey M. Wyatt
1440 New York Avenue, N.W.
Washington, DC  20005
Tel: (202) 371-7000
Email: cliff.sloan@probonolaw.org

*Counsel for Amici Curiae*

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 10-3525

Short Caption: Ezell v. City of Chicago

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[ ]**     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Paul Finkelman, Stanley N. Katz, David Thomas Konig, Patrick J. Charles, Robert J. Spitzer

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Skadden, Arps, Slate, Meagher & Flom LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

     N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

     N/A

Attorney's Signature: /s/ Clifford M. Sloan      Date: 2/24/2011

Attorney's Printed Name: Clifford M. Sloan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  x  **No** _____

Address: 1440 New York Ave. N.W., Washington, D.C. 20005

Phone Number: 202-371-7040      Fax Number: 202-661-8340

E-Mail Address: cliff.sloan@probonolaw.org

rev. 01/08 AK

American LegalNet, Inc.
www.FormsWorkflow.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 10-3525

Short Caption: Ezell v. City of Chicago

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

## [ ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Paul Finkelman, Stanley N. Katz, David Thomas Konig, Patrick J. Charles, Robert J. Spitzer

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Skadden, Arps, Slate, Meagher & Flom LLP

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: /s/ Charles F. Smith      Date: 2/24/2011

Attorney's Printed Name: Charles F. Smith

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ___x___

Address: 155 N. Wacker Drive, Chicago, IL 60606

Phone Number: 312-407-0516      Fax Number: 312-407-8523

E-Mail Address: charles.smith@probonolaw.org

rev. 01/08 AK

American LegalNet, Inc.
www.FormsWorkflow.com

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>10-3525</u>

Short Caption: <u>Ezell v. City of Chicago</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

     **[ ]**     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

<u>Paul Finkelman, Stanley N. Katz, David Thomas Konig, Patrick J. Charles, Robert J. Spitzer</u>

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Skadden, Arps, Slate, Meagher & Flom LLP</u>

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

    <u>N/A</u>

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Geoffrey M. Wyatt</u>      Date: <u>2/24/2011</u>

Attorney's Printed Name: <u>Geoffrey M. Wyatt</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** <u>     </u>   **No** <u>  x  </u>

Address: <u>1440 New York Ave. N.W., Washington, D.C. 20005</u>

Phone Number: <u>202-371-7008</u>      Fax Number: <u>202-661-9118</u>

E-Mail Address: <u>geoffrey.wyatt@probonolaw.org</u>

rev. 01/08 AK

American LegalNet, Inc.
www.FormsWorkflow.com

# TABLE OF CONTENTS

**Page**

Table Of Authorities ........................................................................ ii

Introduction And Summary Of The Argument .............................................. 3

Argument ...................................................................................... 5

    I.      Chicago's Law Does Not Restrict Conduct Understood To Be Within The Second Amendment's Scope At The Time Of Its Adoption. ................................................. 5

            A.      Target Practice And Discharge Of Firearms In Populated Areas Were Not Protected Conduct Under The Second Amendment When It Was Adopted. ............................................................ 8

            B.      Chicago's Laws Do Not Infringe on the Second Amendment's Guarantee Of A "Well-Regulated Militia." .............................................................. 15

    II.     There Is No Historical Evidence To Support The Theory That The First Amendment Protects Target Practice. ............... 27

Conclusion .................................................................................... 30

Certificate Of Compliance Pursuant To Fed. R. App. P. 29(C)(5) And 32(A)(7)(C) ................................................................................ 31

Appendix Of Amici .......................................................................... 33

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .....7, 10, 15, 16, 17, 19

*Georgiacarry.org, Inc. v. Georgia*, 2011 U.S. Dist. LEXIS
    6370 (M.D. Ga. Jan. 24, 2011) ................................................................. 6

*Houston v. Moore*, 18 U.S. 1 (1820)........................................................... 17

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) .............. 7, 15, 16, 17

*Presser v. Illinois*, 116 U.S. 252 (1886) ..................................................... 25

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) ..................................... 26

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ......................... 6, 29

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001)............................ 26

*United States v. Lunsford*, No. 2:10-cr-182, 2011 U.S. Dist.
    LEXIS 4753 (S.D. W. Va. Jan. 18, 2011) ................................................ 5

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ...................... 6, 7

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010)................................. 6

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) .................................... 6

*United States v. Schwimmer*, 279 U.S. 644 (1929)..................................... 25

*United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009) ......................... 5, 6, 7

*United States v. Skoien*, No. 08-3770, 2010 U.S. App. LEXIS
    6584 (7th Cir. Feb. 22, 2010) ................................................................... 5

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ............................ 5, 6

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010).......................... 5, 6

**Constitutional Provisions**

Declaration of Rights art. XIII (Va. 1776) .......................................... 19

Declaration of Rights and Fundamental Rules art. XVIII
    (Del. 1776) ............................................................................................. 19

Mass. Const. of 1780, Declaration of Rights, art. XVII..................... 21

Md. Const. of 1776 art. XXV.................................................................. 19

N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. XVII .......................21

N.H. CONST. of 1784 art. XXIV ..................................................19

OHIO CONST. OF 1802 art. VIII, § 20 .........................................21

U.S. CONST. art. I, § 8, cl. 16 .................................................18, 28

## Statutes and Rules

Chi. Mun. Code § 8-20-280 ......................................................15

2 Edw. 3, c. 3 (1328) (Eng.) ......................................................9

25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) ..................................12

26 Hen. 8, c. 6, § 3 (1534) (Eng.) ............................................10

33 Hen. 8, c. 6, § 4 (1541-42) (Eng.) ......................................10

33 Hen. 8, c. 6, § 6 (1541-42) (Eng.) ......................................10

Militia Act of 1792, ch. 33, 1 STAT. 271 (1792) ......................26

18 U.S.C. § 922(g)(1) ..............................................................5

1 W. & M. 2, c. 2 (1688) (Eng.) ..............................................11

## Other Authorities

AN ACT FOR FORMING AND REGULATING THE MILITIA WITHIN
     THE COMMONWEALTH OF MASSACHUSETTS FOR THAT
     PURPOSE (Mass. 1781) ........................................................20

AN ACT FOR REGULATING AND GOVERNING THE MILITIA OF THE
     STATE OF VERMONT, AND FOR REPEALING ALL LAWS
     HERETOFORE FOR THAT PURPOSE (Vt. 1793) ........................20

BARTGIS'S REPUBLICAN GAZETTE (Fredericktown, MD),
     November 26, 1802 ............................................................22

THE BOSTON POST-BOY & ADVERTISER (Boston, MA),
     September 5, 1768 ..............................................................13

THE BOSTON WEEKLY NEWS-LETTER (Boston, MA), September
     16, 1746 ............................................................................12

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY
     OF VIRGINIA, OF PUBLIC AND PERMANENT NATURE, AS ARE
     NOW IN FORCE (1794) ........................................................11

DAVID HUMPHREY, CONSIDERATIONS ON THE MEANS OF

IMPROVING THE MILITIA FOR THE PUBLIC DEFENSE (1803)....................22

THE ESSEX JOURNAL, AND THE MASSACHUSETTS AND NEW-HAMPSHIRE GENERAL ADVERTISER (Essex, MA), May 11, 1785 ................................................................................14

Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97 (2009) ........................................12

FRANCOIS-XAVIER MARTIN, A COLLECTION OF STATUTES OF PARLIAMENT OF ENGLAND IN FORCE IN THE STATES OF NORTH CAROLINA (1792).............................................11, 12

George Thatcher, "Scribble Scrabble," THE CUMBERLAND GAZETTE (Portland, ME), December 8, 1786.......................29

1 HUGO GROTIUS, THE RIGHTS OF WAR AND PEACE (Richard Tuck ed., 2005)................................................................18

INDEPENDENT CHRONICLE AND UNIVERSAL ADVERTISER (Boston, MA), November 3, 1785.......................................22

JEAN LOUIS DE LOLME, THE CONSTITUTION OF ENGLAND; OR, AN ACCOUNT OF THE ENGLISH GOVERNMENT (David Lieberman ed., 2007)..............................................................18

JOHN FERLING, ALMOST A MIRACLE: THE AMERICAN VICTORY IN THE WAR FOR INDEPENDENCE (2008) ....................................21

JOSEPH STORY, FAMILIAR EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES (1842) ....................................................20

1 LAWS OF NEW-YORK, FROM THE YEAR 1691, TO 1773 INCLUSIVE (1774) ...................................................................14

2 LAWS OF THE STATE OF NEW YORK (1802) .............................14

1 THE PAPERS OF GEORGE MASON, 1725-1792 (Robert A. Rutland ed., 1970)..................................................................28

Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 GEO. J.L. & PUB. POL'Y (forthcoming 2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1705564 .......23, 27

Patrick J. Charles, *"Arms for Their Defence?": An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEV. ST. L. REV. 351 (2009) ..............................................................21

Patrick J. Charles, *The Constitutional Significance of a "Well-Regulated Militia" Asserted and Proven With Commentary*

*on the Future of Second Amendment Jurisprudence*, 3 NE. U. L.J. 1 (2011) ...............................................................18, 19, 20

Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 NW. L. REV. COLLOQUY 227 (2011) .......................................................11, 12, 27, 29

PATRICK J. CHARLES, THE SECOND AMENDMENT: THE INTENT AND ITS INTERPRETATION BY THE STATES AND THE SUPREME COURT (2009).....................................................................................26

Patrick J. Charles, *The Second Amendment Standard of Review After McDonald: "Historical Guideposts" and the Missing Arguments in* McDonald v. City of Chicago, 2010 AKRON L.J. CONST. L. & POL. 7 ................................................................6, 7, 11

Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 CHI.-KENT L. REV. 195 (2000)....................................................................................18

Paul Finkelman, *It Really Was About a Well-Regulated Militia*, 59 SYRACUSE L. REV. 267 (2000) ..........................................22

11 PENNSYLVANIA ARCHIVES (Samuel Hazard ed., 1855)...........................20

2 THE PERPETUAL LAWS, OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE ESTABLISHMENT OF ITS CONSTITUTION TO THE SECOND SESSION OF THE GENERAL COURT, IN 1798 (1799).........................................................................11

RAY RAPHAEL, THE FIRST AMERICAN REVOLUTION: BEFORE LEXINGTON AND CONCORD (2002).........................................................21

A REPORT OF THE RECORD COMMISSIONERS OF THE CITY OF BOSTON CONTAINING THE SELECTMEN'S MINUTES FROM 1764 THROUGH 1768 (1889) .........................................................................13

ST. GEORGE TUCKER, A VIEW OF THE CONSTITUTION OF THE UNITED STATES WITH SELECTED WRITINGS (Clyde N. Wilson fwd., 1999)...........................................................................11

SAMUEL VON PUFENDORF, THE WHOLE DUTY OF MAN, ACCORDING TO THE LAW OF NATURE (Ian Hunter and David Saunders eds., 2003).........................................................................18

1 THE STATUTES OF OHIO AND THE NORTHWESTERN TERRITORY, ADOPTED OR ENACTED FROM 1788 TO 1833 INCLUSIVE (Salmon P. Chase ed., 1833)......................................................9

STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS (2008)......................................28

TIMOTHY PICKERING, AN EASY PLAN OF DISCIPLINE FOR A
MILITIA (1775) .......................................................................... 24

Timothy Pickering, "A Military Citizen," Part I, THE ESSEX
GAZETTE (Salem, MA), January 31, 1769 ............................. 23

Timothy Pickering, "A Military Citizen," Part II, THE ESSEX
GAZETTE (Salem, MA), February 21, 1769 ........................... 24

2 WILLIAM BLACKSTONE, BLACKSTONE'S COMMENTARIES:
WITH NOTES OF REFERENCE TO THE CONSTITUTION AND
LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES
AND OF THE COMMONWEALTH OF VIRGINIA (St. George
Tucker ed., 1803) ..................................................................... 11

William E. White, *The Independent Companies of Virginia,
1774-1775*, 86 THE VIRGINIA MAGAZINE OF HISTORY AND
BIOGRAPHY 149 (1978) ............................................................ 28

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED
STATES OF AMERICA (2d ed., 1829) .................................. 11, 22

WILLIAM THORNTON, THE COUNTERPOISE, BEING THOUGHTS ON
A MILITIA AND STANDING ARMY (1752) ................................ 22

## INTEREST OF *AMICI CURIAE*

*Amici* are historians and law scholars who have published scholarship on the Second Amendment and the history of gun laws:

**Paul Finkelman** is the President William McKinley Distinguished Professor of Law and Public Policy at Albany Law School;

**Stanley N. Katz** is a Lecturer with the rank of Professor at the Woodrow Wilson School of Public and International Affairs at Princeton University;

**David Thomas Konig** is a Professor of History and Law at the Washington University in St. Louis;

**Patrick J. Charles** is a historian for the United States Air Force 352nd Special Operations Group in Mildenhall, United Kingdom; and

**Robert J. Spitzer** is the Distinguished Service Professor of Political Science at the State University of New York in Cortland.

The depth of knowledge *amici* bring to the Court's inquiry in this case is further reflected in the biographical information provided in the Appendix.

*Amici* file this brief in support of appellee, the City of Chicago, to provide this Court with historical context that is crucial to resolving this case. In particular, *amici* offer evidence of the founding generation's understandings of acceptable restrictions on the "right to keep and bear

arms," and of that generation's practices concerning the "well-regulated militia."

All parties have consented to the filing of this brief.

Counsel for *amici* authored this brief in whole. Neither the parties nor the parties' counsel have contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

We submit this brief to aid the Court in addressing the question it has said must be answered first in any Second Amendment case: whether the claimed right was understood to come within the scope of the Second Amendment at the time it was ratified. We have applied our knowledge of Second Amendment history to the principal issue in this case – whether the Second Amendment protects a right to target practice at a gun range. We conclude that it does not – no such right was recognized at the founding, and none was intended to be protected by the Second Amendment.

In attempting to answer this question, appellants fail to even consider the founding history. That failure perhaps is not an accident. The historical record demonstrates that the founding generation heavily restricted the discharge of firearms in populated areas – indeed, there were even laws expressly banning target practice. The law at issue in this case fits comfortably within this country's long tradition of regulating the discharge of firearms outside the home, and it thus does not impinge on the right to keep and bear arms.

Appellants and their *amici* alternatively argue that the law barring gun ranges infringes the Second Amendment by undermining the maintenance of a "well-regulated militia." But the Supreme Court has never held that there

is a right to engage in unsupervised, individualized training for purposes of participation in a militia. Moreover, the historical record demonstrates that the founding generation understood the training of the militia to be within the plenary authority of the federal and state governments. Indeed, the founders feared that leaving the maintenance of the militia to individuals would do little more than facilitate a dangerous mob incapable of contributing to meaningful defense. Thus, in the minds of the founders, a law like Chicago's would facilitate rather than undermine a "well-regulated militia," and certainly would be permissible.

Appellants finally argue that, even if the "right" to target practice is not protected by the Second Amendment, it is protected by the First Amendment. But this argument, too, lacks any historical support. At the time of the founding, laws barring the assembly of people in arms were common, and no court or commentator from the founding through Reconstruction ever suggested that target practice was a protected speech activity.

For all these reasons, appellants' arguments lack merit, and the district court's judgment should be affirmed.

# ARGUMENT

## I. Chicago's Law Does Not Restrict Conduct Understood To Be Within The Second Amendment's Scope At The Time Of Its Adoption.

The Seventh Circuit has adopted a two-step approach to evaluate Second Amendment challenges. First, the Court must "examine whether the challenged conduct falls within the scope of the Second Amendment's protection" at the time it was adopted, in 1791. *United States v. Williams*, 616 F.3d 685, 691 (7th Cir. 2010). If the conduct is not protected, the Second Amendment does not apply; the law is valid. *Id.* If the conduct falls within the historical scope of the Second Amendment, "then the court must move on to step two, which requires courts to apply some level of 'means-ends' scrutiny to establish whether the regulation passes constitutional muster." *Id.* (citing *United States v. Skoien*, 587 F.3d 803, 808-09 (7th Cir. 2009),[1] *vacated, reh'g en banc granted,* No. 08-3770, 2010 U.S. App. LEXIS 6584 (7th Cir. Feb. 22, 2010)); *see also, e.g.*, *United States v. Lunsford*, No. 2:10-cr-182, 2011 U.S. Dist. LEXIS 4753 (S.D. W. Va. Jan. 18, 2011) (applying same two-step analytical framework to facial and as-applied challenges to 18 U.S.C. § 922(g)(1)).

---

[1]     This Court vacated the panel decision in *Skoien*, holding that it had misapplied the test's second step. 614 F.3d 638 (7th Cir. 2010) (en banc). But *Williams* confirms the analytical approach adopted by the *Skoien* panel is the one still used by this Court. *See* 616 F.3d at 691-92.

Regarding the first step, this and other courts have examined whether the conduct "falls outside the terms of the right as publicly understood when the Bill of Rights was ratified." *Skoien*, 587 F.3d at 808-09; *see also Williams*, 616 F.3d at 691.[2] Courts applying these historical inquiries have not demanded express statements covering the precise conduct at issue, nor have they required identification of founding-era laws identical in scope and substance to those under attack. *See, e.g.*, *Rene E.*, 583 F.3d at 15-16 (concluding that federal law barring gun possession by juveniles was consistent with founding-era laws barring possession of arms by "the unvirtuous"); *cf. Skoien*, 614 F.3d at 641 ("exclusions need not mirror limits that were on the books in 1791"); *Georgiacarry.org, Inc. v. Georgia*, 2011 U.S. Dist. LEXIS 6370, at *21 (M.D. Ga. Jan. 24, 2011) (quoting same); *accord* Patrick J. Charles, *The Second Amendment Standard of Review After McDonald: "Historical Guideposts" and the Missing Arguments in* McDonald v. City of Chicago, 2010 AKRON L.J. CONST. L. & POL. 7, 15 (it is "the rare occasion that a modern Second Amendment issue, case, or controversy will exactly replicate … restrictions on … arms circa 1791").

---

[2]     The First, Third, Fourth, and Tenth Circuits have adopted this test. *See United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009); *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).

Instead, this Court looks at the first step for historical guideposts –
i.e., direct or circumstantial evidence of the scope of conduct protected by
the Second Amendment as it was "publicly" or "commonly understood" at
the time of the founding, and determines whether the law at issue regulates
such conduct, with careful attention to traditional and longstanding
restrictions on arms. *See Skoien*, 587 F.3d at 808-09; *Marzzarella*, 614 F.3d
at 91; *see also District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008)
("Constitutional rights are enshrined with the scope they were understood to
have when the people adopted them"). In other words, the Court should
maintain some form of "historical consciousness," and not only examine
"whether the [modern] restriction at issue has a 1791 parallel, but whether
there is sufficient historical evidence to suggest that it was publicly
accepted." Charles, *The Second Amendment Standard*, *supra*, at 5; *see also
McDonald v. City of Chicago*, 130 S. Ct. 3020, 3057-58 (2010) (Scalia, J.,
concurring) (the historical evidence does not have to be the "*perfect means
… but whether it is the best means available* in an imperfect world.").

As set forth below, the historical record shows that regulations on
target practice – like the law at issue here – were not thought to trench on the
rights protected by the Second Amendment. Plaintiffs theorize that
unfettered access to shooting ranges is necessary both to exercise the right to

keep and bear arms and to maintain a "well-regulated militia." These theories lack historical support.

**A.** **Target Practice And Discharge Of Firearms In Populated Areas Were Not Protected Conduct Under The Second Amendment When It Was Adopted.**

Chicago's ban on gun ranges in the City passes muster under this Court's first step because the historical record demonstrates that similar bans were tolerated by the founding generation. Indeed, that record includes nearly identical laws – municipal ordinances banning target practice within city limits. It also includes numerous laws – banning discharge of weapons in populated areas – whose basic rationale strongly supports the validity of Chicago's ordinance.

*First*, at least one law from the founding era expressly regulated the conduct at issue here – the use of firearms for target practice. A 1790 Ohio statute provided for regulation of the discharge of firearms in populated areas, such as "streets and [in the] vicinity of cities, towns, villages and stations." As relevant here, the law included a specific restraint on target practice:

> That if any person shall presume to discharge or fire, or cause to be discharged or fired, any gun or other fire-arms *at any mark or object*, or upon any pretence whatever, unless he or she shall at the same time be with such gun or fire-arms at the distance of *at least one quarter of a mile from the*

> *nearest building* of any such city, town, village or
> station, such person shall for every such offence,
> forfeit and pay to use of the county in which the
> same shall be committed, a sum not exceeding five
> dollars, nor less than one dollar….

An Act for Suppressing and Prohibiting ever Species of Gaming … and also for Restraining the Disorderly Practice of Discharging Fire Arms at Certain Hours and Places ("Nw. Terr. Stat.") § 4 (Ohio 1790), *reprinted in* 1 THE STATUTES OF OHIO AND THE NORTHWESTERN TERRITORY, ADOPTED OR ENACTED FROM 1788 TO 1833 INCLUSIVE 104, 106 (Salmon P. Chase ed., 1833) (emphases added).[3]

*Second*, laws regulating the firing of arms near buildings or densely populated areas have a long and prolific lineage. As early as 1328, the Statute of Northampton made it unlawful "to go nor ride armed by Night nor by Day in Fairs, Markets, nor in the Presence of the Justices or other Ministers nor in no part elsewhere." 2 Edw. 3, c. 3 (1328) (Eng.). By 1541, England had adopted laws that barred the discharge of arms within city

---

[3]    Importantly, this law was still in effect when the Second Amendment was ratified and would have directly applied to the Northwest Territory – and indeed, the law expressly preserved something akin to the core Second Amendment right recognized by the Supreme Court in *Heller*, excluding from regulation the right to the lawful use of "fire-arms as offensive or defensive weapons, in annoying, or opposing a common enemy, or defending his or her person or property, or the person or property of any other … where such opposition, defence, or resistance is allowed by the law of the land." Nw. Terr. Stat. § 4.

limits for any purpose other than self defense.  Specifically, Henry VIII passed a statute preventing the firing of any "Handgune demyhake or hagbutt at any thing at lardge" within populated areas such as a "Cittie, Boroughe or Markett Town or within one quarter of a myle" thereof, "excepteit be at a Butt or Banck of earth in place convenient, or for the defence of his pson or house, upon payne to forfeyte for everie suche Shott tenne pounds[.]"  33 Hen. 8, c. 6, § 4 (1541-42) (Eng.);[4] *see also* 26 Hen. 8, c. 6, § 3 (1534) (Eng.) (preventing the use of arms "within the discance of two myles" of any "Sessions or Courte, nor to any towne, churche, fayre, market, or other congregacion" except upon the hue and cry).[5]

---

[4] The language "Butt or Banck of earth in place convenient" was a recognition of the local government's plenary authority to decide which places were in fact "convenient" – i.e., where arms could be fired – as sections 6 and 7 of the statute confirm.  Section 6 required individuals located in cities, boroughs, and market towns, to shoot "onlye in place convenient for the same[.]"  *See* 33 Hen. 8, c. 6, § 6 (1541-42) (Eng.).  This requirement could be superseded pursuant to section 7, which made a legal exception for individuals dwelling and inhabiting "anye house standing and being sett distant twoo furlongs from any Cittie Boroughe or Town," the modern day equivalent of 402 meters. *Id*. at § 7.  Individuals covered by section 7 were not subject to a city, borough, or town's laws stipulating the time, place, and manner shooting was "convenient," thus affirming the discharging of firearms in both populated and unpopulated areas was subject to detailed regulation.

[5] Anglo origins are of particular significance as historical guideposts for Second Amendment analysis because the Supreme Court recognized that the Founding Fathers would have included the English restrictions concerning the "right to keep and bear arms" in the Second Amendment.  *Heller*, 554 U.S. at 592-94, 598-99.  Early constitutional commentators confirm the

The Statute of Northampton remained in force throughout the eighteenth century, as reflected in contemporaneous and early nineteenth century legal treatises, meaning the Founding Fathers would have been familiar with its tenets. *See* Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 Nw. L. Rev. Colloquy 227, 237 (2011). In fact, many states adopted firearms laws akin to the Statute of Northampton, including the States of Massachusetts, North Carolina, and Virginia, after the adoption of the Constitution and the subsequent Bill of Rights. *See* 2 The Perpetual Laws, of the Commonwealth of Massachusetts, from the Establishment of its Constitution to the Second Session of the General Court, in 1798, at 259 (1799); Francois-Xavier Martin, A Collection of Statutes of Parliament of England in Force in the States of North Carolina 60-61 (1792); A Collection

---

*Heller* Court's determination in this regard. *See* St. George Tucker, A View of the Constitution of the United States with Selected Writings 239 (Clyde N. Wilson fwd., 1999); 2 William Blackstone, Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia 143 n.40 (St. George Tucker ed., 1803); William Rawle, A View of the Constitution of the United States of America 126 (2d ed., 1829). The only significant legal difference between the English right, *see* 1 W. & M. 2, c. 2 (1688) (Eng.), and the Second Amendment is that the Second Amendment is not dependent on privileges of wealth or birth. Charles, *The Second Amendment Standard*, *supra*, at 36-37.

OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF PUBLIC AND

PERMANENT NATURE, AS ARE NOW IN FORCE 33 (1794).[6]

Similarly, states and cities across the United States adopted laws

regulating the discharge of firearms in city streets and other populated areas

both before and after the adoption of the Second Amendment. In

Massachusetts, for example, the towns of Boston and Newburyport had such

restrictions on their books. In 1746, Boston enacted the following:

> That no Person shall … discharge any Gun or
> Pistol charged with Shot or Ball in the town of
> Boston (the Islands thereto belonging excepted) or
> in any Part of the Harbour between the Castle and
> said Town, on Pain of forfeiting Forty Shillings for
> each Gun or Pistol so fired or discharged … or
> shall suffer Ten Days Imprisonment.

An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town

of Boston, *reprinted in* THE BOSTON WEEKLY NEWS-LETTER, September 16,

---

[6]     Contrary to the belief of one commentator, Eugene Volokh, the Statute of Northampton and similar American laws restricting the use, possession, carrying or disposition of firearms, especially in public, were not limited to "covering only those circumstances where carrying of arms was unusual and therefore terrifying." Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009). As is stipulated in 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.), riding or going armed with intent to terrify or harm others was a separate and non-treasonous felony. An individual could be found to violate the law should they "go" or "ride armed" in areas prohibited by law. MARTIN, *supra*, at 61 (no person may go or ride armed "by night nor day, in fairs, markets…nor in no part elsewhere."). For a full legal history analysis, see Charles, *Scribble Scrabble*, *supra*, at 237-42.

1746, pg. 2, col. 1.  The law was reprinted in 1768 when Boston's

Selectmen, which included John Hancock, had been given information that

"inhabitants have been lately surprised and endangered by the firing of

Muskets charged with Shot or Ball on the Neck, Common, and other Parts of

the Town[.]"  An Act to Prevent the Firing of Guns Charged with Shot or

Ball in the Town of Boston, *reprinted in* BOSTON POST-BOY & ADVERTISER,

September 5, 1768, pg. 1, col. 3; A REPORT OF THE RECORD COMMISSIONERS

OF THE CITY OF BOSTON CONTAINING THE SELECTMEN'S MINUTES FROM 1764

THROUGH 1768, at 307 (1889).

In 1785, Newburyport, Massachusetts followed suit, passing an

ordinance outlawing the discharging of firearms, excepting those during

organized militia musters controlled by State officers:

> That no person (excepting the militia, when under
> arms, on muster-days, and by the command of
> their officer) shall fire off any sort of gun, pistol …
> or other thing charged or composed in whole, or in
> part of gun-powder, in array of the streets, lanes or
> public ways in this town, nor so near as to affright
> any horse, or in any sort tend to affright, annoy or
> injury any person whatever—nor shall any person
> discharge at a mark or otherwise any gun, charged
> with ball, at any time or front of any place within
> this town, nor in any direction but such only as
> from time to time shall be approved of the licensed
> by the town, or by the select-men thereof.

At a legal meeting of the freeholders and other inhabitants of the town of
Newburyport … held on the twenty-ninth day of March, A.D. 1785,
*reprinted in* ESSEX JOURNAL, AND THE MASSACHUSETTS AND NEW-
HAMPSHIRE GENERAL ADVERTISER (Essex, Mass.), May 11, 1785, pg. 2, col.
2. New York had similar laws. *See, e.g.*, An Act to Prevent the Firing of
Guns, and other Fire-Arms Within This Colony (N.Y. 1773), *reprinted in* 1
LAWS OF NEW-YORK, FROM THE YEAR 1691, TO 1773 INCLUSIVE 763 (1774)
(making it unlawful for "any Person or Persons of any Age or Quality" to
"fire or discharge any Gun, Pistol…or other Fire-work" in "any House,
Barn, or other Building, or before any Door, or in any Garden, Street, Lane,
or other Inclosure"); An Act for the more effectual Prevention of Fires, and
to regulate Buildings in the City of New-York § 11 (N.Y. 1801), *reprinted in*
2 LAWS OF THE STATE OF NEW YORK 114, 118 (1802) ("That if any person
shall fire or discharge any gun, pistol…or other firework, in any street, lane
or alley, garden or other inclosure, or from any house, or in any other place
where persons frequently walk…every such person…shall forfeit and pay
two dollars and fifty cents, to be sued for, recovered and applied").

Each of these examples serves as an important historical guidepost
supporting the validity of Chicago's statute. The statutes are strong
evidence that it was publicly or commonly understood that eighteenth-

century legislatures could pass laws restricting the discharging of firearms in cities except during times of immediate self-defense. And that understanding in turn suggests that the Second Amendment was not thought to protect such conduct. *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring) ("traditional restrictions [on arms] go to show the scope of the right" just as history helps to define "*other* rights"). Accordingly, Chicago Municipal Code § 8-20-280 regulates conduct not protected by the Second Amendment, and the district court's judgment should be affirmed.

### B. Chicago's Laws Do Not Infringe On The Second Amendment's Guarantee Of A "Well-Regulated Militia."

Appellants and their *amici* suggest an alternative theory: if Chicago's law does not impermissibly tread on the right to bear arms, it is nonetheless invalid under the Second Amendment because it impairs the maintenance of a well-regulated militia. (*See* Appellants' Br. 35 (suggesting that the phrase "'[a] well-regulated militia' supplies a reason for the right's codification") (citing *Heller*, 554 U.S. at 596-97)); Br. of *Amicus Curiae* Benson et al. ("Benson Br."), 7-11 (arguing that a core purpose of the right is to "'prevent elimination of the militia'") (quoting *Heller*, 554 U.S. at 599).) Plaintiffs and their *amici* argue that the "well-regulated militia" language of the Second Amendment is a constitutional guarantee to train (by discharging their personal firearms at shooting galleries within city limits) to effectuate

their constitutional right to armed individual self-defense of the home. (Appellants' Br. 35-36; Benson Br. 7-11.)  They are wrong for several reasons.

*First*, the substantial historical evidence cited in Part I.A above is an insurmountable obstacle to plaintiffs' theory.  That evidence reflects the founding generation's understanding of the entire Second Amendment right – regardless whether it is thought of as one securing the right to keep and bear arms or the maintenance of a "well-regulated militia."  Because laws like the one under attack here were tolerated by that generation, it is reasonable to conclude that the founders did not regard access to target practice in cities as conduct that was protected by any part of the Second Amendment, including any part of it designed to encourage militia training.

*Second*, the Supreme Court has never held that there is a distinct, individual "well-regulated militia" right to train under the Second Amendment.  Neither *Heller* nor *McDonald* was a "well-regulated militia" case or controversy,[7] and instead concerned whether possession of a

---

[7]     The *Heller* Court examined the prefatory "well-regulated militia" language of the Second Amendment, 554 U.S. at 595-99, and concluded that the phrase "well-regulated militia" "does not suggest that preserving the militia was the only reason Americans valued the ancient right," *id*. at 599. Meanwhile, *McDonald* did not recite the "well-regulated militia" language even once in the majority; not even as dicta.  *See* 130 S. Ct. at 3026-50

handgun for self-defense of the home is a right protected by the Second Amendment. 554 U.S. at 598-99, 635-36; 130 S. Ct. at 3036. And plaintiffs and their *amici* offer no basis for the recognition of such a right by this Court.

*Third*, the Second Amendment's "well-regulated militia" language was not intended to be effectuated by an individual right to target practice. Rather, constitutional authority over the "militia" – including the right to prescribe its training – has always been vested in the federal and state governments.

The Constitution expressly divides power over the militia between the state and federal governments, granting plenary power to the states to prescribe the time, place, and manner militia trainings may take place. While Congress has the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States,"[8] the Constitution reserves "to

---

(2010) (Alito, J.); *id*. at 3050-58 (Scalia, J. concurring); *id*. at 3058-88 (Thomas, J., concurring).

[8] The states possess concurrent authority to organize, arm, and discipline the militia should the federal government neglect or not fully legislate on the topic. *See Houston v. Moore*, 18 U.S. 1, 21 (1820).

the States … the Authority of training the Militia according to the discipline prescribed by Congress." U.S. CONST. art. I, § 8, cl. 16.[9]

The adoption of the Second Amendment was not intended to undo this commitment of authority by transferring the task of maintaining a well-regulated militia to the whims of individuals. Rather, it is well established in history that the "well-regulated militia" right to "keep and bear arms" referred to in the Second Amendment is unique and distinct from the right recognized in *Heller*. *See generally* Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 CHI.-KENT L. REV. 195 (2000); Patrick J. Charles, *The Constitutional Significance of a "Well-Regulated Militia" Asserted and Proven With Commentary on the Future of Second Amendment Jurisprudence*, 3 NE. U. L.J. 1 (2011). The "well-regulated militia" right to "keep and bear arms" was a continuation of the provision of Article VI, Section 4 of the Articles of Confederation, that "every State shall always keep up a well-regulated and disciplined militia, sufficiently armed and accoutred, and shall provide and constantly have for

---

[9] Commitment of such authority to government was not novel at the time, as contemporary international law theorists viewed regulation of armed forces to be inherent in sovereignty. *See* 1 HUGO GROTIUS, THE RIGHTS OF WAR AND PEACE 338-39 (Richard Tuck ed., 2005); JEAN LOUIS DE LOLME, THE CONSTITUTION OF ENGLAND; OR, AN ACCOUNT OF THE ENGLISH GOVERNMENT 298-99 (David Lieberman ed., 2007); SAMUEL VON PUFENDORF, THE WHOLE DUTY OF MAN, ACCORDING TO THE LAW OF NATURE 200 (Ian Hunter and David Saunders eds., 2003).

use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition, and camp equipage." *See id.* at 63-67.

Contemporaneous accounts of the militia role bear this out. A "well-regulated militia" was the assemblage of a well-trained and disciplined military force comprised of the state's citizens. It served to protect each state's right of self-preservation, it united society in a common mission, it constitutionally guaranteed a check to unlawful standing armies, and it provided necessary physical security from both internal and external threats. Charles, *The Constitutional Significance of a "Well-Regulated Militia," supra*, at 57-89, 102-4. Indeed, a "well-regulated militia" was of such importance to the founding generation that it was included in five State constitutions circa 1791.[10] Many eighteenth-century commentators thought it the "palladium of liberty" because it was intended to be the military defense of the nation, which preserved the people's liberties in the process. *See id.* at 71-85.

Of course, as *Heller* recognized, codification of the right to "keep and bear arms" was intended in part as a means to effectuate the "well-regulated militia," and such a militia requires "proper discipline and training." 554

---

[10]     *See* MD. CONST. of 1776 art. XXV; N.H. CONST. of 1784 art. XXIV; DECLARATION OF RIGHTS AND FUNDAMENTAL RULES art. XVIII (Del. 1776); DECLARATION OF RIGHTS art. XIII (Va. 1776).

U.S. at 596-97. But a "well-regulated militia" was not created or maintained by the individual exercise and discharge of firearms at firing targets, *see* Charles, *The Constitutional Significance of a "Well-Regulated Militia*," *supra*, at 17-18, 26, 90-94; to the contrary, many states expressly banned such practices under their militia laws.[11] Instead, a "well-regulated militia" was a carefully balanced constitutional military force under the direction of the state and federal governments. *See* 11 PENNSYLVANIA ARCHIVES 738 (Samuel Hazard ed., 1855) (In 1790, militia Lieutenant Bernard Hubley hoped "a Plan might be adopted … [by the Pennsylvania Assembly to establish] a well Regulated militia corresponding with the Constitution"); Charles, *The Constitutional Significance of a "Well-Regulated Militia*," *supra*, at 15-24 (1757 Parliamentarian debate over nature of "well-regulated militia"); *id.* at 24-29 (eighteenth century New Jersey and Pennsylvania debates over what constitutes a "well-regulated militia"); JOSEPH STORY,

---

[11]     AN ACT FOR REGULATING AND GOVERNING THE MILITIA OF THE STATE OF VERMONT, AND FOR REPEALING ALL LAWS HERETOFORE FOR THAT PURPOSE § 36 (Vt. 1793) ("Whereas the good citizens of this State, are often injured by the discharge of single guns … no commissioned officer, or private, shall unnecessarily fire a musket, or single gun, in any public road, or near any house, or near the place of parade"); AN ACT FOR FORMING AND REGULATING THE MILITIA WITHIN THE COMMONWEALTH OF MASSACHUSETTS FOR THAT PURPOSE, at 15 (Mass. 1781) ("That no Soldier…shall unnecessarily discharge his Firelock from and after his appearing…on a Training or Muster-Day, without the express Order or License of his Superior Officer").

FAMILIAR EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES 264-65
(1842) (it is impracticable "to keep the people duly armed without some
organization" because it would "gradually undermine all the protection
intended by this clause"). This fact was frequently conveyed in militia law
preambles, *see* Patrick J. Charles, *"Arms for Their Defence?": An
Historical, Legal, and Textual Analysis of the English Right to Have Arms …
in McDonald v. City of Chicago*, 57 CLEV. ST. L. REV. 351, 450 n.701
(2009), and Second Amendment analogues in state constitutions often
expressly referenced subordination to the civil authority.[12]  And this
allocation of authority over the militia followed from a practice that predated
the Second Amendment and the Constitution – for example, the militia that
assembled at Lexington & Concord was a well-regulated and disciplined
militia force that had been performing military exercise for a year. JOHN
FERLING, ALMOST A MIRACLE: THE AMERICAN VICTORY IN THE WAR FOR
INDEPENDENCE 27 (2008); RAY RAPHAEL, THE FIRST AMERICAN
REVOLUTION: BEFORE LEXINGTON AND CONCORD 157, 162 (2002).

The notion that individuals could be trusted with the responsibility of
training themselves for militia duty was expressly rejected by the founding

---

[12]      *See* MASS. CONST. OF 1780, DECLARATION OF RIGHTS, art. XVII; N.C.
CONST. OF 1776, DECLARATION OF RIGHTS, art. XVII; OHIO CONST. OF 1802
art. VIII, § 20.

generation.  *See, e.g.*, BARTGIS'S REPUBLICAN GAZETTE (Fredericktown, MD), November 26, 1802, pg. 2, col. 4 ("Many appeal to the history of our revolution to prove discipline unnecessary; but those who waded through it, will recollect the enthusiasm which embodied and disciplined our active citizens near *twelve months before the sword was drawn*") (emphasis added). The founders understood that any state or nation that relied on the individual exercise of arms was not establishing a constitutional "well-regulated militia," but a mob of armed people[13] without proper military training and discipline.  *See* Paul Finkelman, *It Really Was About a Well-Regulated Militia*, 59 SYRACUSE L. REV. 267, 277 (2008) (a well-regulated militia "was

---

[13]      *See* DAVID HUMPHREY, CONSIDERATIONS ON THE MEANS OF IMPROVING THE MILITIA FOR THE PUBLIC DEFENSE 8 (1803) ("An armed crowd insubordinate and undisciplined, is but a mob on which no dependence can be placed."); *id*. at 10-11 ("I entertain no good opinion of an armed nation, destitute of order and skill…instead of furnishing the expected support, it would…be crushed by its own weight."); WILLIAM THORNTON, THE COUNTERPOISE, BEING THOUGHTS ON A MILITIA AND STANDING ARMY 11-12 (1752) ("what good can an unexercised Militia do…marched out in such haste that they have suffered greatly by the Arts of undermining and self-interested persons, who took every opportunity of misrepresenting their behaviour, when, in fact, they could not be called a Militia, but a Mob"); RAWLE, A VIEW OF THE CONSTITUTION, *supra*, at 125 ("a disorderly militia…[is] disgraceful to itself, and dangerous not to the enemy, but to its own country."); THE INDEPENDENT CHRONICLE AND UNIVERSAL ADVERTISER (Boston, MA), November 3, 1785, pg. 2 ("Let us either make the militia what the constitution supposes, and what the public safety requires it to be, or discard it.  There can hardly be a medium.  The militia must either be made a well regulated body, or it will sink into a mere armed mul[titude].").

deeply committed to an orderly society. They were not authorizing the people to create an armed mob or rabble.").

The militia writings of founding father Timothy Pickering convey this historical fact.[14] Even before the Revolution, Pickering observed that militia training days, as constituted, were highly inefficient in providing an effective and constitutional militia. One day would be "spent firing at Mark," but the actual military maneuvers were nothing but a "mock-engagement" where the men "learn a little of Military Discipline." Timothy Pickering, "A Military Citizen," Part I, THE ESSEX GAZETTE (Salem, MA), January 31, 1769, pg. 107 col. 2. Pickering elaborated:

> [B]ecause the Men learn nothing, or next to nothing, of Military Discipline … instead of good Order and a just and necessary subordination, such Training serves only to introduce, encourage and promote Licentiousness, a Disregard to all Order, and Contempt of those in Office …

*Id*. at cols. 2-3. It was not the firing or discharging of arms that ensured a constitutional "well-regulated militia." In the words of Pickering:

> The Manner of loading and firing as explained in the *Manual Exercise* is designed … to teach us to do every Action together, as well in the most

---

[14]     For the importance of Pickering in early militia law, discipline, and training see Patrick J. Charles, *The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 GEO. J.L. & PUB. POL'Y, at 26-33 (forthcoming 2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1705564.

expeditious Manner.  For it is not the scattering Fire of one here, and another there, just as they happen to get loaded, that will frighten regular Troops—No it is the close, compact Fire of large Number at once, by which whole Ranks are slaughtered, that dismays an Enemy and puts them to Flight.  But granting that we had the most perfect Use of the Firelock (which is by no Means true) and could load and fire with the exactest Uniformity … our bare Knowledge of the *Firelock* would do us very little Service, and before we could get into Order again, the Enemy might cut us to Pieces.  The right Use of the Firelock therefore is not the *whole*, nay it is the *smallest Part*, of military Discipline.

Timothy Pickering, "A Military Citizen," Part II, ESSEX GAZETTE (Salem, Mass.), February 21, 1769, pg. 119 col. 3 (emphasis added); *see also* PICKERING, AN EASY PLAN OF DISCIPLINE FOR A MILITIA 47 (1775) ("In the militia we are apt to lay too much stress upon, and almost to think ourselves disciplined, if we can perform the manual exercise….the principal part of all exercise depends upon the *legs*: and that to the legs we ought to apply ourselves.  That is to say, the men should, above all things, be taught and accustomed to march in exact order, and in equal time, lifting up their feet and setting them down together, with perfect regularity … that whoever does not follow this method, is ignorant of even the first elements of the art of war.").

Looking back on the Second Amendment's "well-regulated militia" language nearly a century after its adoption, the Supreme Court held the same understanding of those terms. In *Presser v. Illinois*, the Court acknowledged the importance of the militia in terms reminiscent of those used by founding-era proponents of the militia:

> It is undoubtedly true that all citizens capable of bearing arms constitute the reserved military force or reserve militia of the United States as well as of the states, and, in view of this prerogative of the general government … the states cannot … prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.

116 U.S. 252, 265 (1886); *see also United States v. Schwimmer*, 279 U.S. 644, 650 (1929). Nonetheless – again consistent with the founding generation's understanding – the *Presser* Court was clear that individuals do not possess a right to train to effectuate the militia:

> It cannot be successfully questioned that the state governments, unless restrained by their own constitutions, have the power … to control and regulate the organization, drilling, and parading of military bodies and associations, except when such bodies or associations are authorized by the militia laws of the United States. The exercise of this power by the states is necessary to the public peace, safety, and good order.

116 U.S. at 267-68.

Appellants do not cite any historical evidence that undermines this historical understanding of the right of the states and federal government to exercise plenary control over the training of the militia. Although appellants rely on two court of appeals decisions that used the 1792 National Militia Act to construe militia rights broadly (*see* Appellants' Br. 35-36 (quoting *United States v. Emerson*, 270 F.3d 203, 235 (5th Cir. 2001); and *Silveira v. Lockyer*, 328 F.3d 567, 587 (9th Cir. 2003) (Kleinfield, J., dissenting))), the Act does not recognize an individual right to engage in target practice or other types of self-training. *See* Militia Act of 1792, ch. 33, 1 STAT. 271 (1792) (repealed 1903). Furthermore, nothing in the Act sought to alter the states' power to regulate the time, place, and manner of militia training. *See* PATRICK J. CHARLES, THE SECOND AMENDMENT: THE INTENT AND ITS INTERPRETATION BY THE STATES AND THE SUPREME COURT 71-79, 139-53 (2009), *accord* Charles, *The 1792 National Militia Act*, *supra*, at 20-33. To the contrary, the Act if anything undermines the argument for such a right by expressly subjecting the federal militia to Baron Von Steuben's rules of military discipline and required the "several brigades, during the time of their being under arms" to follow "the system of military discipline … agreeable to law, and such orders as they shall … receive from the commander-in-chief of the state[s]." 1 STAT. 271, 273.

For all these reasons, plaintiffs' appeal to the "well-regulated militia" language of the Second Amendment adds nothing to their argument. As noted above, historical evidence shows that bans on target practice specifically, and on the discharge of weapons in cities generally, were publicly understood to fall outside the scope of the Second Amendment at the time of its adoption, and there is no historical support for an individual right to train for militia service. The district court's order should therefore be affirmed.

## II.    There Is No Historical Evidence To Support The Theory That The First Amendment Protects Target Practice.

Plaintiffs and their *amici* finally argue that the right to shoot at a target in a public place is protected by the First Amendment, but this argument, too, lacks historical support.

The available founding-era records are replete with examples that legislatures could prohibit the assembly of people with arms to prevent riots and tumults, Charles, *Scribble Scrabble*, *supra*, at 240-41, and that legislatures could specify that the assemblage and training of the militia was at the discretion of the government, Charles, *The 1792 National Militia Act*, *supra*, at 20-33, 48-64. By itself, this evidence forecloses any argument that the founders would have viewed bans on target practice as abridging First Amendment rights.

Moreover, to date, the First Amendment has never been understood as providing protections for practice in bearing arms or for gathering of the militia.[15] From the Anglo predecessor of the Second Amendment, Article VII of the 1689 Declaration of Rights, through the adoption of the Second Amendment and analogous provisions by states, and through the Reconstruction Era, not one court or prominent legal commentator has ever construed the right to bear arms as protected First Amendment activity.[16]

---

[15] Stephen P. Halbrook has asserted that Virginia's Independent Military Companies prove "the people" have a right to associate and train in arms. STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 53 (2008). However, these companies were formed by a resolution of the Virginia Assembly and directed by the local committees of public safety; thus they were not "independent" of governmental control. *See* William E. White, *The Independent Companies of Virginia, 1774-1775*, 86 THE VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY 149, 150-53 (1978). Furthermore, in 1775, the "independent" militia companies were dissolved and incorporated into the general Virginia militia, confirming that there is no independent right to associate with arms as a militia. *Id*. at 154-55. The text of the "independent" *Fairfax County Militia Plan* itself supports this fact, for the "Regulation & Establishment" of the Fairfax County Militia Association was only "to be preserved & continued, *until a regular and proper Militia Law* for the Defence of the Country shall be enacted by the Legislature of this Colony." 1 THE PAPERS OF GEORGE MASON, 1725-1792, at 216 (Robert A. Rutland ed., 1970).

[16] *Amicus Curiae* Benson et al. attempt to revise the historical record by selectively quoting some historical constitutional treatises. (Benson Br. 7-9.) However, these sources refer solely to training and disciplining in arms as a militia, a power that the Constitution reserves to the States. U.S. CONST. art. I, § 8, cl. 16.

Accordingly, plaintiffs' argument is once again undermined by the historical record, which is devoid of any support.[17]

---

[17] Both plaintiffs and their *amicus* also seem to argue for the adoption of standards of scrutiny from the First Amendment context. Here, again, there is no support for such an argument. It is true that both the First and Second Amendments maintain "cores" that the legislature cannot infringe; a position expressed by George Thatcher, a member of the Continental Congress (1787-89) and the first six Congresses (1789-1801). *See* Charles, *Scribble Scrabble*, *supra*, at 230-36. But Thatcher viewed the Second Amendment "core" to be limited and regarded any use of arms outside of the express text or core of the "right to keep and bear arms" as "alienable right[s]" that legislatures have the "power to controul" in "all cases … whenever they shall think the good of the whole require it." George Thatcher, "Scribble Scrabble," THE CUMBERLAND GAZETTE (Portland, ME), December 8, 1786, pg. 1 col. 2. Moreover, because there is little similarity between the two rights, application of First Amendment precedents in the Second Amendment context is "unjustified" because it "muddle[s], rather than clarif[ies], analysis," as one jurist has noted. *Chester*, 628 F.3d at 687 (Davis, J., concurring).

## CONCLUSION

For the foregoing reasons, *amici* respectfully request the Court affirm the judgment below.

Respectfully submitted,

/s/ Clifford M. Sloan

Charles F. Smith
155 N. Wacker Dr.
Chicago, IL  60606
(312) 407-0700

Clifford M. Sloan
   *Counsel of Record*
Geoffrey M. Wyatt
1440 New York Avenue, N.W.
Washington, DC  20005
Tel: (202) 371-7000
Email: cliff.sloan@probonolaw.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 29(C)(5) AND 32(A)(7)(C)

Undersigned counsel certifies that the attached brief complies with the type volume limitations in Fed. R. App. P. 29(d) because this brief contains 6,978 words, less than half the amount allowed for a party's principal brief under Fed. R. App. P. 32(a)(7)(B)(i), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Undersigned counsel further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. P. 29(c), because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word 2003.

/s/ Geoffrey M. Wyatt
Geoffrey M. Wyatt
1440 New York Ave. N.W.
Washington, D.C. 20005
(202) 371-7000

# CIRCUIT RULE 31(e) CERTIFICATION

Case Number: 10-3525

     The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 31(e), versions of the brief and all of the appendix items that are available in non-scanned PDF format.

                      /s/ Geoffrey M. Wyatt
                      Counsel for Historians and Legal
                      Scholars Paul Finkelman, Stanley N.
                      Katz, David Thomas Konig, Patrick J.
                      Charles, and Robert J. Spitzer as
                      *Amici Curiae* in Support of Appellee

# APPENDIX OF AMICI

**Paul Finkelman** is President William McKinley Distinguished Professor of Law and Public Policy at Albany Law School. His extensive writings in American legal history include AN IMPERFECT UNION: SLAVERY, FEDERALISM, AND COMITY (1981), SLAVERY AND THE FOUNDERS: RACE AND LIBERTY IN THE AGE OF JEFFERSON (1999), *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 CHI.-KENT L. REV. 195 (2000), *It Really Was About a Well Regulated Militia*, 59 SYRACUSE L. REV. 267 (2008), and *The Historical Context of the Fourteenth Amendment*, 13 TEMP. POL. & CIV. RTS. L. REV. 389 (2004).

**Stanley N. Katz** is a Lecturer with the rank of Professor in Public and International Affairs at the Woodrow Wilson School of Public and International Affairs at Princeton University, where he was formerly the Class of 1921 Bicentennial Professor of the History of American Law and Liberty Emeritus at Princeton University. He is former president and current fellow for the American Society for Legal History, president emeritus of the American Council of Learned Societies, and was formerly Professor of Law at the University of Chicago. His writings in early American and legal political history include NEWCASTLE'S NEW YORK: ANGLO-AMERICAN POLITICS, 1732-1753 (1968), and *Thomas Jefferson and the Right to Property in Revolutionary America*, 19 J. L. & ECON. 476 (1976).

**David Thomas Konig** is a Professor of History and Law at the Washington University in St. Louis. He is a leading expert on the Constitution, American colonial history, the Early Republic, and Anglo-American legal history. Professor Konig is the author of multiple articles on the Constitution and the Anglo-American influences on the Second Amendment, including "Constitutional Contexts: The Theory of History and the Concept of Constitutional Origins in Revolutionary America," in CONSTITUTIONALISM AND AMERICAN LIFE (2002), *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of 'the right of the people to keep and bear arms'*, 22 LAW & HIST. REV. 119 (2004), and *"The Persistence of Resistance: Civic Rights, Natural Rights, and Property Rights in the Historical Debate Over the 'right of the people to keep and bear arms',"* 73 FORDHAM L. REV. 539 (2004).

**Patrick J. Charles** is a historian for the United States Air Force 352nd Special Operations Group in Mildenhall, United Kingdom, a contributor for

Encyclopedia Britannica, and the author of multiple publications on the American Revolution and the Second Amendment, including IRRECONCILABLE GRIEVANCES: THE EVENTS THAT SHAPED THE DECLARATION OF INDEPENDENCE (2008), THE SECOND AMENDMENT: THE INTENT AND ITS INTERPRETATION BY THE STATES AND THE SUPREME COURT (2009), *"Arms for Their Defence"?: A Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEV. ST. L. REV. 351 (2009), *The Right of Self-Preservation and Resistance: A True Legal and Historical Understanding of the Anglo-American Right to Arms*, 2010 CARDOZO L. REV. DE NOVO 18 (2010), and *The Second Amendment Standard of Review After* McDonald*: "Historical Guideposts" and the Missing Arguments in* McDonald v. City of Chicago, 2010 AKRON L.J. CONST. L. & POL. 7.

**Robert J. Spitzer** is a Distinguished Service Professor of Political Science at the State University of New York at Cortland. He is the author of multiple publications on the Constitution and Second Amendment including THE BICENTENNIAL OF THE U.S. CONSTITUTION (1990), THE RIGHT TO BEAR ARMS (2001), THE POLITICS OF GUN CONTROL (2004), and GUN CONTROL: A DOCUMENTARY AND REFERENCE GUIDE (2009).

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2011, two bound copies and a disc containing one Portable Document Format (pdf) copy of the foregoing Brief of Historians and Legal Scholars Paul Finkelman, Stanley N. Katz, David Thomas Konig, Patrick J. Charles, and Robert J. Spitzer as *Amici Curiae* in Support of Appellee were served by FedEx to the following:

Mara S. Georges
Corporation Counsel, City of Chicago
30 N. LaSalle St., Ste. 800
Chicago, IL 60602
(312) 744-0220

David G. Sigale
739 Roosevelt Road, Ste. 304
Glen Ellyn, IL 60137
(630) 452-4547

I also certify that on the same date, the original and fifteen copies of of Historians and Legal Scholars Paul Finkelman, Stanley N. Katz, David Thomas Konig, Patrick J. Charles, and Robert J. Spitzer as *Amici Curiae* in Support of Appellee were filed by hand with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit.

/s/ Geoffrey M. Wyatt
Geoffrey M. Wyatt